**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY PARTNERS, L.P, | ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) Case No. ) |
| | ) Hon. |
| GRETCHEN WHITMER, the Governor of the State of Michigan in her official capacity, and DANIEL EICHINGER, Director of the Michigan Department of Natural Resources in his official capacity, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Enbridge Energy, Limited Partnership; Enbridge Energy Company, Inc.; and Enbridge Energy Partners, L.P. (collectively "Enbridge") respectfully file this Complaint for Declaratory and Injunctive Relief.  Defendants are Michigan officials sued in their official capacities under the rule of *Ex Parte Young*, 209 U.S. 123, 152-154 (1908).

**NATURE OF CASE**

1.      This Complaint challenges on federal constitutional grounds Defendants' attempts to shut down an interstate, international pipeline owned and operated by Enbridge.  This pipeline, known as Line 5, has been transporting petroleum products safely from Wisconsin, through Michigan, and to Ontario, Canada for over 65 years.  Those petroleum products serve major refineries in the U.S. Midwest and in Canada and many thousands of consumers across Michigan and the region.  On November 13, 2020, Defendants Whitmer and Eichinger served what they characterized as a "Notice" purporting to revoke and terminate an easement that has been valid

and in effect since 1953, and they directed Enbridge to cease operating the Dual Pipelines, a 4-mile portion of Line 5 located along that easement in the Straits of Mackinac within 180 days. This Notice, effectively a Shutdown Order,  was based on Defendants' stated concern that the continued operation of the Dual Pipelines is not safe, even though the  Pipelines have never released any product into the Straits during the entirety of their existence.

2.      Defendants' November 13 Shutdown Order reflects a local policy that, on its face, interferes with the comprehensive federal regulation of pipeline safety, impermissibly burdens and discriminates against interstate and foreign commerce, and hinders the United States' ability to "speak with one voice" with respect to transboundary shipments by pipeline.  If enforced by judicial ruling, the Shutdown Order  would create  a disturbing precedent whereby other jurisdictions could take copycat actions and thereby impede  interstate and international commerce in petroleum and other products.  Only the Federal Government may determine, taking into account competing interests within the Nation as a whole, whether safety or other local conditions warrant the shutdown of Line 5.

3.      Enbridge seeks a declaratory order that federal law preempts Defendants from attempting to regulate Line 5's operation and maintenance on pipeline safety grounds.  The federal Pipeline Safety Act, 49 U.S.C. §§ 60101, *et seq*., expressly preempts States from regulating the safety of interstate pipelines.  49 U.S.C. § 60104(c).

4.      Enbridge also seeks a declaratory order that, by seeking the closure of Line 5, Defendants have violated the Commerce Clause of the U.S. Constitution, the Foreign Commerce Clause of the U.S. Constitution, and the Foreign Affairs Powers of the U.S. Constitution.

5.       Enbridge also seeks to enjoin Defendants from taking steps to impede or prevent the operation of Line 5 in interstate and foreign commerce, including enforcement of the November 13 Shutdown Order.

## PARTIES

6.       Plaintiff Enbridge Energy, Limited Partnership is a Delaware limited partnership conducting business in Michigan, with its principal place of business located at 5400 Westheimer Court, Houston, Texas 77056.

7.       Plaintiff Enbridge Energy Company, Inc., is a Delaware corporation conducting business in Michigan, with its principal place of business located at 5400 Westheimer Court, Houston, Texas 77056.

8.       Plaintiff Enbridge Energy Partners, L.P., is a Delaware limited partnership conducting business in Michigan, with its principal place of business located at 5400 Westheimer Court, Houston, Texas 77056.

9.       Defendant Gretchen Whitmer was elected as Governor of the State of Michigan on January 1, 2019 and since that time has served as Governor.

10.       Defendant Daniel Eichinger serves as Director of the Michigan Department of Natural Resources.

11.       All named defendants are sued in their official capacities under the rule of *Ex Parte Young*.

## JURISDICTION AND VENUE

12.       This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 2201, because this action arises under the U.S. Constitution and laws of the United States.

3

This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1337, because this action arises under an act of Congress regulating commerce, specifically, the Pipeline Safety Act.

