**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

|  |  |  |
|---|---|---|
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY PARTNERS, L.P., | ) ) ) ) ) | Case No.  1:20-cv-01141-JTN-RSK |
| Plaintiffs, | ) | Hon. Janet T. Neff |
| v. | ) ) | **ORAL ARGUMENT REQUESTED** |
| GRETCHEN WHITMER, the Governor of the State of Michigan in her official capacity, DAN EICHINGER, Director of the Michigan Department of Natural Resources in his official capacity, | ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT ON COUNTS I AND III OF THE COMPLAINT**

**ORAL ARGUMENT REQUESTED**

Peter H. Ellsworth (P23657)
Jeffery V. Stuckey (P34648)
DICKINSON WRIGHT PLLC
123 W. Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730
pellsworth@dickinsonwright.com
jstuckey@dickinsonwright.com

Phillip J. DeRosier (P55595)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866
pderosier@dickinsonwright.com

John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Avenue SE, #78
Caledonia, MI 49316
(616) 450-4235
jbursch@burschlaw.com

David H. Coburn
William T. Hassler
Alice Loughran
Joshua H. Runyan
Mark C. Savignac
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000

*Counsel for Plaintiffs*

TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND....................................................................................................................3

    A.    Factual background .............................................................................. 3

    B.    Procedural history ................................................................................ 5

LEGAL STANDARD .............................................................................................................6

ARGUMENT .......................................................................................................................7

I.    The Pipeline Safety Act bars Defendants' attempt to shut down Line 5 (Count I). ............7

    A.    Federal law occupies the field of pipeline safety and preempts state law. ............. 7

    B.    Defendants' attempts to force a shutdown of Line 5 are preempted under the Pipeline Safety Act. .......................................................................... 10

        1.    The public trust doctrine. ........................................................... 11

            a.    "Void from inception." ..................................................... 12

            b.    Current and continued use. ............................................... 13

        2.    The Easement's safety standards. ................................................ 13

            a.    Due care.......................................................................... 14

            b.    Specific pipeline safety standards. .................................. 15

        3.    Other state-law theories. ............................................................ 16

    C.    Defendants' attempts to force a shutdown of Line 5 are not a permissible "location or routing" determination. ...................................................... 16

II.    The Foreign Affairs Doctrine independently bars Defendants' attempts to shut down Line 5 (Count III) .........................................................................................18

    A.    Under the Foreign Affairs Doctrine, state acts that interfere with federal foreign relations policy are preempted. .............................................................. 18

    B.    Defendants' attempts to shut down Line 5 interfere with federal policy, as embodied in the Transit Pipelines Treaty, and are therefore preempted. ............. 19

    C.    Defendants' counterarguments fail. ...................................................... 23

CONCLUSION....................................................................................................................25

i

TABLE OF AUTHORITIES

CASES                                                                          Page(s)

*ANR Pipeline Co. v. Iowa State Commerce Comm'n,*
    828 F.2d 465 (8th Cir. 1987) ................................................................8

*Capital Cities Cable Inc. v. Crisp,*
    467 U.S. 691 (1984) ...........................................................................7

*English v. Gen. Elec. Co.,*
    496 U.S. 72 (1990) .............................................................................8

*GTE Mobilnet v. Johnson,*
    111 F.3d 469 (6th Cir. 1997) ................................................................6

*Kinley Corp. v. Iowa Utils. Bd.,*
    999 F.2d 354 (8th Cir. 1993) ...........................................................9, 11

*Lakehead Pipe Line Co. v. Dehn,*
    64 N.W.2d 903 (Mich. 1954) ..............................................................17

*Michigan v. Enbridge Energy, LP,*
    ___ F. Supp. 3d ___, 2021 WL 5355511 (W.D. Mich. Nov. 16, 2021) ......................3, 5, 8, 9

*Movsesian v. Victoria Versicherung AG,*
    670 F.3d 1067 (9th Cir. 2012) ............................................................23

*Nye v. CSX Transp., Inc.,*
    437 F.3d 556 (6th Cir. 2006) ................................................................6

*Olympic Pipe Line Co. v. City of Seattle,*
    437 F.3d 872 (9th Cir. 2006) .......................................................8, 10, 14

*Olympic Pipe Line Co. v. City of Seattle,*
    No. C03-2343L, 2003 WL 27392855 (W.D. Wash. Aug. 21, 2003)........................17

*Self-Insurance Institute of America, Inc. v. Snyder,*
    827 F.3d 549 (6th Cir. 2016) ................................................................6

*Slinker v. Jim Beam Brands Co.,*
    689 F. App'x 406 (6th Cir. 2017) ...........................................................7

*United States v. Davis,*
    815 F.3d 253 (6th Cir. 2016) ................................................................6

*Watters v. Wachovia Bank, N.A.,*
    550 U.S. 1 (2007).............................................................................6

*Werner v. Primax Recoveries, Inc.*,
    365 F. App'x 664 (6th Cir. 2010) ................................................................7

*Williams Pipe Line Co. v. City of Mounds View*,
    651 F. Supp. 551 (D. Minn. 1987).......................................................10, 15

*Wisconsin Central Ltd. v. City of Marshfield*,
    160 F. Supp. 2d 1009 (W.D. Mich. 2000) ...........................................16

*Ex parte Young*,
    209 U.S. 123 (1908)..................................................................................1

**STATUTES AND TREATY**

49 U.S.C. §§ 60101(a)(4), (5), (7), (18), (19) ...........................................10

49 U.S.C. § 60102(a)(1) ...............................................................................9

49 U.S.C. § 60104(c) ......................................................................... *passim*

49 U.S.C. § 60104(e) ...............................................................16, 17, 18

49 U.S.C. § 60117(p) ....................................................................................9

*Agreement between the Government Of Canada and the Government of the
    United States Of America Concerning Transit Pipelines*, 28 U.S.T. 7449, 1977
    WL 181731 (1977).................................................................. 2, *passim*

**EXECUTIVE AND LEGISLATIVE MATERIALS**

S. Exec. Rep. No. 95-9, 95th Congress, 1st Session (July 15, 1977), p. 38
    (testimony of Julius Katz, Assistant Secretary for Economic and Business
    Affairs)....................................................................................................20

Papers of the President, President Jimmy Carter's Message to the Senate on the
    United States-Canada Transit Pipeline Agreement, March 30, 1977, Office of
    the Federal Register, p. 534 ..................................................................20

Senate Committee on Foreign Relations, Agreement with Canada Concerning
    Transit Pipelines, S. Exec. Rep. No. 95-9...........................................24

**FEDERAL REGULATIONS**

49 C.F.R. § 190.236...................................................................................10

49 C.F.R. § 195 *et seq.*................................................................................9

Plaintiffs (collectively, "Enbridge") submit this brief in support of their Motion for Summary Judgment on the federal preemption claims in Counts I and III of the Complaint.  *See* Fed. R. Civ. P. 56(a).  Counts I and III represent alternative theories for the declaratory and injunctive relief Enbridge requested.  Each Count provides an independent reason why federal law bars state officials from forcing Enbridge to shut down Line 5.  Accordingly, if the Court were to grant summary judgment on either Count, that ruling will dispose of the entire case.

