**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY PARTNERS, L.P., | ) ) ) ) )  Case No.  1:20-cv-01141-RJJ-RSK |
| Plaintiffs, | )  Hon. Robert J. Jonker |
| v. | ) ) |
| GRETCHEN WHITMER, the Governor of the State of Michigan in her official capacity, SCOTT BOWEN, Director of the Michigan Department of Natural Resources in his official capacity, | ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**(CORRECTED) BRIEF IN SUPPORT OF PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT ON COUNTS I AND III OF THE COMPLAINT**

Jeffery V. Stuckey (P34648)
DICKINSON WRIGHT PLLC
123 W. Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730
jstuckey@dickinsonwright.com

John J. Bursch (P57679)
BURSCH LAW PLLC
9339 Cherry Valley Avenue SE, #78
Caledonia, MI 49316
(616) 450-4235
jbursch@burschlaw.com

Phillip J. DeRosier (P55595)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866
pderosier@dickinsonwright.com

Alice Loughran
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-6202
aloughran@steptoe.com

*Counsel for Plaintiffs*

TABLE OF CONTENTS

**Page**

Introduction ........................................................................................................................... 1

Background ........................................................................................................................... 3

    A.    Factual background ............................................................................... 3

    B.    Procedural history ................................................................................ 5

Legal Standard ..................................................................................................................... 7

Argument ............................................................................................................................. 8

I.     The Pipeline Safety Act bars Defendants' attempt to shut down Line 5 (Count I). ........... 8

    A.    Federal law occupies the field of pipeline safety and preempts state law. ............. 8

    B.    Defendants' attempts to force a shutdown of Line 5 are preempted under the Pipeline Safety Act. ..................................................................................... 11

        1.    The public trust doctrine. ..................................................................... 13

            a.    "Void from inception." ............................................................... 14

            b.    Current and continued use. ........................................................ 15

        2.    The Easement's safety standards. ........................................................ 15

            a.    Due care. ................................................................................. 16

            b.    Specific pipeline safety standards. .............................................. 16

        3.    Other state-law theories. ...................................................................... 18

    C.    Defendants' attempts to force a shutdown of Line 5 are not a permissible "location or routing" determination. ............................................................... 18

II.    The 1977 Transit Pipelines Treaty and Foreign Affairs Doctrine independently bar Defendants' attempts to shut down Line 5 (Count III) ............................................. 20

    A.    Under the Foreign Affairs Doctrine, state acts that interfere with federal foreign relations policy are preempted. ............................................................. 21

    B.    Defendants' attempts to shut down Line 5 violate the 1977 Treaty and interfere with federal foreign policy. ................................................................. 22

    C.    Defendants' counterarguments fail. ..................................................... 26

Conclusion ......................................................................................................................... 29

Addendum

i

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ANR Pipeline Co. v. Iowa State Commerce Comm'n*,
    828 F.2d 465 (8th Cir. 1987) ................................................... 9

*Asakura v. City of Seattle*,
    265 U.S. 332 (1924) ............................................................ 23

*Capital Cities Cable Inc. v. Crisp*,
    467 U.S. 691 (1984) ............................................................. 8

*City of Ozark, Arkansas v. Union Pac. R.R. Co.*,
    843 F.3d 1167 (8th Cir. 2016) ................................................ 18

*CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Georgia*,
    8 F.4th 1007 (9th Cir. 2021) ................................................. 27

*Cook v. United States*,
    288 U.S. 102 (1933) ........................................................... 27

*Couser v. Shelby County, Iowa*,
    139 F.4th 664 (8th Cir. 2025) ............................................... 10

*Couser v. Story County, Iowa*,
    704 F. Supp. 3d 917 (S.D. Iowa 2003), *aff'd in relevant part*, 139 F.4th 664
    (8th Cir. 2025) ................................................................ 10

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) .............................................................. 9

*GTE Mobilnet v. Johnson*,
    111 F.3d 469 (6th Cir. 1997) .................................................. 7

*Kinley Corp. v. Iowa Utils. Bd.*,
    999 F.2d 354 (8th Cir. 1993) ............................................. 11, 12

*Lakehead Pipe Line Co. v. Dehn*,
    64 N.W.2d 903 (Mich. 1954) ................................................. 19

*Michigan v. Enbridge Energy, LP*,
    571 F. Supp. 3d 851 (W.D. Mich. 2021) ............................... 3, 6, 9, 11

*Movsesian v. Victoria Versicherung AG*,
    670 F.3d 1067 (9th Cir. 2012) ............................................... 26

*Nye v. CSX Transp., Inc.*,
    437 F.3d 556 (6th Cir. 2006) ...................................................................................7

*Olympic Pipe Line Co. v. City of Seattle*,
    437 F.3d 872 (9th Cir. 2006) ...................................................................9, 11, 16

*Olympic Pipe Line Co. v. City of Seattle*,
    No. C03-2343L, 2003 WL 27392855 (W.D. Wash. Aug. 21, 2003).....................19

*Self-Insurance Institute of America, Inc. v. Snyder*,
    827 F.3d 549 (6th Cir. 2016) ...................................................................................7

*United States v. Davis*,
    815 F.3d 253 (6th Cir. 2016) ...................................................................................7

*Watters v. Wachovia Bank, N.A.*,
    550 U.S. 1 (2007)......................................................................................................7

*Williams Pipe Line Co. v. City of Mounds View*,
    651 F. Supp. 551 (D. Minn. 1987)...................................................................11, 17

*Wisconsin Central Ltd. v. City of Marshfield*,
    160 F. Supp. 2d 1009 (W.D. Mich. 2000) .............................................................18

*Ex parte Young*,
    209 U.S. 123 (1908).................................................................................................1

**Federal Statutes**

49 U.S.C. §§ 60101(a)(4), (5), (7), (18), (19) ...............................................................12

49 U.S.C. § 60102(a)(1) ................................................................................................10

49 U.S.C. § 60104(c) .............................................................................................*passim*

49 U.S.C. § 60104(e)...............................................................................................19, 20

49 U.S.C. § 60109(g)(5) ................................................................................................12

49 U.S.C. § 60117(p)......................................................................................................11

**Federal Treaty**

*Agreement between the Government Of Canada and the Government of the United States Of America Concerning Transit Pipelines* (Jan. 28, 1977), 1977 WL 181731 .................... *passim*

**Federal Regulations**

49 C.F.R. § 190.236 ................................................................................................................11

49 C.F.R. § 195 *et seq.* ..........................................................................................................10

**Miscellaneous**

123 Cong. Rec. 26275 (Aug. 3, 1977) ..............................................................................27

Senate Committee on Foreign Relations, Agreement with Canada Concerning Transit Pipelines, S. Exec. Rep. No. 95-9 ..............................................................22, 24, 27

Plaintiffs (collectively, "Enbridge") submit this brief in support of their Renewed Motion for Summary Judgment on the federal preemption claims in Counts I and III of the Complaint. *See* Fed. R. Civ. P. 56(a).[1]  Counts I and III represent alternative theories for the declaratory and injunctive relief Enbridge requested.  Each Count provides an independent reason why federal law bars state officials from forcing Enbridge to shut down its pipeline, Line 5.  Accordingly, if the Court were to grant summary judgment on either Count, that ruling will dispose of the entire case.

