# IN THE U.S. DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

**ENBRIDGE ENERGY, L.P., ENBRIDGE ENERGY CO., INC., and ENBRIDGE ENERGY PARTNERS, L.P.,**

*Plaintiffs,*

v.

**GRETCHEN WHITMER, the Governor of the State of Michigan in her official capacity and SCOTT BOWEN, the Director of the Michigan Department of Natural Resources in his official capacity,**

*Defendants.*

**No. 20-cv-1141**

**The Honorable Judge Robert J. Jonker**

**On Plaintiffs' Motion for Summary Judgment on Counts I & III**

---

## BRIEF OF AMICUS CURIAE
## THE GOVERNMENT OF CANADA
## IN PARTIAL SUPPORT OF PLAINTIFFS

---

Gordon D. Giffin
  *Counsel of Record*
Simon A. Steel
Parker B. Bednasek
DENTONS US LLP
303 Peachtree St., Ste. 5300
Atlanta, GA 30308
(404) 527-4020
gordon.giffin@dentons.com

*Counsel for Amicus Curiae
the Government of Canada*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................1

STATEMENT OF INTEREST ........................................................................4

ARGUMENT .................................................................................................13

I.    The Court Must Give Effect To The 1977 Treaty Because It Is Self-Executing. ............................................................................................13

II.   Michigan Officials Cannot Shut Down Line 5 While Canada Has A Colorable Argument, Pending In The Article IX International Dispute Resolution Process, That Doing So Would Violate the 1977 Treaty............17

III.  Canada's Position That A State-Mandated Shutdown Of Line 5, As Sought By Michigan Officials, Would Violate The 1977 Treaty Is At Least Colorable. ...........................................................................................19

IV.   The Great Lakes Tunnel Project Offers A Lawful, Cooperative Way Forward In The Public Interest....................................................................26

CONCLUSION..............................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**U.S. Cases**

*American Ins. Ass'n v. Garamendi*,
    539 U.S. 396 (2003)....................................................................................18

*Cook v. United States*,
    288 U.S. 102 (1933)....................................................................................15

*Doe v. Etihad Airways, PJSC*,
    870 F.3d 406 (6th Cir. 2017) ....................................................................15

*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*,
    525 U.S. 155 (1999)....................................................................................20

*Japan Line, Ltd. v. Cnty. of Los Angeles*,
    441 US 434 (1979).......................................................................................18

*Matta-Ballesteros v. Henman*,
    896 F.2d 255 (7th Cir.1990) ......................................................................17

*Medellín v Texas*,
    552 U.S. 491 (2008)............................................................................14, 16

*Pulsifer v. United States*,
    601 U.S. 124 (2024)....................................................................................24

*Sanchez-Llamas v. Oregon*,
    548 U.S. 331 (2006)....................................................................................16

*United States v. Ali*,
    718 F.3d 929 (D.C. Cir. 2013)...................................................................24

*United States v. Alvarez-Machain*,
    504 U.S. 655 (1992)....................................................................................14

*United States v. Locke*,
    529 U.S. 89 (2000).......................................................................................18

*United States v. Postal*,
    589 F.2d 862 (5th Cir. 1979) .....................................................................15

*United States v. Rauscher*,
    119 U.S. 407 (1886) ........................................................................16

*Whitney v. Robertson*,
    124 U.S. 190 (1888) ........................................................................16

*Zschernig v. Miller*,
    389 U.S. 429 (1968) ........................................................................19

**U.S. Constitution**

Article VI, clause 2 ..............................................................................16

**Statutes**

49 U.S.C. § 60102 ................................................................................24

49 U.S.C. § 60104(c) ...........................................................................24

**Legislative Materials**

123 Cong. Rec. 26275 (Aug. 3, 1977) ................................................15

S. Exec. Rep. No. 95-9 (1977) ..............................................6, 15, 20, 21, 22

**International Treaties**

*Agreement between the Government of the United States and the
    Government of Canada Concerning Transit Pipelines*, Jan. 28, 1977,
    28 U.S.T. 7449 ..................................................................................1

    Article II(1) ................................................... 7, 13, 14, 17, 20, 21, 22, 23

    Article III(1) .............................................................................14, 20

    Article III(2) ...................................................................................14

    Article IV .............................................................................14, 21, 23, 24

    Article IV(1) .........................................................................11, 21, 23

    Article IV(2) ...................................................................................24

    Article V .............................................................................14, 21, 22

Article V(1) ...........................................................................................21, 22

Article VI ...........................................................................................14

Article IX ...........................................................................14, 16, 17, 18, 25

Article X(2) ...........................................................................................15

Preamble ........................................................................................... 19-20

*Great Lakes Water Quality Protocol of 2012*, Sept. 7, 2012, 36 U.S.T. 1383 ...........................................................................................5

*Treaty Between the United States and Great Britain Relating to Boundary Waters between the United States and Canada*, Jan. 11, 1909, 36 Stat. 2449 ...........................................................................................5

*Vienna Convention on the Law of Treaties*, May 23, 1969, Article XXVII, 1155 U.N.T.S. 331, 339 ...........................................................20

**International Cases**

*Garrido & Baigorria v. Argentina*,
    Judgment of Aug. 27, 1998, Inter-Am Ct. HR (ser. C) No. 39 (1998) ...........................................................................................20

**Other Authorities**

Canadian Ass'n of Petroleum Producers, *Canadian Exports of Crude Oil and Natural Gas* (Apr. 2025), https://www.capp.ca/wp-content/uploads/2025/02/Canadian-Exports-of-Crude-Oil-and-Natural-Gas.pdf ...........................................................................................7

Cong. Rsch. Serv., IF12595, *U.S.-Canada Trade Relations* (July 18, 2025), https://www.congress.gov/crs-product/IF12595# ...................................7

Consumer Energy Alliance, *Enbridge Line 5 | Shutdown Impacts on Transportation Fuel* (2022), https://consumerenergyalliance.org/cms/wp-content/uploads/2022/02/CEA-Line-5-Shutdown-Impacts-on-Transportation-Fuel.pdf ...........................................................................................8, 11

Doug Vine, *Interconnected: Canadian and U.S. Electricity*, Ctr for Climate & Energy Sols. (Mar. 2017), https://www.c2es.org/wp-content/uploads/2017/05/canadainterconnected.pdf ..................................................................... 6

Executive Order 14156, *Declaring a National Energy Emergency* (Jan. 20, 2025) ...................................................................... 12

Hart Energy, *Report: Enbridge Line 5 Pipeline Closure Impacts* (June 27, 2019), https://www.hartenergy.com/exclusives/report-closure-enbridge-line-5-would-have-huge-impact-181010 ............................................. 10

*Hearing on the Economic Relationship between Canada and the United States before the Special Comm. on the Econ. Relationship Between Canada and the United States*, 43d Parliament (Testimony of Bill Walker, Ontario Associate Minister of Energy, Mar. 30, 2021), https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/meeting-6/evidence .......................................................... 9

