UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENBRIDGE ENERGY, LIMITED
PARTNERSHIP, ENBRIDGE ENERGY
COMPANY, INC., and ENBRIDGE ENERGY
PARTNERS, L.P.,

      Plaintiffs,

v

GRETCHEN WHITMER, the Governor of the
State of Michigan in her official capacity, and
SCOTT BOWEN, Director of the Michigan
Department of Natural Resources in his
official capacity,

      Defendants.

No. 1:20-cv-01141-JTN-RSK

HON. ROBERT J. JONKER

---

## DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' RENEWED MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS I AND III OF THE COMPLAINT

Keith D. Underkoffler (P84854)
Echo Aloe (P86363)
Assistant Attorneys General
Attorneys for Defendants
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock (P71246)
Special Assistant Attorney General
Attorney for Defendants
Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130
dbock@fsbrlaw.com

Dated:  September 5, 2025

## TABLE OF CONTENTS

Page

Table of Contents..............................................................................................i

Index of Authorities.......................................................................................iii

Concise Statement of Issues Presented ...................................................... ix

Controlling or Most Appropriate Authority.................................................. ix

Introduction .................................................................................................... 1

Statement of Facts and Procedural History ................................................. 1

Legal Standard ............................................................................................... 3

Argument ......................................................................................................... 3

I.      Enbridge is not entitled to summary judgment on Count I. ........................... 3

        A.      Count I is not properly before the Court. ................................................. 4

        B.      Count I fails on the merits. ...................................................................... 7

                1.      The Michigan Officials have not adopted or continued in
                        force any pipeline safety standards. ........................................... 10

                2.      The decision to revoke or terminate an easement—like
                        the decision to grant one—is a location and routing
                        decision outside the ambit of the PSA. ...................................... 12

                3.      The Easement's revocation was not based on pipeline
                        safety standards.......................................................................... 15

                        a.      Section I.B of the Notice does not adopt or continue
                                in force a pipeline safety standard. ................................. 15

                        b.      Section I.C of the Notice does not adopt or continue
                                in force a pipeline safety standard. ................................. 16

                        c.      Enbridge's state law challenges to Defendants'
                                application of the public trust doctrine should be
                                resolved before considering whether it is
                                preempted........................................................................ 19

i

4.     The PSA did not nullify the preexisting terms and conditions of easements over public-trust lands. ........................ 20

II.    Enbridge is not entitled to summary judgment on Count III. ......................... 25

    A.    Count III is an improper claim for violation of the Treaty. ................... 25

    B.    Enbridge's Treaty claim fails on the merits. ........................................ 28

    C.    The Notice does not violate the Foreign Affairs Doctrine. ................... 34

    D.    Nothing authorizes domestic courts to enjoin state action based on a "colorable" Treaty claim. ............................................................. 37

Conclusion and Relief Requested ............................................................................. 39

# INDEX OF AUTHORITIES

<u>Page</u>

## Cases

*Abrahamson v. Florida Gas Transmission Co.*,
  909 F. Supp. 410 (E.D. La. 1992)................................................................................ 19

*AFSCME Mich. Counsel 25 v. City of Detroit*,
  704 N.W.2d 712 (Mich. 2005)................................................................................... 24

*Allen v. United States*,
  83 F.4th 564 (6th Cir. 2023) ....................................................................................... 9

*Altria Grp., Inc. v. Good*,
  555 U.S. 70 (2008) ...................................................................................................... 8

*Am. Energy Corp. v. Texas Eastern Transmission*,
  *LP*, 701 F. Supp. 2d 921 (S.D. Ohio 2010)............................................................... 18

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ....................................................................................... 35, 36, 37

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ............................................................................................... 6, 27

*Askew v. Berrien County*,
  No. 1:24-cv-1010, 2024 WL 4879699 (W.D. Mich. Nov. 25, 2024) (Jonker, J.) ........ 6

*Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad
  River Reservation v. Enbridge Energy Co.*,
  626 F. Supp. 3d 1030 (W.D. Wis. 2022)......................................................... passim

*Bates v. Dow Agrosciences LLC*,
  544 U.S. 431 (2005) (Stevens, J., joined by Kennedy, J. and Breyer, J.)................. 8

*BHK Realty, LLC v. Narragansett Elec. Co.*,
  542 F. Supp. 3d 133 (D.R.I. 2021)............................................................................. 5

*Brown v. City of Albion*,
  136 F.4th 331 (6th Cir. 2025) ................................................................................... 3

*Cal. Rest. Ass'n v. City of Berkeley*,
  89 F.4th 1094 (9th Cir. 2024) (O'Scannlain, J, concurring) ................................... 8

iii

*Chamber of Commerce v. Whiting*,
   563 U.S. 582 (2011) ...................................................................... 35

*Cheverez v. Plains All Am. Pipeline, LP*,
   No. CV15-4113, 2016 WL 4771883 (C.D. Cal. Mar. 4, 2016)................................. 18

*Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*,
   767 F. Supp. 3d 556 (W.D. Mich. 2025)................................................. 38

*Cipollone v. Liggett Grp., Inc.*,
   505 U.S. 504 (1992) (Blackmun, J. concurring, joined by Kennedy, J.)................... 8

*Cisneros v. Alpine Ridge Grp.*,
   508 U.S. 10 (1993) ...................................................................... 30

*Collins v. Gerhardt*,
   211 N.W.2d 115 (Mich. 1926)............................................................ 14

*Columbia Gas Transmission Corp. v. Drain*,
   191 F.3d 552 (6th Cir. 1999) ........................................................... 22

*Columbia Gas Transmission, LLC v. Singh*,
   707 F.3d 583 (6th Cir. 2013) ........................................................... 22

*Commonwealth of Puerto Rico v. Franklin California Tax-free Trust*,
   579 U.S. 115 (2016) ...................................................................... 8

*Couser v. Shelby County*,
   139 F.4th 664 (8th Cir. 2025) ................................................... 11, 16, 18

*CSX Transp., Inc. v. Easterwood*,
   507 U.S. 658 (1993) ...................................................................... 8

*CTS Corp. v. Waldburger*,
   573 U.S. 1 (2014) (Kennedy, J., joined by Kagan, J.) ................................... 8

*Davis v. Sunoco Pipeline LP*,
   No. 346729, 2020 WL 3397386 (Mich. Ct. App. June 18, 2020)........................... 18

*Dunbar v. Seger-Thomschitz*,
   615 F.3d 574 (5th Cir. 2010) ........................................................... 37

*Enbridge Energy v. Town of Lima*,
   No. 13-cv-187, 2013 WL 12109106 (W.D. Wis. Apr. 4, 2013) ............................. 18

*EPLET, LLC v. DTE Pontiac N., LLC*,
   984 F.3d 493 (6th Cir. 2021)............................................................ 24

iv

*Glass v. Goeckel,*
    703 N.W.2d 58 (Mich. 2005).................................................................. 2, 17

*Grant v. EPA,*
    No. 1:22-cv-0186, 2023 WL 5016608 (W.D. Mich. June 1, 2023), R&R
    adopted, 2023 WL 6304911 (W.D. Mich. Sept. 28, 2023) ........................................ 7

*Hallstrom v. Tillamook County,*
    493 U.S. 20 (1989) ....................................................................................... 5

*Happel v. Guilford Cnty. Bd. of Educ.,*
    913 S.E.2d 174 (N.C. 2025) ........................................................................... 8

*Idaho v. Coeur d'Alene Tribe of Idaho,*
    521 U.S. 261 (1997) ........................................................................... 1, 8, 14, 36

*Ill. Cent. R. Co. v. Illinois,*
    146 U.S. 387 (1892) ........................................................................................ 1, 16

*Kinley Corp. v. Iowa Utils. Bd.,*
    999 F.2d 354 (8th Cir. 1993) ........................................................................ 13

*Klukavy v. United Nat'l Ins.,*
    654 F. Supp. 622 (E.D. Mich. 1987)............................................................. 25

*Loretto v. Teleprompter Manhattan CATV Corp.,*
    458 U.S. 419 (1982) ....................................................................................... 23

*Mead Corp. v. ABB Power Generation, Inc.,*
    319 F.3d 790 (6th Cir. 2003) ......................................................................... 28

*Medellín v. Texas,*
    552 U.S. 491 (2008) ........................................................................... 25, 26, 29, 36

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) ......................................................................................... 7

*Merrick v. Diago Am. Supply, Inc.,*
    805 F.3d 685 (6th Cir. 2015)........................................................................... 7

*Mich. Corr. Org. v. Mich. Dep't of Corr.,*
    774 F.3d 895 (6th Cir. 2014) ........................................................................... 6

*Mich. Dep't Nat. Res. v. Carmody-Lahti Real Estate, Inc.,* 6
    99 N.W.2d 272 (Mich. 2005)........................................................................ 21

*Michigan v. Enbridge,*
No. 1:20-cv-1142 (W.D. Mich. June 1, 2021) .......................................................... 27

*Nedtweg v. Wallace,*
208 N.W. 51 (Mich. 1926) ................................................................................. 1, 14

*Obrecht v. Nat'l Gypsum Co.,*
105 N.W.2d 143 (Mich. 1960) ................................................................................ 15

*Olympic Pipe Line Co. v. City of Seattle,*
437 F.3d 872 (9th Cir. 2006) ........................................................................... 13, 23

