# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| ENBRIDGE ENERGY, LIMITED PARTNERSHIP, ENBRIDGE ENERGY COMPANY, INC., and ENBRIDGE ENERGY PARTNERS, L.P., | ) ) ) ) |
|  | ) Case No. 1:20-cv-01141-RJJ-RSK |
| Plaintiffs, | ) ) Hon. Robert J. Jonker |
| v. | ) ) |
| GRETCHEN WHITMER, the Governor of the State of Michigan in her official capacity, SCOTT BOWEN, Director of the Michigan Department of Natural Resources in his official capacity, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

## STATEMENT OF INTEREST OF THE UNITED STATES

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

ERIC J. HAMILTON
*Deputy Assistant Attorney General*
Civil Division
Federal Programs Branch

DIANE K. KELLEHER
*Director*
Federal Programs Branch

CRISTEN C. HANDLEY
*Trial Attorney*
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L St., NW
Washington, DC 20005
(202) 305-2677

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
Environment and Natural Resources Div.

JOHN K. ADAMS
*Chief of Staff & Senior Counsel*
U.S. Department of Justice
Environment and Natural Resources Div.
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 514-5442
John.Adams3@usdoj.gov

*Counsel of Record*

*Of Counsel:*

GREGORY D. COTE
*Acting General Counsel*
CHARLES E. ENLOE
*Assistant General Counsel*
SAMUEL G. FULLER
*Senior Trial Attorney*
U.S. Department of Transportation

BENJAMIN M. FRED
*Assistant Chief Counsel*
Pipeline and Haz. Materials Safety Admin.

# TABLE OF CONTENTS

INTERESTS OF THE UNITED STATES ....................................................... 1

INTRODUCTION ..................................................................................... 2

BACKGROUND ....................................................................................... 4

   I.   The Federal Government Comprehensively Regulates Pipeline Safety ........... 4

      A.   Congress Directed the Department of Transportation and Its Expert Agency—PHMSA—to Adopt and Enforce National Uniform Safety Standards for Pipeline Infrastructure and Transportation ..................... 4

      B.   Congress Expressly Preempted State Safety Standards Because a 50-State Patchwork of Pipeline Safety Regulations Would Be Untenable.... 7

      C.   The Federal Government Has Enhanced Pipeline Safety for Submerged Pipelines in the Great Lakes, Including for Line 5............... 8

      D.   Michigan Issues its Notice to Enbridge to Cease Line 5 Operations and to Permanently Decommission the Straits Pipeline ....................... 11

  II.   Canada Invokes the Transit Treaty as a Result of Michigan's Actions.......... 11

ARGUMENT ........................................................................................ 14

   I.   The Pipeline Safety Act Preempts Michigan's Efforts to Shut Down Line 5 ................................................................................................ 14

      A.   The Pipeline Safety Act Bars States' Attempts to Impose Safety Standards Through a "Notice of Revocation and Termination of Easement" or Otherwise .......................................................... 14

      B.   Concluding That Michigan May Shut Down an Established Pipeline Under the Guise of a Non-Preempted "Locational Decision" Would Upend Preemption Under the Pipeline Safety Act.................................. 20

  II.   The Foreign Affairs Doctrine Preempts Michigan's Efforts to Shut Down Line 5 ................................................................................................ 22

      A.   Michigan's Shut Down Efforts Conflict with U.S. Foreign Policy .......... 22

      B.   Because Alternative Grounds Resolve this Case, the Court Need Not (and Should Not) Interpret or Apply the Transit Treaty ....................... 25

CONCLUSION..................................................................................... 27

## INTERESTS OF THE UNITED STATES

The United States has strong interests in this case. First, through the Pipeline Safety Act ("the Act"), Congress charged the U.S. Department of Transportation ("DOT") with responsibility to adopt and enforce nationwide safety standards for pipeline transportation and pipeline facilities. *See* 49 U.S.C. § 60102(a)(1), (2), (b)(1), (2) (adoption); *id.* §§ 60117, 60118(a), (b), 60120(a), 60122, 60123 (enforcement). The comprehensive nature of the Act and its express preemption provision show Congressional intent that a uniform set of safety standards governs interstate pipeline operations. The United States has filed briefs to ensure that this uniform scheme is not undermined by States' establishment and enforcement of safety standards to an interstate pipeline facility. *See, e.g.*, Br. for United States, *Bad River Band of the Lake Superior Tribe of Chippewa Indians of the Bad River Reservation v. Enbridge Energy Co.*, No. 23-2309, Dkt. No. 94 (7th Cir. Apr. 10, 2024); Br. for the United States, *Portland Pipe Line Corp. v. City of S. Portland*, No. 18-2118 (1st Cir. June 28, 2021).

Second, the United States has a significant interest in promoting an "affordable and reliable domestic supply of energy," which "is a fundamental requirement for the national and economic security of any nation." Declaring a National Energy Emergency, Exec. Order No. 14,156, § 1, 90 Fed. Reg. 8433 (Jan. 20, 2025). Attempts to shut down interstate pipelines threaten that interest.

Finally, this case implicates significant interests of the United States in its conduct of foreign affairs. The pipeline at issue here, Line 5, is subject to a treaty between the United States and Canada. *See* Agreement on Transit Pipelines, Can.-

U.S., Jan. 28, 1977, 28 U.S.T. 7449 (the "Transit Treaty"). The Transit Treaty prohibits certain authorities in either country from taking actions that would impede the transmission of hydrocarbons through a covered pipeline. *See id.* art. II(1). The United States has a compelling interest in complying with its obligations under the Treaty, and it is engaged in ongoing negotiations with Canada regarding the State of Michigan's activities challenged in this case. Accordingly, the United States has a vital stake in ensuring that courts properly consider whether their rulings or other actions might expose the United States to liability for treaty violations.

## INTRODUCTION

Plaintiffs (collectively, "Enbridge") have renewed their motion for summary judgment on two independent grounds: express preemption under the Pipeline Safety Act (Count I) and preemption under the Foreign Commerce Clause and Foreign Affairs Doctrine (Count III). Because the United States has strong interests in this case, it submits this Statement of Interest to provide its views on certain issues that are material to those interests.

