UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENBRIDGE ENERGY, LIMITED
PARTNERSHIP, ENBRIDGE ENERGY
COMPANY, INC., and ENBRIDGE ENERGY
PARTNERS, L.P.,

        Plaintiffs,

v

GRETCHEN WHITMER, the Governor of the
State of Michigan in her official capacity, and
SCOTT BOWEN, Director of the Michigan
Department of Natural Resources in his
official capacity,

        Defendants.

No. 1:20-cv-01141-JTN-RSK

HON. ROBERT J. JONKER

---

**DEFENDANTS' RESPONSE TO THE UNITED STATES' AMICUS BRIEF**

Keith D. Underkoffler (P84854)
Echo Aloe (P86363)
Assistant Attorneys General
Attorneys for Defendants
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock (P71246)
Special Assistant Attorney General
Attorney for Defendants
Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130
dbock@fsbrlaw.com

Dated:  October 10, 2025

# TABLE OF CONTENTS

Page

Table of Contents ....................................................................................... i

Index of Authorities .................................................................................. ii

Introduction ............................................................................................... 1

Argument ................................................................................................... 2

I.    Enbridge is not entitled to summary judgment on Count I. ........................... 2

    A.    Count I is not properly before the Court. .................................. 2

    B.    The PSA does not preempt state law requirements for the issuance of valid easements. .................................................. 2

    C.    The PSA does not preempt the State from granting easements subject to the public trust. ....................................... 6

    D.    The PSA did not retroactively nullify limits on the land use authorized by preexisting easements. ................................. 10

II.   Enbridge is not entitled to summary judgment on Count III. ...................... 11

Conclusion and Relief Requested ............................................................. 16

# INDEX OF AUTHORITIES

Page

**Cases**

*Armstrong v. Exceptional Child Ctr., Inc.,*
    575 U.S. 320 (2015) ........................................................................... 2

*Bad River Band v. Enbridge,*
    No. 23-309 (7th Cir. Apr. 8, 2024) ....................................... 5, 14

*Columbia Gas Transmission Corp. v. Drain,*
    191 F.3d 552 (4th Cir. 1999) ........................................................... 5

*Columbia Gas Transmission, LLC v. Singh,*
    707 F.3d 583 (6th Cir. 2013) ........................................................... 5

*Dong v. Slattery,*
    84 F.3d 82 (2d Cir. 1996) ............................................................... 14

*Eastern Enters. v. Apfel,*
    524 U.S. 498 (1998) ......................................................................... 11

*Glass v. Goeckel,*
    703 N.W.2d 58 (Mich. 2005) ........................................................... 6

*Hallstrom v. Tillamook Cnty.,*
    493 U.S. 20 (1989) ............................................................................. 2

*Idaho v. Coeur d'Alene Tribe of Idaho,*
    521 U.S. 261 (1997) ......................................................................... 13

*Ill. Cent. R. Co. v. Ill.,*
    146 U.S. 387 (1892) ........................................................................... 6

*In re Enbridge Energy, L.P.,*
    964 N.W.2d 173 (Minn. Ct. App. 2021) ....................................... 5

*Independent Meat Packers Ass'n v. Butz,*
    526 F.2d 228 (8th Cir. 1975) ......................................................... 14

*Kamen v. Kemper Fin. Servs., Inc.,*
    500 U.S. 90 (1991) ........................................................................... 13

*Landgraf v. USI Film Prod.,*
    511 U.S. 244 (1994) ......................................................................... 11

*Medellín v. Texas*,
　　552 U.S. 491 (2008) ...................................................................................... 15

*Olympic Pipe Line v. City of Seattle*,
　　437 F.3d 872 (9th Cir. 2006) ......................................................................... 9

*SFPP, L.P. v. Union Pac. R.R. Co.*,
　　No. SACV 05-1015, 2006 WL 8448721 (C.D. Cal. Mar. 20, 2006) ........................... 9