13.     Venue is proper in the Western District of Michigan under 28 U.S.C. § 1391(b) in that, upon information and belief, all Defendants maintain offices and/or reside in Lansing, which is within the Western District.  Further, a substantial part of the events giving rise to Enbridge's claims occurred in this district, and the property that is the subject of the action is situated in this district.

14.     This Court has personal jurisdiction over the Defendants as each is a citizen of and resides in the State.

## FACTUAL ALLEGATIONS

### Line 5's construction and operation

15.     Enbridge is the owner and operator of Line 5.  It transports petroleum products on Line 5 in accordance with applicable federal requirements imposed under the Interstate Commerce Act, Pipeline Safety Act and other federal statutes.

16.     Line 5 is a 645-mile pipeline built in 1953.  Beginning in northwestern Wisconsin, Line 5 stretches into the Upper Peninsula of Michigan, crosses the Straits of Mackinac, and cuts down through the Lower Peninsula before crossing the U.S.-Canada international boundary, where the pipeline ends in Sarnia, Ontario.  Line 5's crossing of the international boundary is federally authorized by a Presidential Permit issued to Enbridge for Line 5.  President Dwight D. Eisenhower issued this Permit on April 28,1953 to authorize the construction, operation and maintenance of the Pipeline at the border crossing, and thereby facilitate foreign commerce.

17.     At the point where it crosses the Straits of Mackinac, Line 5 splits into two 20" pipelines—known as the Dual Pipelines—that run on the lake floor and reunite on the southern

4

side of the Straits. The Line 5 Dual Pipelines were specifically designed to surpass all requirements for long-term safe operation in the submerged waters of the Straits.  The Dual Pipelines are seamless and nearly three times as thick as typical pipelines.  They are also operated in a low-oxygen and therefore non-corrosive environment at the bottom of the Straits and are further protected from corrosion by coating and by effective cathodic protection, a technique used to prevent corrosion through an electric current.  Unsupported spans that develop as the result of natural water current action are controlled by the use of anchor supports that stabilize the Lines. In addition, the Dual Pipelines are operated at a considerably lower pressure than normal for pipelines of their size and type to ensure the longevity of their safe operation.

18.     Prior to the construction of Line 5, Enbridge's predecessor submitted an easement application to lay the Dual Pipeline in the Straits.  On April 23, 1953, the Michigan Conservation Commission granted the easement pursuant to Act No. 10, PA 1953.  The 1953 easement imposed specific safety standards in the construction, testing, operation, and maintenance of the Dual Pipelines.

## Federal Regulation of Line 5

19.     Subsequently, Congress enacted the Pipeline Safety Act and vested a federal agency—now the Pipeline and Hazardous Materials Safety Administration ("PHMSA")—with exclusive authority to regulate pipeline safety.  This Act expressly provides that a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."   49 U.S.C. § 60104(c).

20.     PHMSA comprehensively regulates pipeline safety.  Line 5 is subject to PHMSA's comprehensive safety regulations and requirements.

21.     Pursuant to its authority vested by Congress, PHMSA has authority to issue orders prohibiting operations on a pipeline due to safety concerns, or to impose operational restrictions to ensure the safe operation of a pipeline.

22.     In compliance with PHMSA requirements and subject to PHMSA oversight, Enbridge implements integrity and operational controls designed to ensure the safe operation of the Line 5 Dual Pipelines.  This includes, but is not limited to: hydrotesting the Pipelines with water injected at pressures higher than maximum normal operating pressures in order to ensure their integrity and fitness for service; confirming the safety and integrity of the interior of the Pipelines with in-line inspections that identify any features (e.g., corrosion) that could impair the safe operation of the pipelines; exterior inspections using divers and remote operated vehicles to identify any disturbances or damage, such as to the Pipelines' coating and repairing identified coating disturbances; maintaining the proper physical support of the pipeline; maintaining a cathodic protection system that, using an electric current, prevents corrosion to the exterior of the pipe; and implementing control room procedures to closely monitor the operation of the Pipelines 24-hours per day, 7 days per week and to shut down the Pipelines if any potential safety issue is identified.