**INTRODUCTION**

Enbridge brought this suit against state actors to challenge the constitutionality of their efforts to shut down an interstate and international pipeline known as Line 5.  For decades, Line 5 has safely transported crude oil and natural gas liquids through Wisconsin and Michigan to Ontario, Canada.  In November 2020, Defendants directed Enbridge to cease operation of Line 5 in the Straits of Mackinac within 180 days.  Because Defendants' intended course of action is barred by federal law, Enbridge brought this action against them in their official capacities, seeking declaratory and injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).

Enbridge now moves for summary judgment on two independent grounds: express preemption under the Pipeline Safety Act (Count I) and preemption under the Foreign Affairs Doctrine (Count III).  These are pure issues of law involving no material dispute of facts.

*First*, a federal statute—the Pipeline Safety Act—expressly preempts states from enforcing state-law safety standards on interstate pipelines like Line 5.  Rather than allow individual states to burden interstate and international commerce with a patchwork of policymaking, the Act assigns exclusive authority to regulate pipeline safety to the U.S. Secretary of Transportation.  The Secretary has delegated that authority to an expert federal agency, the Pipeline and Hazardous Materials Safety Administration (PHMSA).  And PHMSA has promulgated detailed safety standards to protect the environment from pipeline releases, including specific safeguards for

pipelines that cross waters.  The Act expressly preempts Defendants' attempts to substitute their judgment for that of the expert federal agency and force a shutdown of Line 5 based on purported safety concerns.

*Second*, to ensure that the United States speaks with one voice in matters of international relations, the Constitution commits those matters to the President and Congress—not to local officials of the 50 states.  As the Supreme Court explained in *American Ins. Assoc. v. Garamendi*, a state action that "interferes with the National Government's conduct of foreign relations … is preempted."  539 U.S. 396, 401 (2003).  Like *Garamendi*, the "claim of preemption" here rests on "interference with the foreign policy … embod[ied]" by an international agreement: the 1977 Transit Pipelines Treaty between the United States and Canada.  *Id*. at 417.  The Treaty expresses a federal policy supporting the unimpeded operation of international pipelines like Line 5 and the bilateral resolution of disputes between the United States and Canada.   In direct response to Defendants' actions here, the Government of Canada formally invoked the Treaty's dispute resolution provision in October 2021.  *See* Joint Statement of Material Facts at ¶ 6; *Michigan v. Enbridge Energy Ltd. P'ship,* No. 1:20-cv-01142, ECF No. 82 at 1, PageID.1048.  Canada and the United States are now engaged in a bilateral dispute resolution process "to determine whether the implementation of the Governor of Michigan's shutdown order would violate the binding commitments the United States made to Canada under international law in the 1977 Treaty."  No. 1:20-cv-01142, ECF No. 82 at 3, PageID.1050.  As in *Garamendi*, "[t]he express federal policy and the clear conflict raised by the state [actions] are alone enough to require state law to yield."  *Id.* at 425.  Because Defendants have overstepped the bounds that the Constitution places on a state official's actions when they interfere with international relations, their attempts to force a shutdown of Line 5 are preempted as a matter of law.

For these independent reasons, Enbridge is entitled to summary judgment and to declaratory and injunctive relief.

BACKGROUND

**A.      Factual background**

The Court is familiar with the parties' dispute, which it discussed in its order denying a motion to remand the suit that Defendants had filed to shut down Line 5.  *See Michigan v. Enbridge Energy, LP*, ___ F. Supp. 3d ___, 2021 WL 5355511 (W.D. Mich. Nov. 16, 2021).  Briefly, Line 5 is a pipeline owned and operated by plaintiff Enbridge Energy, Limited Partnership.[1]  For more than 65 years, Line 5 has transported crude oil and natural gas liquids through Wisconsin and Michigan to Ontario, Canada.[2]  About four miles of Line 5 cross the Straits of Mackinac pursuant to an Easement granted to Enbridge's predecessor in 1953.[3]  (This portion of Line 5 is hereafter referred to as the "Straits Pipelines").

Defendants are Michigan Governor Gretchen Whitmer and Daniel Eichinger, the Director of Michigan's Department of Natural Resources, in their official capacities.  On November 13, 2020, Defendants signed a Notice of Revocation and Termination of Easement ("Notice"), directing Enbridge to "cease operation of the Straits Pipelines 180 days from  the date of the Notice."[4]  Defendants' purported rationale for shutting down the pipeline is protection of the Straits and surrounding environment from a potential risk of release of oil from the Straits Pipelines.[5]  Specifically, Defendants cited to "the inherent risks of pipeline operations" and the

---

[1] Joint Statement of Material Facts at ¶ 1.

[2] *Id*. at ¶ 4.

[3] *Id*. at ¶ 3.

[4] *Id*. at ¶ 5.

[5] Notice at 5-9 (ECF No. 1-1 at 5-9, PageID.26-30).

3

"threat of damage to the Straits Pipelines from anchor strikes or impacts from other external objects …."[6]  The Notice asserts two legal grounds in support of the action it seeks:  Enbridge's operation of Line 5 violates the state-law "public trust" doctrine and certain safety standards contained in the Easement.[7]  Defendants' legal theories are addressed further in the Argument below.

On October 4, 2021, the Government of Canada formally invoked the international dispute resolution provision—Article IX—of the 1977 *Agreement between the Government Of Canada and the Government of the United States Of America Concerning Transit Pipelines*, 28 U.S.T. 7449, 1977 WL 181731 (1977) (" Treaty" or "Transit Pipelines Treaty").[8]  According to Canada, "an order that requires the shutting down of Line 5 would create substantial and material questions at international law regarding the United States' compliance with its obligations owed to Canada under the  Treaty."[9]  The Canadian Government explained that  "Canada's decision to invoke Article IX reflects the importance of this matter to Canada's energy security and economic interests and its relationship with the United States."[10]  The two  sovereigns—the Governments of Canada and the United States—"are now actively engaged in an international dispute resolution process … to determine whether the implementation of the Governor of Michigan's shutdown order would violate the binding commitments the United States made to Canada under international law in the 1977 Treaty."[11]

---

[6] Notice at 6 (ECF No. 1-1 at 6, PageID.27).
[7] Notice at 1 (ECF No. 1-1 at 1, PageID.22).
[8] Joint Statement of Material Facts at ¶ 6.
[9] No. 1:20-cv-00142-JTN-RSK, ECF No. 84 at 1, PageID.1048.
[10] *Id*. at 3, PageID.1050.
[11] *Id*.