## INTRODUCTION

Enbridge brought this suit against state actors to challenge the constitutionality of their efforts to shut down an interstate and international pipeline known as Line 5.  For decades, Enbridge's Line 5 has safely transported crude oil and natural gas liquids through Wisconsin and Michigan to Ontario, Canada.  In November 2020, Defendants directed Enbridge to cease operation of Line 5 in the Straits of Mackinac within 180 days.  Because Defendants' intended course of action is barred by federal law, Enbridge brought this action against them in their official capacities, seeking declaratory and injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908).

Enbridge now moves for summary judgment on two independent grounds: express preemption under the Pipeline Safety Act (Count I) and preemption under the 1977 Transit Treaty Pipeline and the Foreign Affairs Doctrine (Count III).  These are pure issues of law involving no material dispute of facts.

*First*, a federal statute—the Pipeline Safety Act—expressly preempts states from enforcing state-law safety standards on interstate pipelines like Line 5.  Rather than allow individual states to burden interstate and international commerce with a patchwork of policymaking, the Act assigns

---

[1] *See also* ECF Nos. 65, 66 (Enbridge's prior motion for summary judgment on Counts I and III and supporting brief); ECF No. 67 (parties' joint statement of undisputed material facts).

exclusive authority to regulate pipeline safety to the U.S. Secretary of Transportation.  The Secretary has delegated that authority to an expert federal agency, the Pipeline and Hazardous Materials Safety Administration (PHMSA).  And PHMSA has promulgated detailed safety standards to protect the environment from pipeline releases, including specific safeguards for pipelines that cross waters.  The Act expressly preempts Defendants' attempts to substitute their judgment for that of the expert federal agency and force a shutdown of Line 5 based on purported safety concerns.

*Second*, to ensure that the United States speaks with one voice in matters of international relations, the Constitution commits those matters to the President and Congress—not to local officials of the 50 states.  As the Supreme Court explained in *American Ins. Assoc. v. Garamendi*, a state action that "interferes with the National Government's conduct of foreign relations … is preempted."  539 U.S. 396, 401 (2003).  Like *Garamendi*, the "claim of preemption" here rests on "interference with the foreign policy … embod[ied]" by an international agreement: the 1977 Transit Pipelines Treaty between the United States and Canada.  *Id*. at 417.  The 1977 Treaty prohibits any "public authority" from instituting "any measures" that have "the effect[] of impeding … or interfering in any way with the transmission of hydrocarbons" along transit pipelines (such as Line 5).[2]  Defendants are "public authorities" within the meaning of the Treaty, and their shut down order has "the effect" of impeding Line 5's operations.  In direct response to Defendants' actions here, the Government of Canada formally invoked the Treaty's dispute resolution provision in October 2021.[3]  Canada and the United States are now engaged in a bilateral

---

[2] *Agreement between the Government Of Canada and the Government of the United States Of America Concerning Transit Pipelines* at Art. II (Jan. 28, 1977), *available at* 1977 WL 181731.

[3] Brief of Amicus Curiae the Government of Canada at 3 (ECF No. 70 at 3, PageID.484).

dispute resolution process to determine whether the implementation of the Governor of Michigan's shutdown order would violate the binding commitments the United States made to Canada under international law in the 1977 Treaty.[4]  As in *Garamendi*, "[t]he express federal policy and the clear conflict raised by the state [actions] are alone enough to require state law to yield."  539 U.S. at 425.  Because Defendants have overstepped the bounds that the Constitution places on a state official's actions when they interfere with international relations, their attempts to force a shutdown of Line 5 are preempted as a matter of law.

For these independent reasons, Enbridge is entitled to summary judgment and to declaratory and injunctive relief.

## BACKGROUND

### A.    Factual background

The Court is familiar with the parties' dispute.[5]  Briefly, Line 5 is a pipeline owned and operated by plaintiff Enbridge Energy, Limited Partnership.[6]  For more than 65 years, Line 5 has transported crude oil and natural gas liquids through Wisconsin and Michigan to Ontario, Canada.[7]  About four miles of Line 5 cross the Straits of Mackinac pursuant to an Easement granted to

---

[4] *Id.* at 3-5 (ECF No. 70 at 3-5, PageID.484-486); *see also Michigan v. Enbridge Energy, LP*, 571 F. Supp. 3d 851, 860 (W.D. Mich. 2021) (Neff, J.).

[5] *See* ECF Nos. 94 (opinion and order denying Defendants' sovereign immunity defense); *see also Michigan v. Enbridge Energy, LP*, 571 F. Supp. 3d 851, 854-56, 860 (W.D. Mich. 2021) (Neff, J.); *Nessel v. Enbridge Energy, LP*, No. 21-cv-1057, 2022 WL 19005621 (W.D. Mich. Aug. 18, 2022) (Neff, J.), *rev'd*, 104 F.4th 958 (6th Cir. 2024), *cert granted*, 2025 WL 1787715 (June 30, 2025).

[6] Defendants' Answer at 7 (ECF No. 110 at 7, PageID.1054).

[7] Defendants' Answer at 2, 8 (ECF No. 110 at 2, 8, PageID.1049, 1055); Opinion and Order at 1 (ECF No. 94 at 1, PageID.940).

Enbridge's predecessor in 1953.[8]  (This portion of Line 5 is hereafter referred to as the "Straits Pipelines").

Defendants are Michigan Governor Gretchen Whitmer and Daniel Eichinger, the Director of Michigan's Department of Natural Resources, in their official capacities.  On November 13, 2020, Defendants signed a Notice of Revocation and Termination of Easement ("Defendants' Notice"), directing Enbridge to "cease operation of the Straits Pipelines 180 days from the date of the Notice."[9]  Defendants' rationale for shutting down the pipeline is protection of the Straits and surrounding environment from a potential risk of release of oil from the Straits Pipelines.[10]  Specifically, Defendants cited to "the inherent risks of pipeline operations" and the "threat of damage to the Straits Pipelines from anchor strikes or impacts from other external objects …."[11]  The Notice asserts two legal grounds in support of the action it seeks:  Enbridge's operation of Line 5 violates the state-law "public trust" doctrine and certain safety standards contained in the Easement.[12]

On October 4, 2021, the Government of Canada formally invoked the international dispute resolution provision—Article IX—of the 1977 *Agreement between the Government Of Canada and the Government of the United States Of America Concerning Transit Pipelines*, 28 U.S.T.

---

[8] Defendants' Answer at 8-9 (ECF No. 110 at p. 8-9, PageID.1055-1056); Opinion and Order at 1 (ECF No. 94 at 1, PageID.940).

[9] Defendants' Answer at 2 (ECF No. 110 at 2, PageID.1049); Defendants' Notice of Revocation and Termination of Easement (hereafter "Defendants' Notice") at 1, ECF No. 1-1 at 1, PageID.22).

[10] Defendants' Notice at 5-9, 16-17 (ECF No. 1-1 at 5-9, PageID.26-30, 37-38).

[11] Defendants' Notice at 6, 7, 17 (ECF No. 1-1 at 6, PageID.27, 28, 38).

[12] Defendants' Notice at 1, 13-17 (ECF No. 1-1 at 1, PageID.22, 34-38).