ICF Resources L.L.C., *U.S.-Canada Cross-Border Petroleum Trade: An Assessment of Energy Security and Economic Benefits* (2021), https://www.api.org/-/media/Files/News/2021/04/ICF_Cross-Border_Analysis_Final.pdf ............................................................. 6

Letter from Ambassador Robert E. Lighthizer to the Honorable Chrystia Freeland (Nov. 30, 2018), https://www.international.gc.ca/trade-commerce/assets/pdfs/agreements-accords/cusma-aceum/letter-energy.pdf .................................................................. 6

Mich. Dep't of Env't, Great Lakes, & Energy, *Draft Permit for Countersignature; Submission Number HNY-NHX4-FSR2Q* (Jan. 29, 2021), https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Multi-Division/Line-5/EGLE/2021-01-29-Draft-Permit-for-Countersignature.pdf ........................... 12

Mich. Dep't of Env't, Great Lakes, & Energy, *Line 5: Applicable Permits*, https://www.michigan.gov/egle/about/featured/line5/permits ........................... 12

Nat. Res. Canada, *Frequently Asked Questions (FAQs) Concerning Federally-Regulated Petroleum Pipelines in Canada*, https://natural-resources.canada.ca/energy-sources/fossil-fuels/faqs-federally-regulated-petroleum-pipelines-canada ................................6

Nicole Jacobs, *As Energy Prices Soar, Shutting Down Line 5 Would Be Devastating For Michigan, Energy in Depth*, Energy in Depth (Nov. 11, 2021), https://www.energyindepth.org/as-energy-prices-soar-shutting-down-line-5-would-be-devastating-for-michigan/ ........................8

*In the Matter of the Application for the Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac*, No. U-20763-1454 (Mich. Pub. Serv. Comm. Dec. 1, 2023)............................10

U.S. Army Corps of Engineers, *Draft Decision Document* (May 20, 2024), https://www.mvp.usace.army.mil/Portals/57/docs/regulatory/Enbridge/EnbridgeLine5/DCDD/L5R%20Draft%20CDD%2020240520_508_final.pdf?ver=jx4JTdDVjSuQI1-YlG7DwA%3d%3d .............................10

U.S. Army Corps of Engineers, *Draft Environmental Impact Statement for Enbridge Line 5 Tunnel Project*, Executive Summary (May 2025), https://www.line5tunneleis.com/wp-content/uploads/2025/05/Enbridge-Line-5-Tunnel-Project-Draft-Environmental-Statement_Executive-Summary.pdf ......................................8, 26

U.S. Army Corps of Engineers, *Line 5 EIS/NEPA Timeline*, https://www.line5tunneleis.com/nepa-timeline-deis/ ........................................12

U.S. Army Corps of Engineers, *Use of Special Processing Procedures for Review of the Enbridge Line 5 Tunnel Project* (Apr. 15, 2025), https://media.defense.gov/2025/Apr/15/2003689654/-1/-1/0/PUBLIC%20NOTICE%20DETROIT%20DISTRICT,%20PERMIT%20APPLICATION%20NO.%20LRE-2010-00463-56-A19.PDF ........................................................................................12

U.S. Dep't of State, *Treaties in Force: A List of Treaties and Other International Agreements in Force on January 1, 2020* (2020), https://www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf........................................................................................5

U.S. Dep't of State, *Treaties in Force: Supplemental List of Treaties and Other International Agreements* (2023), https://www.state.gov/wp-content/uploads/2023/06/TIF-Supplement-Report-2023.pdf ..............................................................5

U.S. Energy Info. Admin., *Last Year's U.S.-Canada Energy Trade Was Valued Around $150 Billion* (July 30, 2025), https://www.eia.gov/todayinenergy/detail.php?id=65825...................................7

U.S. Energy Info. Admin., *U.S. Uranium Production Up in 2022 after Reaching Record Lows in 2021* (Aug. 17, 2023), https://www.eia.gov/todayinenergy/detail.php?id=60160#.................................7

## INTRODUCTION

Pursuant to this Court's Order, ECF No. 117, and the attached Motion for Leave, the Government of Canada ("Canada") respectfully submits this Amicus Brief[1] to assert Canada's international treaty rights under the *Agreement between the Government of the United States and the Government of Canada Concerning Transit Pipelines*, Jan. 28, 1977, 28 U.S.T. 7449 ("1977 Treaty" or "Treaty"), which bear on Enbridge's Motion for Summary Judgment with respect to Count III of its Complaint.[2]

On November 13, 2020, Michigan Officials[3] issued a notice purporting to revoke the Straits of Mackinac Pipe Line Easement,[4] which the State had granted to Enbridge's predecessor in 1953, and, on that basis, to compel the shutdown of Line 5 across the Mackinac Straits (which would, in effect, compel the total shutdown of Line 5) within 180 days.  ECF No. 1-1 ("2020 Shutdown Notice").  On October 4, 2021, after Michigan Officials attempted to enforce that order in court,[5] Canada

---

[1] Counsel for Canada certify that this brief was not written in whole or in part by counsel for any party, and that no person or entity other than Canada and its counsel has contributed financially to the preparation or submission of this brief.

[2] Canada takes no position on any contested issues of fact or any issues of domestic U.S. law not specifically addressed herein.

[3] This brief uses "Michigan Officials" as a shorthand to refer to Michigan Governor Gretchen Whitmer and the Director of the Michigan Department of Natural Resources (formerly Daniel Eichinger, now Scott Bowen), acting in their official capacities.

[4] ECF No. 1-1 at PageID.43-55.

[5] *See Michigan v. Enbridge*, W.D. Mich. No. 20-cv-1142.  Michigan Officials voluntarily dismissed that case after this Court upheld its removal to federal court.

formally invoked Article IX of the Treaty, which provides for dispute resolution between the Treaty Parties. *See* Attachment A. The Article IX dispute resolution process remains ongoing today and it now encompasses a broader set of issues, including Canada's claims that court-ordered shutdowns of Line 5 sought in pending litigation (by Michigan Attorney General Dana Nessel, and separately by the Bad River Band in Wisconsin) would violate the Treaty.

As Canada advised this Court in 2021 and 2022, any shutdown of Line 5 by public authorities within the United States (including Michigan Officials) while the Article IX international dispute resolution process is ongoing would constitute a violation of the United States' international law obligations to Canada, as well as raise grave international relations concerns, and expose the United States to significant liability.[6] Further, a compelled shutdown would have severe adverse

---

[6] *See* ECF No. 70; *Michigan v. Enbridge*, No. 20-cv-1142, ECF Nos. 45 & 82. The present brief is consistent with those prior amicus briefs, but it provides a more complete and updated statement of Canada's position. Canada has also filed amicus briefs asserting its Treaty rights in the *Nessel* and *Bad River* cases. *Nessel v. Enbridge*, No. 19-474-CE, Amicus Brief of the Government of Canada, Dkt. No. 181 (filed Dec. 2, 2024); *Enbridge Energy Co. v. Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation*, Nos. 23-2309 & 23-2467, Amicus Brief of the Government of Canada, 2023 WL 6324368 (filed Sept. 18, 2023).