*Penn. Servs. Corp. v. Texas Eastern Transmission, LP,*
No. 2:11-cv-1076, 2011 WL 13234909 (W.D. Pa. Oct. 12, 2011) ............................ 18

*Portland Pipe Line Corp. v. City of S. Portland,*
288 F. Supp. 3d 321 (D. Me. 2017) .............................................................. passim

*PPL Montana, LLC v. Montana,*
565 U.S. 576 (2012) ............................................................................................. 14

*Sanches-Llamas v. Oregon,*
548 U.S. 331, 355 (2006) ..................................................................................... 27

*Seminole Tribe of Fla. v. Florida,*
517 U.S. 44 (1996) ............................................................................................... 27

*SFPP, L.P. v. Union Pac. R.R. Co.,*
No. SACV 05-1015, 2006 WL 8448721 (C.D. Cal. Mar. 20, 2006) ......................... 22

*SFPP, L.P. v. Union Pacific R. Co.,*
274 F. App'x 549 (9th Cir. 2008) ........................................................................... 5

*Shuker v. Smith & Nephew, PLC,*
885 F.3d 760 (3d Cir. 2018) .................................................................................... 8

*Sierra Club v. Clinton,*
Civ. No. 09-2622 (D. Minn. Dec. 2, 2009) ............................................................. 31

*State v. Venice of Am. Land Co.,*
125 N.W. 770 (Mich. 1910) ..................................................................................... 2

*Stokes v. Millen Roofing Co.,*
649 N.W.2d 371 (Mich. 2002) .......................................................................... 24, 25

*TCI of North Dakota, Inc. v. Schriock Holding Co.,*
11 F.3d 812 (8th Cir. 1993) ................................................................................... 23

*Texas Midstream Gas Servs., LLC v. City of Grand Prairie,*
 608 F.3d 200 (5th Cir. 2010) ................................................................. 18

*Torres v. Precision Indus., Inc.,*
 938 F.3d 752 (6th Cir. 2019) ............................................................ 19, 20

*Toth v. Callaghan,*
 995 F. Supp. 2d 774 (E.D. Mich. 2014) ................................................. 20

*United States v. Alaska,*
 521 U.S. 1 (1997) .................................................................................. 23

*United States v. Lahey Clinic Hosp., Inc.,*
 399 F.3d 1 (1st Cir. 2005) ..................................................................... 23

*United States v. Zabawa,*
 719 F.3d 555 (6th Cir. 2013) ................................................................... 9

*United Student Aid Funds, Inc. v. Espinosa,*
 558 U.S. 260 (2010) .............................................................................. 38

*Virginia Uranium, Inc. v. Warren,*
 587 U.S. 761 (2019) .............................................................................. 11

*Washington Gas Light Co. v. Prince George's County,*
 711 F.3d 412 (4th Cir. 2013) ................................................................. 18

*Wiggins v. City of Burton,*
 805 N.W.2d 517 (Mich. Ct. App. 2011) ................................................. 21

*Williams v. City of Mounds View,*
 651 F. Supp. 551 (D. Minn. 1987) ................................................... 13, 23

**Statutes**

15 U.S.C. § 717f(h) ................................................................................... 24

28 U.S.C. § 2201 ........................................................................................ 6

49 U.S.C. § 60102(a)(2) ............................................................................ 10

49 U.S.C. § 60102(a)(2)(B) ....................................................................... 10

49 U.S.C. § 60104(c) ......................................................................... passim

49 U.S.C. § 60104(e) ................................................................. 8, 12, 14, 22

49 U.S.C. § 60105(b) ................................................................................................ 10

49 U.S.C. § 60121(a)(1) ............................................................................................. 4

49 U.S.C. § 60121(a)(1)(A) .................................................................................... 4, 5

**Other Authorities**

25 Am. Jur. 2d *Easements and Licenses* § 61 (May 2025).......................................... 21

*Great Lakes Gas Transmission Co.*,
   46 FERC ¶ 61138 (Feb. 3, 1989).............................................................................. 33

Rafael G. Mora et al.,
   *Pipeline Integrity Management Systems: A Practical Approach* § 2.6.1
   (ASME Press 2016) ............................................................................................... 9

Transit Treaty, U.S.-Canada
   Jan. 28, 1977, 28 U.S.T. 7449 ...................................................................... passim

William S. Dodge,
   *What Does the State Department Think About the Transit Pipelines Treaty?*,
   https://tlblog.org/what-does-the-state-department-think-about-the-transit-
   pipelines-treaty/ (Feb. 15, 2024) ........................................................................ 31

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................. 3

W.D. Mich. LCivR 83.1 ........................................................................................... 20

**Regulations**

49 C.F.R. § 195.0 ..................................................................................................... 10

## CONCISE STATEMENT OF ISSUES PRESENTED

1.  Count I alleges a preemption claim under the Supremacy Clause and Pipeline Safety Act.  But Enbridge failed to comply with the mandatory pre-suit requirements to bring a claim under the Pipeline Safety Act and the Supremacy Clause does not create a cause of action. Is Count I properly before this Court?

2.  The Pipeline Safety Act only preempts state authorities from adopting or continuing in force pipeline safety standards.  Does it preempt the revocation and termination of an easement based on state common law and pursuant to an express termination clause?

3.  Count III alleges that foreign affairs preemption applies because Defendants violated the 1977 Transit Treaty.  But the 1977 Transit Treaty does not provide a private cause of action and includes a remedial scheme that precludes treaty claims from being heard in domestic courts.  Is Count III properly before this Court?

4.  Article IV of the 1977 Transit Treaty reserves the right of public authorities to apply nondiscriminatory regulations, requirements, terms and conditions to transit pipelines regarding matters such as environmental protection.  Does the revocation and termination of an easement based on the public trust doctrine and state property law clearly conflict with U.S. foreign policy?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Authority*:    49 U.S.C. § 60104(c), (e)

*Agreement between the Government of Canada and the Government of the United States of America Concerning Transit Pipelines*, Jan. 28, 1977, U.S.T. 7449

*Portland Pipe Line Corp. v. City of South Portland*, 288 F. Supp. 3d 321 (D. Me. 2017)

*Bad River Band v. Enbridge Energy Company, Inc.*, 656 F. Supp. 3d 1030 (W.D. Wisc. 2022)

ix

## INTRODUCTION

Plaintiffs (Enbridge) stake out a remarkable position in their motion for partial summary judgment.  The Supreme Court has long held that grants authorizing private parties to use the submerged lands beneath the Great Lakes are "necessarily revocable" under the public trust doctrine.  *Ill. Cent. R. Co. v. Illinois*, 146 U.S. 387, 455 (1892).  And the 1953 Easement at issue in this case expressly reserves the State's right to terminate it in the event of breach.  (Easement, ECF No. 1-1, PageID.49.)  Yet, Enbridge asks this Court to declare that Enbridge has a *non-revocable* and *non-terminable* right to use (and profit from) a unique, sensitive, and valuable piece of the State's submerged lands without the State's consent.  Enbridge also asks the Court to enjoin Defendants (Michigan Officials) from exercising the State's property rights and state law duties.  Enbridge invokes two theories of federal preemption to this end, but neither is properly before the Court, and neither does the heavy work Enbridge tries to assign it.  Because Enbridge is not entitled to the extraordinary relief it seeks, its motion should be denied.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Upon its admission to the union in 1837, the State of Michigan acquired title to the bottomlands of the Straits of Mackinac, which run between Michigan's Upper and Lower Peninsulas.  *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 283 (1997); *Nedtweg v. Wallace*, 208 N.W. 51, 52 (Mich. 1926).  These submerged lands have "a unique status in the law."  *Coeur d'Alene*, 521 U.S. at 283.  Michigan holds title to them "in trust for the people," *State v. Venice of Am. Land Co.*, 125 N.W.

1

770, 778–79 (Mich. 1910), and "serves, in effect, as the trustee of public rights in the Great Lakes," *Glass v. Goeckel*, 703 N.W.2d 58, 64–65 (Mich. 2005).

In 1953, Michigan, through its Conservation Commission (now known as the Department of Natural Resources (DNR)) purported to grant Enbridge's predecessor "an easement to construct, lay, maintain, use and operate two (2) pipe lines" on a roughly four-mile strip of submerged lands in the Straits.  (Easement, ECF No. 1-1, PageID.44.)  These Straits Pipelines would become part of a 645-mile-long pipeline that runs from Superior, Wisconsin, to Sarnia, Ontario, which today is owned by Enbridge and known as Line 5.  (Compl., ECF No. 1, PageID.4.)

In November 2020, Michigan, through the Michigan Officials, issued a Notice of Revocation and Termination of Easement to Enbridge.  (Notice, ECF No. 1-1, PageID.22–41.)  The Notice revoked the 1953 Easement on two alternative grounds: (1) the Easement was void from its inception because, when the State purported to grant it in 1953, the State failed to make (and could not have made) certain due findings that Michigan law requires before the State can convey an interest in Great Lakes submerged bottomlands to a private party (*id.* at PageID.25–26); and (2) "[e]ven if initially valid," the Easement had to be revoked because its ongoing and continued use violated the public trust (*id.* at PageID.26–30).  To the extent the Easement was ever valid, and not revoked, the Notice also terminated the Easement—pursuant to its termination clause—on the grounds that Enbridge had committed numerous, incurable violations of its terms.  (*Id.* at PageID.33–40.)  Because Enbridge was thus without authorization to use and occupy the State's

submerged lands, the Notice directed Enbridge to cease operating the Straits Pipelines within 180 days and then to decommission them. (*Id.* at PageID.41.)