First, the Act expressly preempts the Notice of Revocation and Termination of Easement (the "Notice") issued to Enbridge by the Governor of Michigan and the Director of Michigan's Department of Natural Resources (collectively, "Michigan"). The Act directs an expert federal agency within DOT—the Pipeline and Hazardous Materials Safety Administration ("PHMSA")—to prescribe and enforce a comprehensive set of nationally uniform safety standards for hazardous liquid pipeline facilities. For decades, PHMSA has developed and enforced hundreds of standards to promote the

safe and reliable operation of more than 3.3 million miles of pipelines that deliver more than two-thirds of energy products to our market. Recognizing that a non-uniform set of safety standards would be untenable, Congress included an express preemption in the Act that gives PHMSA—and PHMSA alone—exclusive authority to regulate the safety of interstate pipeline facilities. *See* 49 U.S.C. § 60104(c). This provision preempts Michigan's attempt to second guess Congress's decision and substitute its own judgment through the Notice for that of PHMSA's.

The Federal Government also took decisive action against the same three environmental events described in the Notice (2010 oil spill, 2018 anchor strike, 2020 external strike) that Michigan uses to justify shutting down Line 5. Indeed, following the 2018 anchor strike, Congress amended the Act in 2020 and PHMSA issued an interim final rule to provide additional protections for the Great Lakes and connecting waters. *See* Pub. L. No. 116-260; 86 Fed. Reg. 73173. By revisiting these same incidents to impose different standards and different results, Michigan is not only thwarting Congressional intent to promote a nationally uniform safety program but also is creating an unworkable patchwork of state standards for interstate pipelines.

Second, the United States has a manifest interest in protecting its exclusive authority over matters of foreign affairs related to energy and its diplomatic relationship with Canada. Michigan's attempt to globalize its regulatory reach by shutting down Line 5 runs afoul of that interest and provides another reason to resolve this case in favor of Enbridge, according to the Foreign Affairs Doctrine. In reaching this issue, however, the United States urges the Court not to address the Transit Treaty due to the unique and complex issues associated with ongoing negotiations between

the United States and Canada about Line 5 as a result of Michigan's conduct here. And if the Court addresses the Transit Treaty, the United States requests that it approach the Treaty carefully and with due regard for the United States' interests in foreign affairs and treaty obligations so as not to either strain our diplomatic relations or potentially expose the United States to damages, as explained below.

## BACKGROUND

### I. The Federal Government Comprehensively Regulates Pipeline Safety

#### A. Congress Directed the Department of Transportation and Its Expert Agency—PHMSA—to Adopt and Enforce National Uniform Safety Standards for Pipeline Infrastructure and Transportation

Congress originally authorized the Secretary of Transportation to administer a nationwide safety program for hazardous liquid pipeline facilities in the Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. No. 96–129, Title II, Nov. 30, 1979, 93 Stat. 1003 ("HLPSA"). The HLPSA was modeled on earlier legislation that provided the Secretary with comparable authority for natural gas pipeline facilities: the Natural Gas Pipeline Safety Act of 1968, Pub. L. No. 90–481, Aug. 12, 1968, 82 Stat. 720 ("NGPSA"). Congress later consolidated the provisions of the HLPSA and NGPSA in Title 49, Chapter 601 of the U.S. Code. *See* Pub. L. No. 103–272, § 7(b), July 5, 1994, 108 Stat. 1391. That consolidated statute is now referred to as the Pipeline Safety Act. PHMSA is the operating administration within DOT that currently administers the provisions in the Pipeline Safety Act on behalf of the Secretary. *See* Norman Y. Mineta Research and Special Programs Improvement Act, Pub. L. No. 108-426, § 2, 118 Stat. 2423, 2423 (Nov. 30, 2004) (creating PHMSA); 49 U.S.C. § 108(f)(1) (directing PHMSA to administer the Act); 49 C.F.R. § 1.97(a)(1) (delegating the Secretary's

4

authority to PHMSA); 49 C.F.R. Part 195.

Consistent with the purpose of the Act, 49 U.S.C. § 60102(a)(1), Congress has delegated broad authority to PHMSA to prescribe federal safety standards for hazardous liquid pipeline facilities. *See* 49 U.S.C. § 60102(a)(2).[1] Those safety standards "may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of [hazardous liquid] pipeline facilities." 49 U.S.C. § 60102(a)(2)(B).

The Act requires PHMSA to consider numerous specific factors when prescribing safety standards for hazardous liquid pipeline facilities. *See, e.g.*, *id.* §§ 60102(b)(2)–(5). These factors include, among other things, the "relevant available . . . hazardous liquid pipeline safety information" and "environmental information" as well as the "appropriateness of the standard for the particular type of pipeline transportation or facility" and "the reasonableness of the standard." *See, e.g.*, *id.*

DOT and PHMSA have prescribed a comprehensive set of federal safety standards for hazardous liquid pipeline facilities in the four decades since the passage of the HLPSA. *See* 49 C.F.R. Part 195. Those safety standards apply to the design, construction, testing, operation, maintenance, and corrosion control of hazardous liquid pipeline facilities, as well as to the qualification of pipeline personnel. *See* 49 C.F.R. §§ 195.100–195.591. PHMSA has also prescribed a comprehensive set of risk-based integrity management requirements that apply to hazardous liquid pipeline facilities in high consequence areas ("HCAs"), including "the Great Lakes and their connecting

---

[1] For simplicity, this brief describes the Act's provisions as applying to hazardous liquid pipelines, even though many provisions also apply to natural gas and other pipelines.

waters." *See* 49 C.F.R. §§ 195.6(b)(7), (c) (defining unusually sensitive areas ("USAs")), 195.450 (defining HCAs to include USAs), 195.452 (applying risk-based integrity management requirements to pipelines that could affect HCAs).

Congress has given PHMSA a variety of enforcement tools to ensure that pipeline owners and operators comply with the federal safety standards for hazardous liquid pipeline facilities. PHMSA may issue compliance orders, 49 U.S.C. § 60118(b); 49 C.F.R. § 190.217, and assess civil penalties in administrative proceedings for violations of the Act, a regulation prescribed, or an order issued pursuant to the Act. *See* 49 U.S.C. § 60122; 49 C.F.R. §§ 190.221–190.227. PHMSA may also issue corrective action orders if the continued operation of a hazardous liquid pipeline facility "is or would be hazardous to life, property, or the environment," 49 U.S.C. § 60112; 49 C.F.R. § 190.233, as well as safety orders if a hazardous liquid pipeline facility "has a condition that poses a pipeline integrity risk to public, safety, property, or the environment." 49 U.S.C. § 60117(m); 49 C.F.R. § 190.239. PHMSA may also require the revision of written plans and procedures for inspecting and maintaining a pipeline facility when they are inadequate. *See* 49 U.S.C. § 60108(a)(2); 49 C.F.R. § 190.206.