*United States v. Emuegbunam*,
　　268 F.3d 377 (6th Cir. 2001) ........................................................................ 12

**Statutes**

15 U.S.C. § 717f(c) ............................................................................................. 3

15 U.S.C. § 717f(h) ............................................................................................. 3

49 U.S.C. § 60102(a)(2)(A) .................................................................................. 5

49 U.S.C. § 60102(a)(2)(B) ........................................................................... 4, 5, 7

49 U.S.C. § 60102(b)(2)(G) .................................................................................. 8

49 U.S.C. § 60104(b) .......................................................................................... 10

49 U.S.C. § 60104(c) .................................................................................. 6, 8, 11

49 U.S.C. § 60104(e) ......................................................................................... 4, 8

49 U.S.C. § 60115(b)–(c) ..................................................................................... 8

49 U.S.C. § 60120(c) ......................................................................................... 4, 8

49 U.S.C. § 60121(a)(1)(A) ................................................................................. 2

49 U.S.C. § 60121(d) ........................................................................................ 4, 8

Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. No. 96–129, Title II,
　　Nov. 30, 1979, 93 Stat. 1003 ......................................................................... 10

**Other Authorities**

Exec. Order No. 14154, 90 Fed. Reg. 8353, 8354 (Jan. 20, 2025) ........................... 13

Exec. Order No. 14260, 90 Fed. Reg. 15513, 15514 (Apr. 8, 2025) .......................... 13

H.R. Rep. No. 102-247, pt. 1 (1991) ........................................................................... 3, 4

H.R. Rep. No. 90-1390 (1968) .................................................................................... 8

Michael R. Ramsey, *International Wrongs, State Laws and Presidential
  Policies,*
  32 Loy. L.A. Int'l & Comp. L. Rev. 19, 21 (2011) .................................................... 14

Treaty, art. II(3), 28 U.S.T. 7449 ............................................................................ 12

Treaty, art. IV, 28 U.S.T. 7449 ............................................................................... 12

Treaty, art. IX, 28 U.S.T. 7449 ............................................................................... 12

**Regulations**

18 C.F.R. Part 157 ...................................................................................................... 3

## INTRODUCTION

Like Enbridge, the United States starts from a false premise:  that Defendants are seeking to shut down Line 5 for violation of a safety standard.  No matter how many times Enbridge and its amici repeat that refrain, it is inaccurate. Instead, Defendants revoked Enbridge's easement because it is not valid as a matter of state law.  Nothing in the federal Pipeline Safety Act (PSA) governs pipeline easements or trumps state law requirements for issuing a valid one.  Nor does the PSA preempt the generally applicable, common-law limitation that applies to all property interests in submerged lands—they are subject to the public trust. Indeed, the Pipeline and Hazardous Materials Safety Administration (PHSMA) *encourages* landowners to address "[s]ite-specific environmental issues" and "[s]tate and local government requirements" in pipeline easements.  Doing so here in no way creates a "patchwork" problem that Congress sought to avoid.

The United States joins Canada in urging this Court not to address the sole basis for Enbridge's Foreign Affairs Doctrine claim:  that the Notice violates the 1977 U.S.-Canada Transit Pipelines Treaty.  The United States instead makes a different argument based on different federal policies not cited by Enbridge, and speculative concerns stemming from highly disputed factual assertions made in Canada's amicus brief.  But the Foreign Affairs Doctrine is not a license for the Executive Branch to preempt state laws by declaring a policy preference, and the Court cannot grant Enbridge's pre-discovery motion for summary judgment based on highly disputed and speculative factual claims that Enbridge itself has not made. Enbridge's motion should be denied.