23.     In addition, to ensure the safe operation of the Line 5 Dual Pipelines in accord with PHMSA regulations, Enbridge implements measures—collectively referred to as Enbridge's Maritime Pipeline Protection Program or "EMP3"—to protect the Pipelines from a vessel anchor strike.  A series of the EMP3 measures, developed in conjunction with maritime experts, are specifically designed to monitor, observe, and communicate with vessels 24 hours per day, 7 days per week that may pose an anchor strike risk to the Line 5 Dual Pipelines.  Should any anchor

strike risk be identified that cannot be resolved, Enbridge's measures require the immediate shutdown of the Line 5 Dual Pipelines to mitigate the impacts of a potential release.

24.     Before accounting for any of the extraordinary measures taken by Enbridge to reduce the risk of an anchor strike, the Attorney General of Michigan acknowledged that based on a State-commissioned 2017 study of the Dual Pipelines undertaken by Dynamic Risk Assessment Systems, and cited in the Notice, the risk of failure of the Dual Pipelines from vessel anchor strikes is an exceedingly low 0.0476% per year.

25.     A recent assessment by C-FER Technologies ("C-FER"), a not-for-profit subsidiary of an Alberta agency, Alberta Innovates, concluded in a September 30, 2020 study that the EMP3 measures implemented by Enbridge reduce the risk of a failure of the Line 5 Dual Pipelines caused by intentional or unintentional anchor strike by more than 99% relative to the absence of any measures.  Accordingly, the chances of an anchor strike causing a failure of the Dual Pipelines is vanishingly small, as further evidenced by the over 65 years of their safe operation.

26.     PHMSA, in its role as the exclusive regulator of the safety of the Line 5 Dual Pipelines, has regularly inspected and audited the safety and integrity of the Pipelines' crossing of the Straits.  For example, in 2015, PHMSA retained an independent expert, LaMontagne Pipeline Assessment Corporation, to audit the Line 5 Dual Pipelines' fitness for service and safe operation, consistent with 49 C.F.R. Part 195.  That expert issued a report on May 12, 2016, confirming that the Line 5 Dual Pipelines are safe to operate based on extensive inspection data.  Similarly, following the discovery of disturbances to the Line 5 Dual Pipelines coating and damage to one of the Pipelines' support anchors in 2020 (but not to the Dual Pipelines themselves), PHMSA closely reviewed data concerning the Line 5 Dual Pipelines, including stress analyses, engineering

assessments, historical remotely-operated vehicle recordings, diver inspection forms, and in-line inspection data.  As a result of that review, PHMSA confirmed in the last several months that the Dual Pipelines are fit for service and safe to operate.  The State did not question and appropriately deferred to PHMSA's determination that the Dual Pipelines were safe to operate.

27.    The Line 5 Dual Pipelines have never released any product into the Straits.

**Line 5 serves shippers in interstate and foreign commerce**

28.    On Line 5, Enbridge transports in federally-regulated common carriage up to 540,000 barrels per day of light crude oil, light synthetic crude oil, and natural gas liquids (NGLs) for shippers in interstate and foreign commerce.

29.    The products transported by Line 5 originate in several States as well as Canada and are transported by other lines to a tank terminal in Superior, Wisconsin, which is the origin point of Line 5.  Line 5 also receives product  at Lewiston, Michigan, where local Michigan crude oil is collected and transported to U.S. and Canadian refineries.  Line 5 has transported 14,000 barrels per day of Michigan-produced crude, amounting to a total of approximately 80 million barrels, since it entered service in 1953.  Line 5 is responsible for transporting about 70 percent of the total Michigan crude oil production.

30.    Line 5 delivers crude oil in the United States, at Marysville, Michigan, and pursuant to its Presidential Permit, in Canada, at several sites in Sarnia, Ontario.  From the Marysville delivery point, Line 5 supplies the Marathon Detroit refinery and two refineries in Toledo, Ohio.  At Sarnia, Line 5 supplies three refineries with Canadian and US-originated crude oil.  In Ontario, Line 5 is also connected to other Enbridge pipelines that transport crude oil to refineries in western Pennsylvania; Nanticoke, Ontario; and Quebec.  Line 5 supplies a total of 10 refineries in the

United States and Canada.  The crude oil transported by Line 5 constitutes approximately 40 percent of the total crude oil demand for those 10 refineries.