**B.      Procedural history**

On November 24, 2020, Enbridge filed a three-count complaint in this  court against Defendants.  (ECF No. 1.)  The first count is a preemption claim under the Pipeline Safety Act and the U.S. Supremacy Clause.  (ECF No. 1 at 10-13, PageID.10-13.)  The second count is a claim under the Interstate Commerce Clause of the U.S. Constitution.  (ECF No. 1 at 13-16, PageID.13-16.)  The third count includes a preemption claim under the Foreign Affairs doctrine.  (ECF No. 1 at 16-18, PageID.16-18.)  The complaint asks for a declaration that (1) the Pipeline Safety Act preempts Defendants from attempting to close Line 5 based on safety concerns including a perceived spill risk, and that (2) the Foreign Affairs doctrine preempts Defendants' attempt to stop or otherwise interfere with Line 5's operation.  (ECF No. 1 at 18-19, PageID.18-9.)  The complaint also seeks injunctive relief.  *Id.*

Also on November 24, 2020, Enbridge removed to this Court a suit that Defendants and the State of Michigan initiated in state court against Enbridge.  No. 1:20-cv-01142, ECF No 1. That complaint incorporated the Notice's allegations and sought an injunction requiring Enbridge to cease operating the Straits Pipeline by May 2021.  *See id*. at ECF No. 1-1.  The State parties moved to remand the action to state court but this Court denied that motion.  In an order dated November 16, 2021, this Court determined that "this case is properly in federal court" because "the State Parties' claims 'arise under' federal law …."  No. 1:20-cv-01142, ECF No 80 at 1, 15, PagID.1021, 1035.  "[T]he scope of the property rights that the State parties assert necessarily turns on the interpretation of federal law that burdens those rights."  No. 1:20-cv-01142, ECF No 80 at 15, PagID.1035.  "[T]his Court is an appropriate forum for deciding these disputed and substantial federal issues."  *Id*.  On November 30, 2021, the State of Michigan and Defendants filed a Notice of Voluntary Dismissal.  No. 1:20-cv-01142, ECF No 83, and the Governor issued a press release stating that the State "is shifting its legal strategy to give Michigan state courts the

final say ... [T]he federal court has now decided to keep the lawsuit ... I believe the people of Michigan, and our state courts, should have the final say."  ECF No. 39-1 at 1, PageID.254.

While Defendants voluntarily dismissed their action, Enbridge's own suit before this Court ensures that the substantial federal questions that this Court pointed to in the remand order will indeed be answered by a federal court—despite the State's attempts to evade this Court's jurisdiction.  For the reasons set forth below, Enbridge is entitled to summary judgment and declaratory and injunctive relief barring Defendants from seeking to use state law to force the shutdown of Line 5 in violation of federal law.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Federal preemption is "a legal question for determination by courts."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 20 (2007); *accord*, *e.g.*, *Self-Insurance Institute of America, Inc. v. Snyder*, 827 F.3d 549, 554 (6th Cir. 2016) ("Whether ERISA preempts a state law is a question of federal law"); *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006) ("preemption by the FRSA is purely a question of law"); *GTE Mobilnet v. Johnson*, 111 F.3d 469, 475 (6th Cir. 1997) ("Questions of federal preemption of state law generally are considered questions of law.").  Questions of federal preemption are therefore appropriate for resolution on summary judgment where, as here, the preemption analysis does not turn on any disputed fact.  *E.g. United States v. Davis*, 815 F.3d 253, 259 (6th Cir. 2016) ("[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986))).

The Sixth Circuit frequently affirms grants of summary judgment on preemption grounds. *E.g.*, *Slinker v. Jim Beam Brands Co.*, 689 F. App'x 406, 408-09 (6th Cir. 2017); *Werner v. Primax Recoveries, Inc.*, 365 F. App'x 664, 666-67 (6th Cir. 2010).

**ARGUMENT**

Defendants seek to use state law to force Enbridge to shut down an international pipeline based on purported safety concerns.  Enbridge vigorously disputes Defendants' claims that the Straits Pipelines are unsafe or pose any undue risk.  But that dispute is immaterial to this Motion. Regardless of the merit of Defendants' demands, they would be preempted by supreme federal law on two separate grounds, each of which is independently sufficient to support summary judgment and the award of declaratory and injunctive relief that Enbridge has requested.  *First*, Defendants' attempts to shut down Line 5 as a safety measure are barred by the federal Pipeline Safety Act: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  Safety concerns must be addressed by relevant federal agencies.  *Second*, Defendants' attempts are also barred categorically by the Foreign Affairs Doctrine, exemplified by the Supreme Court's decision in *Garamendi*, because they "interfere[] with the National Government's conduct of foreign relations" by conflicting with the federal policy embodied in the Transit Pipelines Treaty.  *Garamendi*, 539 U.S. at 401.

**I.    The Pipeline Safety Act bars Defendants' attempt to shut down Line 5 (Count I).**

**A.    Federal law occupies the field of pipeline safety and preempts state law.**

 Count I of the Complaint alleges that Defendants' shutdown order is preempted by the Pipeline Safety Act.  *See* ECF No. 1 at 10-13, PageID.10-13.  The concept of federal preemption stems from the Supremacy Clause, U.S. Const. Art. VI, cl. 2, whose application "is guided by familiar and well-established principles."  *Capital Cities Cable Inc. v. Crisp*, 467 U.S. 691, 698 (1984).  First and foremost, "[p]reemption fundamentally is a question of congressional intent, …

7

and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).  Such is the case here.