7449, 1977 WL 181731 (1977) (hereafter "1977 Treaty" or "Treaty").[13]  According to Canada, "Line 5 is a transit pipeline subject to the 1977 Treaty, and an order that requires the shutting down of Line 5 would create substantial and material questions at international law regarding the United States' compliance with its obligations owed to Canada under the Treaty."[14]  The Canadian Government explained that "Canada's decision to invoke Article IX reflects the importance of this matter to Canada's energy security and economic interests and its relationship with the United States."[15]  The two sovereigns—Canada and the United States—are "engaged in an international dispute resolution process … to determine whether the implementation of the Governor of Michigan's shutdown order would violate the binding commitments the United States made to Canada under international law in the 1977 Treaty."[16]

**B.    Procedural history**

On November 24, 2020, Enbridge filed a three-count complaint in this Court against Defendants.  (ECF No. 1.)  The first count is a preemption claim under the Pipeline Safety Act and the U.S. Supremacy Clause.  (ECF No. 1 at 10-13, PageID.10-13.)  The second count is a claim under the Interstate Commerce Clause of the U.S. Constitution.  (ECF No. 1 at 13-16, PageID.13-16.)  The third count includes a preemption claim under the 1977 Treaty and Foreign Affairs Doctrine.  (ECF No. 1 at 16-18, PageID.16-18.)  The complaint seeks declaratory and injunctive relief.  (ECF No. 1 at 18-19, PageID.18-9.)

---

[13] Brief of Amicus Curiae the Government of Canada at 3 (ECF No. 70 at 3, PageID.484).

[14] Brief of Amicus Curiae the Government of Canada, Ex. 2 at 1 (ECF No. 70, PageID.510).

[15] Brief of Amicus Curiae the Government of Canada, Ex. 2 at 3 (ECF No. 70 at 3, PageID.512).

[16] *Id*.; *see also* Brief of Amicus Curiae the Government of Canada at 3 (ECF No. 70 at 3, PageID.484).

Also on November 24, 2020, Enbridge removed to this Court a suit that Defendants and the State of Michigan initiated in state court against Enbridge.[17]  That complaint incorporated the Notice's allegations and sought an injunction requiring Enbridge to cease operating Line 5 in the Straits by May 2021.[18]  The State parties moved to remand the action to state court but this Court denied that motion.[19]  In denying remand, this Court determined that "this case is properly in federal court" because "the State Parties' claims 'arise under' federal law …."[20]  This Court explained that Congress vested the federal pipeline agency with "exclusive jurisdiction" to issue any emergency order requiring the shutdown of interstate pipelines like Line 5.[21]  It further stated that "with Canada's invocation of the dispute resolution provision in the 1977 Treaty, the federal issues in this case are under consideration at the highest levels of this country's government."[22]  In response to this Court order denying remand, the State of Michigan and Defendants voluntarily dismissed their lawsuit.  On the same day, the Governor issued a press release stating that the State "is shifting its legal strategy to give Michigan state courts the final say ... [T]he federal court has now decided to keep the lawsuit ... I believe the people of Michigan, and our state courts, should have the final say."[23]

---

[17] Opinion and Order at 2 n.1; *see also State of Michigan v. Enbridge Energy, LP*, Case No. 1:20-cv-1142.

[18] *State of Michigan v. Enbridge Energy, LP*, Case No. 1:20-cv-1142, ECF No. 1-1, PageID.19-73.

[19] *Michigan v. Enbridge Energy, LP*, 571 F. Supp. 3d 851, 854 (W.D. Mich. 2021) (Neff, J.).

[20] *Id.* at 854, 862.

[21] *Id.* at 860.

[22] *Id.*

[23] Press Release (ECF No. 39-1 at 1, PageID.254).

While Defendants voluntarily dismissed their action, Enbridge's own suit before this Court ensures that the substantial federal questions that this Court pointed to in the remand order will indeed be answered by a federal court—despite the State's attempts to evade this Court's jurisdiction.  For the reasons set forth below, Enbridge is entitled to summary judgment and declaratory and injunctive relief barring Defendants from seeking to use state law to force the shutdown of Line 5 in violation of federal law.

## LEGAL STANDARD

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Federal preemption is "a legal question for determination by courts."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 20 (2007); *accord*, *e.g.*, *Self-Insurance Institute of America, Inc. v. Snyder*, 827 F.3d 549, 554 (6th Cir. 2016) ("Whether ERISA preempts a state law is a question of federal law"); *Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006) ("preemption by the FRSA is purely a question of law"); *GTE Mobilnet v. Johnson*, 111 F.3d 469, 475 (6th Cir. 1997) ("Questions of federal preemption of state law generally are considered questions of law.").  Questions of federal preemption are therefore appropriate for resolution on summary judgment where, as here, the preemption analysis does not turn on any disputed fact.  *E.g. United States v. Davis*, 815 F.3d 253, 259 (6th Cir. 2016) ("[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment" (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**ARGUMENT**

Defendants seek to use state law to force Enbridge to shut down an international pipeline based on purported safety concerns.  Enbridge vigorously disputes Defendants' claims that the Straits Pipelines are unsafe or pose any undue risk.  But that dispute is immaterial to this Motion. Regardless of the merit of Defendants' demands, they are preempted by supreme federal law on two separate grounds, each of which is independently sufficient to support summary judgment and the award of declaratory and injunctive relief that Enbridge has requested.  *First*, Defendants' attempts to shut down Line 5 as a safety measure are barred by the federal Pipeline Safety Act: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  Congress vested the federal agency with exclusive jurisdiction to order any shut down of interstate pipelines based on any safety or environmental risks.  *Second*, Defendants' attempts are also barred by the Foreign Affairs Doctrine, exemplified by the Supreme Court's decision in *Garamendi*, because they "interfere[] with the National Government's conduct of foreign relations" by conflicting with the federal policy embodied in the 1977 Treaty.  *Garamendi*, 539 U.S. at 401.

**I.      The Pipeline Safety Act bars Defendants' attempt to shut down Line 5 (Count I).**

**A.      Federal law occupies the field of pipeline safety and preempts state law.**

 Count I of the Complaint alleges that Defendants' shutdown order is preempted by the Pipeline Safety Act.[24]  The concept of federal preemption stems from the Supremacy Clause, U.S. Const. Art. VI, cl. 2, whose application "is guided by familiar and well-established principles." *Capital Cities Cable Inc. v. Crisp*, 467 U.S. 691, 698 (1984).  First and foremost, "[p]reemption

---

[24] *See* Complaint at 10-13 (ECF No. 1 at 10-13, PageID.10-13).

fundamentally is a question of congressional intent, … and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).  Such is the case here.

In the Pipeline Safety Act, Congress has spoken on the question of federal preemption. "Federal preemption of the regulation of interstate pipeline safety … is manifest in the language of the [Pipeline Safety Act] provision entitled 'Preemption.'"  *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878 (9th Cir. 2006).  That provision commands: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).  Congress "has chosen, through the express preemption provision of the [Pipeline Safety Act], clearly to preclude [states] from imposing safety regulations" on interstate pipelines.  *Olympic Pipe Line*, 437 F.3d at 883; *accord Michigan v. Enbridge*, 571 F. Supp. 3d at 859 (the Act "expressly prohibit[s] states from imposing safety regulations on interstate pipeline operations").   Under this provision's plain language, it is irrelevant whether the federal agency is actively regulating in the same area as the state safety standard.  The statute says that a state "may not adopt or continue in force safety standards", 49 U.S.C. § 60104(c); in other words, *no* state regulation of pipeline safety is allowed.  Federal preemption of state pipeline safety "leaves nothing to the states in terms of substantive safety regulation of interstate pipelines, regardless of whether the local regulation is more restrictive, less restrictive, or identical to the federal standards."  *ANR Pipeline Co. v. Iowa State Commerce Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987) (interpreting the preemption provision in a predecessor statute to the Pipeline Safety Act).[25]