In the *Bad River* case, which is awaiting the Seventh Circuit's decision, the United States also filed an amicus brief raising concerns based on the Treaty. *See Enbridge Energy Co. v. Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation*, Nos. 23-2309 & 23-2467, Amicus Brief of United States, 2024 WL 1681174, *22–*30 (filed Apr. 10, 2024) ("US *Bad River* Amicus Br."). The concerns arising from a potential Line 5 shutdown raised by the United States included the "effect on the United States' obligations under the [1977] Treaty and the United States' diplomatic and commercial relationship with Canada," *id.* at *23, the "consequences for energy supply in the United States and Canada," *id.* at *27, and the United

impacts on the interests the United States and Canada sought to protect when they entered into the Treaty:  North American energy security; the interests of energy users in both central Canada and the midwestern United States; the interests of energy producers in western Canada; and more broadly, the economies of both nations.

The 2020 Shutdown Notice emphasizes the need to protect the Great Lakes environment from oil spills.  ECF No. 1-1 at PageID.26–30.  Canada shares Michigan Officials' interest in protecting the environment of the Great Lakes region, a major focus of Canadian-United States collaboration since the early 20th century and a vital resource for both nations.  However, enforcement of the 2020 Shutdown Notice is neither necessary to protect the environment nor consistent with the 1977 Treaty.  Line 5 has operated safely across the Mackinac Straits for 72 years, and its safety is properly regulated by the U.S. Pipeline and Hazardous Materials Safety Administration ("PHMSA").  Canada supports the responsible and safe operation of Line 5, consistent with sound science and applicable regulations.  Further, Canada supports the proposed Great Lakes Tunnel Project ("Tunnel" or "Tunnel Project"), which would enhance the safety of Line 5 while generating significant economic benefits to Michigan.

---

States' potential "exposure for significant damages if the [Treaty] arbitration panel found the United States liable for breaching its treaty obligations," *id.* at *29.

The 1977 Treaty provides a narrowly defined set of exceptions and qualifications to its general prohibition on interference with transit pipelines. As outlined below, Canada's position is that none of the exceptions and qualifications could justify Michigan Officials' efforts to compel a shutdown of Line 5. However, Canada does not ask this Court to make a final determination on the potential application of the Treaty exceptions and qualifications. In Article IX, the Treaty reserves the ultimate determination of whether a compelled shutdown would violate its substantive provisions to the international dispute resolution process. This Court should ensure that while the Article IX process is ongoing, there is no state-compelled shutdown that violates the United States' obligations under Article IX, as well as its substantive Treaty obligations, and prevents the United States from speaking in one voice on this important matter of international relations.

## STATEMENT OF INTEREST

Michigan Officials' efforts to compel a shutdown of Line 5 raise grave concerns for Canada, both from a legal and diplomatic standpoint as well as from an energy security and economic prosperity standpoint.

First, a compelled shutdown of Line 5 would violate the United States' obligations to Canada under the 1977 Treaty. The Treaty is an essential element of the historic diplomatic framework that ensures energy security and economic

prosperity along the longest international border in the world.[7]  Through formal and informal diplomatic processes and agreements at the national government level, the two Treaty Parties have worked together closely for over a century to manage their shared resources and protect their shared environment.  Cooperation at the national level between the United States and Canada has created a successful, integrated regime to protect navigation and the environment in the shared waters of the Great Lakes region;[8] it created the NORAD system for the joint air defense protection of North America; and it led to the North American Free Trade Agreement and its successor, the Canada-United States-Mexico Agreement, as well as the side-letter on energy entered into by the two nations in conjunction with that Agreement, in which they mutually committed "to promote North American energy cooperation,

---

[7] Over 200 bilateral treaties are in force between the United States and Canada.  U.S. Dep't of State, *Treaties in Force: A List of Treaties and Other International Agreements in Force on January 1, 2020* at 60 (2020), https://www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf; U.S. Dep't of State, *Treaties in Force: Supplemental List of Treaties and Other International Agreements* at 8 (2023), https://www.state.gov/wp-content/uploads/2023/06/TIF-Supplement-Report-2023.pdf.

[8] *See Treaty Between the United States and Great Britain Relating to Boundary Waters between the United States and Canada*, Jan. 11, 1909, 36 Stat. 2449 (the "Boundary Waters Treaty"); *Great Lakes Water Quality Protocol of 2012*, Sept. 7, 2012, 36 U.S.T. 1383.  The 1909 Boundary Waters Treaty stipulates, among other things, that water levels and flows in the boundary waters must not be altered without the approval of the responsible government and the International Joint Commission.  The Great Lakes Water Quality Protocol is the current iteration of an agreement between the United States and Canada first entered into in 1972 to act jointly to restore and maintain the chemical, physical and biological integrity of the waters of the Great Lakes.

including with respect to energy security and efficiency, standards, joint analysis, and the development of common approaches."[9]

The 1977 Treaty is a key element of that joint energy security framework. While it is fully reciprocal, its initial impetus was to enhance U.S. energy security by ensuring the United States' ability to transport hydrocarbon products from Alaska through Canada to the lower 48 U.S. States.[10]  Today, the Treaty remains critically important to North American energy security and prosperity.  A 2021 American Petroleum Institute study explains that the close integration of American and Canadian oil and refining markets protects both nations from significant risks, including over-reliance on OPEC suppliers.[11]  Currently, at least 70 oil and gas pipelines and 37 major electricity transmission lines cross the border, allowing essential energy to move back and forth unhindered.[12]  In recent years, Canada has become the largest supplier of U.S. energy imports—including crude oil, natural gas,

---

[9] Letter from Ambassador Robert E. Lighthizer to the Honorable Chrystia Freeland (Nov. 30, 2018),  https://www.international.gc.ca/trade-commerce/assets/pdfs/agreements-accords/cusma-aceum/letter-energy.pdf.

[10] *See* S. Exec. Rep. No. 95-9, at 2 (1977).

[11] *See* ICF Resources L.L.C., *U.S.-Canada Cross-Border Petroleum Trade: An Assessment of Energy Security and Economic Benefits* (2021), https://www.api.org/-/media/Files/News/2021/04/ICF_Cross-Border_Analysis_Final.pdf.