Enbridge filed this action for declaratory and injunctive relief 11 days after the Notice was issued. (Compl., ECF No. 1.) Count I of the Complaint alleges that the Michigan Officials violated the Supremacy Clause because the Notice is preempted by the Pipeline Safety Act. (*Id.* at PageID.10–13.) Count III alleges that the Michigan Officials violated the Foreign Affairs Doctrine because the Notice contravenes the 1977 Transit Pipelines Treaty between the United States and Canada. (*Id.* at PageID.16–18.) Enbridge now seeks partial summary judgment as to Counts I and III of the Complaint. (ECF Nos. 124, 128.)

## LEGAL STANDARD

"Summary judgment is proper only 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. City of Albion*, 136 F.4th 331, 334 (6th Cir. 2025) (citing Fed. R. Civ. P. 56(a)). "The court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party." *Id.*

## ARGUMENT

**I.      Enbridge is not entitled to summary judgment on Count I.**

Enbridge's request for summary judgment on Count I should be denied for two reasons: (1) Count I is not properly before the Court; and (2) even if it were, it fails on the merits because the Notice is not preempted by the Pipeline Safety Act.

### A.    Count I is not properly before the Court.

Enbridge describes Count I as a claim of "express preemption under the Pipeline Safety Act."  (Br., ECF No. 128, PageID.1571.)  But while Count I is based on alleged violations of the Pipeline Safety Act's (PSA) preemption clause, 49 U.S.C. § 60104(c), Enbridge did not plead the claim as arising under the PSA.  Instead, Enbridge pleaded Count I as a claim for "Violation of the Supremacy Clause." (Compl., ECF No. 1, PageID.10.)  This appears to have been a deliberate choice, and it illustrates a fundamental problem with the claim.

The PSA authorizes private persons (like Enbridge) to bring suits for injunctive relief (like this one) against governmental authorities (like the Michigan Officials) to the extent permitted under the 11th amendment to the Constitution. But it places clear limitations on that right.  The statute provides:

> A person may bring a civil action in an appropriate district court of the United States for an injunction against another person (including the United States Government and other governmental authorities to the extent permitted under the 11th amendment to the Constitution) for a violation of this chapter or a regulation prescribed or order issued under this chapter.  *However, the person—*
>
> *(A) may bring the action only after 60 days after the person has given notice* of the violation to the Secretary of Transportation or to the appropriate State authority (when the violation is alleged to have occurred in a State certified under section 60105 of this title) and to the person alleged to have committed the violation . . . .  [49 U.S.C. § 60121(a)(1) (emphasis added).]

Section 60121(a)(1)(A) plainly applies to any PSA claim here since Enbridge is bringing a civil action for an injunction against governmental authorities for an alleged violation of § 60104(c) of the PSA.  However, such a claim can be brought "only after 60 days after" giving the requisite notice.  49 U.S.C. § 60121(a)(1)(A).

4

And Enbridge did not comply with the 60-day pre-suit notice requirement.  It filed this action 11 days after the Notice was issued, without first giving the Secretary of Transportation, the appropriate State authority, or the Michigan Officials notice of the alleged violation of § 60104(c).

The Supreme Court has held that statutory pre-suit notice requirements like this "act[] as a specific limitation on a citizen's right to bring suit" and are "mandatory conditions precedent to commencing suit." *Hallstrom v. Tillamook County*, 493 U.S. 20, 26, 31 (1989).  Thus, when a party files a lawsuit without providing the requisite notice, "the district court must dismiss the action as barred by the terms of the statute." *Id.* at 33.  *Hallstrom*'s analysis applies with full force when a plaintiff files a PSA claim without providing the requisite notice.  *See, e.g.*, *id.* at 23 n.1 (citing the Natural Gas Pipeline Safety Act, which became part of the PSA, as a statute with a similar notice provision); *SFPP, L.P. v. Union Pacific R. Co.*, 274 F. App'x 549, 551 (9th Cir. 2008) (affirming the dismissal of a PSA claim where the plaintiff "did not provide the requisite notice 60 days before filing its original complaint" (citing § 60121(a)(1)(A) and *Hallstrom*)); *BHK Realty, LLC v. Narragansett Elec. Co.*, 542 F. Supp. 3d 133, 143 (D.R.I. 2021) (dismissing PSA claim that was filed without providing 60 days' pre-suit notice).

In an apparent effort to evade this procedural limit, Enbridge labeled Count I as a claim under the Supremacy Clause rather than the PSA.  (Compl., ECF No. 1, PageID.10–13.)  However, "the Supremacy Clause is not the source of any federal rights and certainly does not create a cause of action." *Armstrong v. Exceptional*

*Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015) (cleaned up).  Thus, claims premised on the Supremacy Clause are not cognizable.  *See, e.g.*, *Askew v. Berrien County*, No. 1:24-cv-1010, 2024 WL 4879699, at *6 (W.D. Mich. Nov. 25, 2024) (Jonker, J.).

Nor do the Declaratory Judgment Act or *Ex parte Young*, which are cited in the Complaint, provide a path around the PSA's procedural requirements.  The point of the Declaratory Judgment Act, 28 U.S.C. § 2201, "is to create a remedy for a preexisting right enforceable in federal court."  *Mich. Corr. Org. v. Mich. Dep't of Corr.*, 774 F.3d 895, 902 (6th Cir. 2014).  Thus, the statute applies only "when, at the time of the lawsuit, one of the parties already could bring a 'coercive' action that Congress authorized federal courts to hear."  *Id.* (citation omitted).  It does not provide a basis for declaratory relief where, as here, the underlying claim falls outside a statute's limits on seeking coercive relief.  *See id.* at 902–04.

Nor does *Ex parte Young* by itself create such a cause of action.  *Id.* at 905. While *Ex parte Young* in many cases enables plaintiffs to sue executive officials in federal court for prospective injunctive relief, "[t]he power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  *Armstrong*, 575 U.S. at 327.  That is because "[c]ourts of equity can no more disregard statutory . . . requirements and provisions than can courts of law." *Id.* at 327–28 (cleaned up).  Thus, while *Ex parte Young* may "provide a path[] around sovereign immunity," *Mich. Corr. Org.*, 774 F.3d at 905, it does not allow a plaintiff to evade the statutory limits Congress has imposed on a cause of action. *See, e.g.*, *Grant v. EPA*, No. 1:22-cv-0186, 2023 WL 5016608, at *18, *35 (W.D. Mich.

June 1, 2023), R&R adopted, 2023 WL 6304911 (W.D. Mich. Sept. 28, 2023) (holding that a suit fell within *Ex parte Young* but certain claims had to be dismissed for failure to comply with a statute's pre-suit notice requirement).

Because Enbridge's Supremacy Clause claim is not cognizable, and Enbridge has not satisfied the mandatory conditions precedent to bringing a claim under the PSA, the Court should deny Enbridge's motion for summary judgment on Count I.

### B.     Count I fails on the merits.

Even if Count I were properly before the Court, Enbridge would still not be entitled to summary judgment because the Notice is not preempted by the PSA.

"When Congress acts to preempt state law—especially in areas of longstanding state concern—it treads on the states' customary prerogatives in ways that risk upsetting the traditional federal-state balance of authority." *Merrick v. Diago Am. Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015). Because Congress is not likely to do this "cavalierly," the Supreme Court has adopted an interpretive rule: "In all pre-emption cases, and particularly those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (cleaned up).

"If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX*

*Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993). "[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading," however, "courts ordinarily accept the reading that disfavors pre-emption." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (cleaned up).[1]

The PSA's preemption provision states in relevant part: "A State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c). The same section also provides, however, that the PSA "does not authorize the Secretary of Transportation to prescribe the location or routing of a pipeline facility." *Id.* § 60104(e).

---

[1] In *Nessel*, Enbridge argued that no presumption against preemption applies when a statute contains an express preemption clause, relying on a single sentence from *Commonwealth of Puerto Rico v. Franklin California Tax-free Trust*, 579 U.S. 115, 125 (2016) (*Franklin*). While some courts have read the sentence that way, others have been critical of this interpretation because the Supreme Court does not ordinarily overrule its precedents in such a drive-by fashion. *See, e.g.*, *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 771 n.9 (3d Cir. 2018); accord *Happel v. Guilford Cnty. Bd. of Educ.*, 913 S.E.2d 174, n.8 (N.C. 2025) (same); *Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1108 (9th Cir. 2024) (O'Scannlain, J., concurring). There was no need to apply any presumption in *Franklin* since it was a bankruptcy case, which is not an area of traditional state concern, and the Court found the statutory text unambiguous. It is unlikely that the *Franklin* Court intended to overrule precedents applying the presumption in other contexts, especially since three of the five members of the majority—Justices Kennedy, Breyer, and Kagan—authored or joined opinions applying the presumption in express preemption cases. *See, e.g.*, *CTS Corp. v. Waldburger*, 573 U.S. 1, 18–19 (2014) (Kennedy, J., joined by Kagan, J.); *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (Stevens, J., joined by Kennedy, J. and Breyer, J.); *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 532 (1992) (Blackmun, J. concurring, joined by Kennedy, J.). It is unnecessary for the Court to wade into this issue because the Notice falls outside the plain text of the PSA's preemption provision. If the Court has any doubts about the provision's scope, however, it should resolve them in favor of preserving Michigan's traditional sovereign power over the use of the State's submerged lands. *See Coeur d'Alene*, 521 U.S. at 281–85.