Finally, PHMSA has the authority to issue emergency orders, including to multiple owners and operators of hazardous liquid pipeline facilities, if "an unsafe condition or practice, or a combination of unsafe conditions and practices, constitutes or is causing an imminent hazard," 49 U.S.C. § 60117(p); 49 C.F.R. § 190.236. PHMSA also has the authority to refer matters to the United States Attorney General for potential enforcement in civil proceedings, 49 U.S.C. § 60120(a); 49 C.F.R. § 190.235, or

criminal prosecution, 49 U.S.C. § 60123; 49 C.F.R. § 190.291–190.293.[2]

### B. Congress Expressly Preempted State Safety Standards Because a 50-State Patchwork of Pipeline Safety Regulations Would Be Untenable

Recognizing that a 50-state patchwork of safety regulations for interstate pipelines would be untenable and unwise, Congress included an express preemption provision within the Pipeline Safety Act. This provision provides that "[a] State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C. § 60104(c). As defined in the Act, an "interstate hazardous liquid pipeline facility" is a pipeline facility "used to transport hazardous liquid in interstate or foreign commerce." *Id.* § 60101(a)(7). "Interstate or foreign commerce," as it relates to a hazardous liquid pipeline facility, "means commerce between—(i) a place in a State and a place outside that State; or (ii) places in the same State through a place outside the State." *Id.* § 60101(a)(8)(B).

The Eighth Circuit recently reviewed the Act's preemption provision and concluded it "expressly preempted the entire field of hazardous liquid pipeline safety." *Couser v. Shelby Cnty., Iowa*, 139 F.4th 664, 672 (8th Cir. 2025); *see also Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dep't of Com.*, 999 F.2d 354, 358 (8th Cir. 1993) ("Congress has expressly stated its intent to preempt the states from regulating in the area of safety in connection with interstate hazardous liquid pipelines."). Likewise, the Ninth Circuit found "the [Act] 'expressly preempts states from imposing any additional safety standards on *inter* state pipelines.'" *Olympic Pipe Line Co. v. City of*

---

[2] The Act also contains a citizen suit provision that authorizes civil actions to enjoin violations of the Act or regulations or orders prescribed thereunder. *See* 49 U.S.C. § 60121.

*Seattle*, 437 F.3d 872, 880 (9th Cir. 2006) (emphasis in original) (quoting *Shell Oil Co. v. City of Santa Monica*, 830 F.2d 1052, 1063 (9th Cir. 1987)). Federal law thus seeks to provide "a national hazardous liquid pipeline safety program with nationally uniform minimal standards" promulgated by PHMSA. 49 C.F.R. Part 195, app. A.[3] States cannot interfere with this framework enacted by Congress by attempting to impose or enforce safety standards for interstate pipelines.

## C. The Federal Government Has Enhanced Pipeline Safety for Submerged Pipelines in the Great Lakes, Including for Line 5

To prioritize safety in our diverse environments, Congress and PHMSA consider the context of pipeline locations. *See, e.g.*, 49 U.S.C. § 60109 (statutory provisions specific to "[h]igh-density population areas and environmentally sensitive areas"). For example, Congress amended the Act in 2016 and 2020 to designate the Great Lakes and connecting waterways as "unusually sensitive areas" that receive enhanced protection. *See* Protecting Our Infrastructure of Pipelines and Enhancing Safety Act of 2016, Pub. L. No. 114–183, § 19, 130 Stat. 514, 527; Consolidated Appropriations Act, 2021, div. r, § 120(a), (d), 134 Stat. at 2235-36. Importantly, Congress amended the Act in 2020 to ensure that the Federal Government considers "potential impacts by maritime equipment or other vessels, including anchors, anchor chains, or any other attached equipment" in these areas when promulgating safety

---

[3] The Act allows PHMSA to enter into an agreement with a state authorizing it to conduct inspections and investigations of interstate pipeline facilities. 49 U.S.C. § 60106(b). Even if such an agreement is in place, however, PHMSA retains exclusive authority to prescribe and enforce pipeline safety standards for such interstate pipeline facilities. 49 U.S.C. § 60106(b)(1) ("Nothing in this section [authorizing interstate agent agreements] modifies section 60104(c) or authorizes the Secretary to delegate the enforcement of safety standards for interstate pipeline facilities prescribed under this chapter to a State authority.").

standards. 49 U.S.C. § 60109(g)(5). As another example, PHMSA has issued an interim final rule to require operators to comply with enhanced requirements for submerged pipelines. *See* Pipeline Safety: Unusually Sensitive Areas for the Great Lakes, Coastal Beaches, and Certain Coastal Waters, 86 Fed. Reg. 73173, 73174 (Dec. 27, 2021). The Federal Government took these actions following specific safety incidents.

Well before these actions focused on pipelines in the Great Lakes, Congress directed PHMSA to address risks associated with underwater pipelines and vessel navigation. Pub. L. No. 101-599, § 1(b), 104 Stat. 3039 (requiring operators of hazardous liquid pipeline facilities in the Gulf of America and its inlets to identify and address facilities that are exposed or are a hazard to navigation); Pub. L. No. 102-508, § 207, 106 Stat. 3302 (extending the same requirement to all hazardous liquid pipeline facilities that are offshore or in navigable waters). PHMSA prescribed safety standards implementing those mandates. *See* 49 C.F.R. § 195.413. In addition, PHMSA prescribed design and construction standards for pipelines crossing inland bodies of water, in the Gulf of America, or certain other offshore areas. *See e.g.*, 49 C.F.R. §§ 195.246 (supports) and 195.248 (depth of cover). Another regulation requires protecting pipelines from anticipated external pressures and loads, which may include external stresses caused by ship anchors. *See* 49 C.F.R. § 195.110(a) and PHMSA interpretation PI-76-067 (Oct. 14, 1976), https://perma.cc/L8B5-BBLM.