# ARGUMENT

## I. Enbridge is not entitled to summary judgment on Count I.

### A. Count I is not properly before the Court.

The United States says the Court should enter summary judgment in favor of Enbridge on Count I.  (U.S. Amicus Br., ECF No. 140, PageID.2061.)  But the United States ignores a threshold issue:  whether Count I is properly before the Court.  As explained in Defendants' prior brief, it is not.  A person cannot sue a governmental authority for an alleged violation of the Pipeline Safety Act (PSA) without providing 60 days' pre-suit notice.  (Defs' Br., ECF No. 134, PageID.1768–1771 (discussing 49 U.S.C. § 60121(a)(1)(A)).)  Enbridge did not comply with that requirement, so it is not entitled to summary judgment on Count I.[1]

### B. The PSA does not preempt state law requirements for the issuance of valid easements.

The United States also fails to address the first, threshold revocation ground in § I.B. of the Notice—that the easement was void from its inception because it was

---

[1] Enbridge offers two replies, neither of which has merit.  *First*, Enbridge argues that while it could have brought its claim that Defendants' actions "violate the Pipeline Safety Act" (Pls' Br., ECF No. 125, PageID.1599) under § 60121(a)(1)(A), it can avoid the statute's requirements by bringing an identical claim under *Ex parte Young*.  (Pls' Reply Br., ECF No. 148, PageID.2224.)  Not so.  *Ex parte Young* is an equitable doctrine, and "[c]ourts of equity can no more disregard statutory . . . requirements and provisions than can courts of law."  *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327–28 (2015) (citation omitted).  *Second*, Enbridge says that the requirement "serves no purpose in these circumstances."  (Pls' Reply Br., ECF No. 148, PageID.2224.)  But the Supreme Court has rejected such a pragmatic approach to statutory pre-notice requirements, holding that they must be enforced as written and may not be discarded at a district court's discretion.  *Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 30 (1989).

not validly issued under state law.  (Notice, ECF No. 1-1, PageID.25–26; U.S. Amicus Br., PageID.2048 n.7 (noting that the United States has not evaluated or addressed this issue).)  The omission is glaring because the alternative revocation and termination grounds in §§ I.C. and II of the Notice do not come into play unless the easement was initially valid.

Interpreting the PSA to prohibit states from considering an oil pipeline's impact on the public trust when granting an easement to use State-owned, submerged lands would be an enormous intrusion into State sovereignty and fundamentally inconsistent with the PSA's text and design.  To see why, compare the process for siting natural gas versus hazardous liquid pipelines.

For natural gas pipelines, the Federal Energy Regulatory Commission (FERC) determines the location.  15 U.S.C. § 717f(c); 18 C.F.R. Part 157.  FERC's routing determinations can trump the landowner's desires through the power of eminent domain.  15 U.S.C. § 717f(h).  And "[w]hen the proposed pipeline route has been approved by FERC, the interstate gas pipeline is exempt from any further state routing restrictions."  H.R. Rep. No. 102-247, pt. 1, at 13 (1991).

For hazardous liquid pipelines—like Line 5—Congress chose a different path. Neither PHMSA, FERC, nor any other federal agency has the power to determine where an interstate oil pipeline is located, to override a landowner's decision not to allow the pipeline to be sited on its land, or to supersede the traditional land use authority of state and local governments.  Instead, interstate oil pipelines "are subject to the routing *and environmental assessment requirements* of the individual

3

states they traverse." *Id.* at 14 (emphasis added).  PHMSA has long acknowledged as much, observing that "no federal agency has the power to determine siting of oil pipelines"; that federal law leaves the "traditional prerogatives" of state and local governments over land use intact; and that "pipeline safety is a responsibility shared by all three levels of government—federal, state, and local—as well as by pipeline operators, excavators, and property owners."[2]

The PSA's text and structure reflect this scheme in various ways, including by making clear that PHMSA may not "prescribe the location or routing of a pipeline facility," 49 U.S.C. § 60104(e), that the PSA does not supplant state common law, *id.* §§ 60120(c), 60121(d), and that PHMSA's pipeline safety standards apply *only* to "the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities"—not their location, *id.* § 60102(a)(2)(B).  Instead, the PSA leaves the location of oil pipelines to be determined by the pipeline operators themselves,