31.      The NGLs handled by Line 5 are transported to Rapid River, Michigan and Sarnia. At Rapid River, there is a separation facility ("depropanizer") that extracts propane from the NGLs, and returns unneeded butane to Line 5 for further transport.  The Rapid River depropanizer is a key source of propane supply for the Upper Peninsula, supplying approximately 65% of the propane needs of Michiganders who live and work there.  The remainder of NGLs are transported by Line 5 to Sarnia, where a large fractionation facility is located.  That fractionation facility produces both propane and butanes, and services the Michigan and Eastern Canada propane markets.  The butanes produced by Line 5-transported NGLs are key feedstocks for regional petrochemical facilities and refineries.

**Defendants' Actions to Shut Down Line 5**

32.      On November 13, 2020, Defendants Gretchen Whitmer and Daniel Eichinger issued the Shutdown Order, which  they characterized as a Notice of Revocation and Termination of Easement.  *See* Exhibit 1.

33.      That Shutdown Order asserts that "the State is revoking and terminating the 1953 Easement" because of the State's obligation to protect the Straits and based on Enbridge's longstanding, persistent, and incurable violations of the Easement's conditions and standard of due care."  Notice at 1.

34.      Without noting that the Line 5 Dual Pipelines have never released any product in their over 65 year existence and omitting numerous other critical and relevant facts, the Shutdown Order asserts that termination and revocation of the 1953 Easement is warranted based on speculative fears about the safe operation of the Line 5 Dual Pipelines.  Specifically, the Shutdown

Order  purports to provide for termination of the 1953 Easement because "transporting millions of gallons of petroleum products each day through two 67-year old pipelines that lie exposed in the Straits" creates a "very real risk" of a release and "catastrophic effects if an oil spill occurs at the Straits."  While providing no evidence to support these allegations, the Shutdown Order  purports to justify termination based on Enbridge's alleged failure to satisfy a requirement in Paragraph A of the Easement regarding the "exercise the due care of a reasonably prudent person" or to satisfy certain more specific safety standards set forth in  the 1953 Easement, including: (i) Paragraph A.4, which provides that the "minimum curvature of any section of pipe shall be no less than two thousand and fifty (2,050) feet radius"; (ii) Paragraph A.9, which provides that "[a]ll pipe shall be protected by asphalt primer coat, by inner wrap and outer wrap composed of glass fiber material and one which by four inch (1" x 4") slats, prior to installation"; and (iii) Paragraph A.10, which provides the "maximum span or length of pipe unsupported shall not exceed seventy-five (75) feet."

## COUNT I

### Violation of the Supremacy Clause

35.     Enbridge repeats and realleges each and every allegation in Paragraphs 1 through 34 as through fully set forth herein.

36.     Article VI, paragraph 2 of the U.S. Constitution provides: "This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."

37.     Congress enacted the federal Pipeline Safety Act "to provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities by

improving the regulatory and enforcement authority of the Secretary of Transportation."  49 U.S.C. § 60102(a)(1).

38.     Congress directed the U.S. Secretary of Transportation to prescribe minimum safety standards for pipeline transportation and for pipeline facilities.  49 U.S.C. § 60102(a)(2). The safety standards shall be designed to meet the need for "safely transporting hazardous liquids" and "protecting the environment."  49 U.S.C. § 60102(b)(1)(B)(ii).  This federal regulation of pipelines includes the safety of all interstate pipelines, including those that are located on submerged bottomlands.

39.     Under that authority, the Secretary of Transportation, through its sub-agency PHMSA, has promulgated an extensive body of federal safety regulations that govern the construction and operation of pipelines like the one at issue here.  *See* Transportation of Hazardous Liquids by Pipeline, 49 C.F.R. § 195 et seq.  PHMSA's safety regulations address matters such as corrosion, cracking and strain on interstate pipelines, among a broad range of other safety matters addressed in its regulations.

40.     PHMSA possesses exclusive authority to issue an order providing for the shutdown of an interstate pipeline based on safety concerns, or to impose operational restrictions to ensure the safe operation of a pipeline.  *See* Pipeline Safety Act at 49 U.S.C. § 60117(o); 49 C.F.R. § 190.236; 49 C.F.R. § 190.233; 49 C.F.R. § 190.239. In exercising this authority, the statute recognizes the wide-ranging implications of ordering a pipeline to close and thereby directs PHMSA to consider the impact of any shutdown order on (1) public health and safety, (2) the national or regional economy or national security and (3) the ability of pipeline owners and operators to maintain reliability and continuity of services to customers.  The statute further requires that PHMSA consult with appropriate federal and state agencies and entities

knowledgeable in pipeline safety or operations before ordering a pipeline to shut down.  The statute assigns no role to a state to force closure of a federally-regulated interstate pipeline such as Line 5.