In the Pipeline Safety Act, Congress has spoken on the question of federal preemption. "Federal preemption of the regulation of interstate pipeline safety … is manifest in the language of the [Pipeline Safety Act] provision entitled 'Preemption.'" *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878 (9th Cir. 2006).  That provision commands: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  Congress "has chosen, through the express preemption provision of the [Pipeline Safety Act], clearly to preclude [states] from imposing safety regulations" on interstate pipelines.  *Olympic Pipe Line*, 437 F.3d at 883; *accord Michigan v. Enbridge*, 2021 WL 5355511, at *5 (the Act "expressly prohibit[s] states from imposing safety regulations on interstate pipeline operations").  Under this provision's plain language, it is irrelevant whether the federal agency is actively regulating in the same area as the state safety standard.  The statute says that a state "may not adopt or continue in force safety standards", 49 U.S.C. § 60104(c); in other words, *no* state regulation of pipeline safety is allowed.  Federal preemption of state pipeline safety matters "leaves nothing to the states in terms of substantive safety regulation of interstate pipelines, regardless of whether the local regulation is more restrictive, less restrictive, or identical to the federal standards."  *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987) (interpreting the preemption provision in a predecessor statute to the Pipeline Safety Act).[12]

---

[12] The Act is a re-codification, without substantive change, of two earlier federal laws: the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquids Pipeline Safety Act of 1979.

This preemption provision is reinforced by the grant of exclusive federal regulatory jurisdiction over interstate pipeline safety. Congress enacted the federal Pipeline Safety Act to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities." 49 U.S.C. § 60102(a)(1). To achieve that goal, the Act granted the U.S. Secretary of Transportation broad authority to promulgate federal "safety standards" for interstate pipeline transportation and facilities. *Id.* § 60102(a)(2). Such standards "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." *Id.* § 60102(a)(2)(B). The federal safety standards must be "designed to meet the need for … pipeline safety and … protecting the environment." *Id.* § 60102(b)(1). "This Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards." *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 359 (8th Cir. 1993).

The Secretary has delegated authority to implement the Act to an expert federal agency— PHMSA—which has promulgated an extensive body of federal safety regulations governing the design, construction, and operation of interstate pipelines that apply to Line 5. *See* 49 C.F.R. § 195 *et seq.* Among other things, PHMSA's regulations establish specific safeguards to ensure that the operation and maintenance of pipelines that cross waters such as Line 5's crossing of the Straits are conducted in a manner that prevents pipeline releases into the surrounding environment. *See id.* § 195.452.

As this Court recently explained, PHMSA "is vested with exclusive jurisdiction to issue an emergency order requiring pipeline closure" based on safety concerns. *Michigan v. Enbridge*, 2021 WL 5355511, at *6; *accord,* 49 U.S.C. § 60117(p) (an emergency order may be issued when

9

"an unsafe condition or practice, or a combination of unsafe conditions and practices, constitutes or is causing an imminent hazard"); 49 C.F.R. § 190.236 (implementing the PIPES Act of 2016). Under the Pipeline Safety Act, interstate pipelines obey one set of regulations, heed a single set of admonishments, consult a single set of authorities, and inform a central depository of critical information.  If a problem arises, one regulator investigates; one regulator decides; one regulator takes ownership.  Numerous courts have thus confirmed that the Pipeline Safety Act prohibits state authorities from seeking to shut down a pipeline based on safety concerns.  *E.g., Olympic Pipe Line Co. v. City of Seattle,* 437 F.3d at 877-83; *Williams Pipe Line Co. v. City of Mounds View,* 651 F. Supp. 551, 569-70 (D. Minn. 1987) (federal law "preempts … County's claim for injunctive relief" regarding concerns over the danger posed by the operation of interstate pipeline).

### B.    Defendants' attempts to force a shutdown of Line 5 are preempted under the Pipeline Safety Act.

Applying the Act's preemptive scheme to this case is straightforward.  *First*, it is undisputed that Line 5 transports petroleum products through Wisconsin and Michigan (and then on to Ontario).[13]  Line 5 is thus an "interstate pipeline facilit[y]" that provides "interstate pipeline transportation."  49 U.S.C. §§ 60101(a)(4), (5), (7), (18), (19).

*Second*, under the Act, federal "safety standards" must "meet the need for . . . protecting the environment."  *Id.* § 60102(b)(1)(ii).  Environmental protection standards thus are "safety standards" within the meaning of the Act.  *Accord, e.g.*, *id.* § 60102(b)(2)(A)(iii) (the Secretary "shall consider … environmental information" in prescribing safety standards).  As the Eighth Circuit explained, Congress amended the Pipeline Safety Act's predecessor statute to include "protecting the environment" as one of the factors to be considered by the Secretary of

---

[13] Joint Statement of Material Facts at ¶ 4.

Transportation in establishing the agency's pipeline safety standards.  *Kinley*, 999 F.2d at 360.

"[W]e think the addition of new factors to be considered by the Secretary of Transportation

expands, rather than restricts, federal regulation of interstate hazardous liquid pipelines and thus

is consistent with federal preemption."  *Id.*

*Third*, as explained in detail below, Defendants' asserted grounds for demanding that

Enbridge shut down the Straits Pipelines are state-law safety standards that purportedly protect the

environment.  For these reasons, the Act preempts Defendants' attempts to force the shutdown of

the Straits Pipelines.

      **1.**      **The public trust doctrine.**  Defendants' purported revocation of the Easement

under the "public trust" doctrine is an impermissible attempt to subject Line 5 to state-law safety

standards.   According to Defendants' Revocation Notice, the public trust doctrine obliges

Defendants "to protect and preserve the waters of, and lands beneath, the Great Lakes" so that the

natural environment can be used for activities like "'fishing, hunting, and boating.'"  Notice at 2

(ECF No. 1-1 at 2, PageID.23) (quoting *Glass v. Goeckel*, 473 Mich. 667, 679 (Mich. 2005));

*accord id.* at 2-11 (ECF No. 1-1 at 2-11, PageID.23-32).  Explaining Defendants' alleged safety

concerns, the Notice asserts:

> Recent events have made clear that continued operation of the Straits Pipelines
> cannot be reconciled with the State's duty to protect public trust uses of the Lakes
> from potential impairment or destruction.  As outlined below, transporting millions
> of gallons of petroleum products each day through two 67-year old pipelines that
> lie exposed in the Straits below uniquely vulnerable and busy shipping lanes
> presents an extraordinary, unreasonable threat to public rights because of the very
> real risk of further anchor strikes and other external impacts to the Pipelines, the
> inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an
> oil spill occurs at the Straits.

Notice at 5-6 (ECF No. 1-1 at 5-6, PageID.26-27); *see also, e.g.*, *id.* at 7 ("operation of the Straits

Pipelines presents inherent risks of environmental harm"); *id.* at 8 ("An oil spill at the Straits

threatens a wide range of highly valuable resources").  The Notice's discussion of the public trust

doctrine concludes:

> Enbridge's operation of the Straits Pipelines presents a substantial, inherent and
> unreasonable risk of an oil spill and such a spill would have grave ecological and
> economic consequences, severely impairing public rights in the Great Lakes and
> their public trust resources. … For all these reasons, [Defendants] find that
> Enbridge's use of the Straits Pipelines is contrary to and in violation of the public
> trust.