---

[25] The Pipeline Safety Act is a re-codification, without substantive change, of two earlier federal laws: the Natural Gas Pipeline Safety Act of 1968 and the Hazardous Liquids Pipeline

This preemption provision is reinforced by the grant of exclusive federal regulatory jurisdiction over interstate pipeline safety.  Congress enacted the federal Pipeline Safety Act to "provide adequate protection against risks to life and property posed by pipeline transportation and pipeline facilities."  49 U.S.C. § 60102(a)(1).  To achieve that goal, the Act granted the U.S. Secretary of Transportation broad authority to promulgate federal "safety standards" for interstate pipeline transportation and facilities.  *Id.* § 60102(a)(2).  Such standards "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities."  *Id.* § 60102(a)(2)(B).  The federal safety standards must be "designed to meet the need for … pipeline safety and … protecting the environment."  *Id.* § 60102(b)(1).  "This Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room for the state to either establish its own safety standards or supplement the federal safety standards."  *Couser v. Shelby County, Iowa*, 139 F.4th 664, 669 (8th Cir. 2025), quoting *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 359 (8th Cir. 1993).

The Secretary has delegated authority to implement the Act to an expert federal agency—PHMSA—which has promulgated an extensive body of federal safety regulations governing the design, construction, and operation of interstate pipelines that apply to Line 5.  *See* 49 C.F.R. § 195 *et seq.*  Among other things, PHMSA's regulations establish specific safeguards to ensure that the operation and maintenance of pipelines that cross waters such as Line 5's crossing of the Straits

---

Safety Act of 1979.  "This means that decisions interpreting said statutes are relevant to interpreting the PSA."  *Couser v. Story County, Iowa*, 704 F. Supp. 3d 917, 930 n.7 (S.D. Iowa 2003), *aff'd in relevant part*, 139 F.4th 664 (8th Cir. 2025).

10

are conducted in a manner that prevents pipeline releases into the surrounding environment.  *See id.* § 195.452.

As this Court recently explained, PHMSA "is vested with exclusive jurisdiction to issue an emergency order requiring pipeline closure" based on safety concerns.  *Michigan v. Enbridge*, 571 F. Supp. 3d at 860; *accord,* 49 U.S.C. § 60117(p) (an emergency order may be issued when "an unsafe condition or practice, or a combination of unsafe conditions and practices, constitutes or is causing an imminent hazard"); 49 C.F.R. § 190.236.   Under the Pipeline Safety Act, interstate pipelines obey one set of regulations, heed a single set of admonishments, consult a single set of authorities, and inform a central depository of critical information.  If a problem arises, one regulator investigates; one regulator decides; one regulator takes ownership.  Numerous courts have thus confirmed that the Pipeline Safety Act prohibits state authorities from seeking to shut down a pipeline based on safety concerns.  *E.g., Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d at 874, 877-83 (Pipeline Safety Act preempts city order directing pipeline to shut down operations within the city limits, even where the city was enforcing safety requirements in a contractual agreement with the pipeline operator); *Kinley Corp.*, 999 F.2d at 358-59 (federal law preempts state utility board's order directing pipeline owner to cease operations of a 14-mile pipeline); *Williams Pipe Line Co. v. City of Mounds View,* 651 F. Supp. 551, 569-70 (D. Minn. 1987) (federal law "preempts … County's claim for injunctive relief" regarding concerns over the danger posed by the operation of interstate pipeline).

### B.    Defendants' attempts to force a shutdown of Line 5 are preempted under the Pipeline Safety Act.

Applying the Act's preemptive scheme to this case is straightforward.  *First*, it is undisputed that Line 5 transports petroleum products through Wisconsin and Michigan (and then

on to Ontario).[26]  Line 5 is thus an "interstate pipeline facilit[y]" that provides "interstate pipeline transportation."  49 U.S.C. §§ 60101(a)(4), (5), (7), (18), (19).

*Second*, under the Act, federal "safety standards" must "meet the need for . . . protecting the environment."  *Id.* § 60102(b)(1)(ii).  Environmental protection standards thus are "safety standards" within the meaning of the Act.  *Accord, e.g.*, *id.* § 60102(b)(2)(A)(iii) (the Secretary "shall consider … environmental information" in prescribing safety standards).  As the Eighth Circuit explained, Congress amended the Pipeline Safety Act's predecessor statute to include "protecting the environment" as one of the factors to be considered by the Secretary of Transportation in establishing the agency's pipeline safety standards.  *Kinley*, 999 F.2d at 360. "[W]e think the addition of new factors to be considered by the Secretary of Transportation expands, rather than restricts, federal regulation of interstate hazardous liquid pipelines and thus is consistent with federal preemption."  *Id.*

In 2020, Congress imposed additional protections to prevent anchor strikes in the Great Lakes and other coastal areas.  49 U.S.C. § 60109(g)(5) (2020 amendment requiring pipeline operators—when putting together their integrity management plans for PHMSA—"to assess potential impacts by maritime equipment or other vessels, including anchors … or any other attached equipment").  Section 60109(g)(5) confirms that Congress considered pipeline safety issues tied to location to be within PHMSA's exclusive jurisdiction once a pipeline is built.  And the 2020 amendment confirms that Congress also considers impacts by anchor strikes to be within PHMSA's exclusive jurisdiction.

---

[26] Defendants' Answer at 2, 8 (ECF No. 110 at 2, 8, PageID.1049, 1055); Opinion and Order at 1 (ECF No. 94 at 1, PageID.940).

*Third*, as explained in detail below, Defendants' asserted grounds for demanding that Enbridge shut down the Straits Pipelines are state-law safety standards that purportedly protect the environment.  For these reasons, the Act preempts Defendants' attempts to force the shutdown of the Straits Pipelines.

      **1.**      **The public trust doctrine.**  Defendants' purported revocation of the Easement under the "public trust" doctrine is an impermissible attempt to subject Line 5 to state-law safety standards.   According to Defendants' Revocation Notice, the public trust doctrine obliges Defendants "to protect and preserve the waters of, and lands beneath, the Great Lakes" so that the natural environment can be used for activities like "'fishing, hunting, and boating.'"  Defendants' Notice at 2 (ECF No. 1-1 at 2, PageID.23) (quoting *Glass v. Goeckel*, 473 Mich. 667, 679 (Mich. 2005)); *accord id.* at 2-11 (ECF No. 1-1 at 2-11, PageID.23-32).  Explaining Defendants' alleged safety concerns, the Notice asserts:

> Recent events have made clear that continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect public trust uses of the Lakes from potential impairment or destruction.  As outlined below, transporting millions of gallons of petroleum products each day through two 67-year old pipelines that lie exposed in the Straits below uniquely vulnerable and busy shipping lanes presents an extraordinary, unreasonable threat to public rights because of the very real risk of further anchor strikes and other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits.

Defendants' Notice at 5-6 (ECF No. 1-1 at 5-6, PageID.26-27); *see also, e.g.*, *id.* at 7 ("operation of the Straits Pipelines presents inherent risks of environmental harm"); *id.* at 8 ("An oil spill at the Straits threatens a wide range of highly valuable resources").  The Notice's discussion of the public trust doctrine concludes:

> Enbridge's operation of the Straits Pipelines presents a substantial, inherent and unreasonable risk of an oil spill and such a spill would have grave ecological and economic consequences, severely impairing public rights in the Great Lakes and their public trust resources. … For all these reasons, [Defendants] find that

> Enbridge's use of the Straits Pipelines is contrary to and in violation of the public trust.