[12] *See* Nat. Res. Canada, *Frequently Asked Questions (FAQs) Concerning Federally-Regulated Petroleum Pipelines in Canada*, at ¶ 1.4, https://natural-resources.canada.ca/energy-sources/fossil-fuels/faqs-federally-regulated-petroleum-pipelines-canada; Doug Vine, *Interconnected: Canadian and U.S. Electricity*, Ctr. for Climate & Energy Sols. (Mar. 2017), https://www.c2es.org/wp-content/uploads/2017/05/canada-interconnected.pdf.

electricity, and uranium (for nuclear power plants).[13] According to the U.S. Energy Information Administration, the U.S.-Canada integrated energy system supported over $151 billion in two-way energy trade in 2024, including over 4.1 million barrels per day of crude oil supplied by Canada to the United States (more than 60% of the United States' daily crude oil imports).[14]   And this energy trade is reciprocal: the pipelines that flow from the United States to Canada transport almost all of Canada's natural gas imports.[15]

The Treaty entails a solemn and reciprocal undertaking between sovereigns to ensure that no "public authority" in one sovereign's territory (including the State of Michigan and its officials) impedes or interferes with the flow of hydrocarbons in transit along a transit pipeline to the other sovereign unless certain limited exceptions apply.  1977 Treaty, Art. II(1).  It is essential that the two nations can rely on such mutual undertakings.  As such, any Treaty issues must be resolved at the inter-governmental level between the Treaty Parties, as provided by Article IX of the Treaty.

---

[13]  *See* Cong. Rsch. Serv., IF12595, *U.S.-Canada Trade Relations* (July 18, 2025), https://www.congress.gov/crs-product/IF12595#; U.S. Energy Info. Admin., *U.S. Uranium Production Up in 2022 after Reaching Record Lows in 2021* (Aug. 17, 2023), https://www.eia.gov/todayinenergy/detail.php?id=60160#.

[14]  U.S. Energy Info. Admin., *Last Year's U.S.-Canada Energy Trade Was Valued Around $150 Billion*, (July 30, 2025), https://www.eia.gov/todayinenergy/detail.php?id=65825.

[15]  *See* Canadian Ass'n of Petroleum Producers, *Canadian Exports of Crude Oil and Natural Gas* (Apr. 2025), https://www.capp.ca/wp-content/uploads/2025/02/Canadian-Exports-of-Crude-Oil-and-Natural-Gas.pdf.

As elaborated below, enforcement of the 2020 Shutdown Notice would violate the United States' obligations to Canada under the Treaty.  On October 4, 2021, Canada formally invoked the Article IX dispute resolution process regarding the 2020 Shutdown Notice.  *See* Attachment A.  That dispute resolution process is ongoing, and Canada is diligently pursuing a resolution.

Second, Line 5 is vitally important to Canada's energy security and economic prosperity.  Since 1953, Canada has relied on Line 5 to transport hydrocarbons from producers in western Canada to users in central Canada and the midwestern United States.[16]  Line 5 currently transports up to 540,000 barrels per day of predominantly western Canadian hydrocarbons (light and synthetic crude oil and natural gas liquids

---

[16] Canada focuses here on Canadian interests, but Line 5 is also an important source of fuel for businesses and consumers in midwestern U.S. States—including Michigan.  A 2022 study concluded that a shutdown of Line 5 would deprive regional refineries of about 45% of their crude oil input, Consumer Energy Alliance, *Enbridge Line 5 / Shutdown Impacts on Transportation Fuel* at 6 (2022), https://consumerenergyalliance.org/cms/wp-content/uploads/2022/02/CEA-Line-5-Shutdown-Impacts-on-Transportation-Fuel.pdf ("CEA Report"), and increase transportation fuel expenses in Indiana, Michigan, Ohio and Pennsylvania by about $5 billion per year (including about $2 billion in Michigan), *id.* at 4.  According to a 2021 analysis, Line 5 delivers feedstock to produce 65% of the propane consumed in Michigan's Upper Peninsula (55% for Michigan as a whole), heating homes (including 85% of homes in northern Michigan) and powering essential businesses.  *See* Nicole Jacobs, *As Energy Prices Soar, Shutting Down Line 5 Would Be Devastating For Michigan, Energy in Depth*, Energy in Depth (Nov. 11, 2021), https://www.energyindepth.org/as-energy-prices-soar-shutting-down-line-5-would-be-devastating-for-michigan/.  And "[m]arket demand for [petroleum] products in the Eastern North Central region of the U.S., which consumes much of the commodities transported by Line 5, remains steady or slightly increases through 2050, according to the U.S. Energy Information Administration." U.S. Army Corps of Engineers, *Draft Environmental Impact Statement for Enbridge Line 5 Tunnel Project*, Executive Summary at 4 (May 2025), https://www.line5tunneleis.com/wp-content/uploads/2025/05/Enbridge-Line-5-Tunnel-Project-Draft-Environmental-Statement_Executive-Summary.pdf ("Army Corps DEIS").

("NGLs")) to refineries in central Canada and midwestern United States.[17] Toronto Pearson International Airport, Canada's largest airport, relies heavily upon refineries supplied by Line 5 for jet fuel supplies.  Line 5 supplies over 60% of Quebec's crude oil needs and over 50% of the feedstock used by Ontario's refineries to make gasoline and other fuels.  Line 5 is also the main source of NGLs to produce propane for the entire Great Lakes region, on both sides of the U.S.-Canada border.

In western Canada (Alberta and Saskatchewan), the loss of Line 5 would have a devastating impact on the economy.  In the context of a pipeline system already operating at close to full capacity, a Line 5 shutdown would displace up to 400,000 barrels per day of oil originating from Alberta and Saskatchewan and approximately 80,000 barrels per day of NGLs.  Line 5 is the only pipeline that can deliver NGLs from western Canada to a specialized facility in central Canada (Sarnia, Ontario), which is the main source of propane used by households and industry in Ontario, Quebec, Michigan, and the Great Lakes region.  As of 2021, Sarnia's refining and petrochemical complex employed more than 4,900 people and indirectly generated an additional 23,500 jobs which could be impacted by a shutdown of Line 5.[18]

---

[17] *See id.*

[18] *Hearing on the Economic Relationship between Canada and the United States before the Special Comm. on the Econ. Relationship Between Canada and the United States*, 43d Parliament (Testimony of Bill Walker, Ontario Associate Minister of Energy, Mar. 30, 2021), https://www.ourcommons.ca/DocumentViewer/en/43-2/CAAM/meeting-6/evidence.

The market could not adapt to a shutdown of Line 5 without serious harm to North American energy security and economic prosperity.[19]  Alternative existing pipeline routes are not viable and are already at or close to capacity.[20]  North America's integrated rail system, already subject to seasonal reliability constraints in the peak winter months and disruptions, lacks capacity to handle such a volume and, even if it did, diversion to oil-by-rail would significantly increase costs, entail increased greenhouse gas emissions during the transportation process, raise additional environmental concerns, and displace other essential goods (such as grain) that travel by rail.[21]  A shutdown would cause massive revenue losses and potentially significant job losses in the energy sector in Alberta and Saskatchewan, while at the same time severely disrupting the supply and increasing the price of fuel

---

[19] *See, e.g.*, Hart Energy, *Report: Enbridge Line 5 Pipeline Closure Impacts* (June 27, 2019), https://www.hartenergy.com/exclusives/report-closure-enbridge-line-5-would-have-huge-impact-181010.