The PSA does not define the terms "adopt," "continue in force," or "safety standards."  Undefined statutory terms should be given their ordinary meaning. *United States v. Zabawa*, 719 F.3d 555, 559 (6th Cir. 2013).  "In determining that meaning, dictionaries are a good place to start."  *Id.*

The relevant definition of "adopt" is "to accept or start to use something new."[2]  To "come into force" means "(of laws, rules, or systems) to begin to exist and be used."[3]  "Continue" means "to keep happening, existing, or doing something."[4]  And "standard" means "an official rule, unit of measurement, or way of operating that is used in a particular area of manufacturing or services."[5]  Within the pipeline industry specifically, a "standard" is "a set of technical definitions and guidelines that function as instructions for designers, manufacturers, operators or users of equipment to provide consistent and comparable results."  Rafael G. Mora et al., *Pipeline Integrity Management Systems: A Practical Approach* § 2.6.1 (ASME Press 2016) (Ex. A) (cleaned up).

When read in context,[6] the phrase "adopt or continue in force safety standards" clearly refers to the adoption or continuation of technical requirements

---

[2] *E.g.*, https://dictionary.cambridge.org/us/dictionary/english/adopt.

[3] *E.g.*, https://dictionary.cambridge.org/us/dictionary/english/come-into-force?q=come+into+into+force.

[4] *E.g.*, https://dictionary.cambridge.org/us/dictionary/english/continue.

[5] *E.g.*, https://dictionary.cambridge.org/us/dictionary/english/standard.

[6] "A fundamental canon of statutory construction requires [courts] to read words in context, with a view to their place in the overall statutory scheme."  *Allen v. United States*, 83 F.4th 564, 568–69 (6th Cir. 2023) (cleaned up).

governing the design, manufacture, or operation of a pipeline.  Other sections of the statute confirm this.  For example, the PSA directs the Secretary of Transportation to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities."  49 U.S.C. § 60102(a)(2).  And it illustrates what "safety standard" means by stating that such standards "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities."  *Id.* § 60102(a)(2)(B); *see also* 49 C.F.R. § 195.0 ("This part prescribes safety standards . . . .").  The PSA also provides that state authorities that satisfy certain conditions—including having "regulatory jurisdiction" and "a sufficient number of employees"—"may adopt additional or more stringent safety standards for intrastate pipeline facilities and intrastate pipeline transportation."  *Id.* §§ 60104(c), 60105(b).  All of this connotes rules and protocols, promulgated by an agency with technical expertise, governing the design, manufacture, or operation of a pipeline.

Here, the PSA's preemption clause does not apply because the Notice does not "adopt" or "continue in force" any "safety standards for interstate pipeline facilities or interstate pipeline transportation."

### 1. The Michigan Officials have not adopted or continued in force any pipeline safety standards.

Begin by considering the action being challenged.  The Michigan Officials have not "adopt[ed]" or "continu[ed] in force" *anything*.  It is not their role to regulate pipeline operations, and they have not purported to do so.  Rather, the

Michigan Officials have issued a Notice, on behalf of the State as grantor of an Easement, revoking and terminating that Easement as part of their duties in administering the State's real property interests in submerged lands.

The revocation and termination of an easement are not among the actions proscribed by § 60104(c)—*i.e.*, the "adopt[ion]" or "continu[ation] in force" of standards.  Enbridge asks the Court to ignore the verbs in the statute and apply § 60104(c) more broadly to *any action* (not just an adoption or continuation in force) that is "based on purported safety concerns." (Br., ECF No. 128, PageID.1613, 1619, 1622.)  But that is not what the statute says, and this Court's task is to apply the text as it is written.

Enbridge's repeated conflation of the adoption or continuation of safety standards, on the one hand, and the taking of other actions based on safety concerns, on the other, is fatal to its position.  Ordinarily, preemption turns on "*what* the State did, not *why* it did it." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 762 (2019).  And when it comes to the PSA, courts have "emphasize[d] the distinction between safety *standards*—which the PSA preempts—and safety *considerations*—which the PSA does not preempt." *Couser v. Shelby County*, 139 F.4th 664, 671 (8th Cir. 2025); *see also Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Co.*, 626 F. Supp. 3d 1030, 1049 (W.D. Wis. 2022) ("The glaring problem with [Enbridge's] argument is that while the Band's refusal to consent to easements may

11

be based in part on safety concerns (at least environmental in nature), it is not based on the imposition of any safety *standards*." (emphasis in original)).

Enbridge's repeated refrain that the revocation and termination of the Easement were based on safety considerations does not bring such actions within the scope of § 60104(c).  The plain language of the PSA preempts only adopting or continuing in force standards.  Because the Michigan Officials have done no such thing, Enbridge is not entitled to summary judgment on Count I.

> **2.    The decision to revoke or terminate an easement—like the decision to grant one—is a location and routing decision outside the ambit of the PSA.**

The PSA expressly does not govern "the location or routing of a pipeline facility."  49 U.S.C. § 60104(e).  When the State granted the Easement, it purported to authorize Enbridge to use an approximately four-mile strip of Michigan's submerged lands to operate a pipeline.  Enbridge concedes that this was a location and routing decision within meaning of § 60104(e).  (Br., ECF No. 128, PageID.1589 (arguing that "Line 5's 'location' and 'routing' at the Straits were 'prescribe[d]' nearly seven decades ago when the State granted the Easement").)

But what Enbridge fails to appreciate is that when the State subsequently revoked and terminated that Easement it *also* made a location and routing decision—albeit one less to Enbridge's liking.  The Notice does not dictate *how* Enbridge may operate the Straits Pipelines or impose "safety standards" governing

12

their operation.[7]  49 U.S.C. § 60104(c).  It simply notifies Enbridge that it can no longer use and occupy a certain portion of State land.[8]  Enbridge may still be able to locate pipelines elsewhere on State land—indeed, it is currently seeking to do so, through a proposal to re-route this segment of Line 5 through a tunnel under the Straits.  (*See* Notice, ECF No. 1-1, PageID.30–31.)  But what Enbridge cannot do is locate its pipelines on the four-mile strip of State land specified in the Easement.

The decision in *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321 (D. Me. 2017) illustrates the point.  There, the City of South Portland enacted "a local ordinance prohibiting loading crude oil onto tankers and new structures for that purpose."  *Id.* at 329.  The ordinance expressly stated that its purposes included "'protect[ing] citizens and visitors from harmful effects caused by air pollutants;' 'promot[ing] a wholesome home environment;' and 'conserve[ing] natural resources.'"  *Id.* at 384.  Yet the court held that the city's ordinance was not a preempted safety standard.

---

[7] The cases Enbridge relies on all involved attempts to dictate safety standards.  In *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 874–76 (9th Cir. 2006), the city sought to impose a "list of pipeline safety demands."  *Kinley Corp. v. Iowa Utils. Bd.*, 999 F.2d 354, 356–57 (8th Cir. 1993), involved an attempt to adopt a "comprehensive state program supervising the intrastate and interstate transportation by pipeline of solid, liquid or gaseous substances."  And in *Williams v. City of Mounds View*, 651 F. Supp. 551, 568 (D. Minn. 1987), a city and county sought to force a pipeline operator to repair or replace certain segments of pipe.

[8] Enbridge makes much of the fact that the Notice directed it to cease operations within 180 days.  But that directive was not based on any safety standard.  Rather, it was based Enbridge's lack of a valid easement.  Ordinarily, Enbridge would have been required to immediately vacate the land once it was determined that Enbridge had no right to use or occupy it.  But the State delayed the effective date of the Notice by 180 days "to allow for an orderly transition to ensure Michigan's energy needs are met."  (Notice, ECF No. 1-1, PageID.22.)

13

The court analogized the PSA's safety provisions to federal vehicle emission standards, explaining that while federal emissions standards preempt state attempts to regulate fuel economy, they "do not prevent states or municipalities from imposing restrictions on where cars may be parked, where cars may travel, or even whether cars are allowed." *Id.* at 430. Likewise, while the PSA preempts state and local safety standards, "[u]nder their police power, states and localities retain their ability to prohibit pipelines altogether in certain locations." *Id.* at 429–30. That is precisely what the State has done here—it has prohibited a pipeline altogether in a certain location. The PSA does not preempt such action; to the contrary, § 60104(e) preserves it.

The fact that the lands in question are Great Lakes bottomlands only deepens the sovereign character of this locational decision. The lands beneath navigable waters "have historically been considered sovereign lands," and State ownership of them "has been considered an essential attribute of sovereignty." *Coeur d'Alene*, 521 U.S. at 283. Such lands are infused with "a high, solemn, and perpetual trust, which it is the duty of the state to forever maintain." *Collins v. Gerhardt*, 211 N.W.2d 115, 118 (Mich. 1926). "The State may not, by grant, surrender such public rights any more than it can abdicate the police power or other essential power of government." *Nedtweg*, 208 N.W. at 53. And "accepted principles of federalism" have long respected this sovereign power and obligation. *PPL Montana, LLC v. Montana*, 565 U.S. 576, 604 (2012). As the *Portland Pipe Line*

14

court correctly held, it is "unlikely Congress intended to remove this local police power" in the PSA.  288 F. Supp. 3d at 431.