PHMSA's regulation and enforcement of pipeline safety has included Line 5. In 2018, a tugboat anchor struck Line 5 in the Straits of Mackinac. *See Marine Accident Brief*, Nat'l Transportation Safety Board (Apr. 1, 2018), https://perma.cc/7PQP-

FYTV. The anchor caused three dents to Line 5 and raised concerns about the vulnerability of the pipeline to other anchor strikes. PHMSA diligently investigated the safety incident and afterward provided detailed testimony to the U.S. Senate. *See* PHMSA Statement, *Pipeline Safety in the Great Lakes: Incident Prevention and Response Efforts at the Straits of Mackinac*, U.S. Senate (Aug. 20, 2018) (PHMSA U.S. Senate Testimony), https://perma.cc/UD5K-BQ6D.

In its testimony, PHMSA underscored that its mission is to "protect people and the environment by advancing the safe transportation of energy and other products that are essential to our daily lives," including through nearly 3,500 miles of hazardous liquid "pipelines in Michigan alone." *Id.* PHMSA "emphasiz[ed] that Line 5 was designed and constructed to significantly higher safety standards than [other pipelines] that had failed." *Id.* (concluding further that "Line 5 has a much lower risk of failure"). Nonetheless, due to the "widespread concern[s] over the safety of Line 5," PHMSA requires Enbridge "to meet or exceed [its] pipeline safety regulation[s], policies, and procedures." *Id.* PHMSA thus takes a proactive approach with Line 5, such as reviewing "Enbridge's internal inspections, maximum operating pressure determinations, and capacity increase modifications." *Id.* PHMSA also supervises "Enbridge's hydrostatic pressure tests of the crossings" and monitors "Enbridge's compliance with the Congressional mandate for annual inspections of pipeline water crossings over 150 feet deep." *Id.*[4]

---

[4] PHMSA continues to monitor Line 5 as part of its statutory duties to prioritize pipeline safety. *See, e.g.*, PHMSA Correspondence to Enbridge Energy Regarding Line 5 (June 29, 2020) (describing safety efforts related to Line 5), https://perma.cc/9HXH-VULT.

### D. Michigan Issues its Notice to Enbridge to Cease Line 5 Operations and to Permanently Decommission the Straits Pipeline

In November 2020, Michigan issued a "Notice of Revocation and Termination of Easement" (the Notice) directing Enbridge to "cease operation of the Straits Pipeline 180 days after the date of the Notice" and to "permanently decommission the Straits Pipeline." Dkt. No. 1-1, PageID.22–41. The key rationale for the Notice is Michigan's concern that Line 5 creates a risk of an oil spill that will harm the Straits of Mackinac and the surrounding environment. *See e.g.*, *id.*, PageID.28–29. Michigan cites supposed risks created by Line 5's design and maintenance, as well as "the inherent risks of pipeline operations" and the "threat of damage to the Straits Pipelines from anchor strikes or impacts from other external objects" as reasons for shutting down Line 5. *Id.*, PageID.27. The Notice asserts two theories in support: (1) state-law "public trust" doctrine and (2) state safety standards for pipeline spans or lengths, coatings, and curvature. *Id.*, PageID.23–40.

Shortly after receiving the Notice, Enbridge filed this suit seeking declaratory and injunctive relief based on violations of the Act and Foreign Affairs Doctrine.

## II.  CANADA INVOKES THE TRANSIT TREATY AS A RESULT OF MICHIGAN'S ACTIONS

Entered in 1977, the Transit Treaty is an international agreement between the United States and Canada intended "to ensure the uninterrupted transmission by pipeline" of hydrocarbons between the two countries. Transit Treaty, pmbl. To further that purpose, Article II(1) of the Treaty provides that "[n]o public authority in the territory of either [nation] shall institute any measures, other than those provided for in Article V, which are intended to, or which would have the effect of, impeding,

11

diverting, redirecting or interfering with in any way the transmission of hydrocarbons in transit." *Id.* art. II(1).[5] Article V permits the transmission of hydrocarbons to "be temporarily reduced or stopped in the interest of sound pipeline management and operational efficiency" if there is an "actual or threatened natural disaster, an operating emergency, or other demonstrable need . . . for safety or technical reasons" and if the reduction or stoppage is "by or with the approval of the appropriate regulatory authorities" of the relevant party. *Id.* art. V(1). The party in whose territory the "temporary reduction or stoppage" occurs may not "unnecessarily delay or cause delay in the expeditious restoration of normal pipeline operations." *Id.* art. V(3).

The Treaty provides for nondiscriminatory regulations of covered pipelines by "appropriate governmental authorities having jurisdiction over" the relevant pipeline. *Id.* art. IV(1). "Notwithstanding" Article II, Article IV(1) provides that:

> a Transit Pipeline and the transmission of hydrocarbons through a Transit Pipeline shall be subject to regulations by the appropriate governmental authorities having jurisdiction over such Transit Pipeline in the same manner as for any other pipelines or the transmission of hydrocarbons by pipeline subject to the authority of such governmental authorities with respect to such matters as [pipeline safety and environmental protection, among others].

Such regulations must "be just and reasonable, and shall always, under substantially similar circumstances with respect to all hydrocarbons transmitted in similar pipelines, . . . be applied equally to all persons and in the same manner." *Id.* art. IV(2).

The Transit Treaty provides a two-step process for dispute resolution. First,

---

[5] The Transit Treaty does not define "public authority," "impeding," "diverting," "redirecting," or "interfering." It also does not define "appropriate governmental authorities having jurisdiction" over a pipeline or "appropriate regulatory authorities," terms that appear in Articles IV(1) and V(1), respectively.

Article IX(1) requires that "[a]ny dispute between the Parties regarding the interpretation, application or operation of" the Treaty "shall, so far as possible, be settled by negotiation." *Id.* art. IX(1). Second, if negotiation does not resolve a dispute, the dispute "shall be submitted to arbitration at the request of either Party." *Id.* art. IX(2). The arbitration panel has the authority to decide the dispute, "including appropriate remedies," and its "decision shall be binding on the Parties." *Id.* art. IX(3).