---

[2] Ltr. From Jeffrey D. Wiese, Assoc. Admin. for Pipeline Safety, PHMSA, to Russell K. Girling, Pres., TransCanada Corp., *Role of U.S. Local Governments in Pipeline Safety* (May 28, 2014), https://pstrust.org/wp-content/uploads/2014/05/PHMSA-Letter-to-TransCanada-on-Role-of-Local-Governments-in-Pipeline-Safety.pdf (last visited Oct. 10, 2025); Ltr. from Alan K. Mayberry, Assoc. Admin. for Pipeline Safety, PHMSA, to David Giles, Pres. and COO, Navigator CO2 (Sept. 15, 2023), https://www.phmsa.dot.gov/sites/phmsa.dot.gov/files/2023-09/PHMSA%20Letters%20to%20Wolf%20Carbon%2C%20Summit%2C%20and%20Navigator%20Clarifying%20Federal%2C%20State%2C%20and%20Local%20Government%20Pipeline%20Authorities.pdf (last visited Oct. 10, 2025) ("As was the case in 2014, PHMSA continues to support and encourage all three levels of government—federal, state, and local—working collaboratively to ensure the nation's pipeline systems are constructed and operated in a manner that protects public safety and the environment.").

which are required to work with landowners and to acquire the right to locate a pipeline on the land through a valid right-of-way or easement.  *See* U.S. Amicus Br., *Bad River Band v. Enbridge*, No. 23-309, ECF No. 92 at 10–22 (7th Cir. Apr. 8, 2024) (arguing that without a valid right-of-way Enbridge "lacked the legal right to remain on the Band's lands" and was "trespassing").)

The PSA says nothing at all about what sort of factors can and cannot be considered in determining the validity of an easement.  *See, e.g.*, *Columbia Gas Transmission, LLC v. Singh*, 707 F.3d 583, 590 (6th Cir. 2013) ("[T]he scope of easements is a typical state-law property issue."); *Columbia Gas Transmission Corp. v. Drain*, 191 F.3d 552, 55–56 (4th Cir. 1999) (the PSA is "silent as to rights-of-way and easements"); *In re Enbridge Energy, L.P.*, 964 N.W.2d 173, 204 (Minn. Ct. App. 2021) (the PSA does not preempt state authorities from considering safety issues when making routing and location decisions).  Instead, the requirements to obtain a valid pipeline easement on state land are determined solely by state law.

There is no way to construe the common law requirement that the State must take public trust factors into account to grant a valid easement over the State's submerged lands to be a pipeline safety standard within the meaning of the PSA.  The requirement pertains to *the State's* conduct, not the pipeline operator's, *contra* 49 U.S.C. § 60102(a)(2)(A) (pipeline safety standards "apply to . . . the owners or operators of pipeline safety facilities"); and it pertains only to the *location* of a pipeline, *contra id.* § 60102(a)(2)(B) (pipeline safety standards apply to "design, installation, inspection, emergency plans and procedures, testing, construction,

extension, operation, replacement, [or] maintenance"). Whether Enbridge's easement was ever valid is a state law issue on which the PSA is silent.

### C.   The PSA does not preempt the State from granting easements subject to the public trust.

The United States' argument as to the alternative revocation ground in § I.C. of the Notice fares no better. The United States argues that by conveying Enbridge's pipeline easement *subject to the public trust*, Michigan imposed a pipeline "safety standard" within the meaning of § 60104(c).[3] Not so.

The roots of the public trust doctrine are described in the Notice and well-explained in the amicus brief filed on behalf of Minnesota and nine other states. (Notice, ECF No. 1-1, PageID.23–25; State Amici Br., ECF No. 145, PageID.2099–2101.) Assuming *arguendo* that the easement was ever valid, the State "necessarily convey[ed] such property *subject to the public trust*." *Glass v. Goeckel*, 703 N.W.2d 58, 65 (Mich. 2005) (emphasis in original). This is not because the State imposed a pipeline safety standard but because the State has no power to extinguish the public's rights in the Straits or to convey an interest in the Straits' submerged lands free and clear of the public trust. (Notice, ECF No. 1-1, PageID.26; State Amici Br., ECF No. 145, PageID.2101 ("[N]o private entity can enjoy permanent property rights to the sovereign lakebed."); *id.* at PageID.2100 ("any grant of the kind is necessarily revocable" (quoting *Ill. Cent. R. Co. v. Ill.*, 146 U.S. 387, 455 (1892)).)