41.     Congress included in the Pipeline Safety Act a section entitled "Preemption," which provides: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).

42.     Through the Shutdown Order, Defendants seek to shut down Line 5's operations based on their view that Line 5 does not satisfy safety standards asserted by Michigan, including those identified in the 1953 Easement and now sought to be enforced against Enbridge through termination of the Easement.  Defendants' attempt to shut down Line 5 on the basis of the various safety standards  described  in the Shutdown Order is preempted by the Pipeline Safety Act and accompanying regulations, and contrary to the carefully crafted factors that PHMSA is required to consider and balance before ordering the closure of an interstate pipeline.  As a result, Defendants' actions violate the Supremacy Clause.

43.     Enbridge seeks a declaration from this Court that federal law, including the Pipeline Safety Act, preempts Defendants' efforts to regulate the safety of the operation of the Line 5 Dual Pipelines—including through standards respecting perceived spill risks from the Pipelines, standards respecting span management, coating, and curvature, and any other standards articulated in or related to the purported Shutdown Order—and further preempts Defendants' attempts to direct Enbridge to shut down the Dual Pipelines on the basis of these safety concerns or any others.

44.     Enbridge seeks a further declaration that any enforcement of the 1953 Easement based on safety concerns—including based on an asserted "reasonably prudent" standard, or the

span management, coating, and curvature provisions contained in the 1953 Easement—constitutes a form of state safety standards that are expressly preempted by the Pipeline Safety Act.

45.     Further, Defendant's Shutdown Order is not compatible with, and conflicts with, the comprehensive federal laws, regulations, and orders governing Line 5.  Among other federal laws including the Pipeline Safety Act and the implementing regulations, Enbridge's operation of Line 5 is subject to federal regulation as a common carrier under the Interstate Commerce Act administered through the Federal Energy Regulatory Commission ("FERC").  Enbridge is also subject to FERC regulation of the rates and terms of service provided to shippers utilizing Line 5 to ensure reasonableness and non-discrimination.  Where a conflict exists between federal and state law, the Supremacy Clause requires that the federal law prevail.  Accordingly, Enbridge seeks a declaration that Defendants' actions are preempted on the basis of a conflict between federal and state law.

46.     Enbridge further seeks to enjoin Defendants from taking any steps to enforce the Shutdown Order or to otherwise interfere with operations on Line 5 for reasons based on pipeline safety concerns that fall exclusively within PHMSA's jurisdiction.

## COUNT II

### Violation of Interstate Commerce Clause

47.     Enbridge repeats and realleges each and every allegation in Paragraphs 1 through 46 as through fully set forth herein.

48.     The Commerce Clause of the U.S. Constitution, Article I, § 8, prohibits States from engaging in discriminatory or protectionist actions against interstate commerce.  The Commerce Clause also prohibits a State from regulating conduct outside its borders or placing an undue burden on interstate commerce.

49.     The promotion and protection of interstate commerce is a central function of the Federal Government.  The federal government has long recognized that the free flow of goods and materials throughout the nation is essential to the national economy.  The federal government has also recognized the importance of petroleum products to the economy of the United States.

50.     The strong federal interest in Line 5 is further underscored by PHMSA's role under the Pipeline Safety Act as the exclusive regulator of Line 5's safety, by FERC's regulation of Enbridge's common carrier obligations and Enbridge's tariffs, and by the Presidential Permit held by Line 5 authorizing it to be used as a critically important instrumentality of foreign commerce.

51.     Defendants' Shutdown Order, on its face, violates the Commerce Clause because it would block the continued flow of interstate shipments on Line 5.