*Id.* at 9 (ECF No. 1-1 at 9, PageID.29).

In short, Defendants contend that Line 5 should be shut down under state law because it is

allegedly unduly unsafe from the perspective of environmental protection.  They assert that the

public trust doctrine requires revocation of the Easement and shutdown of the Straits Pipelines

because (1) there supposedly was no express finding made by the State when the Easement was

granted in 1953 that the Easement "could be conveyed without impairment of the public trust," *id.*

at 4; and (2) "continued operation of the Straits Pipelines [allegedly] cannot be reconciled with the

State's duty to protect public trust uses of the Lakes from potential impairment … because of the

very real risk of further anchor strikes and other external impacts to the Pipelines, the inherent

risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the

Straits," *id.* at 5-6.  Both theories are barred by the Pipeline Safety Act's express preemption clause.

     **a.**     **"Void from inception."**  Defendants assert that the public trust doctrine required

the State, before granting the Easement, to make an express finding "that the Easement: (1) would

improve navigation or another public trust interest; or (2) could be conveyed without impairment

of the public trust."  Notice at 4 (ECF No. 1-1 at 4, PageID.25).  Under this theory, Defendants

contend that the Easement is void because there supposedly is "no indication whatsoever that the

[State] determined that the conveyance of the Easement and the operation of the Straits Pipelines

would improve public rights in navigation, fishing, or other uses protected by the public trust" or

"that the Pipelines' operation could not adversely affect those rights." *Id.*  Defendants are wrong about the requirement and wrong that the State never satisfied it, but neither claim  ultimately matters because this is plainly a state-law safety standard: Under Defendants' theory, the public trust doctrine requires state agencies granting easements first to determine whether the easement would pose a safety risk to the natural environment.  And the Pipeline Safety Act does not allow states to shut down interstate pipelines based on a state-law requirement for a review of the safety risk posed by a pipeline.  Defendants' attempt to "continue in force" that safety standard—by retroactively applying it to revoke the Easement—is expressly preempted by 49 U.S.C. § 60104(c).

**b.    Current and continued use.**  Defendants also seek to revoke the Easement on the ground that "[r]ecent events have made clear that continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect public trust uses of the Lakes from potential impairment or destruction."  Notice at 5 (ECF No. 1-1 at 5, PageID.26).  Defendants purportedly fear such "impairment or destruction" in light of "the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits."  *Id.* at 6.  In short, Defendants' theory is that state law requires that the Straits Pipelines be shut down because they allegedly pose an unduly high risk of harming the environment.  *See also id.* at 7 ("inherent risks of environmental harm"); *id.* at 8 ("An oil spill at the Straits threatens a wide range of highly valuable resources"); *id.* at 9 ("a spill would have grave ecological and economic consequences").  This is a quintessential attempt to impose a state-law safety standard on an interstate pipeline and is expressly barred by the Pipeline Safety Act.

**2.    The Easement's safety standards.**  The Notice also asserts that Enbridge has violated certain safety standards included in the 1953 Easement itself.  Notice at 11-19 (ECF No. 1-1 at 11-19, PageID.32-40).  Enbridge vigorously disputes this assertion, but that, too, is of no

13

legal consequence.  Congress nullified the Easement's safety standards when it passed the 1994 Pipeline Safety Act, which expressly prohibits any "State authority" from "*continu[ing] in force* safety standards for interstate pipeline facilities."  49 U.S.C. § 60104(c) (emphasis added).  The state is preempted from enforcing safety standards, even if those standards are contained in a contract between the pipeline and the state regulator.  *Olympic Pipe Line*, 437 F.3d at 882-83 (making the very point).

      **a.**    **Due care.**  The Notice invokes the Easement's requirement that Enbridge "exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all public and private property."  Notice at 11 (ECF No. 1-1 at 11, Page.32.)  The Notice expressly equates the requirements of the Easement's due care provision with those of the public trust doctrine:

> [T]he continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect the public trust resources of the Great Lakes from the risk of additional anchor strikes or other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects of an oil spill in the Straits. *These very same risks and concerns are contrary to and incompatible with Enbridge's obligation under the 1953 Easement to exercise the due care of a reasonably prudent person.*

*Id.* at 16-17 (emphasis added).  The Notice concludes that "Enbridge's continued operation of the Straits Pipelines is contrary to and incompatible with its affirmative duty under the Easement to 'exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all private and public property'" and that "continued operation of the Straits Pipelines presents a substantial, inherent and unacceptable risk of a catastrophic oil spill with grave ecological and economic consequences."  *Id.* at 17 (quoting Easement ¶ A).

      The Easement's requirement that the pipeline operator "exercise … due care" for "safety" is plainly a "safety standard."  It is therefore preempted by the Pipeline Safety Act.

     **b.**    **Specific pipeline safety standards.**  Defendants also invoke the Easement's specific requirements that Enbridge "(1) maintain a maximum span or length of unsupported pipe not to exceed 75 feet; (2) protect all pipe with a specified coating and wrap; and (3) maintain a minimum curvature of any section of pipe of not less than 2,500 feet radius."  Notice at 12 (ECF No. 1-1 at 12, Page.33.)  As Defendants acknowledge in the Notice, these requirements are all targeted at safety.  *E.g.*, *id.* at 13 (standard regarding span lengths "serves to protect the structural integrity of the Pipelines"); *id.* at 14 ("protective coating is intended to prevent the steel from being exposed to environmental factors that could cause corrosion or other physical damage"); *id.* at 16 (standard regarding "pipeline curvature limits stresses placed on the Pipelines").  Standards intended to prevent releases from a pipeline into the environment are quintessential "safety standards" and are expressly preempted by the Pipeline Safety Act.

     As one court explained:

> Hazardous liquid pipelines run through 21 states, and presumably through small and large plots of land belonging to vast numbers of persons.  Were each of these landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted.

*Williams Pipe Line*, 651 F. Supp. at 569.

     Because the provisions of the Easement that Defendants invoke are plainly "safety standards for [an] interstate pipeline facilit[y]" (49 U.S.C. § 60104(c)), the Act's preemption provision bars Defendants from continuing them in force.  The Act expressly preempts state-law safety standards without regard for whether PHMSA has adopted federal safety standards covering the same subject matter.  That said, PHMSA has indeed promulgated regulations covering the same subject matter as the Easement.  While these regulations are not necessary to the legal analysis, they are summarized for context in the Appendix, infra.