Defendants' Notice at 9 (ECF No. 1-1 at 9, PageID.29).

In short, Defendants contend that Line 5 should be shut down under state law because it is allegedly unduly unsafe from the perspective of environmental protection.  They assert that the public trust doctrine requires revocation of the Easement and shutdown of the Straits Pipelines because (1) there supposedly was no express finding made by the State when the Easement was granted in 1953 that the Easement "could be conveyed without impairment of the public trust," *id.* at 4; and (2) "continued operation of the Straits Pipelines [allegedly] cannot be reconciled with the State's duty to protect public trust uses of the Lakes from potential impairment … because of the very real risk of further anchor strikes and other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits," *id.* at 5-6.  Both theories are barred by the Pipeline Safety Act's express preemption clause.

a.      **"Void from inception."**  Defendants assert that the public trust doctrine required the State, before granting the Easement, to make an express finding "that the Easement: (1) would improve navigation or another public trust interest; or (2) could be conveyed without impairment of the public trust."  Defendants' Notice at 4 (ECF No. 1-1 at 4, PageID.25).  Under this theory, Defendants contend that the Easement is void because there supposedly is "no indication whatsoever that the [State] determined that the conveyance of the Easement and the operation of the Straits Pipelines would improve public rights in navigation, fishing, or other uses protected by the public trust" or "that the Pipelines' operation could not adversely affect those rights."  *Id.* Defendants are wrong about the requirement and wrong that the State never satisfied it, but neither claim ultimately matters because this is plainly a state-law safety standard: Under Defendants' theory, the public trust doctrine requires state agencies granting easements first to determine

14

whether the easement would pose a safety risk to the natural environment.  And the Pipeline Safety Act does not allow states to shut down interstate pipelines based on a state-law requirement for a review of the safety risk posed by a pipeline.  Defendants' attempt to "continue in force" that safety standard—by retroactively applying it to revoke the Easement—is expressly preempted by 49 U.S.C. § 60104(c).

      **b.**    **Current and continued use.**  Defendants also seek to revoke the Easement on the ground that "[r]ecent events have made clear that continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect public trust uses of the Lakes from potential impairment or destruction."  Defendants' Notice at 5 (ECF No. 1-1 at 5, PageID.26).  Defendants purportedly fear such "impairment or destruction" in light of "the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits."  *Id.* at 6.  In short, Defendants' theory is that state law requires that the Straits Pipelines be shut down because they allegedly pose an unduly high risk of harming the environment.  *See also id.* at 7 ("inherent risks of environmental harm"); *id.* at 8 ("An oil spill at the Straits threatens a wide range of highly valuable resources"); *id.* at 9 ("a spill would have grave ecological and economic consequences").  This is a quintessential attempt to impose a state-law safety standard on an interstate pipeline and is expressly barred by the Pipeline Safety Act.

      **2.**    **The Easement's safety standards.**  The Notice also asserts that Enbridge has violated certain safety standards included in the 1953 Easement itself.  Defendants' Notice at 11-19 (ECF No. 1-1 at 11-19, PageID.32-40).  Enbridge vigorously disputes this assertion, but that, too, is of no legal consequence.  Congress nullified the Easement's safety standards when it passed the 1994 Pipeline Safety Act, which expressly prohibits any "State authority" from "*continu[ing] in force* safety standards for interstate pipeline facilities."  49 U.S.C. § 60104(c) (emphasis added).

The state is preempted from enforcing safety standards, even if those standards are contained in a contract between the pipeline and the state regulator.  *Olympic Pipe Line*, 437 F.3d at 882-83 (making the very point).

a.    **Due care.**  The Notice invokes the Easement's requirement that Enbridge "exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all public and private property."  Defendants' Notice at 11 (ECF No. 1-1 at 11, Page.32).  The Notice expressly equates the requirements of the Easement's due care provision with those of the public trust doctrine:

> [T]he continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect the public trust resources of the Great Lakes from the risk of additional anchor strikes or other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects of an oil spill in the Straits. *These very same risks and concerns are contrary to and incompatible with Enbridge's obligation under the 1953 Easement to exercise the due care of a reasonably prudent person*.

Defendants' Notice at 16-17 (emphasis added) (ECF No. 1-1 at 16-17, Page.37-38).  The Notice concludes that "Enbridge's continued operation of the Straits Pipelines is contrary to and incompatible with its affirmative duty under the Easement to 'exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all private and public property'" and that "continued operation of the Straits Pipelines presents a substantial, inherent and unacceptable risk of a catastrophic oil spill with grave ecological and economic consequences." *Id.* at 17 (quoting Easement ¶ A).

The Easement's requirement that the pipeline operator "exercise … due care" for "safety" is plainly a "safety standard."  It is therefore preempted by the Pipeline Safety Act.

b.    **Specific pipeline safety standards.**  Defendants also invoke the Easement's specific requirements that Enbridge "(1) maintain a maximum span or length of unsupported pipe

not to exceed 75 feet; (2) protect all pipe with a specified coating and wrap; and (3) maintain a minimum curvature of any section of pipe of not less than 2,500 feet radius."  Defendants' Notice at 12 (ECF No. 1-1 at 12, Page.33.)  As Defendants acknowledge in the Notice, these requirements are all targeted at safety.  *E.g.*, *id.* at 13 (standard regarding span lengths "serves to protect the structural integrity of the Pipelines"); *id.* at 14 ("protective coating is intended to prevent the steel from being exposed to environmental factors that could cause corrosion or other physical damage"); *id.* at 16 (standard regarding "pipeline curvature limits stresses placed on the Pipelines").  Standards intended to prevent releases from a pipeline into the environment are quintessential "safety standards" and are expressly preempted by the Pipeline Safety Act.

As one court explained:

> Hazardous liquid pipelines run through 21 states, and presumably through small and large plots of land belonging to vast numbers of persons.  Were each of these landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted.

*Williams Pipe Line*, 651 F. Supp. at 569.

Because the provisions of the Easement that Defendants invoke are plainly "safety standards for [an] interstate pipeline facilit[y]" (49 U.S.C. § 60104(c)), the Act's preemption provision bars Defendants from continuing them in force.  The Act expressly preempts state-law safety standards without regard for whether PHMSA has adopted federal safety standards covering the same subject matter.  That said, PHMSA has indeed promulgated regulations covering the same subject matter as the Easement.  While these regulations are not necessary to the legal analysis, they are summarized for context in the Appendix, attached hereto.

3.     **Other state-law theories.**  Even if the state actors were to present their safety arguments under a different state law theory, it would make no difference to the outcome.  This is not a hypothetical concern.