[20] Alternative pipeline routes would also raise more environmental concerns: "the alternative southern pipeline route would cross 8 rivers, 24 streams, 5 drainage canals, 231 miles of wetlands, 13 protected areas, and 52.9 miles of highly populated areas, and could expose 11 well-head protection areas and two community drinking water well areas to a potential oil spill" and "the southern pipeline route exhibits a greater failure frequency and safety risk when compared to the tunneling alternative." *In the Matter of the Application for the Authority to Replace and Relocate the Segment of Line 5 Crossing the Straits of Mackinac into a Tunnel Beneath the Straits of Mackinac*, No. U-20763-1454 at 338 (Mich. Pub. Serv. Comm. Dec. 1, 2023), https://mi-psc.my.site.com/s/filing/a008y00000475LDAAY/u207631454 ("MPSC Order").

[21] In its preliminary review of the Line 5 Wisconsin Relocation Project, the U.S. Army Corps of Engineers found that Line 5 alternatives—such as rail, truck, or hybrid transportation—would be economically infeasible and have greater environmental impacts than continued operation of Line 5. *See* U.S. Army Corps of Engineers, *Draft Decision Document* at 35–37 (May 20, 2024), https://www.mvp.usace.army.mil/Portals/57/docs/regulatory/Enbridge/EnbridgeLine5/DCDD/L5R%20Draft%20CDD%2020240520_508_final.pdf.

across Quebec and Ontario.  In sum, the economic impacts of a shutdown would be severe, both for crude oil and NGLs producers in the west, and for downstream refineries and facilities in central Canada and midwestern United States that produce refined products for industry and consumers.[22]

Canada shares Michigan Officials' interest in protecting the environment of the Great Lakes region.  A clean and responsibly managed Great Lakes environment is crucial for the public interest and the economies of both Canada and the United States.  To that end, and consistent with Article IV(1) of the Treaty, Canada is strongly supportive of rigorous regulation of Line 5's safety, based on sound science, by the appropriate U.S. Government regulatory agency, PHMSA.  Canada understands that Line 5 meets PHMSA's requirements, and in its 72-year history, there has never been a pollution event at the Mackinac Straits section of Line 5.[23]

Canada also strongly supports voluntary and economically feasible enhancements to pipeline safety, even where not required by regulation. Accordingly, Canada supports the project to house Line 5 inside the proposed Great Lakes Tunnel, which would obviate Michigan Officials' concerns about potential "anchor strikes and other external impacts to the Pipelines," 2020 Shutdown Notice,

---

[22] *See generally* CEA Report, *supra* n.16.

[23] In June 2020, the pipeline operations were subject to a temporary partial shutdown after an accidental anchor drop incident and a cable drag incident.  *See* 2020 Shutdown Notice, ECF No. 1-1 at PageID.27–28.  However, no spill resulted and PHMSA found it unnecessary to continue the shutdown after additional precautions were implemented.

11

ECF 1-1 at PageID.27, while creating critical transportation and communications infrastructure and jobs in Michigan.[24]  The Michigan Public Service Commission has approved Enbridge's application for permission to house the Mackinac Straits section of Line 5 inside that Tunnel.[25]  Canada understands that Enbridge is awaiting a permit from the U.S. Army Corps of Engineers, which has projected that it will issue its final Record of Decision in Fall 2025.[26]  Once the Tunnel Project is fully permitted and completed, the existing Mackinac Straits section of Line 5 can be safely decommissioned without interrupting the flow of hydrocarbons along Line 5—enhancing long-term safety without violating the 1977 Treaty and without

---

[24] *See* Attachment B (Canada's comments to U.S. Army Corps of Engineers on the Great Lakes Tunnel Project, dated Oct. 14, 2022); Attachment C (Canada's supplemental comments to the U.S. Army Corps of Engineers on the Great Lakes Tunnel Project, dated June 27, 2025).

[25] MPSC Order.  The Michigan Department of Environment, Great Lakes and Energy ("MEGLE") also initially approved Enbridge's application for a permit for surface facilities associated with the Tunnel, *see* Mich. Dep't of Env't, Great Lakes, & Energy, *Draft Permit for Countersignature; Submission Number HNY-NHX4-FSR2Q* (Jan. 29, 2021), https://www.michigan.gov/-/media/Project/Websites/egle/Documents/Multi-Division/Line-5/EGLE/2021-01-29-Draft-Permit-for-Countersignature.pdf, but Enbridge has now reapplied to MEGLE, and that application is pending, *see* Mich. Dep't of Env't, Great Lakes, & Energy, *Line 5: Applicable Permits,* https://www.michigan.gov/egle/about/featured/line5/permits.

[26] *See* U.S. Army Corps of Engineers, *Line 5 EIS/NEPA Timeline*, https://www.line5tunneleis.com/nepa-timeline-deis/.  The Army Corps determined that special emergency permitting procedures should apply to accelerate its permitting process for the Tunnel, pursuant to Executive Order 14156, *Declaring a National Energy Emergency* (Jan. 20, 2025).  *See* U.S. Army Corps of Engineers, *Use of Special Processing Procedures for Review of the Enbridge Line 5 Tunnel Project* (Apr. 15, 2025), https://media.defense.gov/2025/Apr/15/2003689654/-1/-1/0/PUBLIC%20NOTICE%20DETROIT%20DISTRICT,%20PERMIT%20APPLICATION%20NO.%20LRE-2010-00463-56-A19.PDF.

impairing energy security and economic prosperity for both Canada and the United States.

## ARGUMENT

## I.    The Court Must Give Effect To The 1977 Treaty Because It Is Self-Executing.

The 1977 Treaty represents an express and reciprocal binding commitment the United States and Canada made under international law not to impede or interfere with the pipeline transit of hydrocarbon products from anywhere in Canada to anywhere else in Canada via the United States, or vice versa:

> No public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbon in transit.

1977 Treaty, Art. II(1). The protections the Treaty provides to binational energy infrastructure, such as Line 5, are of the utmost importance to Canada.  Giving full and proper effect to the Treaty is necessary to uphold the United States' commitments under international law and to further shared U.S.-Canada public interests in energy security and cross-border cooperation.