### 3. The Easement's revocation was not based on pipeline safety standards.

That the PSA does not preempt the revocation or termination of an interest in real property should be the end of this matter.  However, even if the Court were to look past *what* the State did to the underlying state-law *reasons* for the State's action, as Enbridge has requested, Count I would *still* fail because the Easement's revocation was not premised on any "safety standards for interstate pipeline facilities or interstate pipeline transportation."  49 U.S.C. § 60104(c).

### a. Section I.B of the Notice does not adopt or continue in force a pipeline safety standard.

The first basis for the Notice of Revocation is that the Easement was void *ab initio* and never valid.[9]  (Notice, ECF No. 1-1, PageID.25–26 (§ I.B).)  This is because, as explained in the Notice, Michigan law provides that "[n]o part of the beds of the Great Lakes, belonging to Michigan . . . can be alienated or otherwise devoted to private use *in the absence of due finding of one of two exceptional reasons for such alienation or devotion to non-public use*." (*Id.* at PageID.24 (quoting *Obrecht v. Nat'l Gypsum Co.*, 105 N.W.2d 143, 149 (Mich. 1960).)  And here, the

---

[9] This is a threshold issue of state law, pending in the *Nessel* case.  As discussed below, Enbridge's request to ignore the underlying state-law dispute and proceed directly to federal preemption is contrary to fundamental principles of constitutional avoidance and judicial restraint.  *See infra* § I.B.3.b.

Easement was invalid from the outset "because the State never made a finding that the Easement:  (1) would improve navigation or another public trust interest; or (2) could be conveyed without impairment of the public trust."  (*Id.* at PageID.25.)

The common law requirement that the State must make certain due findings before conveying submerged bottomlands to a private party is *not* a "safety standard[] for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c).  It does not govern the conduct of interstate pipeline facilities or those engaged in interstate pipeline transportation.  Rather, it requires *the State*, as trustee, to make certain findings before alienating submerged lands to private use.  In other words, it is a trust administration requirement.  That the State's fiduciary duties in administering public-trust lands may involve "safety considerations," *Couser*, 139 F.4th at 671; *Bad River Band*, 626 F. Supp. 3d at 1049, does not transform the State's duties into "safety standards for interstate pipeline facilities or interstate pipeline transportation," 49 U.S.C. § 60104(c).

### b.    Section I.C of the Notice does not adopt or continue in force a pipeline safety standard.

The second basis for the Notice of Revocation is that, even if the Easement was valid (which the State disputes), it remained subject to the public's rights to use and benefit from the Great Lakes and was "necessarily revocable" because it interfered with those rights.[10]  (Notice, ECF No. 1-1, PageID.26–30 (§ I.C) (quoting *Illinois Central*, 146 U.S. at 455.)  As explained in the Notice, Michigan law

---

[10] This is a state-law issue that only arises if the Easement was not void *ab initio.*

16

recognizes the public trust doctrine as the modern descendant of the ancient Roman and English common law rule that the sovereign "must sedulously guard" the public's rights to use navigable waters "for fishing, hunting, and boating for commerce or pleasure." *Glass*, 703 N.W.2d at 63–65.

This longstanding doctrine is not principally concerned with pipeline safety; it is a common law property doctrine concerned with preserving the public's traditional rights to use the State's navigable waters. *See id.* And applying the doctrine involves inherently local, case-by-case determinations that do not lend themselves to uniform standards. Indeed, Enbridge has not—because it cannot—identified any particular "standards" imposed on its facilities or operations by the public-trust revocation grounds in Section I.C. of the Notice.

Numerous federal courts have held that the PSA's preemption provision does not insulate interstate pipelines from similar common law requirements—even if those requirements implicate safety concerns. For example, the U.S. District Court for the Western District of Wisconsin rejected Enbridge's similar argument in *Bad River*, holding that § 60104(c) did not bar a trespass action based on the invalidity of an easement, or a nuisance claim alleging that local conditions created "a high risk of pipeline rupture," because "the Band is not seeking to impose specific pipeline safety standards on Enbridge." *See Bad River*, 626 F. Supp. 3d at 1059, 1061. Enbridge also lost a similar argument in the Michigan Court of Appeals, which held that air pollution and nuisance claims related to a Line 5 facility were not preempted because they did not "directly regulate pipelines and pipeline safety"

17

but rather sought to protect "a property owner's use and enjoyment of his or her property." *Davis v. Sunoco Pipeline LP*, No. 346729, 2020 WL 3397386, at *4–5 (Mich. Ct. App. June 18, 2020).

Courts have also found that the PSA does not preempt local zoning laws setting standards for where pipelines can be located. *See, e.g.*, *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 210–12 (5th Cir. 2010); *Washington Gas Light Co. v. Prince George's County*, 711 F.3d 412, 421–22 (4th Cir. 2013); *but see Couser*, 139 F.4th at 671, 677 (2-1 opinion creating a circuit split regarding certain requirements). And they have upheld restrictions on a pipeline operator's authorization to use real property. *Enbridge Energy v. Town of Lima*, No. 13-cv-187, 2013 WL 12109106, at *4 (W.D. Wis. Apr. 4, 2013).

Federal courts have also repeatedly rejected efforts by pipeline companies to use the PSA's preemption provision to insulate themselves from state tort and property law. *See, e.g.*, *Cheverez v. Plains All Am. Pipeline, LP*, No. CV15-4113, 2016 WL 4771883, at *6 (C.D. Cal. Mar. 4, 2016) ("[T]he Court declines to read the PSA as granting Defendants the infallible right to continue interfering with Plaintiffs' real property."); *Penn. Servs. Corp. v. Texas Eastern Transmission, LP*, No. 2:11-cv-1076, 2011 WL 13234909, at *1 (W.D. Pa. Oct. 12, 2011) (holding that a claim that a pipeline did not have "appropriate subsidence mitigation measures," thereby interfering with the use of adjoining lands, was not preempted because "the PSA does not supplant state real property law"); *Am. Energy Corp. v. Texas Eastern Transmission, LP*, 701 F. Supp. 2d 921, 931 (S.D. Ohio 2010) ("The PSA does not

18

preempt Ohio property law or tort law"); *Abrahamson v. Florida Gas Transmission Co.*, 909 F. Supp. 410, 416–17 (E.D. La. 1992) (common law remediation claim not preempted by the PSA).

Simply put, the common-law, public-trust grounds in Sections I.B and I.C of the Notice are not pipeline safety standards.  This provides yet another reason that Enbridge is not entitled to summary judgment on Count I.

> ### c.  Enbridge's state law challenges to Defendants' application of the public trust doctrine should be resolved before considering whether it is preempted.

A final observation about Enbridge's request for this Court to declare Michigan's public trust doctrine preempted by federal law.  Enbridge "vigorously disputes"—and has litigated at length in *Nessel*—whether state law requires the Easement's revocation, as the Attorney General and Michigan Officials contend. (*See* Br., ECF No. 128, PageID.1619, 1625, 1626.)  Yet, Enbridge asks this Court to ignore that state-law dispute, and plunge directly into federal preemption.  That is the opposite of how such matters should be decided.[11]

Federal courts ordinarily will not decide constitutional questions—including whether federal law preempts state action—"unless absolutely necessary." *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 754 (6th Cir. 2019) (cleaned up).  This

---

[11] The impropriety of Enbridge's approach is highlighted by the section of its brief titled "Other state-law theories," where Enbridge makes preemption arguments against claims that were raised by a different party in other litigation and are not at issue here.  (Br., ECF No. 128, PageID.1629.)

"fundamental principle[] of judicial restraint" stems from "the very limits on [the] power to decide cases and controversies" and has "become deeply rooted in our constitutional tradition." *Id.* at 754–55 (cleaned up). Thus, "courts should not decide a question of preemption if they can resolve the case on non-constitutional grounds." *Id.* at 756.

One tool that can be used to further these principles is to certify an underlying state-law issue to the Michigan Supreme Court, *see Toth v. Callaghan*, 995 F. Supp. 2d 774, 781 (E.D. Mich. 2014), as provided in W.D. Mich. LCivR 83.1. The Michigan Officials believe it could be appropriate to certify the question of whether the 1953 Easement is invalid as a matter of state law before considering whether the revocation and termination of that Easement is preempted. The Michigan Officials would welcome an opportunity to discuss certification.

### 4. The PSA did not nullify the preexisting terms and conditions of easements over public-trust lands.

Enbridge's attempt to raise the PSA as a defense against the Easement's termination for breach is also without merit.[12] (Notice, ECF No. 1-1, PageID.32–40 (§ II).) The PSA does not purport to eliminate a state landowner's right to insist that a pipeline company comply with the terms of an easement. Nor does the PSA purport to prevent a State from exercising an easement's express termination provision. Stretching § 60104(c) to reach that far here would raise serious constitutional concerns. And it would not entitle Enbridge to the relief it seeks.

---

[12] Again, this issue only arises if the Easement was not void *ab initio*.

20

An easement is a limited property interest giving its holder a right to use another's land for a specific purpose. *Mich. Dep't Nat. Res. v. Carmody-Lahti Real Estate, Inc.*, 699 N.W.2d 272, 284 (Mich. 2005). "The scope of an easement is defined by the terms of the instrument creating it." 25 Am. Jur. 2d *Easements and Licenses* § 61 (May 2025). "Thus, an easement privileges a party to use another's land only to the extent expressly allowed by the easement." *Id.*; *see also, e.g.*, *Wiggins v. City of Burton*, 805 N.W.2d 517, 531 (Mich. Ct. App. 2011) ("A party's use of the servient estate . . . must be confined to the plain and unambiguous terms of the easement." (cleaned up)).