The Government of Canada has invoked the Treaty's dispute resolution provisions, asserting that Michigan's efforts to shut down Line 5 at the Straits place the United States in violation of Article II of the Treaty. In its amicus brief filed in this Court, Canada contends that "any shutdown of Line 5 by public authorities within the United States (including Michigan [o]fficials) while the Article IX international dispute resolution process is ongoing would constitute a violation of the United States' international law obligations to Canada . . . and expose the United States to significant liability." *See* Dkt. No. 133, PageID.1713. Canada further identifies the "devastating impact" that it believes a shutdown of Line 5 would have on significant parts of the Canadian economy. *See id.*, PageID.1720-1722. The United States and Canada are involved in diplomatic negotiations to address Canada's allegations, as required under Article IX. If these negotiations do not lead to a resolution, Canada may submit its dispute to binding international arbitration. *See* Transit Treaty art. IX(3).

13

## ARGUMENT

**I.    THE PIPELINE SAFETY ACT PREEMPTS MICHIGAN'S EFFORTS TO SHUT DOWN LINE 5**

The Supremacy Clause, U.S. Const., Art. VI, cl. 2, "invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cnty. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden,* 9 Wheat. 1, 211, 6 L.Ed. 23 (1824)). When acting within constitutional limits, "Congress is empowered to pre-empt state law by so stating in express terms." *Id.* "Pre-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. General Elec. Co.*, 496 U.S. 72, 78–79 (1990) (internal citation omitted). Such is the case here: Michigan may not "adopt or continue in force safety standards" for Line 5. 49 U.S.C. § 60104(c).[6]

**A.    The Pipeline Safety Act Bars States' Attempts to Impose Safety Standards Through a "Notice of Revocation and Termination of Easement" or Otherwise**

**1.** Because Michigan is attempting to impose its own state safety standards on Line 5, its actions are preempted under section 60104(c).[7]

---

[6] If a state law does not come within the scope of a federal statute's express preemption provision, the state law will still be preempted if it actually conflicts with federal law. *See Geier v. American Honda Motor Co.*, 529 U.S. 861, 867 (2000). Because, as explained below, Michigan's Notice is expressly preempted by the Pipeline Safety Act, the Court need not consider whether the Notice also actually conflicts with the statute.

[7] Michigan's brief in opposition filed on September 5, 2025, presents several legal arguments that Michigan did not rely on to any significant extent in its prior summary judgment briefing. This includes an argument that relies on the Notice's theory that the 1953 easement was void upon issuance. Dkt. No. 134, PageID.1779–80. The United States has not attempted to evaluate and address *all* of Michigan's newly developed arguments from last week.

Section 60104(c) provides that a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." "Safety standards" here include standards needed for "protecting the environment." 49 U.S.C. § 60102(b)(1)(ii). Congress, courts, and PHMSA thus consider efforts to protect the environment a "safety standard" under the Act. *See, e.g.*, *id.* 60102(b)(2)(A)(iii) (the Secretary "shall consider . . . environmental information" in prescribing safety standards); *Olympic Pipe Line*, 437 F.3d at 879–80 (preempting efforts to protect "the state's environment"); 49 C.F.R. §§ 195.6 & 195.450 (defining "unusually sensitive area" and "high consequence area" subject to heightened safety standards to include sensitive ecological areas and commercially navigable waterways); PHMSA U.S. Senate Testimony, *supra* (stating that the mission of PHMSA "is to protect people and the environment").[8]

In this case, Michigan is enforcing its own safety standards—in the guise of the public trust doctrine and the easement conditions—to shut down Line 5 to protect the environment and concomitant concerns on human health and the economy.[9] Both state-law theories to protect the environment from interstate pipelines are barred by

---

[8] Relying on a textbook about the practical approaches to pipeline management, Michigan construes "standard" in the Act too narrowly in arguing that it is confined to a "set of technical definitions and guidelines." Dkt. No. 134, PageID.1773 (citing Rafael G. Mora et al., *Pipeline Integrity Management Systems: A Practical Approach* (ASME Press 2016)). In fact, section 60102(b)(1)(A) calls for "practicable" rules for safety standards—not technical rules. And in any event, Michigan's Notice is largely based on Enbridge's purported violation of the "set of technical definitions and guidelines" contained in the Easement.

[9] PHMSA also couples safety standards for the environment with those for human life or property. *See, e.g.*, 49 C.F.R. § 195.260(c) (requiring safety valves "[o]n each pipeline at locations along the pipeline system that will minimize or prevent safety risks, property damage, or environmental harm"); *id.* § 195.416(b) (requiring periodic assessments of pipeline segments as necessary to ensure public safety).

the express preemption clause in the Pipeline Safety Act.

First, Michigan contends that Line 5 should shut down under the public trust doctrine because Line 5 is allegedly unsafe due to potential environmental harms. *See* Dkt. No. 1-1, PageID.23–32. The throughline of the Notice is to address "an extraordinary, unreasonable threat to public rights because of the very real risk of further anchor strikes and other external impacts" on Line 5. *Id.*, PageID.26–27. The Notice goes on to describe repeatedly the "inherent risks of pipeline operations" that could cause "catastrophic effects if an oil spill occurs." *Id.*, PageID.27 (describing further a report commissioned by Michigan about the threat of "anchor strikes" in the Straits). Moreover, "even apart from [Line 5's] unique vulnerability to anchor strikes," Michigan believes that "operation of [Line 5] presents inherent risks of environmental harm" due, in part, to threats of an "oil spill." *Id.*, PageID.28–29; *id.*, PageID.30 (describing "the unique and complex environment of the Great Lakes and the Straits area" that are threatened by an "oil spill").

Statements about pipeline safety from Michigan officials bolster what is plain from the text of the Notice. In a contemporaneous press release, Governor Whitmer stated that Line 5 poses "an unacceptable risk of a catastrophic oil spill in the Great Lakes that could devastate" Michigan given that the Great Lakes "supply drinking water" to "5 million [people] in Michigan." *Governor Whitmer Takes Action to Shut Down the Line 5 Dual Pipelines through the Straits of Mackinac*, Gov. Gretchen Whitmer (Nov. 13, 2020), https://perma.cc/94EQ-5G9J. Michigan's director of natural resources echoed this safety concern: "Our number one priority is protecting the Great

Lakes . . . ." *Id.*[10] Yet seeking to protect against interstate pipeline risks of environmental and attendant harm is a core purpose of federal safety standards under the Act. *See* 49 U.S.C. § 60102(a)(1) (stating the "purpose" of providing "adequate protection against risks to life and property posed by pipeline[s]").