---

[3] Enbridge and the United States both rely solely on express preemption. No other preemption theory is before the Court. (*See* Pls' Br., ECF No. 125, PageID.1571–72, 1579, 1585–87, 1590; U.S. Amicus Br., ECF No. 140, PageID.2048 & n.6.)

The United States argues that by determining that the easement violates the public trust the State has "second guess[ed]" Congress and "substitute[d] its own judgment . . . for that of PHMSA's."  (U.S. Amicus Br., ECF No. 140, PageID.2037.) But PHMSA never made any determination that this land use is consistent with the public trust—that is not its role.  And the notice of revocation was not based on any finding that PHMSA's pipeline safety standards are insufficient—that is not the State's role.  The easement's revocation is not based on any judgment about how a pipeline operator must design, construct, maintain, test, or operate its pipeline, *contra* 49 U.S.C. § 60102(a)(2)(B), or any "standard" governing such matters, but solely on the State's assessment of public trust requirements.

The United States argues that giving the term "standard" its typical industry meaning of "a set of technical definitions and guidelines that function as instructions for designers, manufacturers, operators or users of equipment to provide consistent and comparable results," (Defs' Br., ECF No. 134, PageID.1773 (citation omitted)), is "too narrow[]" because the PSA says that safety standards should be "practicable" (U.S. Amicus Br., ECF No. 140, PageID.2049 n.8.)  But there is no tension between standards being technical *and* practicable.  And the PSA repeatedly emphasizes the technical nature of safety standards, requiring that before PHMSA can adopt a safety standard, it must give the proposed standard to a Technical Pipeline Safety Standards Committee—composed of individuals with technical qualifications appointed after consulting with agencies "concerned with the technical aspect" of oil transportation and pipeline operation—which provides a

report on "the technical feasibility, reasonableness, cost-effectiveness, and practicability of the proposed standard" that PHMSA "shall consider" before the standard is adopted.  49 U.S.C. §§ 60102(b)(2)(G), 60115(b)–(c).

In addition to the PSA's tort saving clauses, *id.* §§ 60120(c), 60121(d), and its prohibition on prescribing the routing or location of oil pipelines, *id.* § 60104(e), the history of the PSA also makes clear that Congress was not concerned with common-law requirements like the public trust doctrine.  Congress enacted the preemption provision now located in § 60104(c) as part of the Natural Gas Pipeline Safety Act of 1968.  In doing so, Congress's focus was on states "prescrib[ing] pipeline safety standards by legislative or State commission action," noting that state "codes" and state "regulations" had been adopted in some states but not others and "deviate[d] considerably" with respect to such matters as "minimum electric resistivity standard for pipe coatings" and "X-ray examination of . . . a prescribed minimum sample of . . . welds in each project."  H.R. Rep. No. 90-1390, p. 13–14 (1968).  Congress was concerned that then-existing regulation of pipeline transportation—an "inherently dangerous" activity—was insufficient and a robust federal code was needed.  *Id.* at 15.  Defendants have done nothing to second-guess that judgment.  The State has not imposed its own pipeline safety standards or done anything to disrupt the uniformity of PHMSA's pipeline regulations.  Rather, Defendants have made a locational decision—pursuant to their sovereign duties—about the permissible use of a four-mile strip of land.