52.     Defendants' Shutdown Order unreasonably burdens and/or discriminates against interstate commerce, which is impermissible under the Commerce Clause.  Defendants' Shutdown Order would prevent Line 5 from continuing to provide services relied on by businesses in and residents of numerous States and Canada.  Such a burden on interstate pipeline traffic would be excessive in relation to any perceived local benefits to Michigan.  The purported benefits are illusory or minimal because the expert federal agency (PHMSA) oversees the safety of Line 5 and in fact recently conducted an investigation of the Line 5 Dual Pipelines and confirmed that the Dual Pipelines are fit for service.  PHMSA also regulates, to the exclusion of State safety standards, Line 5's safety to prevent any release into the Great Lakes and retains the exclusive authority to close Line 5 upon its consideration and balancing of various factors spelled out in federal law and following consultation with state authorities and others.

53.     Any decision about the safety issues relating to the transportation of petroleum products on an interstate  pipeline must be made by the Federal Government.  Only the Federal

Government may determine, taking into account the competing interests within the Nation as a whole, including specifically the factors set forth in the Pipeline Safety Act, whether the conditions within the Straits, or other local area, warrant a shutdown.

54.     Taking Line 5 out of service—temporarily or permanently—would have dire consequences for the interstate and foreign refineries supplied by Line 5. The affected refineries include Marathon's Detroit refinery, refineries in Ohio, all four refineries in Ontario, the United Warren refinery in western Pennsylvania, and the Suncor Montreal refinery. These refineries would lose approximately 40 percent or more, of their current crude supply. Some refineries could be forced to close, others would become less competitive and suffer job losses. By contrast, the risk of a release into the Straits is so small that it is barely measurable.

55.     A closure of Line 5 would also significantly decrease the local supply of refined products in Michigan, Ontario, Quebec, and western Pennsylvania. Refineries served by Line 5 comprise the vast majority of the total refinery output in the Midwest for gasoline, jet fuel, and diesel. Because Michigan is dependent on receipt of such refined products from other areas, any closure of Line 5 would require Michigan to receive refined products from as far afield as the Gulf Coast to compensate for reduced oil runs from refineries that currently serve Michigan, including the Marathon Detroit refinery. Ontario does not have excess refined pipeline capacity. Therefore, in the event of a Line 5 shutdown, Ontario could face shortages or would be required to locate additional refined products from uncertain sources that are not currently accessed by it.

56.     Line 5's uninterrupted transport of NGLs is critical for Michigan and Michiganders. According to the federal Energy Information Agency, in 2018, Michigan had the highest residential sector hydrocarbon gas liquids (mostly propane) consumption in the nation. Any

shutdown of Line 5 would severely impact Michigan residents who are reliant on propane to heat their homes.

57.     The Rapid River depropanizer, which is fully dependent on Line 5, would be required to shut down, which would also result in job losses.  A Line 5 shutdown would also have a major adverse impact on the Sarnia fractionator facility, which is the single largest propane production source in Eastern Canada and exclusively reliant on Line 5 for its NGLs.

58.     Given that studies—including a State-sponsored study conducted by Dynamic Risk Assessment Systems, Inc., Alternatives Analysis for the Straits Pipeline (June 27, 2017)—have confirmed that no realistic alternatives exist to Line 5, any disruption of service on Line 5—planned or unplanned—would result in an immediate significant regional supply disruption that would impact the State through increased costs, potential supply shortfalls (and the public safety concerns that coincide with that), and reduced competitiveness.

59.     Enbridge thereby seeks declaratory and injunctive relief finding that Defendants' actions are unconstitutional under the Commerce Clause of the United States.

## COUNT III

### Violation of Foreign Commerce Clause and Foreign Affairs Doctrine

60.     Enbridge repeats and realleges each and every allegation in Paragraphs 1 through 59 as through fully set forth herein.

61.     The Foreign Commerce Clause of the United States Constitution authorizes Congress to "regulate Commerce with foreign Nations and among the several States."  U.S. Constitution, Article I, § 8, cl. 3. The Foreign Commerce Clause prohibits protectionist policies and restrains the States from excessively interfering with foreign affairs.

62.     Further, the Constitution, including Article II, Sections 2 and 3, establishes the Foreign Affairs doctrine, through which the power to regulate foreign affairs is reserved for the

federal government.  Pursuant to this authority, the United States establishes rules governing international trade with foreign countries in furtherance of national policy objectives.

63.     The transportation of petroleum products on Line 5 in international commerce, from the U.S. to Canada, serves the U.S. national interest, as evidenced by the Presidential Permit issued for  Line 5.