3.  **Other state-law theories.**  Even if the state actors were to present their safety arguments under a different state law theory, it would make no difference to the outcome.  This is not a hypothetical concern.

For example, counsel for the state actors—the Attorney General of Michigan—has asserted that the operation of the Straits Pipelines is a public nuisance because "the inherent risks of pipeline operations, and the foreseeable consequences of an oil spill at the Straits," allegedly "create[] a continuing, unreasonable risk of catastrophic harm to public rights."  *Nessel v. Enbridge Energy Ltd. P'ship*, No. 21-CV-01057, ECF No. 1-1 at 26, PageID.47.  This claim is identical to Defendants' public trust claim, except that it is clothed in the garb of state-law nuisance doctrine rather than state-law public trust doctrine.  Similarly, Michigan's Attorney General also claims that the Straits Pipelines should be shut down under Michigan's Environmental Protection Act because they allegedly pose "substantial risks of grave environmental harm."  *Id.* at 27, PageID.48.  Again, this is merely an attempt to impose safety standards on an interstate pipeline under a different state law ground.  Under the federal preemption provision, the doctrinal label that the State ascribes is irrelevant.  *Wisconsin Central Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1014 (W.D. Mich. 2000) (the "nature of the preempted state regulation is irrelevant").

In short, the state actors cannot avoid the preemptive federal regime by changing the label of the state law theory.  A state safety standard for interstate pipelines by any name cannot stand.

**C.    Defendants' attempts to force a shutdown of Line 5 are not a permissible "location or routing" determination.**

Defendants have argued that their attempt to shut down this international pipeline would not impose state-law safety standards but, instead, would merely "prescribe the location or routing of [the] pipeline facility"—matters that the Pipeline Safety Act leaves in state hands.  49 U.S.C. § 60104(e).    The argument fails.  Line 5's "location" and "routing" at the Straits were

"prescribe[d]" nearly seven decades ago when the State granted the Easement and the Straits Pipelines were built. *See, e.g.*, *Lakehead Pipe Line Co. v. Dehn*, 64 N.W.2d 903, 906 (Mich. 1954) (noting that "[t]he use of two 20-inch pipes across the Straits of Mackinac was approved" by the Michigan Public Service Commission).  Defendants' current attempts to shut down the Straits Pipelines because state law supposedly deems them too unsafe fall within the Act's express preemption of state-law "safety standards for interstate pipelines" (*id.* § 60104(c)), not its reservation of state authority over the long-ago settled "location or routing of a pipeline facility" (*id.* § 60104(e)).  Indeed, Congress's decision to preempt state-law safety standards would be effectively nullified if, as Defendants contend, a state authority could set state-law standards and demand that pipeline operators comply with them on pain of being shut down.  Both the statutory text and congressional intent are clear that states may determine where *new* pipelines can be built but cannot interfere with the operation of an *existing* pipeline based on purported safety concerns. *See also* PHMSA Interpretation Response #PI-95-028 (July 24, 1995) ("the location of *new* pipeline facilities may be subject to state or local regulation" (emphasis added), *available at* https://www7.phmsa.dot.gov/regulations/title49/interp/PI-95-028.

A federal court rejected the same argument in *Olympic Pipe Line Co. v. City of Seattle*, No. C03-2343L, 2003 WL 27392855 (W.D. Wash. Aug. 21, 2003).  There, Seattle argued that its attempt to shut down a pipeline was permissible as a determination of the pipeline's "location or routing" under § 60104(e).  *Id.* at *4.  The court disagreed, explaining that "this argument's fatal flaw" was Seattle's "mis-characterization" of its attempt to shut down the pipeline.  *Id.*  As the court explained, "[t]he location and routing of the pipeline has already been established.  Rather, the subject of this action is Seattle's apparent attempt to impose pipeline safety-related requirements … as conditions to the continued operation of the existing [pipeline].

Notwithstanding 49 U.S.C. § 60104(e), safety regulation of … pipelines is expressly preempted by 49 U.S.C. § 60104(c)." *Id.*  The same reasoning applies here.

*     *     *

For the foregoing reasons, the federal Pipeline Safety Act expressly preempts Defendants' attempts to use state-law safety standards to force a shutdown of Line 5.  Enbridge is entitled to declaratory and injunctive relief.

## II.    The Foreign Affairs Doctrine independently bars Defendants' attempts to shut down Line 5 (Count III)

Count III of the Complaint presents a preemption claim under the Foreign Affairs Doctrine. *See* ECF No. 1 at 16-18, PageID.16-18.  That doctrine, exemplified by the Supreme Court's decision in *Garamendi*, says that state actions are preempted if they "interfere[] with the National Government's conduct of foreign relations."  539 U.S. at 401.  "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Id.* at 413 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)).  Here, Defendants' attempted interference with the operation of Line 5 must yield to the Federal Government's express policy that the operation of international pipelines between the United States and Canada, including Line 5, must be maintained unimpeded, with any disputes to be resolved bilaterally between those two Nations.

### A.    Under the Foreign Affairs Doctrine, state acts that interfere with federal foreign relations policy are preempted.

In *Garamendi*, the Supreme Court considered a California state law called the Holocaust Victim Insurance Relief Act of 1999.  *See* 539 U.S. at 401.  California passed the law to address the complicity of certain insurance companies in Nazi Germany's "theft of Jewish assets, including

18

the value of insurance policies." *Id.* at 401-02; *see also id.* at 408-13.  The California law sought to force European insurance companies to acknowledge and pay unpaid claims under Nazi-era insurance policies, and it used relatively draconian means in pursuit of that goal.  *See id.*  At the same time, the U.S. Federal Government was negotiating with Germany, culminating in the signing of the German Foundation Agreement, which established a process for presenting unpaid claims.  *See id.* at 405-08.  As the Court explained: "The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves."  *Id.* at 427.

The Supreme Court held that the California law was preempted because it "interfere[d] with foreign policy of the Executive Branch, as expressed principally in the executive agreements with Germany, Austria, and France."  *Id.* at 413.  The relevant agreements "include[d]  no preemption clause."  *Id.* at 417.  Thus, the "claim of preemption" rested on "interference with the foreign policy those agreements embody."  *Id.*  The California law "'compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments' to resolve claims against European companies arising out of World War II."  *Id.* at 424 (quoting *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000)).  The Court concluded that "[t]he express federal policy and the clear conflict raised by the state statute are alone enough to require state law to yield."  *Id.* at 425.  "The question relevant to preemption in this case is conflict, and the evidence here is 'more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives.'"  *Id.* at 427 (quoting *Crosby*, 530 U.S. at 386).