For example, counsel for the state actors—the Attorney General of Michigan—has asserted that the operation of the Straits Pipelines is a public nuisance because "the inherent risks of pipeline operations, and the foreseeable consequences of an oil spill at the Straits," allegedly "create[] a continuing, unreasonable risk of catastrophic harm to public rights."  *Nessel v. Enbridge Energy Ltd. P'ship*, Case No. 21-CV-01057, ECF No. 1-1 at 26, PageID.47 (W.D. Mich.).  This claim is identical to Defendants' public trust claim, except that it is clothed in the garb of state-law nuisance doctrine rather than state-law public trust doctrine.  Similarly, Michigan's Attorney General also claims that the Straits Pipelines should be shut down under Michigan's Environmental Protection Act because they allegedly pose "substantial risks of grave environmental harm."  *Id.* at 27, PageID.48.  Again, this is merely an attempt to impose safety standards on an interstate pipeline under a different state law ground.  Under the federal preemption provision, the doctrinal label that the State ascribes is irrelevant.  *See City of Ozark, Arkansas v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1172 (8th Cir. 2016) ("preemption does not depend upon the source of a state law claim"); *Wisconsin Central Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1014 (W.D. Mich. 2000) (the "nature of the preempted state regulation is irrelevant").

In short, the state actors cannot avoid the preemptive federal regime by changing the label of the state law theory.  A state safety standard for interstate pipelines by any name cannot stand.

**C.     Defendants' attempts to force a shutdown of Line 5 are not a permissible "location or routing" determination.**

Defendants have argued that their attempt to shut down this international pipeline would not impose state-law safety standards but, instead, would merely "prescribe the location or routing

18

of [the] pipeline facility"—matters that the Pipeline Safety Act leaves in state hands.  49 U.S.C. § 60104(e).   The argument fails.   Line 5's "location" and "routing" at the Straits were "prescribe[d]" nearly seven decades ago when the State granted the Easement and the Straits Pipelines were built.  *See, e.g.*, *Lakehead Pipe Line Co. v. Dehn*, 64 N.W.2d 903, 906 (Mich. 1954) (noting that "[t]he use of two 20-inch pipes across the Straits of Mackinac was approved" by the Michigan Public Service Commission).

Defendants seek to shut down Line 5 because state law supposedly deems it too unsafe currently.  These claims fall within the Act's express preemption of state-law "safety standards for interstate pipelines" (49 U.S.C. § 60104(c)), not its reservation of state authority over the long-ago settled "location or routing of a pipeline facility" (*id.* § 60104(e)).  Indeed, Congress's decision to preempt state-law safety standards would be effectively nullified if, as Defendants contend, a state authority could set state-law standards and demand that pipeline operators comply with them on pain of being shut down.  Both the statutory text and congressional intent are clear that states may determine where *new* pipelines can be built but cannot interfere with the operation of an *existing* pipeline based on purported safety concerns.  *See also* PHMSA Interpretation Response #PI-95-028 (July 24, 1995) ("the location of *new* pipeline facilities may be subject to state or local regulation" (emphasis added),  https://www7.phmsa.dot.gov/regulations/title49/interp/PI-95-028 (last visited August 1, 2025).

A federal court rejected the same argument in *Olympic Pipe Line Co. v. City of Seattle*, No. C03-2343L, 2003 WL 27392855 (W.D. Wash. Aug. 21, 2003).  There, Seattle argued that its attempt to shut down a pipeline was permissible as a determination of the pipeline's "location or routing" under § 60104(e).  *Id.* at *4.  The court disagreed, explaining that "this argument's fatal flaw" was Seattle's "mis-characterization" of its attempt to shut down the pipeline.  *Id.*  As the

19

court explained, "[t]he location and routing of the pipeline has already been established.  Rather, the subject of this action is Seattle's apparent attempt to impose pipeline safety-related requirements … as conditions to the continued operation of the existing [pipeline].  Notwithstanding 49 U.S.C. § 60104(e), safety regulation of … pipelines is expressly preempted by 49 U.S.C. § 60104(c)."  *Id.*  The same reasoning applies here.

*    *    *

For the foregoing reasons, the federal Pipeline Safety Act expressly preempts Defendants' attempts to use state-law safety standards to force a shutdown of Line 5.  Enbridge is entitled to declaratory and injunctive relief.

## II.    The 1977 Transit Pipelines Treaty and Foreign Affairs Doctrine independently bar Defendants' attempts to shut down Line 5 (Count III)

Count III of the Complaint presents a preemption claim under the 1977 U.S.-Canada Transit Pipelines Treaty and the Foreign Affairs Doctrine.[27]  As explained below, the 1977 Treaty is self-executing.  It prohibits any public authority, including Defendants, from interfering in any way with the uninterrupted flow of hydrocarbons on Line 5.  The Foreign Affairs doctrine, exemplified by the Supreme Court's decision in *Garamendi*, says that state actions are preempted if they "interfere[] with the National Government's conduct of foreign relations."  539 U.S. at 401.  "There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations' that animated the Constitution's allocation of the foreign relations power to the National Government in the first place."  *Id.* at 413 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)).   Here,

---

[27] ECF No. 1 at 16-18, PageID.16-18.

Defendants' attempted interference with the operation of Line 5 must yield to the Federal Government's express policy that the operation of transit pipelines between the United States and Canada, including Line 5, must be maintained unimpeded, with any disputes to be resolved bilaterally between those two Nations.

### A.     Under the Foreign Affairs Doctrine, state acts that interfere with federal foreign relations policy are preempted.

In *Garamendi*, the Supreme Court considered a California state law called the Holocaust Victim Insurance Relief Act of 1999.  *See* 539 U.S. at 401.  California passed the law to address the complicity of certain insurance companies in Nazi Germany's "theft of Jewish assets, including the value of insurance policies."  *Id.* at 401-02; *see also id.* at 408-13.  The California law sought to force European insurance companies to acknowledge and pay unpaid claims under Nazi-era insurance policies, and it used relatively draconian means in pursuit of that goal.  *See id.*  At the same time, the U.S. Federal Government was negotiating with Germany, culminating in the signing of the German Foundation Agreement, which established a process for presenting unpaid claims.  *See id.* at 405-08.  As the Court explained: "The basic fact is that California seeks to use an iron fist where the President has consistently chosen kid gloves."  *Id.* at 427.

The Supreme Court held that the California law was preempted because it "interfere[d] with foreign policy of the Executive Branch, as expressed principally in the executive agreements with Germany, Austria, and France."  *Id.* at 413.  The relevant agreements "include[d] no preemption clause."  *Id.* at 417.  Thus, the "claim of preemption" rested on "interference with the foreign policy those agreements embody."  *Id.*  The California law "'compromise[d] the very capacity of the President to speak for the Nation with one voice in dealing with other governments' to resolve claims against European companies arising out of World War II."  *Id.* at 424 (quoting *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 381 (2000)).  The Court concluded that

21

"[t]he express federal policy and the clear conflict raised by the state statute are alone enough to require state law to yield." *Id.* at 425.  "The question relevant to preemption in this case is conflict, and the evidence here is 'more than sufficient to demonstrate that the state Act stands in the way of [the President's] diplomatic objectives.'" *Id.* at 427 (quoting *Crosby*, 530 U.S. at 386).

### B. Defendants' attempts to shut down Line 5 violate the 1977 Treaty and interfere with federal foreign policy.

The same reasoning the Supreme Court applied in *Garamendi* is fatal to Defendants' attempts to use state law to force the shutdown of a Treaty-protected international pipeline here, in clear conflict with the express terms of the 1977 Treaty and the foreign affairs policy of the Federal Government.