At an earlier stage of this litigation, Michigan Officials denied that the Treaty is self-executing.  ECF No. 73 at PageID.564–65 n.7 ("Michigan Br.").  However, it plainly is self-executing.  The United States has acknowledged that the 1977 Treaty meets the test for a self-executing treaty set by the U.S. Supreme Court.  *See*

US *Bad River* Amicus Br. at *30 n.7 ("In the view of the United States, Article II's prohibition is self-executing under traditional canons of treaty construction: it is mandatory, precise, and needs no legislation to make it operative.") (citing *Medellín v. Texas*, 552 U.S. 491, 505–06 (2008)).[27]

Under *Medellín*, a treaty is self-executing when it "operates of itself without the aid of any legislative provision."  552 U.S. at 505.  Whether a treaty is self-executing depends on whether "the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms."  *Id.*  The treaty need not "provide for self-execution in so many talismanic words."  *Id.* at 521.  Instead, courts must "decide whether a treaty's terms reflect a determination by the President who negotiated it and the Senate that confirmed it that the treaty has domestic effect."  *Id.*

"In construing a treaty, as in construing a statute, [courts] first look to its terms to determine its meaning."  *United States v. Alvarez-Machain*, 504 U.S. 655, 663 (1992).  The 1977 Treaty's text clearly indicates that it is self-executing.  It uses mandatory language (*e.g.,* "No public authority in the territory of either Party shall . . ." in Articles II(1), III(1), and III(2)) and imposes specific, justiciable rules (*e.g.,* precise definitions in Article I; detailed caveats/exceptions in Articles IV, V and VI) and procedures (in Article IX).  In other words, it sets rules for courts to apply—not

---

[27] Enbridge likewise argues that the 1977 Treaty is self-executing.  ECF No. 125 at PageID.1596–97 ("Enbridge Br.").

just goals for later implementation by the political branches of government.  The Treaty also expressly provides that it "shall enter into force on the first day of the month following the month in which Instruments of Ratification are exchanged." Art. X(2).

The Treaty's negotiation and ratification history confirms its self-executing status.[28]  In a letter to Congress, the State Department explicitly stated: "The agreement is self-executing upon its entry into force, and U.S. implementing legislation accordingly will not be required."  S. Exec. Rep. No. 95-9, at 83 (1977). Additionally, the Chairman of the Senate Foreign Relations Committee noted that the Treaty "will apply immediately [*i.e.,* without any implementing legislation] to the pipeline carrying Canadian oil through the United States to Canadian markets [*i.e.,* Line 5]." 123 Cong. Rec. 26275, at 26281 (Aug. 3, 1977).   Those uncontradicted statements by senior Executive Branch and Senate officials during the ratification process should be given great weight.  *See, e.g.*, *Cook v. United States*, 288 U.S. 102, 119 n.19 (1933) (relying on pre-ratification statement of Secretary of State to conclude treaty was self-executing); *United States v. Postal*,

---

[28] Ratification history for treaties carries more weight than legislative history typically does for statutes. *See, e.g.*, *Doe v. Etihad Airways, PJSC*, 870 F.3d 406, 418 (6th Cir. 2017) ("[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty [and] the negotiations that produced the treaty.") (citation omitted).

589 F.2d 862, 881–83 (5th Cir. 1979) (relying on pre-ratification statements of State Department officials and U.S. negotiators to conclude treaty was not self-executing). As a self-executing treaty, the 1977 Treaty constitutes Federal law that this Court can and must effectuate.  U.S. Const., Art. VI, cl. 2 ("all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby"); *see Medellin,* 552 U.S. at 505 & n.2 (a self-executing treaty is "equivalent to an act of the legislature" and has "automatic domestic effect as U.S. law upon ratification"); *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 346–47 (2006) ("where a treaty provides for a particular judicial remedy, there is no issue of intruding on the constitutional prerogatives of the States or the other federal branches.  Courts must apply the remedy as a requirement of federal law."); *Whitney v. Robertson*, 124 U.S. 190, 194 (1888) ("By the constitution, a treaty is placed on the same footing, and made of like obligation, with an act of legislation.").

Michigan Officials previously argued that "Canada is not the United States and does not speak for it."  Michigan Br., ECF No. 73 at PageID.566.  But Canada's formal invocation of Article IX in 2021, reinforced by its subsequent amicus briefs, is ample to trigger this Court's obligation to give legal effect to the Treaty, notwithstanding that neither of the Treaty Parties, Canada and the United States, are parties in this case.  In *United States v. Rauscher*, 119 U.S. 407, 430–31 (1886), for

16

example, the Supreme Court held that an extradited defendant could invoke jurisdictional limits set by an extradition treaty without any involvement of the treaty parties.  As a matter of comity, a domestic court should not presume to enforce a foreign sovereign's treaty right if that foreign sovereign does not want it enforced: "it is up to the offended nations to determine whether a violation of sovereign interests occurred and requires redress."  *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259–60 (7th Cir.1990) (citation omitted) (declining to enforce a foreign sovereign's international treaty rights against the United States because the foreign sovereign raised no treaty concerns in or out of court).  Here, however, Canada has clearly and properly invoked its rights under the Treaty.

## II.    Michigan Officials Cannot Shut Down Line 5 While Canada Has A Colorable Argument, Pending In The Article IX International Dispute Resolution Process, That Doing So Would Violate the 1977 Treaty.

In order to give effect to both Article II(1) and Article IX, domestic courts should (1) defer to the Article IX process, which Canada has properly invoked, for the ultimate resolution of Treaty issues, and act accordingly once such a resolution is reached, and (2) ensure that in the interim, no actions are taken by domestic public authorities (including State officials) that would risk being determined to violate the Treaty when the Article IX process concludes.  Canada does not suggest that a frivolous Treaty assertion should preclude the normal application of domestic law pending international dispute resolution.  But once a colorable Treaty objection is

raised by a Treaty Party who invokes Article IX—and, as explained in Section III below, Canada's objection to the 2020 Shutdown Notice amply meets that threshold—domestic courts must prevent actions identified by the invoking Treaty Party as potential Treaty violations unless and until the Article IX process has concluded in a determination that those actions are permissible under the Treaty.

Even apart from the specifics of Article IX, general constitutional principles lead to the same conclusion. A unilateral shutdown imposed by State officials would entail State interference in the Federal Executive Branch's conduct of foreign relations, effectively disabling the United States from speaking with "one voice" on an important international matter. That would contravene the U.S. Constitution's allocation of authority between the Federal and State governments. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) ("There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the concern for uniformity in this country's dealings with foreign nations that animated the Constitution's allocation of the foreign relations power to the National Government in the first place.") (internal quotations omitted); *United States v. Locke*, 529 U.S. 89, 103 (2000) (concluding that State regulations on international shipping were preempted where they would impair the ability of United States to speak with one voice on an issue of international commerce affected by international treaties); *Japan Line, Ltd. v. Cnty.*

*of Los Angeles*, 441 US 434, 449 (1979) (negative Foreign Commerce Clause protects the Government's ability to speak with "one voice" in regulating commerce with foreign countries); *Zschernig v. Miller*, 389 U.S. 429, 440–41 (1968) ("[State] regulations must give way if they impair the effective exercise of the Nation's foreign policy" or "conflict with a treaty.").[29]

## III. Canada's Position That A State-Mandated Shutdown Of Line 5, As Sought By Michigan Officials, Would Violate The 1977 Treaty Is At Least Colorable.