In 1953, the State of Michigan purported to sell Enbridge's predecessor the Easement "for and in consideration of the sum of Two Thousand Four Hundred Fifty Dollars ($2,450,00) . . . and for and in consideration of the undertakings of Grantee and subject to the terms and conditions set forth herein." (Easement, ECF No. 1-1, PageID.40.)  By making the grant "subject to the terms and conditions set forth herein," the State limited the authorization conferred by the Easement.  The holder was not allowed to occupy the State's submerged lands with a pipeline that, *inter alia*, had a curvature of greater than 2,050 feet radius, was not protected by a specified coating and wrap, or had unsupported spans exceeding 75 feet in length. (*Id.* at PageID.47.)  Further, in "exercising its rights under this easement," the Grantee was required to "exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all public and private property" and to "comply with all laws of the State of Michigan and the Federal Government." (*Id.* at

21

PageID.45–46.)  The State reserved its right to terminate the Easement if the Grantee violated these terms, thereby exceeding the scope of its authorization to use the State's submerged lands.  (*Id.* at PageID.49.)

Enbridge claims that "Congress nullified the Easement's [terms and conditions] when it passed the 1994 Pipeline Safety Act," asserting that the PSA expanded its property rights in the State's submerged lands and exempted it from the express limits the parties had previously negotiated.  (Br., ECF No. 128, PageID.1626.)  This argument fails for at least three reasons.

*First*, "[t]he allocation of property rights among contracting parties is a paradigmatic question of state law." *Columbia Gas Transmission Corp. v. Drain*, 191 F.3d 552, 556 (6th Cir. 1999); *accord Columbia Gas Transmission, LLC v. Singh*, 707 F.3d 583, 590 (6th Cir. 2013) ("While there is a federal interest in the safe transmission of natural gas, the scope of easements is a typical state-law property issue.").  The PSA is "silent as to rights-of-way and easements," *Drain*, 191 F.3d at 555, and confers no authority to "prescribe the location or routing of a pipeline facility," 49 U.S.C. § 60104(e).  Thus, disputes about the scope of the rights conferred by an easement fall outside of the PSA's reach.  *See Drain*, 191 F.3d at 555–56 (holding that neither the PSA nor the Natural Gas Act "establish a right to a federal forum for an action to determine the location and scope of an easement created by express agreement"); *SFPP, L.P. v. Union Pac. R.R. Co.*, No. SACV 05-1015, 2006 WL 8448721, at *4 (C.D. Cal. Mar. 20, 2006) (dismissing claim that

easement terms were preempted because "[t]he PSA does not create a federal claim . . . for a determination of the parties' contractual rights.").[13]

*Second*, construing the PSA to have retroactively expanded the scope of the Easement—and to have nullified the State's contractual right of termination, derogated the State's sovereign authority to control the use of public trust lands, and eradicated the State's property right to exclude unauthorized uses of its land— would effectuate a taking of the State's sovereign property rights. *Cf. Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (a permanent physical occupation is a taking). Courts ordinarily construe statutes to avoid constitutional takings issues, *TCI of North Dakota, Inc. v. Schriock Holding Co.*, 11 F.3d 812, 815 (8th Cir. 1993), and the divestment of pre-existing sovereign rights, *United States v. Lahey Clinic Hosp., Inc.*, 399 F.3d 1, 16 (1st Cir. 2005). And they will find that Congress authorized a taking of the State's public-trust lands only if "the intention was definitely declared or otherwise made very plain." *United States v. Alaska*, 521 U.S. 1, 34 (1997) (citation omitted). Section 60104(c) of the PSA does not remotely fit the bill. In other contexts, Congress has authorized pipeline operators to use or occupy another's lands without their consent, *see, e.g.*, 15 U.S.C.

---

[13] None of the cases that Enbridge cites involved a dispute over rights expressly reserved in a real property agreement. *Olympic Pipe Line* involved the renewal of a franchise by city ordinance. 437 F.3d at 875. *Kinley* involved state permit requirements. 999 F.2d at 356. And *Williams*, in which the court made only a "tentative" ruling on motions for preliminary relief, addressed requirements in city ordinances and a county resolution. 651 F. Supp. at 553, 555–56, 560. It is one thing to preempt such regulatory requirements but another thing entirely to retroactively expand a party's real property interests.

§ 717f(h) (eminent domain provision of Natural Gas Act), but the PSA contains no such authorization—much less the sort of clear and unequivocal language necessary to extinguish the State's authority over public-trust lands where, as here, the State's sovereign property rights were expressly reserved in a preexisting easement.

*Third*, if the Court were to find that the Easement's terms are preempted by federal law, that would *still* not entitle Enbridge to the injunctive relief it seeks.  If the Easement's terms are found to be unenforceable (because they are preempted by federal law), the question would then become whether those terms can be severed from the rest of the Easement (which purports to give Enbridge the right to operate the Straits Pipelines on Michigan's submerged lands), or whether the entire Easement is invalid.  The rule in Michigan is that "[i]llegal portions of a contract may be severed.  However, in order to sever the illegal portion, the illegal provision must not be central to the parties' agreement." *AFSCME Mich. Counsel 25 v. City of Detroit*, 704 N.W.2d 712, 716 (Mich. 2005) (cleaned up).  "If the agreements are interdependent and the parties would not have entered into one in the absence of the other, the contract will be regarded as entire and not divisible." *EPLET, LLC v. DTE Pontiac N., LLC*, 984 F.3d 493, 505 (6th Cir. 2021) (quoting *Stokes v. Millen Roofing Co.*, 649 N.W.2d 371, 374 (Mich. 2002)).

Here, the Easement states *three different times* that it was being granted "subject to the terms and conditions" that Enbridge now claims are unenforceable. (Easement, ECF No. 1-1, PageID.44–45.)  There is absolutely no indication the State would have granted the Easement without those terms.  Thus, if the Court

24

were to find that the Easement's terms and conditions were nullified by federal law, the entire Easement would fail.  *See, e.g., Stokes*, 649 N.W.2d 371 (entire contract was void where an illegal term was "central to the parties' agreement"); *Klukavy v. United Nat'l Ins.*, 654 F. Supp. 622, 627 (E.D. Mich. 1987) (same).  Enbridge would have no right to occupy the Straits bottomlands and would not be entitled to the injunctive relief it seeks.

## II.    Enbridge is not entitled to summary judgment on Count III.

In Count III, Enbridge argues that the Notice is preempted "under the 1977 U.S.-Canada Transit Pipelines Treaty and the Foreign Affairs Doctrine."  (Br., ECF No. 128, PageID.1631.)  This claim falters from the start, however, because private parties cannot bring a federal court action to enforce the Treaty.  Instead, the Treaty provides a nonjudicial, international remedy.  Enbridge cannot circumvent that remedial scheme by bringing a Treaty claim in this Court under another name. And even if it could, its claim fails because the Notice is a traditional exercise of the State's sovereign powers—expressly *preserved* by the Treaty—and does not "clearly conflict" with U.S. foreign policy.

### A.    Count III is an improper claim for violation of the Treaty.

"A treaty is, of course, primarily a compact between independent nations.  It ordinarily depends for the enforcement of its provisions on the interest and the honor of the governments which are parties to it."  *Medellín v. Texas*, 552 U.S. 491, 505 (2008) (cleaned up).  "If these interests fail, its infraction becomes the subject of

international negotiations and reclamations.  It is obvious that with all this the judicial courts have nothing to do and can give no redress." *Id.* (cleaned up).

In response to a footnote in a prior brief, Enbridge and Canada argue that the 1977 Transit Treaty is self-executing.  (Br., ECF No. 128, PageID.1637; Amicus Br., ECF No. 133, PageID.1724.)  But that misses the underlying point.  "Even when treaties are self-executing in the sense that they create federal law, the background presumption is that international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." *Medellín*, 552 U.S. at 506 n.3 (cleaned up).  "In fact, courts presume that the rights created by an international treaty belong to a state and that a private individual cannot enforce them." *United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001).

As the Wisconsin district court recently observed, "Enbridge is not a party to the Transit Treaty, and nothing in the Treaty suggests that a private entity could bring a cause of action to enforce it or even that it may be enforced in federal court." *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Co.*, No. 19-cv-602, 2022 WL 17249085, at *5 (W.D. Wis. Nov. 28, 2022).  Instead, under Article IX of the Treaty, "the signatory countries may bring claims under the Transit Treaty pursuant to a specific arbitration process." *Id.*  First, any dispute "regarding the interpretation, application or operation" of the Treaty "shall, so far as possible be settled by negotiation" between the U.S. and Canada.  Transit Treaty, U.S.-Canada, art. IX(1),

26

Jan. 28, 1977, 28 U.S.T. 7449.  Then, if negotiations fail, the dispute "shall be submitted to arbitration at the request of either Party."  *Id.* art. IX(2).  The Treaty thus "contemplates quintessential *international* remedies," *Sanches-Llamas v. Oregon*, 548 U.S. 331, 355 (2006), not enforcement in domestic courts.