Second, Michigan asserts that Line 5 should shut down because Enbridge allegedly failed to follow state "standard[s] of due care," *i.e.*, state safety standards. *See* Dkt. No. 1-1, PageID.32–40. The Notice analyzes the characteristics of Line 5 when assessing "due care," *e.g.*, pipeline spans or lengths, coatings, and curvature. *Id.* These are the same types of characteristics that PHMSA considers when assessing pipeline safety. *See, e.g.*, 49 U.S.C. § 60102(a)(2)(A), (B) (requiring a pipeline operator to take, or refrain from taking, specific action respecting the design, installation, construction, or operation of the pipeline); 49 C.F.R. §§ 195.100–195.266 (specifying design and construction standards); § 195.557 (identifying which pipelines must have coating). Said otherwise, Michigan is using its own safety standards in place of PHMSA's.

Under either its public trust rationale or its own easement conditions, Michigan has not even attempted to offer a non-safety rationale for its actions. Instead, Michigan wants to shut down Line 5 because it believes, under the public trust doctrine, that "Enbridge's operation of the Straits Pipelines presents a substantial,

---

[10]    *See also* Statement from Governor Whitmer's Office (June 27, 2019), https://perma.cc/ET4H-FHCG ("The risk of a catastrophic oil spill in the Great Lakes, and the harm that would follow to Michigan's economy, tourism, and our way of life, is far too great to allow the pipelines to continue to operate indefinitely.").

inherent and unreasonable risk of an oil spill." Dkt. No. 1-1, PageID.30. It expresses this same environmental concern to justify imposing pipeline spans or lengths, coatings, and curvature. *Id.*, PageID.38 (alleging that "external impacts from anchors and other objects" justify state safety standards). Michigan's shutdown efforts under either theory thus correspond to attempts to impose state safety standards on Enbridge. Such efforts are preempted under the Act. *See* 49 U.S.C. § 60104(c).

**2.** The Notice describes three "[r]ecent events" that further show that Michigan is using environmental protection standards to shut down Line 5: (1) 2010 "Michigan Line 6B failure," (2) 2018 anchor strike, and (3) 2020 report by Enbridge of external objects striking its pipelines. *See* Dkt. No. 1-1, PageID.27–28. The Federal Government investigated these same incidents and took decisive action.

First, immediately following the 2010 oil spill, PHMSA issued a corrective action order requiring the operator to take specific steps to ensure the safety of the pipeline before PHMSA would allow the pipeline to return to service, which was subsequently amended. *See In the Matter of Enbridge Energy Partners, L.P.*, CPF No. 3-2010-5008H (U.S. DOT 2010), https://perma.cc/X4A9-JGLB. In addition, PHMSA issued a notice of probable violation and assessed a civil penalty of $3,699,200 for violations of the pipeline safety regulations that were committed in connection with the spill. *See Enbridge Enforcement Action Details*, CPF No. 320125013 (U.S. DOT 2012), https://perma.cc/MTQ3-HB79.

Next, following the 2018 anchor strike, Congress amended the Act to impose additional protections to prevent future anchor strikes in the Great Lakes and other coastal areas. *See* Pub. L. No. 116-260, 134 Stat. 2235, 49 U.S.C. § 60109(g)(5)

("[E]ach operator shall implement procedures that assess potential impacts by maritime equipment or other vessels, including anchors, anchor chains, or any other attached equipment."). The 2020 amendment reflects one of a series of legislative choices to task PHMSA and the Secretary of Transportation—not States—with regulation of pipeline safety issues, such as anchor strikes.

PHMSA also issued an interim final rule to its pipeline safety regulations after the 2018 anchor strike to protect the Great Lakes explicitly as an "unusually sensitive area." *See* 86 Fed. Reg. 73173. In support of its rule, PHMSA wanted to "ensure that events like the [2018] anchor strike that damaged Enbridge's Line 5 in the Straits of Mackinac are promptly identified and remediated before they result in environmental damage." 86 Fed. Reg. at 73174; *see also id*. at 73177–78 (describing 2010 "rupture of Enbridge Line 6B" incident).

Third, following the 2020 revelation of external strikes, PHMSA yet again investigated Line 5. *See* PHMSA Letter to Congressman Robert E. Latta at 2 (Jan. 11, 2021), https://perma.cc/VP8U-E2TP. "PHMSA's investigation concluded that no integrity concerns [had] been identified" due to the external strikes. PHMSA nevertheless recommitted to "closely monitor[] Enbridge's compliance and integrity verification activities on Line 5, including in-line inspections." *Id*.

These events demonstrate Congress's longstanding choice to rely on federal action to protect our environment and public health through regulation of interstate pipelines. By revisiting these same incidents to impose different standards and different results, however, Michigan is thwarting Congressional intent to promote a "safety program with nationally uniform minimal standards." 49 C.F.R. Part 195,

19

app. A. The result, if Michigan is successful, would be an untenable environment for pipeline operators to comply with multitudinous state safety standards.

**3.** Finally, the preemptive effect of the Pipeline Safety Act here does not depend on the state-law theory promulgated in the Notice or elsewhere. *See* Dkt. 1-1 (public trust; easement conditions). States cannot artfully plead around preemption. *See City of Ozark, Arkansas v. Union Pac. R.R. Co.*, 843 F.3d 1167, 1172 (8th Cir. 2016) ("preemption does not depend upon the source of a state law claim"); *Wis. Central Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1014 (W.D. Mich. 2000) (the "nature of the preempted state regulation is irrelevant"). Nor can they regulate interstate pipeline safety under the guise of contractual obligations. *See Olympic Pipe Line*, 437 F.3d at 881–82 (finding preemption when the city regulated safety under an agreement).