The United States argues that requiring any use of this four-mile stretch of land to be consistent with the public trust creates a "patchwork" problem that "Congress sought to avoid."  (U.S. Amicus Br., ECF No. 140, PageID.2055.)  That concern is misplaced.  Most oil pipelines are located not on submerged lands held in public trust but on private lands.  That is significant because a pipeline operator must obtain a valid easement or right-of-way to cross private land, and "the PSA does not preempt private parties from agreeing to more restrictive operating conditions" in such agreements.  *SFPP, L.P. v. Union Pac. R.R. Co.*, No. SACV 05-1015, 2006 WL 8448721, at *3 (C.D. Cal. Mar. 20, 2006).[4]

Indeed, PHMSA's published guidance observes that "the legal requirements of a right-of-way easement differ from state to state" and "the agreement must conform to all of the requirements set out by state law."[5]  And it encourages landowners to include "a series of applicable provisions that further establish the rights and responsibilities of each party," which may include "[c]onstruction related provisions," "[s]ite-specific environmental issues," and "[o]ther transmission pipeline

---

[4] Courts have also recognized that a state entity can impose additional pipeline safety standards when acting in a proprietary capacity.  *SFPP*, 2006 WL 8448721, at *3 (citing *Olympic Pipe Line v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006)).  Here, the revocation was done by the State "in both its sovereign and proprietary capacities."  (Notice, ECF No. 1-1, PageID.23.)  As Minnesota points out, "the public trust doctrine is proprietary in that it implicates state ownership over state sovereign lands."  (State Amici Br., ECF No. 145, PageID.2105.)  There is also a sovereign component due to the character of the lands and the limits the public trust doctrine imposes on the State's proprietary use of them.

[5] PHMSA, Stakeholder Communication BL07, *Understand the Elements of a Transmission Pipeline Easement*, https://primis.phmsa.dot.gov/comm/pipa/pipa_practice_BL07.htm?nocache=9569 (last visited Oct. 10, 2025).

details" like "depth of cover requirements," "maximum size," "maximum pressure," and "[s]tate and local requirements," among other matters.[6]  Given the wide number of such easements across the country, applying public-trust requirements to easements over submerged lands can hardly be charged with creating a patchwork.

### D.      The PSA did not retroactively nullify limits on the land use authorized by preexisting easements.

The only thing the United States cites that resembles a pipeline safety standard are the terms and conditions of the Easement, which are the basis for the termination in § II of the Notice.  (Notice, ECF No. 1-1, PageID.32–38.)  But termination is only an issue if the easement was not void from its inception as set forth in § I.B. of the Notice (*id.* at PageID.25–26) or revoked as set forth in § I.C. (*id.* at PageID.26–30).  It is not unusual for pipeline easements to contain these sorts of land-use restrictions as part of "further establish[ing] the rights and responsibilities of each party,"[7] and the United States does not address any of the arguments in Defendants' prior brief.  (Defs' Br., ECF No. 134, PageID.1784–89.)

Most saliently, the 1953 Easement predated the federal government's regulation of hazardous liquid pipelines by 26 years.  *See* Hazardous Liquid Pipeline Safety Act of 1979, Pub. L. No. 96–129, Title II, Nov. 30, 1979, 93 Stat. 1003. PHMSA's later-adopted design and construction standards do not apply to Line 5. 49 U.S.C. § 60104(b); *contra* U.S. Amicus Br., ECF No. 140, PageID.2051.

---

[6] *Id.*

[7] *Id.*

The 1953 Easement expressly limits the permissible uses of the State's land and reserves the State's right to terminate it for breach.  (Easement, ECF No. 1-1, PageID.43–50.)  Nothing in the PSA purports to impair rights established in pre-existing property agreements.  Retroactive legislation that cancels existing contract rights is repugnant to United States law.  "Since the early days of this Court, we have declined to give retroactive effect to statutes burdening private rights unless Congress had made clear its intent." *Landgraf v. USI Film Prod.*, 511 U.S. 244, 270 (1994).  And here, there is nothing like a clear statement.  The Court cannot construe the PSA to have expanded Enbridge's rights in the land—and nullified the State's right to terminate the easement—without rendering the PSA unconstitutional as applied as a taking of the State's sovereign land.  *See Eastern Enters. v. Apfel*, 524 U.S. 498, 532–37 (1998).  Nothing in the PSA calls for that interpretation.  Terminating an easement for breach is not adopting or continuing in force a pipeline safety standard.  49 U.S.C. § 60104(c).  Not only would holding otherwise contravene principles of non-retroactivity and constitutional avoidance, it also would not help Enbridge because if the easement's essential terms and conditions fail, so does the entire grant.  (Defs' Br., ECF No. 134, PageID.1788–89.)