64.     The Federal Government's exclusive regulation of transboundary pipelines in foreign commerce and the important foreign policy objectives they serve are reflected in relevant international agreements to which the United States and Canada are parties.  These agreements are designed to promote the flow of commerce and remove undue barriers to pipelines that transport hydrocarbons between the nations.  *See* Canada-United States Transit Pipelines Treaty, Article II(1) (ratified by US Senate on August 3, 1977) ("No public authority … shall institute any measures … [which] have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbon in transit [from one nation to the other through pipelines]"); USMCA Energy Regulatory Measures and Regulatory Transparency Annex, Article 5(1)(a) (signed into law on January 29, 2020 following Congressional approval) ("Each party shall … accord[ ] access to … pipeline networks for the purposes of importation … that is neither unduly discriminatory nor unduly preferential").

65.     Defendants' Shutdown Order violates the Foreign Commerce Clause and Foreign Affairs doctrine by seeking to, among other things:

    a.  interfere with the United States to "speak with one voice" with respect to transboundary shipments by pipeline;

b.  impermissibly impact conduct beyond the borders of the United States by preventing continued shipments of hydrocarbons originating in Canada on Line 5 from the United States to refineries and other facilities in Canada;

c.  interfere with the United States' obligations under its international agreements with Canada barring undue restrictions on pipeline transportation.

66.    Defendants' Shutdown Order has more than an incidental or indirect effect on foreign relations.

67.    Enbridge therefore seeks declaratory and injunctive relief holding that Defendants' actions are invalid under the Foreign Commerce Clause and Foreign Affairs doctrine.

68.    By entering and ratifying the relevant agreements pertaining to pipeline transportation, the federal government has expressed its intent to occupy the entire field of transboundary movement shipments by pipeline and has left no room for the State to supplement federal law.  The Shutdown Order also stands as an obstacle to the accomplishment and execution of the full objectives of the international agreements.  It also creates a conflict between federal and state law.  Due to the agreements, along with other federal laws, the Supremacy Clause bars the Defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, Enbridge prays for judgment in its favor and requests:

(1) A declaration in favor of Enbridge:

a.  That the federal Pipeline Safety Act, 49 U.S.C. §§ 60101 *et seq*., preempts Defendants from adopting safety standards to regulate the safety Enbridge's Line 5 pipeline.

b.  That any revocation or termination of the 1953 Easement based on safety concerns, including perceived spill risk, an asserted "reasonably prudent" due care standard or specific provisions of the 1953 Easement, or any other reason relied on in the Notice amounts in practice to applying and enforcing Michigan's own safety standards to Line 5 that is expressly preempted by the federal Pipeline Safety Act.

c.  That Defendants cannot stop or otherwise interfere with Line 5's operations based on  their perception of safety risks associated with Line 5's operation.

d.  That Defendants' actions to seek the closure of Line 5's operation in interstate commerce violates the Commerce Clause of the U.S. Constitution, Article I, § 8.

e.  That Defendants' actions to seek the closure of Line 5's operation in foreign commerce violates the Foreign Commerce Clause of the U.S. Constitution, Article I, § 8, cl. 3, and the Foreign Affairs Doctrine.

(2) An injunction prohibiting Defendants from taking any steps to impede or prevent the interstate and international operation of Line 5, including the revocation or termination of the 1953 Easement based on the alleged non-compliance with pipeline safety standards in the Easement; and

(3) Any other relief the Court deems just and appropriate.

Dated this 24th of November, 2020              Respectfully submitted,

/s/ *Peter H. Ellsworth*

_____

Peter H. Ellsworth  (P23657)
Jeffery V. Stuckey (P34648)
DICKINSON WRIGHT PLLC
123 W. Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730
pellsworth@dickinsonwright.com
jstuckey@dickinsonwright.com

Phillip J. DeRosier (P55595)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866
pderosier@dickinsonwright.com

John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Avenue SE, #78
Caledonia, MI 49316
(616) 450-4235
jbursch@burschlaw.com

David H. Coburn
William T. Hassler
Alice Loughran
Joshua H. Runyan
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
dcoburn@steptoe.com
whassler@steptoe.com
aloughran@steptoe.com
jrunyan@steptoe.com