## B.    Defendants' attempts to shut down Line 5 interfere with federal policy, as embodied in the Transit Pipelines Treaty, and are therefore preempted.

The same reasoning the Supreme Court applied in *Garamendi* is fatal to Defendants' attempts to use state law to force the shutdown of a Treaty-protected international pipeline here, in clear conflict with the foreign affairs policy of the Federal Government.

Line 5 crosses the border between the United States and Canada.  Joint Statement of Material Facts at ¶ 2.  During the oil crisis of the 1970s, the United States and Canada negotiated to ensure that petroleum and other hydrocarbon products originating in one nation could flow through the other nation to reach another point in the origin nation without interruption by regional or local officials.  The immediate U.S. interest was to ensure that Alaskan oil could flow unimpeded to the Lower 48 States, while Canada had a reciprocal interest in pipelines transiting through the United States from Western to Eastern Canada.  The negotiations resulted in the 1977 Transit Pipeline Treaty, which was ratified by President Carter with the advice and consent of the Senate.[14]  As President Carter explained to the Senate, the Treaty "prohibits public authorities of contracting parties from instituting any measures impeding, diverting, redirecting, or interfering with the transmission of hydrocarbons in transit except in such events as an actual or threatened natural disaster, an operating emergency, and so forth."[15]  The lead U.S. treaty negotiator explained the Treaty's central purpose as follows: "both the United States and Canada recognized that security of throughput is a fundamental requirement and both countries have made binding, reciprocal commitments to non-interference."[16]

---

[14] *Agreement between the Government Of Canada and the Government of the United States Of America Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449, 1977 WL 181731; *see also* U.S. Department of State, *Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2020*, at 67, www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf.

[15] Papers of the President, President Jimmy Carter's Message to the Senate on the United States-Canada Transit Pipeline Agreement, March 30, 1977, Office of the Federal Register, p. 534.

[16] S. Exec. Rep. No. 95-9, 95th Congress, 1st Session (July 15, 1977), p. 38 (testimony of Julius Katz, Assistant Secretary for Economic and Business Affairs).

The Treaty's provisions are consistent with this central purpose.  As this Court has recognized, the Treaty expressly governs not only the "pipeline or any part thereof" but also "all real …property … connected therewith."  No. 20-CV-01142, ECF No. 80 at 10, PageID.1030.  The Treaty declares that "[*n]o public authority* in the territory of either Party *shall institute any measures,* other than those provided for in Article V, which are intended to, or *which would have the effect of*, *impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit*."  Art. II(1) (emphasis added).  The Treaty also provides for its own international dispute resolution mechanism.  *See* Art. IX.  Thus, the express federal policy is to funnel any disagreements over the Treaty's scope through the dispute resolution provisions in Article IX.

There is no question that Line 5 is one of the pipelines subject to the Treaty.  During the Senate hearings prior to its advice and consent, a State Department representative submitted a list of pipelines transiting the United States that would be covered by the Treaty.  That list includes a detailed description of Line 5 and the network of connecting pipelines that originate in Western Canada: "At Superior, Wisconsin, the system divides into two pipelines, one leg following a northeastern route through Michigan and then south to Sarnia, Ontario …."[17]

Enbridge does not need to prove that the State's actions here amount to a direct, existing conflict with the Transit Treaty—though it can and has.  Even where a state action is inward-focused, such state action must yield when it conflicts with an express foreign policy such as a treaty.  *Garamendi*, 539 U.S. at 421-22, 425.  The mere "'likelihood that state legislation will

---

[17] *Id.* at 40, 80.

produce something more than incidental effect in conflict with express foreign policy'" demands preemption.  *Id.* at 420.

Canada's recent actions provide more than sufficient proof of such likelihood.  On October 4, 2021—in direct response to the Michigan Governor's attempts to shutdown Line 5—the Government of Canada formally invoked the bilateral dispute resolution process established by Article IX of the Treaty.  *See* Joint Statement of Material Facts at ¶ 6; *see also* No. 1:20-cv-01142, ECF No. 84 at 1, PageID.1048 (Supplemental Brief of *Amicus Curiae* the Government of Canada). As Canada explained in its supplemental brief filed with this Court, "[t]he Governments of Canada and the United States are now actively engaged in an international dispute resolution process that has the sole authority to determine whether the implementation of the Governor of Michigan's shutdown order would violate the binding commitments the United States made to Canada under international law in the 1977 Treaty."  No. 1:20-cv-01142, ECF No. 84 at 3, PageID.1050; *accord*, No. 1:20-cv-01142, ECF Nos. 45, 52, 82.

Like the California law that the Supreme Court struck down in *Garamendi*, Defendants' attempts to shut down Line 5 are preempted under the Foreign Affairs Doctrine because they "interfere[] with the National Government's conduct of foreign relations."   539 U.S. at 401. Importantly, the doctrine as applied in *Garamendi* does *not* call on this Court to consider whether the Treaty itself expressly preempts Defendants' attempts to shut down Line 5 or whether those attempts directly violate the Treaty itself, as distinct from the foreign policy embodied in the Treaty.   After all, in *Garamendi*, the relevant international agreements contained no express preemption clauses and did not directly address the ability of states to pass laws like the California law at issue there (much less prohibit such laws).  *See id.* at 416-17.  Rather, the "claim of

preemption" focused on the "interference with *the foreign policy those agreements embody*."  *Id.* (emphasis added).

In *Garamendi*, the agreements between the United States and Germany embodied a policy of compromise that conflicted with the "iron fist" of the unilaterally adopted California statute.  *Id.* at 424-27.  Here, the Treaty between the United States and Canada embodies a policy that mandates the unimpeded operation of cross-border pipelines like Line 5 and requires bilateral resolution of disputes that arise between the two Nations by the two governments of those countries.  Indeed, the Treaty expressly recites that the United States and Canada "[b]eliev[e] that pipelines can be an efficient, economical and safe means of transporting hydrocarbons" and are "[c]onvinced that measures to ensure the uninterrupted transmission by pipeline" is "the proper subject of an agreement between the two Governments."  Treaty Preamble.  The federal policy embodied by the Treaty conflicts with Defendants' belief that Line 5 should be shut down for alleged violation of the state laws of just one of the states through which it passes.  As in *Garamendi*, "[t]he express federal policy and the clear conflict raised by [state law] are alone enough to require state law to yield."  539 U.S. at 425.

Because the relevant facts are undisputed, summary judgment is appropriate.  *E.g. Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1069, 1077 (9th Cir. 2012) (directing district court to dismiss plaintiff's claims as preempted under the Foreign Affairs Doctrine).