Line 5 crosses the border between the United States and Canada.[28]  During the oil crisis of the 1970s, the United States and Canada negotiated to ensure that petroleum and other hydrocarbon products originating in one nation could flow through the other nation to reach another point in the origin nation without interruption by regional or local officials.[29]  The immediate U.S. interest was to ensure that Alaskan oil could flow unimpeded to the Lower 48 States, while Canada had a reciprocal interest in pipelines transiting through the United States from Western to Eastern Canada.[30]  The negotiations resulted in the 1977 Transit Pipeline Treaty, which was ratified by President Carter with the advice and consent of the Senate.[31]  The Treaty thus "stands on the same

---

[28] Defendants' Answer at 2, 8 (ECF No. 110 at 2, 8, PageID.1049, 1055).

[29] Senate Committee on Foreign Relations, Report on Agreement with Canada Concerning Transit Pipelines, S. Rep. No. 95-9, at 2-3 (1977).

[30] *See id.* at 2, 36-37.

[31] 1977 Treaty, *available at* 1977 WL 181731; *see also* U.S. Department of State, *Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2020*, at 67, www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf (last visited August 1, 2025).

footing of supremacy as do the provisions of the Constitution and laws of the United States." *Asakura v. City of Seattle*, 265 U.S. 332, 341 (1924).

Article II is the Treaty's central substantive provision.  It ensures that "[n]o public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit."   Art. II(1), 1977 WL 181731.  The Treaty does not define the term "public authority," but that phrase's plain meaning encompasses the Defendant state officials.  And Defendants' shutdown order clearly has "the effect" of "impeding" Line 5's operations.

Article V reinforces Article II's plain meaning.  To avoid interruptions to the flow of hydrocarbons along transit pipelines, Article V provides that the flow of hydrocarbons may be stopped only "temporarily," only in certain exigent circumstances such as a natural disaster or operating emergency, and only "with the approval of the appropriate regulatory authorities …." Art. V.1, 1977 WL 181731.[32]  In the United States, the "appropriate regulatory authorit[y]" is the federal Pipeline and Hazardous Materials Safety Administration (PHMSA).  Article V further provides that there must be an "expeditious restoration" of "normal operations" after that temporary operating condition has passed.  *See* Art. V.3 ("The Party shall not unnecessarily delay or cause delay in the expeditious restoration of normal pipeline operations.").  This provision also

---

[32] "In the event of an actual or threatened natural disaster, an operating emergency, or other demonstrable need temporarily to reduce or stop for safety or technical reasons the normal operation of a Transit Pipeline, the flow of hydrocarbons through such Transit Pipeline may be temporarily reduced or stopped in the interest of sound pipeline management and operational efficiency by or with the approval of the appropriate regulatory authorities of the Party in whose territory such disaster, emergency or other demonstrable need occurs …."  Treaty Art. V(1), 1977 WL 181731.

23

precludes the Governor's shutdown plan since the state officials are not "the appropriate regulatory authority"—PHMSA is.  As these provisions demonstrate, the 1977 Treaty prohibits public authorities from permanently shutting down transit pipelines.

Article IX of the Treaty provides an international dispute resolution mechanism.  *See* Art. IX, 1977 WL 181731 ("Any dispute between the Parties regarding the interpretation, application or operation of this Agreement shall, so far as possible, be settled by negotiation between them. *** Any such dispute which is not settled by negotiation shall be submitted to arbitration at the request of either Party.").  As this Article reflects, the express federal U.S. policy is to funnel any disagreements over the Treaty's scope through the dispute resolution provisions in Article IX.

There is no question that Line 5 is one of the pipelines subject to the Treaty.  During the Senate hearings prior to its advice and consent, a State Department representative submitted a list of pipelines transiting the United States that would be covered by the Treaty.  That list includes a detailed description of Line 5 and the network of connecting pipelines that originate in Western Canada:  "At Superior, Wisconsin, the system divides into two pipelines, one leg following a northeastern route through Michigan and then south to Sarnia, Ontario …."[33]

Here, Defendants' attempts to shut down Line 5 violate Article II(1) of the 1977 Treaty.  Those attempts also violate the Foreign Affairs doctrine.  The Foreign Affairs doctrine displaces state law when it creates a likelihood of "something more than an incidental effect in conflict with express foreign policy."  *Garamendi*, 539 U.S. at 420.  Canada's actions provide more than sufficient proof of such likelihood.  On October 4, 2021—in direct response to the Michigan Governor's attempts to shut down Line 5—the Government of Canada formally invoked the

---

[33] S. Exec. Rep. No. 95-9, 95th Congress, 1st Session, p. 40, 80 (July 15, 1977).

24

bilateral dispute resolution process established by Article IX of the Treaty.  *See* Note 3 & 4, *supra*. As Canada explained in its brief filed with this Court, "[t]he Governments of Canada and the United States are now actively engaged in an international dispute resolution process that has the sole authority to determine whether the implementation of the Governor of Michigan's shutdown order would violate the binding commitments the United States made to Canada under international law in the 1977 Treaty."[34]

Like the California law that the Supreme Court struck down in *Garamendi*, Defendants' attempts to shut down Line 5 are preempted under the Foreign Affairs doctrine because they "interfere[] with the National Government's conduct of foreign relations."  539 U.S. at 401. Importantly, the doctrine as applied in *Garamendi* does *not* call on this Court to consider whether the Treaty itself expressly preempts Defendants' attempts to shut down Line 5 or whether those attempts directly violate the Treaty itself, as distinct from the foreign policy embodied in the Treaty.  After all, in *Garamendi*, the relevant international agreements contained no express preemption clauses and did not directly address the ability of states to pass laws like the California law at issue there (much less prohibit such laws).  *See id.* at 416-17.  Rather, the "claim of preemption" focused on the "interference with *the foreign policy those agreements embody*."  *Id.* (emphasis added).

In *Garamendi*, the agreements between the United States and Germany embodied a policy of compromise that conflicted with the "iron fist" of the unilaterally adopted California statute.  *Id.* at 424-27.  Here, the Treaty between the United States and Canada embodies a policy that mandates the unimpeded operation of cross-border pipelines like Line 5 and requires bilateral resolution of

---

[34] Brief of Amicus Curiae the Government of Canada, Ex. 2 at 3 (ECF No. 70 at 3, PageID.512).

disputes that arise between the two Nations by the two governments of those countries.  Indeed, the Treaty expressly recites that the United States and Canada "[b]eliev[e] that pipelines can be an efficient, economical and safe means of transporting hydrocarbons" and are "[c]onvinced that measures to ensure the uninterrupted transmission by pipeline" is "the proper subject of an agreement between the two Governments."  Treaty Preamble, 1977 WL 181731.  The federal policy embodied by the Treaty conflicts with Defendants' belief that Line 5 should be shut down for alleged violation of the state laws of just one of the states through which it passes.  As in *Garamendi*, "[t]he express federal policy and the clear conflict raised by [state law] are alone enough to require state law to yield." 539 U.S. at 425.

Because the relevant facts are undisputed, summary judgment is appropriate.  *E.g. Movsesian v. Victoria Versicherung AG*, 670 F.3d 1067, 1069, 1077 (9th Cir. 2012) (directing district court to dismiss plaintiff's claims as preempted under the Foreign Affairs Doctrine).

### C.    Defendants' counterarguments fail.

In prior briefing, Defendants suggested two counterarguments.  *See* ECF No. 40 at 3, PageID.261.  Both are meritless.