Canada reiterates that it is the Article IX process—not this Court—that is charged with making substantive determinations under the 1977 Treaty.  But this Court should be in no doubt that Canada has a substantial basis for contending that a compelled shutdown of Line 5, as sought by Michigan Officials, would violate the Treaty's substantive provisions.  Thus, Canada respectfully submits that injunctive relief prohibiting Michigan Officials from shutting down Line 5 is appropriate.

As its Preamble recites, the Treaty was entered into and ratified "to ensure the uninterrupted transmission by pipeline through the territory of one Party of hydrocarbons not originating in the territory of that Party, for delivery to the territory

---

[29] Consistent with these constitutional principles, the United States raised concerns in the *Bad River* case that a Line 5 shutdown compelled by a public authority other than the Executive Branch of the Federal Government would impair the United States' "manifest interest in complying with its treaty obligations" and the "public interest in avoiding a dispute with Canada over whether a shutdown order would violate the [1977] Treaty and in recognizing the importance of the broader diplomatic and trade relationship with Canada."  US *Bad River* Amicus Br. at *30; *see also* Enbridge Br., ECF No. 125 at PageID.1594–97.

of the other Party."  That goal reflects a national policy imperative for both Treaty Parties: to ensure energy security and economic prosperity.  Further, the 1977 Treaty's text, and its negotiation and ratification history, identify a specific concern it was intended to address: interference with pipelines by sub-national authorities that might prioritize local over national interests.  Concerns that Canadian Provinces or U.S. States might interfere with transit pipelines were a central theme of both Treaty negotiations and the U.S. Senate approval process.[30]

Consistent with those concerns, Articles II(1) and Article III(1) generally prohibit interference with transit pipelines by any "public authority *in the territory* of either Party" (emphasis added)—not just national government entities.  As a matter of plain meaning, State officials acting in their official capacity are "public authorit[ies] in the territory of" the United States.[31]  Equally clearly, Line 5 is a transit pipeline carrying hydrocarbons in transit subject to the protection of the

---

[30] For example, during U.S. Senate hearings on the Treaty, William W. Brackett, Chairman of the Alaska Arctic Gas Pipeline Company, testified to the Senate Foreign Relations Committee that Canadian Provincial Governments would be considered "public authorit[ies]" under Article II.  S. Exec. Rep. No. 95-9, at 51.

[31] Holding the United States responsible under the Treaty for acts of State officials is consistent with well-established international law.  "A party may not invoke the provisions of its internal law as justification for its failure to perform a treaty."  *Vienna Convention on the Law of Treaties*, May 23, 1969, Art. XXVII, 1155 U.N.T.S. 331, 339.  Accordingly, a nation-state "cannot plead its federal structure to avoid complying with an international obligation."  *Garrido & Baigorria v. Argentina*, Judgment of Aug. 27, 1998, Inter-Am Ct. HR (ser. C) No. 39, P46 (1998); *see also El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 175 (1999) ("the nation-state, not subdivisions within one nation, is the focus of [an international treaty] and the perspective of our treaty partners.").

Treaty—indeed, it was one of a handful of existing pipelines identified by the State Department as subjects of the Treaty during the Senate hearings on the Treaty. *See* S. Exec. Rep. No. 95-9, at 40, 80; Enbridge Br., ECF No. 125 at PageID.1594. The 2020 Shutdown Notice and any efforts to enforce it would therefore violate the substantive provisions of the Treaty unless they fall within the Treaty's enumerated exceptions and qualifications to its general prohibition under Article II(1).

The only Treaty provisions that create potentially relevant exceptions or qualifications are Articles IV(1) and V(1). The 2020 Shutdown Notice relies as a legal matter on the common law public trust doctrine and the "standard of due care" language found in the 1953 Straits of Mackinac Pipe Line Easement, and as a factual matter on the alleged potential for oil spills from the Mackinac Straits section of Line 5. ECF No. 1-1 at PageID.23, 32–33. There is, at a minimum, a strong case that Michigan Officials' stated justifications for compelling a shutdown fail to meet the Treaty's express requirements for invoking Articles IV and V.

First, nothing in the Treaty plausibly permits Michigan to shut Line 5 down because it concludes, pursuant to the public trust doctrine, that Line 5's routing is contrary to Michigan's interests. In Article VI, the Treaty Parties reserved the right to regulate construction and routing for ***new*** pipelines. That could well permit reference to the public trust doctrine before the initial grant of a pipeline easement. But Line 5 is not new. When the Treaty was ratified, Line 5 had already been

21

operating for almost a quarter of a century with an express permanent easement across the Mackinac Straits that Michigan granted Enbridge's predecessor in 1953, and Line 5, with its existing route, was one of the handful of pipelines the Treaty was specifically intended to protect. *See* S. Exec. Rep. No. 95-9, at 40, 80.  With respect to *existing* pipelines—such as Line 5—Article II(1) prohibits interference, and the Treaty provides no routing regulation/easement/public trust exception.  If a State official could override Article II(1) at any time based on state law arguments about an alleged public trust defect in an easement that pre-dates the Treaty, the protection the Treaty Parties agreed to provide to Line 5 and other pipelines built before the Treaty was ratified in 1977 would be illusory.

Second, there is no basis for application of the one clear exception to Article II(1) in the Treaty, Article V(1):

> In the event of an actual or threatened natural disaster, an operating emergency, or other demonstrable need temporarily to reduce or stop for safety or technical reasons the normal operation of a Transit Pipeline, the flow of hydrocarbons through such Transit Pipeline may be temporarily reduced or stopped in the interest of sound pipeline management and operational efficiency by or with the approval of the appropriate regulatory authorities of the Party in whose territory such disaster, emergency or other demonstrable need occurs.

Michigan Officials have not identified any environmental disaster, emergency, or other "demonstrable need," within the meaning of Article V, to shut down Line 5 temporarily.  Line 5 has operated across the Mackinac Straits for 72 years without any "disaster."  And Michigan Officials have not sought the only relief

contemplated by Article V(1)—a temporary shutdown.  Instead, the 2020 Shutdown Order purports to compel a permanent shutdown.

Third, Michigan Officials' arguments that the 2020 Shutdown Order is permitted by Article IV(1), Michigan Br., ECF No. 73 at PageID.561–64, are unpersuasive.  Article IV(1) qualifies Article II(1) by permitting certain "regulations by the appropriate governmental authorities having jurisdiction" over transit pipelines.  However, Article II(1) identifies Article V's provision for temporary shutdowns in emergency circumstances as the only exception to its prohibition on measures impeding uninterrupted flow of hydrocarbons in transit through transit pipelines.  Article IV(1) is designed to operate as a qualification, but not an exception, to Article II(1).  It permits only certain "regulations"—involving matters such as pipeline safety, technical construction and operation "standards," "environmental protection," and financial and reporting requirements—which are compatible with the continued pipeline operation Article II(1) protects.  Article IV says nothing about "reduc[ing] or stop[ping]" hydrocarbon flow, as in Article V, or "impeding, diverting, redirecting or interfering with" that flow, as in Article II.  On its face, Article IV(1) authorizes certain regulatory conditions on pipeline operation, not shutdown orders.  Moreover, if Article IV were read to authorize permanent shutdown orders, Article V would serve no function: there would be no reason to provide for a shutdown under Article V, which must be "temporary" and justified

23

by an "emergency," if (as Michigan Officials appear to assume) Article IV provides for permanent shutdowns in non-emergency situations.  Instead, to make Articles II(1), IV and V work together and to avoid violating the canon against surplusage,[32] Article IV must be read as limited to regulations short of a shutdown.