The Treaty's specific remedial scheme precludes Enbridge from bringing a private action against the Michigan Officials in this Court, *Armstrong*, 575 U.S. at 328, as federal courts may not "supplement that scheme with one created by the judiciary." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996).  Canada agrees with the Michigan Officials on this point.  *Michigan v. Enbridge*, No. 1:20-cv-1142, ECF No. 45, PageID.557 (W.D. Mich. June 1, 2021) ("Canada does not contend . . . that the Treaty creates a private right of action for Enbridge against Michigan. Instead, the Treaty specifies its own primary mode of implementation, enforcement and interpretation, which is to occur outside this Court."); *see also* Amicus Br., ECF No. 133, PageID.1730 ("Canada reiterates that it is the Article IX process—not this Court—that is charged with making substantive determinations under the 1977 Treaty.").  And even Enbridge acknowledges that "the express federal U.S. policy is to funnel any disagreements over the Treaty's scope through the dispute resolution provisions in Article IX." (Br., ECF No. 128, PageID.1635.)

Given Enbridge's explicit acknowledgment that Treaty claims should be resolved elsewhere, Enbridge's decision to bring Count III in this Court is puzzling. Enbridge argues at length that "Defendants' attempts to shut down Line 5 violate Article II(1) of the 1977 Treaty." (Br., ECF No. 128, PageID.1635; *see also id.* at

27

PageID.1633 (arguing that the Notice "violate[s] the 1977 Treaty").)  But that is *precisely* the sort of claim Enbridge cannot bring, and this Court cannot decide.

Enbridge tries to mask the nature of its claim by suggesting that it "does *not* call on this Court to consider whether the Treaty itself expressly preempts Defendants' attempts to shut down Line 5 or whether those attempts directly violate the Treaty itself," but rather to decide whether the Notice violates "the foreign policy embodied in the Treaty." (*Id.* at PageID.1636.)  But that is pure artifice.  It is belied by Enbridge's brief, which could not be clearer in making a Treaty claim.  (*Id.* at PageID.1633–1636.)  After all, what is a violation of the "policy embodied in the Treaty" if not a violation of the Treaty?  Enbridge points to no other policy.  It simply argues for a broad, purpose-based application of the Treaty.

Because "[t]he label which a plaintiff applies to his pleading does not determine the nature of his cause of action," courts must "look[] beyond labels" and "examine the substance of the complaint." *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 795 (6th Cir. 2003) (cleaned up).  Here, Count III invites the Court to decide nothing less than whether the Notice violates the Treaty.  The Court should decline that invitation.

## B.  Enbridge's Treaty claim fails on the merits.

To the extent the Court entertains Enbridge's Treaty claim, it fails on the merits because the Treaty preserves, rather than preempts, the State's sovereign property rights and regulatory authority over public-trust lands.

"[T]he interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin*, 552 U.S. at 506.  Enbridge relies on Article II(1) of the Treaty, which states:  "No public authority in the territory of either Party shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbon in transit." 1977 Treaty, art. II(1).  Article II also contemplates, however, that pipeline operators must obtain "such permits, licenses, *or other authorizations* as may be required."  *Id.*, art. II(3) (emphasis added).  And Article IV of the Treaty further limits the broad language in Article II.  It provides:

1. *Notwithstanding the provisions of Article II* and paragraph 2 of Article III, a Transit Pipeline and the transmission of hydrocarbons through a Transit Pipeline shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline in the same manner as for any other pipelines or the transmission of hydrocarbons by pipeline subject to the authority of such governmental authorities with respect to such matters as the following:

   a. Pipeline safety and technical pipeline construction and operation standards;

   b. environmental protection;

   c. rates, tolls, tariffs and financial regulations relating to pipelines;

   d. reporting requirements, statistical and financial information concerning pipeline operations and information concerning valuation of pipeline properties.

2. All regulations, requirements, terms and conditions imposed under paragraph 1 shall be just and reasonable, and shall always, under substantially similar circumstances with respect

29

to all hydrocarbons transmitted in similar pipelines, other than intra-provincial and intra-state pipelines, be applied equally to all persons and in the same manner.  [*Id.*, art. IV (emphasis added).]

The Supreme Court has held that "the use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."  *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 18 (1993).  Thus, the provisions in Article II do not apply to actions within the express "notwithstanding clause" of Article IV.

Two federal courts have construed the 1977 Transit Treaty, and they have both read it this way.  In *Portland Pipe Line*, the Maine district court described Article IV as "an express savings clause" and rejected the idea that the foreign policy embodied in the Treaty is one of keeping hydrocarbons flowing at all times.  288 F. Supp. 3d at 443.  Instead, the court explained, "the federal policy embodied in the Transit Pipeline Agreement is one of anti-discrimination.  Regulatory bodies with authority to regulate to minimize or eliminate environmental impacts must do so by imposing the same restrictions on interstate and intrastate pipelines as they do on international transit pipelines."  *Id*. at 444 (citation omitted).

In *Bad River*, the Wisconsin district court came to the same conclusion, holding that "the evidence at trial did not establish any violation of the Transit Treaty, which specifically states that, 'notwithstanding the provisions of Article II,' international pipelines 'shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline' with respect to matters of 'environmental protection.'"  2022 WL 17249085, at *5.

30

Scholarly commentary is in accord.  *See, e.g.*, William S. Dodge, *What Does the State Department Think About the Transit Pipelines Treaty?*, https://tlblog.org/what-does-the-state-department-think-about-the-transit-pipelines-treaty/ (Feb. 15, 2024) ("Article IV makes clear that pipelines covered by the treaty remain subject to regulations in Canada and the United States so long as they are reasonable and are applied without discrimination.").

The State's enforcement of the public trust doctrine and the terms of Enbridge's easement fit comfortably within these limits.  Indeed, the United States' conduct since the Treaty was signed confirms as much.  Transit pipelines crossing the U.S.-Canada border must be authorized by a Presidential Permit.  And since 1977, many Presidential Permits issued to Enbridge and its predecessor, over multiple presidential administrations, have made clear that Enbridge must obtain valid easements and comply with generally applicable state laws.[14]

For example, several of Enbridge's Presidential Permits require it to "acquire such right-of-way grants, easements, permits, and other authorizations as may become necessary and appropriate."  (Ex. B, pp. 23, 28, 32, 38, 42, 46.)  One of them is particularly instructive:  "This permit . . . is subject to the acquisition by the permittee of a servitude of passage or right-of-way, *valid under the laws of the State of Michigan*, from any and all persons owning or asserting an interest in the nature

---

[14] Because discovery has not yet begun, the Michigan Officials have not had an opportunity to review all of Enbridge's Presidential Permits or related documents. However, in 2009, Enbridge filed several of them on the public docket in a different case in Minnesota district court. (*Sierra Club v. Clinton*, Civ. No. 09-2622, ECF No. 161-1 (D. Minn. Dec. 2, 2009).)  That filing is attached as Exhibit B.

or kind whatsoever in and to the land . . . ." (*Id.* at 19 (emphasis added).)  Others require Enbridge to obtain state and local permits.  (*Id.* at 36, 45.)  And several of them state:  "This permit is subject to the limitations, terms, and conditions contained in any orders issued by any competent agency of . . . the State of Michigan." (*Id.* at 22, 27, 31.)  It would have made no sense for the United States to include these provisions in Enbridge's permits if it intended in the 1977 Treaty to broadly immunize transborder pipelines from the need to obtain valid easements and comply with state law.

Enbridge offers only three counterarguments against this interpretation of the Treaty, and all of them are weak:

*First*, Enbridge accuses the Michigan Officials of "unilaterally trying to circumvent" the Treaty's dispute-resolution process.  (Br., ECF No. 128, PageID.1638–39.)  To the contrary, <u>*that is what Enbridge is doing*</u>.  The Michigan Officials have done nothing more than seek to fulfill their duties under state law by telling Enbridge that its easement is invalid, and its pipelines cannot be on a four-mile strip of state-owned submerged land.  Further, the dispute-resolution process between United States and Canada need not—and will not—come to a halt if Enbridge complies with the Notice.  Canada would remain free to attempt to establish that the Treaty has been violated and seek whatever remedy an arbitrator might award.  1977 Treaty, art. IX(3).  The Michigan Officials have done nothing to circumvent or in any way interfere with that process.

*Second*, Enbridge argues that the phrase "appropriate governmental authorities having jurisdiction over such Transit Pipeline" in Article IV refers to a single regulatory agency—PHMSA—which did not even exist when the Treaty was signed.  While Enbridge may wish that were the case, it blinks reality.  Article IV refers to a broad and non-inclusive list of regulatory topics, and the appropriate authority varies by location and subject matter.  The complexity of international pipeline regulation is well-illustrated by the number of governmental authorities involved after Enbridge's Line 6b pipeline ruptured near Marshall, Michigan, causing "one of the largest freshwater oil spills in North American history."[15]  In the wake of the spill, numerous governmental authorities took action, including the U.S. Environmental Protection Agency, the U.S. Coast Guard,[16] the State of Michigan, Tribal Nations,[17] the Michigan Department of Environmental Quality, and the Michigan Attorney General.[18]  And that is far from the whole list.  *See, e.g.*, *Great Lakes Gas Transmission Co.*, 46 FERC ¶ 61138 (Feb. 3, 1989) (FERC decision applying nondiscriminatory regulation to transborder pipeline over objection that it

---

[15] EPA, *Federal On Scene Coordinator Desk Report for the Enbridge Line 6b Oil Spill*, p. 89, https://www.epa.gov/system/files/documents/2025-04/enbridge-fosc-report-20160407-241pp.pdf (last visited Sept. 5, 2025).