## B. Concluding That Michigan May Shut Down an Established Pipeline Under the Guise of a Non-Preempted "Locational Decision" Would Upend Preemption Under the Pipeline Safety Act

Michigan argues that its attempt to shut down an international pipeline would not levy safety standards but, rather, impose a locational decision preserved to the States under 49 U.S.C. § 60104(e). *See* Dkt. No. 134, PageID.1776–79. Section 60104(e)—which forbids "the Secretary of Transportation to prescribe the location or routing of pipeline facility"—does not limit PHMSA's authority over all matters relating to the "location or routing" of pipelines. It circumscribes "just the Secretary's authority to '*prescribe* the location or routing of a pipeline facility.'" *Couser*, 139 F.4th at 671 (quoting 49 U.S.C. § 60104(e)) (emphasis in original). Here, because the

20

Secretary has not dictated the location or route of Line 5, this provision is inapt.[11]

A contrary interpretation of section 60104(e) or the Act more broadly, one that allows States to set pipeline safety standards under the guise of "locational decisions," as Michigan contends, would become the locational exception that swallows the preemption rule. States could evade pipeline preemption—and undermine the expertise of PHMSA—merely by recasting their standards as "locational" decisions. This is precisely what Michigan has done here: claiming that it has made a "locational" decision despite pipeline safety concerns driving the basis for its decision. This then would create an unworkable 50-state patchwork of pipeline safety standards that Congress sought to avoid in enacting the express preemption provision in section 60104(c), effectively subjecting an interstate pipeline to multiple conflicting state pipeline safety standards. Courts have rejected such efforts. *See Couser*, 139 F.4th at 671–72 (local setback regulations preempted and not permissible "location or routing" decisions); *Olympic Pipe Line Co. v. City of Seattle, et al.,* No. 03-2343, 2003 WL 27392855, at *4–*5 (W.D. Wash. Aug. 21, 2003) (granting pipeline's motion for preliminary relief, finding that the city likely attempted to impose a safety standard, not a "location or routing" decision, on pipeline when it required "hydrostatic testing").[12]

---

[11] The Act's provisions governing State regulation of *intrastate* pipelines are more complicated but not at issue. Further, the locations and routes of interstate natural gas facilities are prescribed by the Federal Energy Regulatory Commission under the Natural Gas Act. *See* 15 U.S.C. § 717, *et seq.*

[12] Michigan also relies on *Portland Pipe Line Corp. v. City of S. Portland*, 332 F. Supp. 3d 264 (D. Me. 2018), in which the court concluded that a city ordinance that prohibited loading crude oil onto tankers and associated construction of new structures was not a preempted safety standard. At the request of the court, the United States filed an amicus brief in the First Circuit while that case was on appeal. *See* Br. for the United States, *Portland Pipe Line Corp. v. City of S. Portland*, No. 18-2118 (1st Cir. June 28, 2021). In its brief, the United States explained that the Act's preemption provision did not apply because the movement of

21

## II. THE FOREIGN AFFAIRS DOCTRINE PREEMPTS MICHIGAN'S EFFORTS TO SHUT DOWN LINE 5

The United States has a manifest interest in protecting its exclusive authority over matters of foreign affairs related to energy and its diplomatic relationship with Canada. As evident by Canada's amicus brief here, Dkt. No. 133, PageID.1704-1738, Michigan's attempt to globalize its regulatory reach by shutting down Line 5 runs afoul of that interest wholly apart from having to interpret or apply the Transit Treaty. *See Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 213 (4th Cir. 2022) ("Field preemption applies 'in the absence of a treaty' and when a state law or policy 'disturb[s] foreign relations' or if a State attempts to 'establish its own foreign policy.'") (quoting *Zschernig v. Miller*, 389 U.S. 429, 441 (1968)).

### A. Michigan's Shut Down Efforts Conflict with U.S. Foreign Policy

The Supreme Court has long recognized "the supremacy of the national power in the general field of foreign affairs," *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941), and the Executive Branch's "lead role" in the conduct of foreign relations on behalf of the United States, *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972). Accordingly, under the Foreign Affairs Doctrine, the "foreign policy of the Executive Branch" preempts conflicting determinations made in the execution of state law because the President's authority over the Nation's foreign policy is part of the "executive Power" vested in the President by Article II of the Constitution. *Am.*

---

petroleum that occurred in *Portland Pipe Line* was not a "pipeline transportation" for purposes of the Act. *Id.* at 14–16. There is no similar issue here.

*Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413–14 (2003); *see also id.* at 413 ("There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy, given the 'concern for uniformity in this country's dealings with foreign nations.'") (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)). To be preempted, a state action need not make the Executive's foreign policies impossible to effectuate; it is enough that "the likelihood" of the State's conduct "will produce something more than an incidental effect in conflict with express foreign policy." *Id.* at 420.

Here, and again wholly apart from interpreting or applying the Transit Treaty, the "likelihood" of Michigan's Notice producing "something more than an incidental effect in conflict with express foreign policy" is self-evident. *Id.* Canada is a key U.S. partner in energy trade, with investment flowing in both directions across the border, and the continued operation of Line 5 plays a significant role in that partnership. Nothing more is needed to determine that Michigan's conduct imposes significant effects contrary to the United States' foreign policy.

But the conflict doesn't stop there. Michigan's actions to shut down Line 5 clash with the United States' foreign policy related to energy and the construction of interstate pipelines, as expressed in recent Executive Orders. In February 2025, the President issued a directive aimed in part "to protect the United States' economic and national security and military preparedness by ensuring that an abundant supply of reliable energy is readily accessible in every State and territory of the Nation." Unleashing American Energy, Exec. Order No. 14154, § 2, 90 Fed. Reg. 8353, 8353 (Jan. 20, 2025). The President also recently issued an Executive Order affirming that

a "reliable domestic energy supply is essential to the national and economic security of the United States, *as well as our foreign policy*." Protecting American Energy From State Overreach, Exec. Order No. 14260, § 1, 90 Fed. Reg. 15513, 15513 (Apr. 8, 2025) (emphasis added). State laws and policies that try to "dictate interstate and international disputes over air, water, and natural resources" "undermine federalism" and "are fundamentally irreconcilable" with the United States' objective to unleash American energy and advance American interests overseas. *Id*. at 15,514.

Shutting down Line 5 is at odds with these foreign policy interests. A shutdown of Line 5 could cause economic harm to energy markets, particularly in the upper Midwest.[13] For example, natural gas liquids transported by Line 5 provide an estimated 55 percent of Michigan's propane supply, with the propane used to heat Michigan households.[14] These households could be adversely affected if Line 5 ceases to provide them energy. Above all, shutting down Line 5 could disrupt the energy supply chain, increase domestic prices, and enhance the economic and political power and leverage of malign foreign actors worldwide. Such outcomes conflict with our nation's foreign policy goals.