## II.    Enbridge is not entitled to summary judgment on Count III.

Enbridge's motion for summary judgment on Count III rests on a single argument:  that revoking or terminating the 1953 Easement violates the Transit Treaty.  (Defs' Br., ECF No. 125, PageID.1590–96; Defs' Reply Br., ECF No. 148, PageID.2226–29.)  But no violation of the Treaty has occurred.  As Defendants

explained in their prior brief, the Treaty contemplates that pipeline operators must obtain "such permits, licenses or other authorizations as may be required" and comply with non-discriminatory "regulations, requirements, terms and conditions" relating to matters such as "environmental protection." Treaty, arts. II(3), IV, 28 U.S.T. 7449. Requiring Enbridge to operate its pipeline on a valid easement and subject to the same state-law requirements that apply to every other easement in submerged lands fits comfortably within that language. (See Defs' Br., ECF No. 134, PageID.1794–1796.)

In any event, the United States' brief confirms that Enbridge is not entitled to summary judgment on Count III for a more fundamental reason: "[T]he rights created by an international treaty belong to a state" and "a private individual cannot enforce them" in a domestic lawsuit. *United States v. Emuegbunam*, 268 F.3d 377, 389 (6th Cir. 2001). The United States and Canada have agreed that any disputes regarding the Treaty's "interpretation, application or operation" are to be resolved through a non-judicial process to which only they are parties. Treaty, art. IX. Accordingly, they have both "urge[d] the Court not to address the Transit Treaty." (U.S. Amicus Br., ECF No. 140, PageID.2037; Canada Amicus Br., ECF No. 133, PageID.1730.) The Court should honor that request.

Without the alleged Treaty violation on which Enbridge so heavily relies, however, it cannot obtain summary judgment on Count III. The United States attempts to prop up Enbridge's case by asserting a different argument: That foreign affairs preemption may still apply for reasons "wholly apart from having to

interpret or apply the Transit Treaty." (*Id.* at PageID.2056.)  The Court should not even consider this argument, which was not raised by any party.  *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97, n.4 (1991) ("[W]e do not ordinarily address issues raised only by *amici*.").

At any rate, the argument is without merit.  Most of what the United States says is pure hyperbole.  It claims that Michigan is "attempt[ing] to globalize its regulatory reach" and "establish its own foreign policy."  (U.S. Amicus Br., ECF No. 140, PageID.2056.)  That is absurd.  All the State has done is make a decision about the permissible use of a four-mile strip of submerged land *that Michigan owns* and holds in public trust.  There is no more traditional realm of State authority than deciding what can be done on the State's sovereign lands.  *See Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 283 (1997) (explaining that State's ownership of submerged lands is "an essential attribute of sovereignty" and conferred "by the Constitution itself" (cleaned up)).  The Notice does not set any foreign policy, target any foreign actor, or reach outside the State's sovereign domain.