### C.    Defendants' counterarguments fail.

In their response to Enbridge's Pre-Motion Conference Request, Defendants suggested two counterarguments.  *See* ECF No. 40 at 3, PageID.261.  Both are meritless.

*First*, Defendants suggest that "it is not clear that the Treaty is self-executing."  *Id.*  A "self-executing" treaty is one that is effective as domestic law without the need for implementing legislation.  Here, the Federal Government has made clear that the Treaty *is* "self-executing upon

23

its entry into force, and U.S. implementing legislation accordingly will not be required."[18]  In any event, under the Foreign Affairs Doctrine, it does not matter whether the Treaty is self-executing. The doctrine is not concerned with enforcing the Treaty directly, but rather with preventing state "interference with the foreign policy [that the Treaty] embod[ies]."  *Garamendi*, 539 U.S. at 417. The Supreme Court in *Garamendi* itself thus made no inquiry into whether the agreements that embodied the federal policy there were self-executing or not.

*Second*, Defendants assert that their attempts to force a shutdown of Line 5 fall within the Treaty's statement that "a Transit Pipeline … shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline … with respect to … environmental protection."  Art. IV(1) of the Treaty.  This fails for three independent reasons. First, it is undisputed that the Government of Canada has formally invoked the dispute resolution process under the Treaty.  *See* Joint Statement of Material Facts at ¶ 6.  Because the Treaty provides for a bilateral resolution of disputes between the United States and Canada, the state actors here are preempted from unilaterally trying to circumvent that process here.  This should be the end of the matter.  *See Garamendi*, 539 U.S. at 425.  Second, in any event, it is PHMSA regulators—not Michigan officials—who are "the appropriate governmental authorit[y] having [regulatory] jurisdiction over" Line 5.  Third, Defendants seek not merely to "subject [Line 5] to regulations" but to force it to shut down entirely, which is precisely what the Treaty forbids.  Such a forced shutdown would fly in the face of the federal foreign policy embodied by the Treaty and is therefore preempted under the Foreign Affairs Doctrine.

*      *      *

---

[18] Senate Committee on Foreign Relations, Agreement with Canada Concerning Transit Pipelines, S. Exec. Rep. No. 95-9, at 83 (1977).

Because they "interfere[] with the National Government's conduct of foreign relations," Defendants' attempts to shut down Line 5 are preempted.  *Garamendi*, 539 U.S. at 401.  Enbridge is entitled to declaratory and injunctive relief.

CONCLUSION

This Court should grant summary judgment for Enbridge, enter a declaratory judgment that Defendants' attempts to force a shutdown of Line 5 violate the Pipeline Safety Act and the Foreign Affairs Doctrine, and enjoin Defendants from taking any steps to impede or prevent the interstate and international operation of Line 5.  *See* ECF No. 1 at 18-19, PageID.18-19 (Enbridge's Prayer for Relief).

Dated this 18th day of January, 2022                    Respectfully submitted,

                                                        s/   Peter H. Ellsworth
                                                        Peter H. Ellsworth  (P23657)
                                                        Jeffery V. Stuckey (P34648)
                                                        DICKINSON WRIGHT PLLC
                                                        123 W. Allegan Street, Suite 900
                                                        Lansing, MI 48933
                                                        (517) 371-1730
                                                        pellsworth@dickinsonwright.com
                                                        jstuckey@dickinsonwright.com

                                                        Phillip J. DeRosier (P55595)
                                                        DICKINSON WRIGHT PLLC
                                                        500 Woodward Avenue, Suite 4000
                                                        Detroit, MI 48226
                                                        (313) 223-3866
                                                        pderosier@dickinsonwright.com

                                                        John J. Bursch (P57679)
                                                        Bursch Law PLLC
                                                        9339 Cherry Valley Avenue SE, #78
                                                        Caledonia, MI 49316
                                                        (616) 450-4235
                                                        jbursch@burschlaw.com

                                                        David H. Coburn
                                                        William T. Hassler

Alice Loughran
Joshua H. Runyan
Mark C. Savignac
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-3000
dcoburn@steptoe.com
whassler@steptoe.com
aloughran@steptoe.com
jrunyan@steptoe.com
msavignac@steptoe.com

## APPENDIX: FEDERAL PIPELINE SAFETY STANDARDS

Set forth below are requirements imposed by the Act and regulations promulgated by PHMSA that address the same subject matter as raised by Defendants' Notice.  This list is for purposes of illustration only.  It is not necessarily exhaustive.

1.    *Anchor strikes*.  A primary safety concern reflected in the Revocation Notice is the possibility of an anchor from a vessel traversing the Straits striking the pipelines.  That concern is directly addressed by the Act, as amended by the PIPES Act of 2020.   The PIPES Act requires operators of pipelines located under water at depths greater than 150 feet (such as the Straits Pipelines) to "implement procedures that assess potential impacts by maritime equipment or other vessels, including anchors, anchor chains, or any other attached equipment."   49 U.S.C. § 60109(g)(5); *see also* PHMSA regulation at 49 C.F.R. § 195.454 (requiring operators of such pipelines to implement an enhanced integrity management program to monitor risks to a pipeline in such a high-consequence area).

2.    *Span length*.  PHMSA enforces regulatory requirements pertaining to the "physical support" of any interstate pipeline located in a high-consequence area like the Straits.  *See* Appendix C to 49 C.F.R. Part 195 (requiring operators to account for the "physical support" of a pipeline with respect to the integrity management of a pipeline in a high-consequence area).  PHMSA regulations also prohibit operators from neglecting the length of unsupported pipe and require operators to implement measures to ensure proper pipeline support.  *See* 49 C.F.R. § 195.452.

3.    *Coating*.  PHMSA regulates coating on interstate pipelines.  *See, e.g*., id. §§ 195.557, .559 and .561 ("each buried or submerged pipeline must have an external coating for external corrosion control").  PHMSA further requires that submerged pipelines like the Straits

Pipelines have cathodic protection to protect against external corrosion.  *See id*. § 195.563.  And PHMSA requires pipeline operators to address measures to protect the external condition of a pipeline in their Integrity Management Programs.  *See id*. § 195.452.

       4.     *Curvature*.  PHMSA has a framework that (i) governs the bending of a pipe at the time of construction (*see id.* § 195.246); (ii) regulates the installation of pipe to minimize the introduction of secondary stresses and the possibility of damage to the pipe (*see id*.); (iii) requires that a pipeline be operated and maintained to account for outside stresses from the surrounding environment, including bending of the pipe due to earthquakes, vibration, or thermal expansion (see id. § 195.110); and (iv) requires operators to account for pipe bending through an inspection program that is completed as part of an Integrity Management Program (*see id*. § 195.452).