*First*, Defendants have suggested that "it is not clear that the Treaty is self-executing."  *Id.* A "self-executing" treaty is one that is effective as domestic law without the need for implementing legislation.  Here, both Canada and the United States have taken the position that the 1977 Treaty *is* self-executing.  During the Senate approval process for the Treaty, the U.S. lead negotiator, another congressional witness, and at least four Senators clearly articulated the understanding that the Treaty would be self-executing.[35]   The point was highlighted repeatedly when Senators

---

[35] The Federal Government made clear that the Treaty is "self-executing upon its entry into force, and U.S. implementing legislation accordingly will not be required."  Senate Committee on

discussed concerns that Canadian law might not treat the Treaty as self-executing in the same way as U.S. law would.[36]  These statements are more than sufficient to establish that the Treaty is self-executing.  *Cook v. United States*, 288 U.S. 102, 119 n.19 (1933) (relying on pre-ratification letter to Congress from the Secretary of State to conclude treaty was self-executing).[37]  Canada—the other contracting state—has also expressed its view in these proceedings that the Treaty is self-executing, and Canada's views are entitled to weight. *See CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Georgia,* 8 F.4th 1007, 1014 (9th Cir. 2021).  In any event, under the Foreign Affairs doctrine, it does not matter whether the Treaty is self-executing.  The doctrine is not concerned with enforcing the Treaty directly, but rather with preventing state "interference with the foreign policy [that the Treaty] embod[ies]."  *Garamendi*, 539 U.S. at 417.  The Supreme Court in *Garamendi* itself thus made no inquiry into whether the agreements that embodied the federal policy there were self-executing or not.

*Second*, Defendants also asserted in prior briefing that their attempts to force a shutdown of Line 5 fall within the Treaty's statement that "a Transit Pipeline … shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline … with respect to … environmental protection."  Art. IV(1), 1977 WL 181731.  This fails for three independent reasons.  First, it is undisputed that the Government of Canada has formally invoked the dispute resolution process under the Treaty.  Because the Treaty provides for a bilateral resolution of disputes between the United States and Canada, the state actors here are preempted

---

Foreign Relations, Agreement with Canada Concerning Transit Pipelines, S. Exec. Rep. No. 95-9, at 83 (1977); *see id.* at 22, 27-28, 38, 47, 92.

[36] *See id.* at 22, 27-28, 92; see also 123 Cong. Rec. 26275, 26280 (Aug. 3, 1977).

[37] *Cook* was the governing precedent at the time of the 1977 Treaty's ratification and has not been overruled.

from unilaterally trying to circumvent that process here.  This should be the end of the matter.  *See Garamendi*, 539 U.S. at 425.  Second, in any event, it is PHMSA regulators—not Michigan officials—who are "the appropriate governmental authorit[y] having [regulatory] jurisdiction over" Line 5.  Third, Defendants seek not merely to "subject [Line 5] to regulations" but to force it to shut down entirely, which is precisely what the Treaty forbids.  Such a forced shutdown would fly in the face of the federal foreign policy embodied by the Treaty and is therefore preempted under the Foreign Affairs doctrine.

*    *    *

Because they "interfere[] with the National Government's conduct of foreign relations," Defendants' attempts to shut down Line 5 are preempted.  *Garamendi*, 539 U.S. at 401.  Enbridge is entitled to declaratory and injunctive relief.

## CONCLUSION

This Court should grant summary judgment for Enbridge, enter a declaratory judgment that Defendants' attempts to force a shutdown of Line 5 violate the Pipeline Safety Act and the Foreign Affairs Doctrine, and enjoin Defendants from taking any steps to impede or prevent the operation of Line 5.

Respectfully submitted,

_____/s/    Alice E. Loughran_____.
Alice Loughran (DC Bar No. 470792)
STEPTOE LLP
1330 Connecticut Avenue, NW
Washington, DC 20036
(202) 429-6202
aloughran@steptoe.com

Phillip J. DeRosier (P55595)
DICKINSON WRIGHT PLLC
500 Woodward Avenue, Suite 4000
Detroit, MI 48226
(313) 223-3866
pderosier@dickinsonwright.com

Jeffery V. Stuckey (P34648)
DICKINSON WRIGHT PLLC
123 W. Allegan Street, Suite 900
Lansing, MI 48933
(517) 371-1730
jstuckey@dickinsonwright.com

John J. Bursch (P57679)
Bursch Law PLLC
9339 Cherry Valley Avenue SE, #78
Caledonia, MI 49316
(616) 450-4235
jbursch@burschlaw.com

Dated:  August 1, 2025

29

## APPENDIX: FEDERAL PIPELINE SAFETY STANDARDS

Set forth below are requirements imposed by the Pipeline Safety Act and regulations promulgated by PHMSA that address the same subject matter as raised by Defendants' Notice. This list is for purposes of illustration only.  It is not necessarily exhaustive.

1.      *Anchor strikes*.  A primary safety concern reflected in the Revocation Notice is the possibility of an anchor from a vessel traversing the Straits striking the pipelines.  That concern is directly addressed by the Act, as amended by the PIPES Act of 2020.  The PIPES Act requires operators of pipelines located under water at depths greater than 150 feet (such as the Straits Pipelines) to "implement procedures that assess potential impacts by maritime equipment or other vessels, including anchors, anchor chains, or any other attached equipment."   49 U.S.C. § 60109(g)(5); *see also* PHMSA regulation at 49 C.F.R. § 195.454 (requiring operators of such pipelines to implement an enhanced integrity management program to monitor risks to a pipeline in such a high-consequence area).

2.      *Span length*.  PHMSA enforces regulatory requirements pertaining to the "physical support" of any interstate pipeline located in a high-consequence area like the Straits.  *See* Appendix C to 49 C.F.R. Part 195 (requiring operators to account for the "physical support" of a pipeline with respect to the integrity management of a pipeline in a high-consequence area). PHMSA regulations also prohibit operators from neglecting the length of unsupported pipe and require operators to implement measures to ensure proper pipeline support.  *See* 49 C.F.R. § 195.452.

3.      *Coating*.  PHMSA regulates coating on interstate pipelines.  *See, e.g.*, *id.* §§ 195.557, .559 and .561 ("each buried or submerged pipeline must have an external coating for external corrosion control").  PHMSA further requires that submerged pipelines like the Straits

30

Pipelines have cathodic protection to protect against external corrosion.  *See* 49 C.F.R. § 195.563. And PHMSA requires pipeline operators to address measures to protect the external condition of a pipeline in their Integrity Management Programs.  *See id*. § 195.452.

      4.    *Curvature*.  PHMSA has a framework that (i) governs the bending of a pipe at the time of construction (*see id.* § 195.246); (ii) regulates the installation of pipe to minimize the introduction of secondary stresses and the possibility of damage to the pipe (*see id*.); (iii) requires that a pipeline be operated and maintained to account for outside stresses from the surrounding environment, including bending of the pipe due to earthquakes, vibration, or thermal expansion (*see id.* § 195.110); and (iv) requires operators to account for pipe bending through an inspection program that is completed as part of an Integrity Management Program (*see id*. § 195.452).

## CERTIFICATE OF COMPLIANCE

I certify that this brief contains 9026 words, excluding the material exempted by W.D. Michigan LCivR 7.3(b).  This word count was determined using Microsoft Word, version 2016.

s/ Alice E. Loughran      .
Alice Loughran (DC Bar No. 470792)
STEPTOE LLP
aloughran@steptoe.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2025, the foregoing was served on all parties of record via the ECF filing system.

s/ Alice E. Loughran      .
Alice Loughran (DC Bar No. 470792)
STEPTOE LLP
aloughran@steptoe.com