There are also other grounds to conclude that Article IV is not applicable here. Article IV regulations can only be imposed "by the appropriate governmental authorities having jurisdiction."  Consistent with the Pipeline Safety Act, 49 U.S.C. §§ 60102, 60104(c), on matters relating to interstate pipeline safety, that authority in the United States is PHMSA, not Michigan Officials.  *See* Enbridge Br., ECF No. 125 at PageID.1598.  Further, Article IV requires regulations to be "just and reasonable." 1977 Treaty, Art. IV(2).  At a minimum, a compelling rationale should be required to justify a mandatory shutdown of Line 5 after seven decades of safe operation across the Mackinac Straits during which Enbridge (and its predecessor) and thousands of Canadian and American energy producers, transporters and users have invested billions of dollars and structured their businesses and lives in reliance on Line 5.  The 2020 Shutdown Notice does not appear to provide such a rationale.[33]

---

[32] *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction . . . 'render[s] an entire subparagraph meaningless,' this Court has noted, the canon against surplusage applies with special force.") (citation omitted).  The canon applies to treaty interpretation as well as statutory interpretation. *See, e.g.*, *United States v. Ali*, 718 F.3d 929, 937 (D.C. Cir. 2013) (recognizing that "interpretations resulting in textual surplusage are typically disfavored.").

[33] Michigan Officials' earlier brief emphasized that "Michigan's public trust doctrine is a generally applicable and non-discriminatory law that is deeply rooted in . . . precedent."  Michigan Br., ECF No. 73 at PageID.562.  Canada does not dispute that.  But that does not mean that every application

Moreover, any case for shutting down Line 5 permanently based on long-term safety concerns is now undermined by the prospect that the Great Lakes Tunnel Project may soon provide a means of enhancing environmental protection while keeping hydrocarbons flowing along Line 5.[34]

\* \* \*

Canada has—at the very minimum—a colorable argument that Michigan Officials' 2020 Shutdown Notice and any efforts to enforce it would violate the Treaty.  Canada is not asking this Court for a ruling that Canada will ultimately prevail on that claim; Article IX assigns that determination to the international dispute resolution process.  But this Court has an important role to play by enforcing the Treaty to ensure that the United States' obligations are not violated, the Article IX process is not undermined, and the United States' ability to speak in one voice on this important foreign policy matter is not undermined, by a State-compelled shutdown while the Article IX process is ongoing.

---

of that doctrine—which, according to Michigan Officials, apparently affords State officials broad discretion to reverse the State's prior decisions without regard to reliance interests—constitutes "just and reasonable" regulation within the meaning of a Treaty designed to protect the broader binational interest in transit pipelines.

[34] Although the Great Lakes Tunnel Project would divert Line 5 into the proposed Tunnel, it raises no Article II(1) concerns because Article II(1) prohibits the "diver[sion]" of a transit pipeline only when that diversion is compelled by a "public authority" (such as Michigan Officials).  Both the pipeline's operator, Enbridge, and Canada, support the Tunnel Project, which would further the Treaty's objective of ensuring the safe and uninterrupted flow of hydrocarbons through Line 5 on a long-term basis.

## IV.    The Great Lakes Tunnel Project Offers A Lawful, Cooperative Way Forward In The Public Interest.

This case implicates important transnational public interests in energy security, prosperity and environmental protection.   Relief against a compelled shutdown of Line 5 would serve the public interest by facilitating progress towards a cooperative solution that will serve all those interests: the re-routing of the pipeline, housed inside the proposed Great Lakes Tunnel.

The Great Lakes Tunnel Project would eliminate the possibility of pipeline failure due to an anchor strike (the primary environmental risk emphasized by the 2020 Shutdown Notice) and enhance the overall safety of the pipeline.[35]   Enbridge has applied for State and Federal permits and invested millions of dollars in the Tunnel Project.  Canada's understanding is that the construction process can begin as soon as State and Federal permits are in place.  All that is needed is for the U.S. Army Corps of Engineers to conclude its environmental review (which is expected to occur later this year) and approve the Project and for the State of Michigan Department of Environment, Great Lakes and Energy to conclude its permitting process.  Once that occurs, Line 5's safety will be enhanced without disrupting its

---

[35] *See* Army Corps DEIS, Executive Summary at 4, 30, 31–32.  The Army Corps notes that the Great Lakes Tunnel Project is an outgrowth of a 2018 agreement between Enbridge and the State of Michigan in which the State acknowledged that the Project would enhance the safety of Line 5 "in furtherance of the public's interest in the protection of waters, waterways or bottomlands held in public trust by the State of Michigan."  *Id.* at 4.

operations, thereby protecting the vital energy security and economic interests it serves in both Canada and the United States.

## CONCLUSION

Canada respectfully supports Enbridge's Motion for Summary Judgment to the extent of requesting that the Court enjoin Michigan Officials from compelling a shutdown of Line 5 while the Article IX process is ongoing.

August 8, 2025

Respectfully submitted,

/s/ *Gordon D. Giffin*
Gordon D. Giffin
   *Counsel of Record*
Simon A. Steel
Parker B. Bednasek
DENTONS US LLP
303 Peachtree St., Ste. 5300
Atlanta, GA 30308
(404) 527-4020
gordon.giffin@dentons.com

*Counsel for Amicus Curiae*
*the Government of Canada*

## CERTIFICATE OF COMPLIANCE

Counsel hereby certifies that the foregoing Amicus Brief complies with Local Civil Rule 7.2(b), because it contains 7,158 words, excluding material exempted by Local Rule 7.2(b)(i).    The word count was determined using Microsoft Word Version 2016.

/s/ *Gordon D. Giffin*
Gordon D. Giffin
DENTONS US LLP
gordon.giffin@dentons.com

*Counsel for Amicus Curiae*
*the Government of Canada*

## CERTIFICATE OF SERVICE

Counsel hereby certifies that the foregoing Amicus Brief, including its three Attachments, was served on all parties of record via the ECF filing system on August 8, 2025.

*/s/ Gordon D. Giffin*
Gordon D. Giffin
DENTONS US LLP
gordon.giffin@dentons.com

*Counsel for Amicus Curiae*
*the Government of Canada*