[16] *See* Consent Decree, *United States v. Enbridge*, No. 1:16-cv-914, ECF No. 14 (W.D. Mich. May 23, 2017), https://www.epa.gov/sites/default/files/2017-06/documents/enbridge_consent_decree.pdf.

[17] *See* Consent Decree, *United States v. Enbridge*, Civil Action No. 1:15-cv-590, ECF No. 9 (W.D. Mich. Dec. 3, 2015), https://www.gc.noaa.gov/gc-cd/MI-Enbridge-Energy-CD-2015.pdf.

[18] *See* Consent Judgment, *MDEQ v. Enbridge*, Case No. 15-1411 (Calhoun County Circuit Court May 13, 2015), https://www.siskinds.com/wp-content/uploads/wrd-enbridge-consent-judgment_489105_7.pdf.

violated the 1977 Transit Treaty).  It beggars belief to suggest that PHMSA, rather than the State of Michigan, is the appropriate governmental authority to decide whether Enbridge's easement is valid and consistent with the public trust in the Straits of Mackinac.

*Third*, Enbridge argues that "Defendants seek not merely to subject Line 5 to regulations but to force it to shut down entirely, which is precisely what the Treaty forbids."  (Br., ECF No. 128, PageID.1639 (cleaned up).)  But that is wrong in both fact and law.  Factually, the Michigan Officials have only sought to prohibit the use of a four-mile strip of land—not to shut down the entire the 645-mile Line 5.  And they did not even purport to foreclose the possibility of rerouting the affected segment in another location.  Legally, Enbridge's argument gives no meaning to the words "[n]otwithstanding the provisions of Article II"—which make clear that the Treaty *does not* forbid "impeding, diverting, redirecting, or interfering with" the flow of hydrocarbons pursuant to Article IV regulations.  1977 Treaty, arts. II(1), IV(1).  Regulations are *routinely* prohibitory in nature.  *See, e.g.*, *Portland Pipe Line*, 288 F. Supp. 3d at 429–30.  And here, the Michigan Officials are regulating where a portion of Line 5 may *not* be located out of concern for "environmental protection."  1977 Treaty, art. IV(1).  That falls squarely within Article IV.

### C.    The Notice does not violate the Foreign Affairs Doctrine.

Enbridge's artfully pleaded Foreign Affairs Doctrine claim fares no better. The Foreign Affairs Doctrine is an implied preemption doctrine that "does not enjoy any textual detail" but is inferred from Article II of the Constitution.  *Am. Ins. Ass'n*

34

*v. Garamendi*, 539 U.S. 396, 414 (2003).  It provides that state action may be preempted where it creates a "clear conflict" with federal foreign policy.  *Id.* at 420–21.  Courts consider "the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted."  *Garamendi*, 539 U.S. at 420.  Implied preemption analysis requires a "high threshold" and "does not justify a freewheeling judicial inquiry into whether a state [action] is in tension with federal objectives."  *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011).

Enbridge's argument relies entirely on *Garamendi*—a rarely cited case that does not establish a broad preemption doctrine and is limited to highly distinguishable facts.  In *Garamendi*, the United States had signed the German Foundation Agreement, which established an international process for resolving claims made under Holocaust-era insurance policies, following the theft of Jewish assets by Nazi Germany.  539 U.S. at 405.  It was expressly pronounced to be "in the foreign policy interests of the United States for the Foundation to be the exclusive forum and remedy for the resolution of all asserted claims against German companies arising from their involvement in the National Socialist era and World War II."  *Id.* at 406 (citation omitted).  Despite this, California enacted its own remedial scheme to address this international problem.  The statute targeted foreign insurance companies and threatened "regulatory sanctions to compel disclosure and payment, supplemented by a new cause of action for Holocaust survivors if the other sanctions should fail."  *Id.* at 423.  The Supreme Court held

35

that there was "a sufficiently clear conflict" between that California law and the United States' policy that the Foundation should be the exclusive mechanism for resolving these claims to require California's law to yield.  *Id.* at 420.

The driving features behind *Garamendi* are entirely absent here.  *See Portland Pipe Line Corp.*, 288 F. Supp. 3d at 440–45 (explaining that foreign affairs preemption is most likely to apply when a state law is not "within the realm of state and local police power," and directly conflicts with the "consistent policy" of the federal government).

*First*, the Supreme Court emphasized "the weakness of the State's interest . . . in regulating disclosure of European Holocaust-era insurance policies."  *Id.* at 425.  Here, by contrast, Michigan has not sought to target foreign nationals or address an international issue.  Instead, it has sought to regulate the use and occupation of a four-mile strip of submerged lands located in its territorial bounds. It is hard to imagine a more firmly entrenched area of "traditional state responsibility."  *Garamendi*, 539 U.S. at 419 n.11.  Indeed, the Supreme Court has repeatedly recognized that the lands beneath navigable waters "have historically been considered sovereign lands" and are "infused with a public trust the State itself is bound to respect."  *Coeur d'Alene*, 521 U.S. at 283.

*Second*, the Supreme Court noted that it is "a longstanding practice of the national Executive to settle [claims against foreign nationals] in discharging its responsibility to maintain the Nation's relationships with other countries." *Garamendi*, 539 U.S. at 420 (cleaned up); *see also Medellín*, 552 U.S. at 531 (noting

36

that *Garamendi* "involve[d] a narrow set of circumstances:  the making of executive

agreements to settle civil claims between American citizens and foreign

governments or foreign nationals").  Here, by contrast, there is no longstanding

federal foreign policy pertaining to the use and occupation of a State's submerged

lands.  Indeed, the only foreign policy that Enbridge points to—the 1977 Transit

Treaty—*preserves* the State's authority to regulate matters such as environmental

protection.  This is a far cry from the situation in *Garamendi,* where a state sought

to establish a competing process for resolving international claims.  *Cf. Dunbar v.

Seger-Thomschitz*, 615 F.3d 574, 579 (5th Cir. 2010) (chastising a plaintiff that

invoked foreign affairs preemption but "present[ed] no proof that U.S. policy . . . is

committed to overriding generally applicable state property law").

Especially considering the dubious nature of Enbridge's Treaty claim, the

numerous Presidential Permits requiring Enbridge to obtain valid easements and

comply with generally applicable Michigan laws, and the standard of review on this

pre-discovery motion for summary judgment, Enbridge has come nowhere close to

demonstrating the sort of "clear conflict" necessary for the Court to find that the

State's traditional, sovereign authority over State-owned, public-trust lands has

been impliedly preempted.

### D.  Nothing authorizes domestic courts to enjoin state action based on a "colorable" Treaty claim.

Canada suggests that, while the Court should not make a "substantive

determination under the 1977 Treaty," it should enjoin the Michigan Officials for an

37

indefinite duration (the informal dispute-resolution process began *four years ago*) because the Treaty claim is at least "colorable." (Amicus Br., ECF No. 133, PageID.1728–30.) As an initial matter, courts "do not ordinarily address issues raised only by *amici*." *United Student Aid Funds, Inc. v. Espinosa*, 558 U.S. 260, 267 n.4 (2010) (citation omitted). Regardless, nothing supports the idea that, although Enbridge cannot bring a Treaty claim in this Court, it somehow *can* secure injunctive relief from this Court upon a finding that a Treaty claim is "colorable."

This "colorable claim" standard appears to have been invented from whole cloth. Canada cites no support for it, and it is unmoored from the usual preliminary injunction standard, which requires the Court to assess the likelihood of success on the merits—an inquiry Canada expressly requests the Court *not* to engage in— among other factors. *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 767 F. Supp. 3d 556, 579 (W.D. Mich. 2025).

Commentators have noted that Canada's position is contrary to the usual presumption in international law that, when a Treaty claim is made, domestic law applies unimpeded unless there is language in the Treaty specifying otherwise. *See* Dodge, *supra*, 31. This usual rule makes good sense. The United States is a party to hundreds of treaties on a wide variety of topics, and many of them include similar dispute resolution provisions.[19] Holding that a nonparty to a Treaty may obtain indefinite injunctive relief in domestic court, absent any language in the Treaty to

---

[19] *See, e.g.*, https://investmentpolicy.unctad.org/international-investment-agreements/countries/223/united-states-of-america (last visited Sept. 5, 2025).

that effect, would enable an enormous array of collateral attacks by foreign actors on state action of all kinds.

Here, there is simply nothing in the Treaty—or any other source of law that has been cited—authorizing this Court to enjoin the Michigan Officials based on a finding that Enbridge's Treaty claim is "colorable."  Instead, the Treaty makes plain that any "appropriate remedies" are to be obtained through international negotiation and arbitration.  1977 Treaty, art. IX(3).  The Wisconsin district court rejected a similar argument, finding that Article IX did not permit or require a stay. *Bad River*, 626 F. Supp. 3d at 1057.  This Court should follow suit.

## CONCLUSION AND RELIEF REQUESTED

For all these reasons, Enbridge's motion for partial summary judgment on Counts I and III of the complaint (ECF No. 124) should be denied.

Respectfully submitted,

/s/ *Keith D. Underkoffler*
Keith D. Underkoffler (P84854)
Echo Aloe (P86363)
Assistant Attorneys General
Attorneys for Defendants
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock (P71246)
Special Assistant Attorney General
Attorney for Defendants

39

Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130
dbock@fsbrlaw.com

Dated:  September 5, 2025

LF:  Enbridge Straits (Dec & Inj Relief) (v DNR) WD/AG #2020-0306464-A/Response to Motion for Summary 2025-09-05

40