---

[13] In analyzing potential effects of a shutdown of Line 5 in Wisconsin, the court stated that "both sides' experts acknowledge that the loss of Line 5, even with time for planning its closing, will have near-term economic impacts on consumers, particularly with respect to the delivery of propane during heating season." *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Reservation v. Enbridge Energy Co.*, No. 19-cv-602, 2023 WL 4043961, at *8 (W.D. Wis. June 16, 2023); *see also* Dkt. No. 72, PageID.524 (Joint Amicus Brief of North America's Building Trades Unions and United Steelworkers) ("Operating and maintaining the pipeline and its associated industrial facilities provides thousands of members of the Union Amici with meaningful work and solid, middle[-]class wages and benefits.").

[14] *See, e.g., Amicus Brief of American Fuel & Petrochemical Manufacturers, et al*, Dkt. No. 68, PageID.399-400, 408-409; *Joint Amicus Brief of Ohio and Louisiana*, Dkt. No. 21, PageID.144-145.

## B. Because Alternative Grounds Resolve this Case, the Court Need Not (and Should Not) Interpret or Apply the Transit Treaty

Line 5 is subject to a treaty intended "to ensure the uninterrupted transmission" of hydrocarbons between the United States and Canada. *See* Transit Treaty, pmbl. The Court need not, and indeed should not, interpret or otherwise apply the Treaty because the Court could grant Enbridge summary judgment on Count I and/or Count III, for the reasons given above, which would fully resolve this case. Should the Court decide to address the Transit Treaty, however, it should do so carefully and with due regard for the Executive Branch's authority over the United States' dealings with other countries and the possible consequences of an order allowing the shutdown of Line 5, including its effect on the United States' treaty obligations.

Relevant here, the United States has adopted a foreign policy commitment to avoid substantial disruptions to Line 5. *See id*. To that end, the United States has agreed with Canada that "[n]o public authority" of either country may "institute any measures," except in limited circumstances, "which are intended to, or which would have the effect of" interfering "in any way" with Line 5's transmission. *See id*. art. II(1). The countries have further agreed that disputes over the treaty's "interpretation, application or operation" be resolved through bilateral negotiations and, if necessary, international arbitration. *See id*. art. IX(1)–(2).

Enbridge and Canada (through its amicus brief filed in this Court) contend that enforcement of Michigan's Notice would violate the United States' obligations under the Transit Treaty. *See* Dkt. No. 128, PageID.1633-1637; Dkt. No. 133, PageID.1719, 1730–36. Canada further asserts that a shutdown of Line 5 would have

a "devastating impact" on parts of the Canadian economy. *See* Dkt. No. 133, PageID.1720. Canada has invoked the treaty's dispute resolution provisions to address those contentions, and the two countries are engaged in negotiations, which is the first step required under the treaty before arbitration. *See* Transit Treaty art. IX(1), (2).[15] A judicial ruling validating Michigan's Notice could complicate those ongoing negotiations. Moreover, if Michigan were to prevail in requiring Enbridge to cease operating and permanently decommission Line 5 at the Straits before a replacement or re-route plan is put into operation—and if that were to lead to the sort of economic harm Canada describes—it is possible that the United States could be exposed to liability for significant damages if an arbitral panel found the United States in breach of its treaty obligations.

The United States has a manifest interest in complying with its treaty obligations with all sovereigns, and in avoiding potential monetary liability if it is found to have breached those obligations. There is also a significant public interest in avoiding a dispute with Canada over whether Michigan's conduct would violate the treaty given our broader diplomatic and trade relationship with Canada. *Cf. Biden v. Texas*, 597 U.S. 785, 806 (2022) (rejecting a statutory interpretation that "authorized the District Court to force the Executive to the bargaining table with Mexico, . . . and to supervise its continuing negotiations with Mexico").

Accordingly, the Court need not (and should not) address the unique and

---

[15] In light of these sensitive and ongoing negotiations, the United States takes no position on the interpretation or application of the Transit Treaty as relevant to Michigan's actions challenged in this suit. Under the treaty, such issues are to be settled through bilateral negotiation and, if necessary, international arbitration. *See* Transit Treaty art. IX(1)-(2).

complex issues regarding the treaty's interpretation to resolve this case, because Enbridge is independently entitled to summary judgment on other grounds. If it does address the treaty, however, it should craft a ruling considering the United States' interests described herein. The Court should give due regard to the foreign affairs principles discussed above, and the possibility that an arbitral panel could find that any order here allowing a shutdown of Line 5 would be inconsistent with the United States' international obligations.

## CONCLUSION

For these reasons, the Court should enter summary judgment in favor of Enbridge on either Count I or Count III without interpreting or applying the Transit Treaty. Should the Court decide to address the Transit Treaty, it should do so consistent with the principles identified above.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*
Civil Division

ERIC J. HAMILTON
*Deputy Assistant Attorney General*
Civil Division
Federal Programs Branch

DIANE K. KELLEHER
*Director*
Federal Programs Branch

CRISTEN C. HANDLEY
*Trial Attorney*
U.S. Department of Justice
Civil Division

ADAM R.F. GUSTAFSON
Acting Assistant Attorney

/s/   John K. Adams
JOHN K. ADAMS
*Chief of Staff & Senior Counsel*
U.S. Department of Justice
Environment and Natural Resources Div.
950 Pennsylvania Ave., NW
Washington, D.C. 20530
(202) 514-5442
John.Adams3@usdoj.gov

*Counsel of Record*

Federal Programs Branch
1100 L St., NW
Washington, DC 20005
(202) 305-2677
Cristen.Handley@usdoj.gov

*Of Counsel:*

GREGORY D. COTE                          BENJAMIN M. FRED
*Acting General Counsel*                 *Assistant Chief Counsel*
CHARLES E. ENLOE                         Pipeline and Haz. Materials Safety Admin.
*Assistant General Counsel*
SAMUEL G. FULLER
*Senior Trial Attorney*
U.S. Department of Transportation

## Certificate of Compliance

Undersigned counsel hereby certifies pursuant to LCivR 7.2(b)(ii) that counsel prepared this brief using the Office 365 version of Microsoft Word and that this brief contains 7,645 words, excluding the case caption, cover sheet, table of contents, and signature block, in full compliance with LCivR 7.2(b)(i).

/s/    John K. Adams
JOHN K. ADAMS