The United States' argument rests on two Executive Branch policies, which post-date the Notice by years.  The first focuses on revising government procedures to expedite approvals for development of "domestic energy sources."  Exec. Order No. 14154, 90 Fed. Reg. 8353, 8354 (Jan. 20, 2025).  Similarly, the second is a directive to the Attorney General to take certain actions regarding "domestic energy resources."  Exec. Order No. 14260, 90 Fed. Reg. 15513, 15514 (Apr. 8, 2025).  Neither contains any specific policies that relate to transit pipelines, the

13

procurement of energy from non-U.S. sources, or relations with any foreign country. Indeed, the Notice is *consistent with* the United States' foreign policy, as reflected in Article IV of the Treaty, the multiple Presidential Permits cited in Defendants' prior brief, and the United States' position in the *Bad River* case, where it argued that Enbridge trespassed by locating Line 5 on another's land without a valid right-of-way. (*See* Defs' Br., ECF No. 135, PageID.1793–96; U.S. Amicus Br., *Bad River Band v. Enbridge*, No. 23-309, ECF No. 92 at 10–22 (7th Cir. Apr. 8, 2024).)

Regardless, the State's sovereign duty to manage its own submerged lands cannot be overridden by Executive Branch policies of this sort. This follows from two bedrock constitutional principles. "First, state law applies unless it is displaced by federal law. Second, the President does not make federal law." Michael R. Ramsey, *International Wrongs, State Laws and Presidential Policies*, 32 Loy. L.A. Int'l & Comp. L. Rev. 19, 21 (2011). The Executive Orders the United States cites serve "primarily as a managerial tool for implementing the President's personal economic policies and not as a legal framework enforceable by private civil action." *Independent Meat Packers Ass'n v. Butz*, 526 F.2d 228, 236 (8th Cir. 1975). They were not "derived from an express or implied grant of Congressional power." *Dong v. Slattery*, 84 F.3d 82, 86 (2d Cir. 1996). And the Executive Branch enjoys no power "to establish on [its] own federal law or to override state law." *Medellín v.*

*Texas*, 552 U.S. 491, 530 (2008).  Scholarly commentators have been sharply critical of the United States' arguments.[8]  The Court should reject them.

Finally, the United States raises hypothetical concerns about what an arbitrator might rule *if* its negotiations with Canada fail and speculative economic harms that could result if the Straits Pipelines are shut down.  (U.S. Amicus Br., ECF No. 140, PageID.2058–61.)  Defendants are not unsympathetic to these issues and delayed the Notice's effective date "to allow for an orderly transition to ensure Michigan's energy needs are met."  (Notice, ECF No. 1-1, PageID.41.)  But the reality is that these concerns are misplaced.  At a minimum, they are fact-bound and highly disputed.  (*See* Bus. Net. Amicus Br., ECF No. 144, PageID.2094–95.)  They cannot warrant pre-discovery summary judgment.

---

[8] William S. Dodge, *DOJ Takes Broad View of Foreign Affairs Preemption in Pipeline Case*, Transnat'l Litig. Blog, https://tlblog.org/doj-takes-broad-view-of-foreign-affairs-preemption-in-pipeline-case/ (last visited Oct. 10, 2025) ("Foreign affairs preemption is not a grant of authority to the President to override state law. It is a narrow doctrine, applied only once by the Supreme Court, that allows federal courts to police state efforts to run independent foreign policies. Nothing of that kind appears to be happening here.").

## CONCLUSION AND RELIEF REQUESTED

Enbridge's motion for partial summary judgment on Counts I and III of the complaint (ECF No. 124) should be denied.

Respectfully submitted,

/s/ *Keith D. Underkoffler*
Keith D. Underkoffler (P84854)
Echo Aloe (P86363)
Assistant Attorneys General
Attorneys for Defendants
Environment, Natural Resources, and
Agriculture Division
P.O. Box 30755
Lansing, MI 48909
(517) 335-7664
underkofflerk@michigan.gov
aloee1@michigan.gov

Daniel P. Bock (P71246)
Special Assistant Attorney General
Attorney for Defendants
Fahey Schultz Burzych Rhodes PLC
4151 Okemos Road
Okemos, MI 48864
(517) 312-3130

Dated:  October 10, 2025

LF:  Enbridge Straits (Dec & Inj Relief) (v DNR) WD/LF# 2020-0306464-A/Response to US Amicus Brief 2025-10-10