UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENBRIDGE ENERGY, LIMITED
PARTNERSHIP, et al.,

          Plaintiffs,

                                Case No. 1:20-cv-1141

v.

                                HON. ROBERT J. JONKER

GRETCHEN WHITMER, et al.,

          Defendants,

_____ /

## OPINION AND ORDER

Line 5 is a 645-mile-long international pipeline owned and operated by Enbridge. A 4-mile-strip of Line 5 runs underneath the Straits of Mackinac in an easement granted by the State of Michigan. In November 2020, state officials moved to stop Enbridge from using the 4-mile strip, which would effectively shut down Line 5 entirely. Enbridge says that federal law preempts this move by state officials. The Court agrees. Congress expressly preempted State regulation of interstate pipeline safety through the Pipeline Safety Act of 1992. Moreover, two sovereign nations—the United States and Canada—agree that Michigan's attempt to shut down Line 5 interferes with their explicit federal foreign policy positions and trade relations. Accordingly, the Court grants Enbridge's motion for summary judgment on its preemption claims and enjoins Defendants from enforcing their shutdown order. Pipeline safety generally, and protection of the Straits of Mackinac, are critical interests to be sure. But when it comes to Line 5, they are the responsibility of the United States and Michigan lacks the power to interfere.

**FACTUAL BACKGROUND**

Enbridge's Line 5 is a 645-mile-long international crude oil pipeline that begins in Wisconsin, passes through Michigan, and ends in Canada. (ECF No. 1, PageID.4). Four of those 645 miles of Line 5 run beneath the Straits of Mackinac—the strip of water between Michigan's Lower and Upper Peninsula that connects Lake Michigan and Lake Huron. (*Id.* at PageID.2). The following maps may be useful to put Line's 5 location in perspective:





Every day, Line 5 transports up to 540,000 barrels (22.48 million gallons) of light crude oil, synthetic crude, and natural gas liquids, which are refined into propane. *"What is Line 5?*" ENBRIDGE, https://www.enbridge.com/projects-and-infrastructure/public-awareness/line-5-answering-your-questions/what-is-line-5. Line 5 supplies 55% of Michigan's statewide propane needs. *Id.* And 65% of the Upper Peninsula's needs. *Id.* Some of the oil is refined in Detroit, Michigan and Toledo, Ohio. *Line 5: Overview*, DEP'T OF ENV'T, GREAT LAKES, AND ENERGY, https://www.michigan.gov/egle/about/featured/line5/overview. The remainder crosses into Canada and is refined there, a portion of which ends up as propane shipped back to Michigan. *Id.*

**1. The 1953 Easement to Construct Line 5 Under the Straits of Mackinac**

In 1953, Michigan granted an easement to Enbridge's predecessor that allowed it to construct two 20-inch diameter pipelines under the Straits of Mackinac. (ECF No. 1, PageID.44).

The easement did not have an expiration date. Instead, it stated that Michigan granted the easement "unto said Grantee, its successors and assigns, subject to the terms and conditions herein set forth, until terminated as hereinafter provided." (*Id.* at PageID.45). Those "terms and conditions" allowed Michigan to oversee the pipelines' construction and regulate the pipelines' operations. (*Id.* at PageID.45-51). The easement further explained Michigan's remedies for violations of those conditions. (*Id.* at PageID.49-51).

Michigan's property grant was subject to numerous conditions. One of the conditions, for example, was that:

> Grantee in its . . . constructing, testing, operating, maintaining . . . said pipelines, shall follow the usual, necessary and proper procedures for the type of operation involved, and *at all times shall exercise the due care of a reasonably prudent persons for the safety and welfare of all persons and of all public and private property*, shall comply with all laws of the State of Michigan and the Federal Government . . . .

(*Id.* at PageID.45-46 (emphasis added)). The easement also contained many technical conditions on how the pipeline was to be constructed and operated. A few examples are:

- "All pipe line laid in water up to fifty feet in depth shall be laid in a ditch with not less than fifteen feet of cover . . . . deep enough to protect the pipe lines against ice and anchor damage."
- "All welded joints shall be tested by X-ray"
- "The minimum curvature of any section of pipe shall be no less than two thousand and fifty feet wide"
- "Cathodic protection shall be installed to prevent deterioration of pipe"
- "All pipe shall be protected by asphalt primer coat, by inner wrap and outer wrap composed of glass fiber fabric material and one inch by four inch"
- "The maximum span or length of pipe unsupported shall not exceed seventy-five feet"
- "In locations where fill is used, the top of the fill shall be no less than fifty feet wide"

(*Id.* at PageID.46-48).

Michigan reserved the right to terminate the easement "[i]f, after being notified in writing by Grantor of any specified breach of the terms and conditions of the easement, Grantee shall fail to correct said breach within 90 days." (*Id.* at PageID.49). Michigan further reserved the right to "immediately and completely shut down the pipe line" if "there is a break or leak" in either of the pipelines. Enbridge would not be able to restart operations until it "has conducted a shut-in two hour pressure test . . . showing that no substance is escaping from a break or leak in said pipeline." (*Id.* at PageID.51).

### 2.  Congress Assumes Responsibility for Pipeline Safety: Pipeline Safety Act of 1992

In 1992, Congress passed the Pipeline Safety Act. The act recodified two prior acts: the Natural Gas Pipeline Act of 1968 and the Hazardous Liquids Pipeline Safety Act of 1979. H.R. 1489, 102nd Cong., 2d Sess. (1992). Congress passed the act to "increase the safety to humans and the environment from the transportation by pipeline of natural gas and hazardous liquids, and for other purposes." *Id.* To help achieve this purpose, Congress ordered the Secretary of Transportation to "prescribe minimum safety standards for pipeline transportation and for pipeline facilities" that account for "protecting the environment." 49 U.S.C. 60102(a)(2), (b)(1)(B)(iii). And to ensure that states would not interfere with national safety regulation, Congress dictated that a "State authority may not adopt or continue in force safety standards for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C § 60104(c).

### 3.  Michigan Orders Enbridge to Stop Using the Straits Pipelines over Safety Issues

Michigan's concern over Line 5's safety grew after there were multiple incidents with the Straits portion of Line 5. In 2018, a commercial tugboat inadvertently dropped and dragged an anchor across the floor of the Straits, which struck Line 5. (*Id.* at PageID.27). The pipeline did not rupture, but it was dented in at least three locations. (*Id.*). Further, in June 2020, the state discovered

that both pipelines have been hit by external objects, like cables or anchors. (*Id*.). Those strikes damaged pipeline coating and, at one location, damaged a pipeline support structure. (*Id*.).

In November 2020, two Michigan officials—Governor Gretchen Whitmer and Dan Eichinger—notified Enbridge that Michigan was terminating the 1953 Easement. (ECF No. 1-1). In the notice, the officials ordered Enbridge to "cease operation of the Straits Pipelines 180 days after the date of this Notice" and begin to "permanently decommission" it. (*Id.* at PageID.41). The officials explained that, in their view, the 1953 Easement that gave Enbridge the right to operate the pipeline on Michigan's land was invalid. (*Id.* at PageID.22). The officials asserted (1) that the easement was void and revocable because it violated the "public trust" doctrine, and (2) even if not void, Enbridge's continued operation of breached the terms of the easement. (*Id.*). Because the easement, in the officials' view, was revoked, that allowed them to shut down Line 5.

### a.  Alleged Violation of the "Public Trust" Doctrine

The first reason the officials gave for shutting down the Straits Pipeline was that, in their view, the 1953 was revocable under the common law "public trust" doctrine. (*Id.* at PageID.23). The officials reasoned that under this doctrine, "[t]he state serves, in effect, as the *trustee of public rights* in the Great Lakes for fishing, hunting, and boating for commerce or pleasure." (*Id.* at PageID.23). They further reasoned that Michigan may grant a property interest in the Great Lakes only if the state has "in due recorded form, determined that a given parcel of such submerged land may and should be conveyed in the improvement of the interest thus held . . .  [and would be] without detriment to the public interest in the lands and waters remaining." (*Id.* at PageID.24 (internal quotations omitted)).

The officials first determined that under the public trust doctrine, the 1953 Easement was "void from its inception" because Michigan never expressly found that the easement (1) would

improve a public trust interest, or (2) could be conveyed without impairing the public trust. (*Id.* at PageID.25). The officials asserted that because Michigan failed to make those explicit findings when it conveyed the original property interest, the easement has never been valid. (*Id.*).

The officials also asserted that Enbridge's continued use of the Straits Pipeline violated the public trust doctrine. (*Id.* at PageID.26). When explaining why they thought Enbridge was violating this doctrine, the officials said:

> Recent events have made clear that continued operation of the Straits Pipelines cannot be reconciled with the State's duty to protect public trust uses of the Lakes from potential impairment or destruction. . . . [T]ransporting millions of gallons of petroleum products each day through two 67-year old pipelines that lie exposed in the Straits below uniquely vulnerable and busy shipping lanes presents an extraordinary, unreasonable threat to public rights because of the very real risk of further anchor strikes and other external impacts to the Pipelines, the inherent risks of pipeline operations, and the foreseeable, catastrophic effects if an oil spill occurs at the Straits.

(*Id.* at PageID.26-27). According to the officials, the pipeline's location at the bottom of the lakebed with heavy shipping activity makes it uniquely vulnerable to damage from anchor strikes or other external objects. (*Id.* at PageID.27). The pipeline also "present[ed] inherent risks of environmental harm," such as "incorrect operations" by Enbridge. (*Id.* at PageID.28).

The officials concluded that "Enbridge's operation of the Straits Pipelines presents a substantial, inherent and unreasonable risk of an oil spill and such a spill would have grave ecological and economic consequences, severely impairing public rights in the Great Lakes and their public trust resources." (*Id.* at PageID.30). For that reason, the officials determined that "Enbridge's use of the Straits Pipelines is contrary to and in violation of the public trust" and therefore the easement must be revoked and pipeline operations must cease. (*Id.*).

*b. Alleged Failure to Exercise "Due Care"*

In addition to their "public trust" doctrine rationale, the Michigan officials also found that Enbridge must shut down the Straits Pipeline because it violated numerous safety provisions in the 1953 Easement. (*Id.* at PageID.32). More specifically, according to the officials, Enbridge did not "exercise the due care of a reasonably prudent person" when operating the pipeline. (*Id.*).

As evidence of Enbridge's lack of "due care," the officials pointed to multiple technical conditions from the 1953 Easement that Enbridge allegedly violated. (*Id.* at PageID.33). Each specific condition was related to preserving the pipeline's structural integrity. First, the officials found that Enbridge violated the requirement that the pipeline must "be physically supported . . . at least every 75 feet." (*Id.* at PageID.34). The officials explained that the prohibition serves "to protect the structural integrity of the Pipelines from stresses and vibrations that may be caused by the strong currents surrounding the Pipelines. (*Id.*). Second, the officials determined that Enbridge violated a provision that requires them to maintain a multi-layer coating on the Pipelines. (*Id.* at PageID.35). Again, the officials explained that the requirement is there to "prevent the steel from being exposed to environmental factors that could cause corrosion or other physical damage." (*Id.*). Third, the officials concluded that Enbridge violated the requirement that "minimum curvature shall be no less than two thousand and fifty (2,050) feet radius." (*Id.* at PageID.37). Once again, the Notice stated that the requirement was put in place to "limit[] stress on the Pipelines." (*Id.*). In light of these alleged violations, the Michigan officials concluded:

> In the face of the documented and recently demonstrated vulnerability of the Straits Pipelines to external impacts from anchors and other objects, and the complete failure of safety systems intended to mitigate such impacts, as well as the inherent threats to pipeline integrity from incorrect operations and procedural errors, Enbridge's continued operation of the Straits Pipelines is contrary to and incompatible with its affirmative duty under the Easement to "exercise the due care of a reasonably prudent person for the safety and welfare of all persons and of all private and public property."

8

(*Id.* at PageID.38).

### 4.  Canada Invokes 1977 Transit Treaty Dispute Resolution Mechanism

In October 2021—roughly a year after Michigan's shutdown attempt—Canada challenged Michigan's actions as a violation of the 1977 Transit Treaty between the United States and Canada. Under Article IX of the treaty, "[a]ny dispute between the Parties . . . shall be settled by negotiation" and if that fails, then by "arbitration at the request of either party." Agreement Concerning Transit Pipelines, Can.-U.S., art. IX, Jan. 28, 1977, 1086 U.N.T.S. 344. Canada alleged that "a compelled shutdown would violate the United States' obligations to Canada under" the treaty. (ECF No. 133, PageID.1715). Both Canada and the United States have indicated that the two sovereigns are currently engaged in the international dispute process to determine whether Michigan's conduct would violate the United States' commitment to Canada under the treaty. (ECF No. 140, PageID.2060 ("[T]he two countries are engaged in negotiations, which is the first step required under the treaty before arbitration.)).

### 5.  Procedural Posture

This case is the third in a series addressing the portion of Line 5 passing through the Straits of Mackinac. Michigan officials voluntarily dismissed the second case. The first case, filed by Michigan's Attorney General, remains pending in a state court, albeit with the United States Supreme Court considering a procedural issue that could end up moving the case here.

#### a.  The Second, and now Dismissed, Case

The second case in the series was filed in state court in November 2020 by the State of Michigan, the Governor of Michigan, and the Michigan Department of Natural Resources against Enbridge to enforce Michigan's shutdown order. (Case No. 1:20-cv-01142-RJJ-RSK, ECF No. 1-1). The lawsuit sought a declaration that the 1953 Easement violated the public trust doctrine and

that Enbridge violated the terms of the easement, and an injunction enjoining Enbridge's operation of the pipeline. (*Id.* at PageID.36-37). Enbridge removed the case from state to federal court in November 2020. (*Id.* ECF No. 1). Michigan moved to remand the case in June 2021. (*Id.* ECF No. 41). This Court denied that motion, finding that the case was properly in federal court under *Grable*. (*Id.* ECF No. 80). Michigan officials then voluntarily dismissed the case. (*Id.* ECF No. 83).

### b.   The First, Still Pending, Case in the Series

The first case was brought by Michigan Attorney General Dana Nessel against Enbridge in Michigan state court in June 2019. (No. 1:21-cv-01057, ECF No. 23, PageID.611). Nessel sought a declaration that the 1953 Pipeline easement was void under the public trust doctrine, and that the Straits portion of Line 5 was a common law public nuisance and violated the Michigan Environmental Protection Act. Nessel also sought to enjoin Enbridge's continued operation of the pipeline.

Fifteen days after Michigan officials voluntarily dismissed the second case, Enbridge removed the first case to federal court in December 2021. (*Id.*). Nessel sought a remand because it came more than 30 days from the initial filing in 2019. This Court, however, rejected that argument, concluding that "Plaintiff's attempt to gain an unfair advantage through the improper use of judicial machinery" required the case to remain here. (*Id.* at PageID.621-22). On appeal, the Sixth Circuit reversed, holding "Enbridge failed to timely remove this case to federal court . . . and there are no equitable exceptions to the statute's deadlines for removal." *Nessel on behalf of People of Michigan v. Enbridge Energy, LP*, 104 F.4th 958 (6th Cir. 2024). This Court implemented the mandate of the Sixth Circuit and remanded the case to State Court where it is currently pending. After the remand, the Supreme Court accepted Enbridge's petition for certiorari to decide the

removal issue. *Enbridge Energy, LP v. Nessel*, 145 S. Ct. 2843 (2025). Argument in the Supreme Court has not yet been scheduled. (*See* ECF No. 160, PageID.2405).

### c.   This Case

In November 2020, Enbridge filed this suit in the Western District of Michigan. (ECF No. 1). It names the Michigan officials that issued the 2020 Easement Revocation Notice, Governor Gretchen Whitmer and Dan Eichinger, as defendants.

Enbridge seeks declaratory and injunctive relief on two separate counts. First, Enbridge seeks a declaration that Defendants' attempt to revoke the 1953 Easement and shut down Line 5 is preempted by the Pipeline Safety Act of 1992 and therefore in violation of the Supremacy Clause. (*Id.* at PageID.10). Second, Enbridge seeks a declaration that Defendants violated the Foreign Commerce Clause and Foreign Affairs Doctrine. (*Id.* at PageID.16).[1]

Over a year-and-a-half later, Defendants moved to dismiss the case. (ECF No. 62). They argued that the Eleventh Amendment Sovereign Immunity barred both claims. (ECF No. 63, PageID.330). This Court disagreed and denied Defendants' motion. (ECF No. 94). Defendants appealed, but the Sixth Circuit affirmed this Court's decision. *Enbridge Energy, LP v. Whitmer*, 135 F.4th 467 (6th Cir. 2025). The case continued in this Court.

Two motions are currently pending before the Court. First, Defendants argue that this Court should either abstain from hearing this case or issue a stay to halt proceedings, allowing completion of the case pending in state court. (ECF No. 120). Defendants assert that abstention is warranted under either the *Younger* or *Colorado River* doctrines. As an alternative, they ask the Court to stay

---

[1] Originally, Enbridge also sought a declaration that Defendants' actions are unconstitutional under the Commerce Clause of the U.S. Constitution. (ECF No. 1, PageID.13). Enbridge later amended its complaint to dismiss this claim. (ECF No. 158, PageID.2346).

the case to allow the state case to proceed. Second, Enbridge moves for summary judgment on both of its preemption claims. (ECF No. 124). The parties have fully briefed both pending motions.

In addition, multiple parties have filed amicus briefs. [2] Both the United States and Canada have submitted briefs in support of Enbridge's preemption position. (ECF Nos. 133, 140). As to Count I, the United States agrees that the Pipeline Safety Act preempts Defendant's shutdown order. (ECF No. 140, PageID.2048). As to Count III, the United States agrees that the foreign affairs doctrine preempts Michigan's conduct. (*Id.* at PageID.2056-61). But it asks the Court to forgo interpreting the 1977 Transit Treaty because it is unnecessary to resolve that claim. (*Id.*). Canada, on the other hand, focuses exclusively on Count III. (ECF No. 133). It asserts that 1977 Transit Treaty preempts Defendant's shut down attempt. (*Id.* at PageID.1715). And it asks that the Court, at the very least, enjoin Defendants from compelling the shutdown of Line 5 while the Article IX dispute resolution process is ongoing. (*Id.* at PageID.1738). Notably, both countries assert that the Defendants' actions interfere with their respective foreign policy positions and will disturb their trade relations.

## LEGAL STANDARD

Summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Parks v. LaFace Records*, 329 F.3d 437, 444 (6th Cir. 2003). A genuine issue of material fact exists if the evidence is such that a reasonable

---

[2] Mulitple States submitted a joint brief in an effort to "preserv[e] their powers under the public trust doctrine." (ECF NO. 145, PageID.2098). The brief primarily argues that the Pipeline Safety Act does not preempt Defendants' conduct. Further, multiple Indian Tribes also filed a joint brief in support of Defendant's position.  (ECF No. 146). That brief primarily focuses on Count III. The tribes argue that the Defendants' actions do not violate either the Transit Treaty or the Foreign Affairs Doctrine. Finally, the Great Lakes Business network filed a brief, also in support of Defendants' conduct. (ECF No. 144). The brief asserts that construing the Pipeline Safety Act to prevent enforcement of conditions in the easement would be an unconstitutional taking of Michigan's property.

jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a summary judgment motion, "the ultimate question . . . is whether the evidence presents a sufficient factual disagreement to require submission of a particular legal claim to the jury or whether the evidence on the claim is so one-sided that [the moving party] should prevail as a matter of law. *Bobo v. United Parcel Service, Inc.*, 665 F.3d 741, 748–49 (6th Cir. 2012).

DISCUSSION

Enbridge argues that federal law preempts Defendants' conduct in two independent ways. First, in Count I, Enbridge asserts that the Pipeline Safety Act of 1992 preempts Defendants' attempt to regulate Line 5's safety by ordering Enbridge to shut down the portion that runs under the Straits of Mackinac. Second, in Count III, Enbridge asserts that Defendants' conduct is preempted under the foreign affairs doctrine because a shutdown of Line 5 conflicts with the United States' explicit foreign policy positions and interferes with its relations with Canada. The Court agrees on both counts. As such, Enbridge's motion for summary judgment is granted.

### A. <u>Supremacy Clause Preemption Through the Pipeline Safety Act of 1992</u>

Enbridge first asserts that the Pipeline Safety Act of 1992 expressly preempts Defendants' attempt to shut down Line 5.[3] Because the Pipeline Safety Act precludes any attempt by a state authority to regulate the safety of interstate pipelines, the Court agrees.

---

[3] Defendants assert that Enbridge is barred from bringing its Supremacy Clause preemption claims because it failed to comply with the Act's notice provision. (ECF No. 134, PageID.1768-69). The Court disagrees. Under the Act, "[a] person may bring a civil action . . . only after 60 days after the person has given notice of the violation to the Secretary of Transportation or to the appropriate State authority . . . and *to the person alleged to have committed the violation*." 49 U.S.C. § 60121(a)(1)(A) (emphasis added). This text shows that Congress intended for the notice provision to apply in citizen suits where an unsuspecting entity has violated one of the Act's substantive provisions. Enbridge's action is not a citizen suit. It is an *Ex Parte Young* action seeking injunctive relief. Like the plaintiffs in *Couser* and *Olympic Pipe*, Enbridge sued the officials under 28 U.S.C. § 1331. As such, the Pipeline Safety Act's notice provision does not apply here.

13

### 1.  Legal Background

The Supremacy Clause of the United States Constitution instructs that federal law is "the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Put simply, "[t]his unequivocal command affords Congress the power to preempt state law." *Matthews v. Centrus Energy Corp.*, 15 F.4th 714, 720 (6th Cir. 2021).

Congress can preempt state law either expressly or by implication. Under any preemption inquiry, the "purpose of Congress is the ultimate touchstone," whether "explicitly stated in the statute's language or implicitly contained in its structure and purpose." *In re Ford Motor Co. F-150 & Ranger Truck Fuel Econ. Mktg. & Sales Pracs. Litig.*, 65 F.4th 851, 860 (6th Cir. 2023) 860 (quoting *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992)).

Express preemption occurs when Congress makes clear "that it is displacing or prohibiting the enactment of state legislation in a particular area." *In re Ford Motor Co.*, 65 F.4th at 859 (quoting *Matthews,* 15 F.4th at 720). This form of preemption is "explicit" in "a statute's text." *Matthews*, 15 F.4th at 720. "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one." *English v. Gen. Elec. Co.*, 496, U.S. 72, 78-79 (1990).[4]

---

[4] Defendants argue that *Armstrong v. Exceptional Child Center*, 575 U.S. 320 (2015), bars Enbridge's Supremacy Clause claim because *Armstrong* held that there is no private cause of action under the Supremacy Clause. Defendants are correct that the Supremacy Clause does not supply a private cause of action. But Enbridge is not attempting to sue directly under the Supremacy Clause: this is an *Ex Parte Young* action to prevent state law officials from acting in a way that violates a federal statute. *Armstrong* and other courts interpreting *Armstrong* specifically recognize that the *Ex Parte Young* exception still applies in this context. *See Armstrong* (recognizing that courts have long granted injunctive relief against "state officials who are violating, or planning to violate, federal law"); *Churchill Downs Tech. Initiatives Co. v. Michigan Gaming Control Bd.*, 767 F. Supp. 3d 556, 567-70 (W.D. Mich. 2025) (rejecting the defendants' argument that the Court has no jurisdiction over the plaintiff's *Ex Parte Young* action because the Supremacy Clause does not provide a private cause of action).

## 2.  Pipeline Safety Act of 1992 and Accompanying Federal Regulation

Congress addressed interstate pipeline safety through the Pipeline Safety Act of 1992. Congress passed the Pipeline Safety Act to "increase the safety to humans and the environment from the transportation by pipeline of natural gas and hazardous liquids, and for other purposes." H.R. 1489, 102nd Cong., 2d Sess. (1992). One of Congress's "other purposes" in passing the Act was to "provid[e] national uniformity in the establishment and enforcement of hazardous liquid pipeline safety regulations." *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 883 (9th Cir. 2006); *see* 49 C.F.R. pt. 195 app. A.[5]

### a. Express Preemption Provision

To help establish nationally uniform standards, Congress expressly eliminated the states' role in regulating interstate pipeline safety. Under a subsection entitled "Preemption," Congress concluded that a "State authority *may not adopt or continue in force safety standards* for interstate pipeline facilities or interstate pipeline transportation." 49 U.S.C § 60104(c) (emphasis added). The Pipeline Safety Act grants states some regulatory authority over the safety of intrastate pipelines,[6] but it makes no exceptions for interstate pipelines. In place of state regulation, Congress instructed that the Secretary of Transportation "shall prescribe minimum safety standards for pipeline transportation and for pipeline facilities." 49 U.S.C. 60102(a)(2). In short, Congress

---

[5] The Pipeline Safety Act of 1992 recodified two earlier federal laws—the Natural Gas Pipeline Act of 1968 and the Hazardous Liquids Pipeline Safety Act of 1979. The Pipeline Safety Act did not make any substantive changes to these provisions. Because of this, "decisions interpreting said statues are relevant to interpreting the PSA." *Couser v. Story County*, 704 F. Supp. 3d 917, 930 n.7 (S.D. Iowa 2023), *aff'd in part*, *Couser v. Shelby Cnty.*, 139 F.4th 664 (8th Cir. 2025).

[6] The same preemption provision allows states to "adopt additional or more stringent safety standard for intrastate pipeline" transportation. States may regulate the safety of intrastate pipelines if they have "submitted a current certification under section 60105(a)" and those standards "are compatible with the minimum standards prescribed under this chapter." *Id.* The statute makes no such exception for interstate pipelines.

decided to address interstate pipeline safety as an exclusive federal matter to the exclusion of state authority.

The scope of the Pipeline Safety Act's preemption provision is extensive. The statutory scheme demonstrated Congressional intent to interpret "safety standard"—and thus the preemption provision—broadly. Congress expressly empowered the Secretary of Transportation to prescribe "safety standards" applicable "to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, *operation*, replacement, and maintenance of pipeline facilities." 49 U.S.C. 60102(a)(2) (emphasis added). Further, Congress instructed that those safety standards "shall be . . . practicable; and []designed to meet the need for . . . protecting the environment." § 60102(b). These instructions show, first, that Congress expressly intended for the federal government's safety regulations to account for environmental protection. *See Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dep't of Com.*, 999 F.2d 354, 360 (8th Cir. 1993). But even more strikingly, they show that the federal government has plenary power to determine how to keep pipelines safe at every stage from design through construction, testing, operation, maintenance, and even replacement. Because Congress reserved for the federal government almost unbridled authority and discretion to regulate the safety of interstate pipelines, states have virtually no authority to make safety-related determinations.

Courts interpreting the Pipeline Safety Act's express preemption provision have uniformly recognized its expansive scope. *See, e.g.*, *Kinley Corp.*, 999 F.2d at 358-59 ("Congress has expressly stated its intent to preempt the states from regulating in the area of safety . . . . the state cannot regulate in this area. . . . This Congressional grant of exclusive federal regulatory authority precludes state decision-making in this area altogether and leaves no regulatory room."); *Couser v. Shelby County*, 139 F.4th 664, 672 (8th Cir. 2025) ("Congress expressly preempted the entire

field of hazardous liquid pipeline safety in § 60104(c) . . . preclud[ing] state decision-making in this area altogether . . . leav[ing] no regulatory room."); *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872, 878 (9th Cir. 2006) ("Federal preemption of [state] regulation of interstate pipeline safety . . . is manifest in the language of the PSA provision entitled 'Preemption.' "); *see also ANR Pipeline Co. v. Iowa State Com. Comm'n*, 828 F.2d 465, 470 (8th Cir. 1987) ("Congress intended to preclude states from regulating *in any manner whatsoever* with respect to the safety of interstate transmission facilities." (emphasis added)); *cf.* 49 C.F.R. pt. 195, app. A ("The HLPSA provides for a national hazardous liquid pipeline safety program with nationally uniform minimal standards . . . . [and] leaves to *exclusive Federal regulation* and enforcement the 'interstate pipeline facilities,' those used for the pipeline transportation of hazardous liquids in interstate or foreign commerce." (emphasis added)).

The text of the Pipeline Safety Act and the caselaw applying it leave no doubt that it is the exclusive responsibility and prerogative of the federal government to regulate interstate pipeline safety to the exclusion of any competing regulation by the states.

### b. Federal Regulation of Pipeline Safety

In practice, federal regulation of interstate pipeline safety further demonstrates the broad scope of the federal government's authority over interstate pipeline safety, which, in turn, shows that states have no authority to regulate interstate pipeline safety.

The Pipeline and Hazardous Materials Safety Administration (PHMSA), which is part of the United States Department of Transportation, is tasked with regulating pipeline safety and administering the Pipeline Safety Act. From its inception, PHMSA has promulgated extensive pipeline safety regulations, as instructed by Congress. *See* 49 C.F.R. pt. 195. The safety regulations are tailored to cover reporting requirements (Subpart B), design requirements (Subpart C),

17

construction requirements (Subpart D), operations and maintenance requirements (Subpart F), pressure testing (Subpart E), corrosion control (Subpart H), and the qualifications for pipeline personnel. (Subpart G). *See id.* Notably, some of the regulations under the "Operations and Maintenance" specifically deal with pipelines that cross under navigable waters. *See* 49 C.F.R. § 195.412.

PHMSA's authority over interstate pipeline operations includes orders to cease operations entirely. As this Court previously recognized, PHMSA has the authority to respond to emergencies, which includes the power to close a pipeline. *Michigan v. Enbridge*, 571 F. Supp. 3d 851 (W.D. Mich. 2021) ("[PHMSA] is vested with exclusive jurisdiction to issue an emergency order requiring pipeline closure 'when an unsafe condition or practice, or a combination of unsafe conditions and practices, constitutes or is causing an imminent hazard.' " (quoting 49 U.S.C. § 60117(p)). Therefore, if PHMSA determines that a pipeline is too unsafe to operate under current conditions, it can shut down the pipeline. By the same token, unless and until PHMSA or other lawful federal authority makes that determination, a state cannot do so on its own.

PHMSA and Congress have actually addressed the safety of Line 5, specifically. After the anchor strike incidents in 2018, Congress tightened restrictions on pipelines, like Line 5, that pass-through water-sensitive regions. *See* 49 U.S.C. 60109(g)(5) (requiring pipeline operators to "assess potential impacts by maritime equipment or other vessels, including anchors, anchor chains, or any other attached equipment"). There is no doubt that Congress cut the State out of the role of regulating the safety of interstate pipelines like Line 5.

c.  *Specific Preemption Carveouts*

Although the Pipeline Safety Act expressly precludes state regulation of interstate pipeline safety, it includes narrow carve outs that preserve some state authority for location and routing.

The Act explicitly states that it "does not authorize the Secretary of Transportation *to prescribe the location or routing of a pipeline facility*." 49 U.S.C § 60104(e) (emphasis added). This limit on the federal government's authority has led many courts to conclude that Congress reserved the power to determine and the "location or routing of [pipeline] facilities" for States. *See, e.g.*, *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 430-31 (D. Me. 2017); *Olympic Pipe Line Co. v. City of Seattle*, No. C03-2343L, 2003 WL 27392855, at *4 (W.D. Wash. Aug. 21, 2003).

The Pipeline Safety Act also contains a savings clause for tort claims. It states, "[t]his chapter does not affect the tort liability of any person." 49 U.S.C. § 60120(c). Because of this provision, district courts have rejected the argument that federal common law tort claims against pipeline operators are preempted by the Pipeline Safety Act. *E.g.*, *Cheverez v. Plains All Am. Pipeline, LP*, No. CV15-4113 PSG (JEMX), 2016 WL 4771883, at *5 (C.D. Cal. Mar. 4, 2016); *Am. Energy Corp. v. Texas E. Transmission, LP*, 701 F. Supp. 2d 921, 925, 927 (S.D. Ohio 2010). In practice, this provision would allow a government authority or private party to sue a pipeline operator for negligence if, for example, a pipeline bursts, causing damage to property.

These narrow carveouts reinforce the broad preemptive force against any other state regulatory power.

### 3.   Courts Have Held That the Pipeline Safety Act Preempts State Actions Involving Shutdown Attempts

Multiple courts have analyzed how the Pipeline Safety Act applies to a state authority's attempt to shut down a pipeline. In *Olympic Pipe Line Co. v. City of Seattle*, 437 F.3d 872 (9th Cir. 2006), for example, the Ninth Circuit found that the Pipeline Safety Act preempted Seattle's regulations on a pipeline that ran under the city. Long before the city attempted to shut down the pipeline, it agreed to a Franchise Agreement with the pipeline company that allowed the company to maintain and operate its pipeline under Seattle streets for a ten-year term. *Id.* at 875. Seattle

conditioned the franchise "on the execution of an Indemnity Agreement" that ensured the pipeline would "not result in the City incurring any liability, environmental or otherwise." *Id.*

In 1999, part of the pipeline exploded, spilling over 230,000 gallons of unleaded gas. *Id.* As a result, three people were killed. *Id.* And devasting property and ecological damage ensued. *Id.* Before Seattle renewed the franchise agreement, it required that Olympic respond to safety related concerns and perform a hydrostatic test on the pipeline. *Id.* Olympic refused. *Id.* Seattle subsequently "notified Olympic that [it] was suspending all pipeline operations no later than sixty days from the letter's date . . . ." *Id.* Olympic sued for injunctive relief and for a declaration that "the PSA preempts Seattle's attempts to control, regulate, or otherwise interfere with matters relating to the safety, design, construction, testing, or operation of Olympic's pipeline." *Id.* at 876.

The court agreed with Olympic. It found that the Pipeline Safety Act, through an express preemption provision, broadly precluded state "regulation of interstate pipeline safety." *Id.* at 878. Per the court, this is manifest in the "PSA provision entitled 'Preemption.' " *Id.* The court ultimately concluded that the "provisions of the Franchise Agreement and the Indemnity Agreement that impose safety standards" were preempted by the Pipeline Safety Act. *Id.* at 879-80. As such, the city could not enforce its shutdown order.

Notably, the fact that the safety provisions were found in a contract did not change the court's preemption determination. The court rejected Seattle's argument that because the pipeline company knowingly entered into a contract with Seattle, the pipeline company waived its right to advance a preemption argument. *Id.* at 882-83. Per the court, "[p]reemption is a power of the federal government, not an individual right of a third party that the party can "waive.' " *Id.* at 883. The court stated that:

> Although a sound public policy might normally discourage companies from entering into contracts that they do not intend to honor, that policy concern is more

> than balanced by the superordinate federal need to maintain the PSA's policy of providing national uniformity in the establishment and enforcement of hazardous liquid pipeline safety regulations. . . .

*Id.* at 883. According to the court, then, the PSA preempts a state authority's attempt to enforce safety standards on pipelines, even if the enforced standards are found in a contractual agreement between the parties.

Other cases also involve attempts by state authorities to shut down pipelines. For example, in *Kinley Corp. v. Iowa Utilities Bd., Utilities Div., Dep't of Com.*, 999 F.2d 354 (8th Cir. 1993), the Eighth Circuit found that HLPSA (the Pipe Safety Act's predecessor) preempted Iowa's actions. In *Kinley*, Iowa "establishe[d] a comprehensive state program supervising the intrastate and interstate transportation by pipeline." *Id.* at 356. The pipeline company did not apply for a permit as required by Iowa's program. *Id.* Even so, it went ahead and built the pipeline. *Id.* After the pipeline was in operation for 20 years, Iowa insisted that the company apply for a permit. *Id.* After the company did, the state denied the application for a state pipeline permit and ordered it to stop operating the pipeline in Iowa. *Id.* at 357.

The court held that the state's actions and regulatory scheme were preempted. *Id.* at 357-59. The court noted that through the express preemption provision, "Congress has expressly stated its intent to preempt the states from regulating in the area of safety in connection with interstate hazardous liquid pipelines," and as such, "the state cannot regulate in this area." *Id.* at 358. Because "Congress granted exclusive authority to regulate the safety of construction and operation of interstate hazardous liquid pipelines to the Secretary of the Department of Transportation," the state was precluded from "decision-making in this area altogether."  *Id.* at 359.[7] Thus, much like Seattle in *Olympic Pipe*, Iowa could not shut down the interstate pipeline.

---

[7] The court also noted that with the recent passing of the Pipeline Safety Act of 1992, which amended the HLPSA to include the "environment" as a factor for safety standards, "expands, rather

One court has gone further than both *Olympic Pipe* and *Kinley* to find that a county's attempt to shut down a pipeline—through a preliminary injunction—was likely preempted. *See Williams Pipe Line Co. v. City of Mounds View*, 651 F. Supp. 551 (D. Minn. 1987). In *Williams*, a county attempted to enjoin operation of a pipeline because the pipeline company allegedly violated provisions from their 1957 property agreement. *Id.* at 560. The county argued that its contract and property claims were not preempted because "it gave [the pipeline company] revocable licenses to use its property and that, as a property owner, it is free to demand that its licensee abide by conditions it chooses to set" and also "that HLPSA does not prohibit it, acting as property owner, from entering into a contract requiring a licensee to comply with higher safety standards." *Id.* at 568-69. The court denied the county's motion, finding the HLPSA most likely "preempts [the county's] claim for injunctive relief." *Id.* at 570. In so finding, the court determined that:

> Hazardous liquid pipelines run through 21 states, and presumably through small and large plots of land belonging to vast numbers of persons. Were each of these landowners entitled to demand compliance with their own safety standards, the clear Congressional goal of a national standard for hazardous liquid pipeline safety would be thwarted. Ramsey County's property and contract-based claims for injunctive relief appear to be "so repugnant to the statute that the survival of such rights would in effect deprive [HLPSA] of its efficacy. . . ."

*Id.*

Finally, a recent case out of the Eighth Circuit demonstrates the broad scope of interstate pipeline preemption. In *Couser v. Shelby County*, 139 F.4th 664 (8th Cir. 2025)**,** the Eighth Circuit found that a county's pipeline regulations were preempted by the PSA. There, a company wanted to build a carbon dioxide pipeline that would cross five states. *Id.* at 668. Two counties, however,

---

than restricts, federal regulation of interstate hazardous liquid pipelines and thus is consistent with federal preemption." *Kinley*, 999 F.2d at 360.

imposed their own requirements on the pipeline companies, which included setback standards and emergency response plans. *Id.*

The main question for the court to decide was whether the counties' actions were safety regulations. Regarding setbacks, the court found that because "the effect on safety is not incidental, but rather the 'primary motivation' " of the setbacks, the setbacks qualified as safety standards. *Id.* at 671. Because Congress "preclude[d] state decision-making in this area altogether . . . leav[ing] no regulatory room," the safety-motivated setbacks regulations were preempted. *Id.* at 669. *Couser* thus illustrates that Congress' ban on state intervention into interstate pipeline regulation applies even to regulations as seemingly mundane as local setback requirements.[8]

### 4. Defendants' Shutdown Notice Is Preempted

Defendants' actions fall directly within the Pipelines Safety Act's preemptive scope. Defendants unlawfully regulated the safety of Line 5 by attempting to shut it down. The shutdown order alone is dispositive, but Defendants also unlawfully regulated Line's 5 safety by "continu[ing] in force" numerous state law safety standards found in the 1953 Easement to justify their decision to shut down Line 5. These regulatory decisions are within the exclusive power of the federal government.

---

[8] Defendants largely rely on *Bad River Band of Lake Superior Tribe of Chippewa Indians of Bad River Rsrv. v. Enbridge Energy Co., Inc.*, 626 F. Supp. 3d 1030 (W.D. Wis. 2022). In *Bad River*, an easement between the Tribe and Enbridge expired by its own terms, and the Tribe did not consent to the renewal of a 20-year easement. The court rejected Enbridge's preemption argument because nothing in the Pipeline Safety Act required the party to grant an easement. This case has no force here because the Michigan easement, unlike the one in *Bad River*, has no expiration date. This is not a question of forcing a state to grant a new easement or renew one that expires on its own; this is about regulating the safety of an existing interstate pipeline in an easement with no expiration date.

*a. Michigan Unlawfully Regulated Line 5's Safety by Ordering Enbridge to Shut It Down*

As demonstrated by *Olympic Pipe*, *Kinley*, *Williams*, and the structure of the Pipeline Safety Act's regulatory scheme, Michigan's directive to shut down and permanently decommission the Straits portion of Line 5 is preempted by the Pipeline Safety Act.

The overarching message of Defendants' shutdown order is a straightforward safety determination: pipelines are too unsafe to operate underneath the Straits of Mackinac. In the shutdown order, Defendants clearly stated that "Enbridge's operation of the Straits Pipelines presents a substantial, inherent and unreasonable risk of an oil spill." (ECF No. 1-1, PageID.30). According to Defendants, a pipeline's location at the bottom of the Straits presents unique safety concerns because of "the very real risk of further anchor strikes and other external impacts" as well as the "inherent risks of pipeline operations." (*Id.* at 26-27). Defendants further noted that an oil spill "would have grave ecological and economic consequences." (*Id.* at 30). Accordingly, to prevent the "foreseeable, catastrophic effects of an oil spill," Defendants revoked Enbridge's easement and ordered it to "cease operation" and "permanently decommission" the Straits Pipeline. (*Id.* at PageID.41).

A shutdown order of this magnitude falls squarely within the Pipeline Safety Act's preemptive scope. Plainly, an order to "cease operation" of a pipeline regulates its operations. Defendants may be right in their policy judgments, but it was not their call to make. Congress explicitly delegated regulatory authority over the "operation" of an interstate pipeline to the Secretary of Transportation, 49 U.S.C. 60102(a)(2), and preempted state authority. The Secretary's power includes the authority to shut down a pipeline if circumstances warrant. That delegation of authority—combined with the broad preemption clause—precludes the Defendants' attempt to shut down the interstate pipeline even when based on understandable state concerns.

Defendants acknowledge that "[i]t is not their role to regulate pipeline operations." (ECF No. 134, PageID.1774). But that's exactly what they did. They ordered Enbridge to shut down and permanently decommission the Straits Pipeline. This is far more intrusive than the state regulations rejected in *Couser* (setbacks regulations and emergency plan submission); *Olympic Pipe* (hydrostatic testing); and *Kinley* (permit and inspection requirements). Because an attempt by a state authority to shut down an interstate pipeline is "so repugnant to the" Pipeline Safety Act, *Williams*, 651 F. Supp. at 570, Defendants' attempt to shut down Line 5 must be preempted.

*b.   Defendants Unlawfully Enforced Numerous State-Imposed Safety Standards to Justify Shutting Down the Line 5*

The Pipeline Safety Act further preempts Defendants' shutdown order because they unlawfully "continued in force" numerous other state-imposed safety standards to justify their decision to shut down the Straits Pipeline. More specifically, Defendants found that Enbridge "breached . . . its obligations to comply with the conditions" in the 1953 Easement. (ECF No. 1-1, PageID.34).

Each condition from the 1953 Easement that Enbridge allegedly violated is a safety standard. To begin, Defendants asserted that Enbridge did not "exercise the due care of a reasonably prudent person" when operating the Straits Pipeline. (*Id.*). The easement specifically acknowledged that the "due care" standard was necessary "for the safety and welfare of all persons and of all public and private property." (*Id.* at 32). Further, as support for their finding that Enbridge did not exercise "due care," Defendants cited multiple technical conditions from the 1953 Easement that Enbridge apparently violated. (*Id.* at 33). Defendants concluded that Enbridge violated the requirements that the pipeline must "be physically supported . . . at least every 75 feet;" maintain a multi-layer coating on the Pipelines; and maintain a "minimum curvature shall be no less than two thousand and fifty (2,050) feet radius." (ECF No. 1-1, PageID.34-37).

Defendants' shutdown order explicitly shows that Michigan's "primary motivation" for including these standards in the easement was to ensure Line 5's safety. *Couser*, 139 F.4th at 671. The Notice concluded that these conditions were included in the easement "to protect the structural integrity of the Pipelines," to prevent the pipelines from being "exposed to environmental factors that could cause corrosion or other physical damage," and to "limit[] stress on the Pipelines." (*Id.* at 34-37). Clearly, Defendants' invocation of these easement conditions is a straightforward attempt by state authorities to regulate pipelines safety and "continue in force" state law safety standards. Defendants acknowledged as much during oral arguments. (ECF No. 160, PageID.2423 ("[T]hose terms and conditions would meet the definition that we have offered of safety standards."). As such, the easement conditions are exactly the kind of state-imposed safety standards that the Pipeline Safety Act intended to preempt.

Defendants first respond that the preemptive scope of the Pipeline Safety Act does not extend to easements. (ECF No. 134, PageID.1774-76, 1784-89). But the caselaw is to the contrary. The similarities between the enforced safety provisions in both the 1953 contract granting the easement and the contracts in *Olympic Pipe* and *Williams* are apparent. In both cases, the relevant state authorities enforced safety regulations found in contracts to justify attempting to shut down the pipeline. Still, both *Olympic Pipe* and *Williams* found preemption. That finding is necessary to achieve Congress's purpose. If states could contract around the Pipeline Safety Act, that would surely "thwart[]" Congress's "goal of a national standard for hazardous liquid pipeline safety." *Olympic Pipe*, 437 F.3d at 883 (quoting *Williams*, 651 F. Supp. at 570).

Defendants further argue that the Pipeline Safety Act should not apply retroactively here. (ECF No. 134, PageID. 1784). But Congress explicitly disagreed. The Act instructs that a state "may not adopt *or continue in force* safety standards." 49 U.S.C § 60104(c) (emphasis added).

Congress, then, did not intend to preempt only new state law safety standards but also safety standards already in place before the Act was passed. Congress intended to supplant state regulation entirely. *See Couser*, 139 F.4th at 672 ("Congress expressly preempted the entire field of hazardous liquid pipeline safety."). Allowing state authorities, like Defendants, to continue enforcing old safety standards would surely interfere with Congress's goal for uniform safety standards. *See Olympic Pipe*, 437 F.3d at 883. Therefore, it does not matter that the Defendants enforced safety provisions contained in an easement contract that existed before the Pipeline Safety Act was passed. They are still preempted.

The Pipeline Safety Act is not concerned with *how* the state imposed or enforced safety standards on an interstate pipeline but rather *whether* it did. Here, there is no question that Defendants enforced multiple state-imposed safety requirements to justify shutting down Line 5. As such, Defendants' enforcement of the safety conditions in the 1953 Easement is preempted because Congress reserved these judgments exclusively to the federal government.

*c. The Pipeline Safety Act Preempts Defendants' Use of the Public Trust Doctrine*

Defendants argue that the Pipeline Safety Act does not preempt their shutdown order because one their reasons for revoking the easement was that it was, from the Defendants' perspective, invalid under the public trust doctrine. (ECF No. 134, PageID.1779-83). According to Defendants, because the public trust doctrine is not a "safety standard" as envisioned by the Pipeline Safety Act, their attempt to revoke the easement and shutdown Line 5 is not preempted. The Court disagrees.

Defendants are correct that, in the abstract, the public trust doctrine is not a typical pipeline safety standard[9] but more of a general common law doctrine that obligates states to protect and preserve navigable waters, like the Great Lakes. *Glass v Goeckel*, 473 Mich. 667, 678-79 (2005). It does not apply to pipelines, specifically, but to any conduct that could threaten the public trust. But the legal significance of the public trust doctrine in the abstract is largely beside the point. Defendants' *application* of the public trust doctrine to Line 5 operates as a unlawful safety regulation. As applied by Defendants, the public trust doctrine was simply a vehicle for Defendants to make ad hoc safety judgments about Line 5 and regulate its operations according to those judgments. As such, Defendants' use of the public trust doctrine must be preempted.

i.    Defendants' Claim That Enbridge's Continued Operation of Line 5 Violates the Public Trust Doctrine

Defendants invoked the public trust doctrine because of concerns over Line 5's safety and its impact on the environment. In the notice, Defendants described that Enbridge's continued "operation of the Straits Pipelines presents a substantial, inherent and unreasonable risk of an oil spill," which would "severely impair[e] public rights in the Great Lakes." (ECF No. 1-1, PageID.30). According to Defendants, Line 5 "present[ed] inherent risks of environmental harm," such as "incorrect operations" by Enbridge. (*Id.* at PageID.28). The shut down—again, according

---

[9] Defendants' argument rests largely on its restrictive understanding of the term "safety standard." According to Defendants, a standard is "a set of technical definitions and guidelines that function as instructions for designers, manufacturers, operators or users of equipment to provide consistent and comparable results," and as such, the statute should be read as preempting only "technical requirements governing the design, manufacture, or operation of a pipeline. But this is not what the caselaw or the statutory text support. No other court analyzing the Pipeline Safety Act has defined "safety standard" in this limited manner. And the Pipeline Safety Act, as a whole, indicates that Congress meant for safety standard to have an expansive scope by empowering the Secretary with virtually unlimited discretion to regulate all aspects of interstate pipeline safety from design to replacement and everything in between.

to Defendants—would be necessary to prevent the "grave ecological and economic consequences" of an oil spill. (*Id.* at PageID.30). This public trust analysis largely repackages the same rationale found throughout the notice, including Defendants' finding that Enbridge violated the "due care" standard, which Defendants do not deny is a state-imposed safety standard.

Consider the disruption on interstate pipeline operation that would result if any state, like Michigan, could enforce this general common law standard to shut down the pipeline. Under this doctrine, states could shut down pipelines when—in the state's independent determination—the pipeline has safety issues that could affect the environment and threaten the public trust. Used in this way, the doctrine would allow states to adopt and enforce whatever pipeline safety standard they think is necessary to serve that purpose. As Defendants acknowledge in their briefing, application of the doctrine involves "inherently local, case-by-case determinations that do not lend themselves to uniform standards." (ECF No. 134, PageID.1781). This would subject operators to the amorphous ad hoc judgments of state regulators, rather than a uniform set of federal standards, which is exactly the result that Congress wanted to avoid when it passed the Pipeline Safety Act to unify standards nationally. *See Olympic Pipe*, 437 F.3d at 883. Congress sought to construct one regulatory regime for interstate pipeline operators to follow. A general safety standard that allows 50 states to make "local, case-by-case determinations" leads to the opposite result.

ii.    Defendants' Claim That the 1953 Easement is Void from Inception under the Public Trust Doctrine

Defendants' other reason for shutting down Line 5 under this doctrine fares no better. Defendants determined that the easement was void because Michigan, when originally granting the easement in 1953, never made an express finding that the easement would benefit the public trust. (ECF No. 1-1, PageID.25). Even if Michigan was required to make this finding—which the

Court need not decide[10]—Defendants cannot continue to enforce it. It operates as a safety standard: Michigan officials would have to review whether the pipeline poses a safety risk to the environment. As such, enforcing this safety requirement 70 years later is precluded by the Pipeline Safety Act.

In sum, the public trust doctrine, as applied to interstate pipelines, cannot be reconciled with Congress's decision to preclude state regulation of pipeline safety.[11] Defendants' logic would lead to a rather remarkable position on preemption: state authorities are not allowed to impose minimally intrusive requirements—like local setback rules (*Couser*), testing requirements (*Olympic Pipe*), or emergency response plans (*Couser*)—but they are allowed to shut down entire interstate pipelines by invoking general concerns about protecting the environment. That does not square with the Congressional judgment to give the federal government exclusive power to regulate pipeline safety. As applied here, the public trust doctrine is nothing but a vehicle for imposing state safety judgments that Congress precluded the state from making.

---

[10] There is some evidence to indicate that, contrary to Defendants' arguments, the State did make this finding. In the 1953 Easement, for example, the Michigan expressly stated that it is "of the opinion that the proposed pipeline system will be of benefit to all of the people of the State of Michigan and in furtherance of the public welfare." (ECF N. 158-1, PageID.2387).

[11] Nor does Defendants' invocation of the public trust doctrine fall under the Pipeline Safety Act's saving's clause for tort claims. As show by *Cheverez v. Plains All Am. Pipeline, LP*, No. CV15-4113 PSG (JEMX), 2016 WL 4771883 (C.D. Cal. Mar. 4, 2016), and *Am. Energy Corp. v. Texas E. Transmission, LP*, 701 F. Supp. 2d 921, 925 (S.D. Ohio 2010), this provision applies to tort claims brought in court against a pipeline operator. In essence, that provision allows harmed individuals to sue a pipeline operator if something goes wrong with operations (i.e. a spill). It protects these individuals' rights and ensures that they can seek redress for an operator's malfeasance. Defendants' shutdown order is nothing like this. Defendants invoked common law doctrines to independently decide—outside of the court system—that there were violations of the common law doctrine that warrant shutting down the pipeline. Congress did not intend for the tort savings clause to cover this kind of action.

d. *Defendants' Shut Down Order Is Not a "Location and Routing" Determination*

Finally, Defendants argue that their decision to shut down the Straits Pipeline is not preempted because it falls under the "location or routing" decision carveout to preemption. (ECF No. 134, PageID.1776). Defendants are correct that the Pipeline Safety Act carves out "location or routing" decisions from state preemption. But even so, Defendants' argument fails for one simple reason: Line 5 is not a *new* pipeline facility.

As shown by the caselaw and other relevant authorities, the Pipeline Safey Act's exception for "location or routing" decisions applies only to *new* pipeline facilities. Courts typically find that state authorities can regulate under this provision only when new pipeline facilities are involved. *See, e.g.*, *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321 (D. Me. 2017) (finding that a city was allowed to prohibit new facilities for the loading of crude oil as a "location and routing decision"); *cf. Washington Gas Light Co. v. Prince George's Cnty. Council*, 711 F.3d 412 (4th Cir. 2013) (finding that a county could pass a zoning ordinance that prevented a company from expanding its gas facilities); *Texas Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200 (5th Cir. 2010) (finding that a city could pass a setback ordinance that applied before a company constructed an interstate natural gas pipeline facility). And courts reject application of the location exception to pipeline facilities that are already operational in a distinct location. *See Olympic Pipe Line Co. v. City of Seattle*, No. C03-2343L, 2003 WL 27392855, at *4 (W.D. Wash. Aug. 21, 2003) ("This litigation does not concern the 'location or routing of' the Seattle Lateral. The location and routing of the pipeline has already been established."). PHMSA has recognized this distinction, stating that because federal law "excludes from coverage in pipeline safety standards the location or routing of pipeline facilities, the location of *new* pipeline facilities may

31

be subject to state or local regulation." U.S. DOT, Interpretation Response #PI-95-028 (July 24, 1995), https://www.phmsa.dot.gov/regulations/title49/interp/pi-95-028.

Line 5, however, is not a new pipeline facility. Its location has been established for over 70 years. Michigan made its "location and routing" determination when it agreed to the 1953 Easement. The pipeline has been fully operational since that time. As such, Michigan can no longer determine its "location or routing."

Restricting the "location" exception to *new* pipeline facilities makes practical sense. For one, a contrary reading of the "location" exception statute could flatten out the safety standard preemption provision entirely. If a state could shut down an operating pipeline as a "location" decision, even though it is actually concerned about the pipeline's safety, the state could, in effect, turn the location exception into a loophole for regulating pipeline safety—exactly what Congress wanted to prevent. Further, the federal government already has some authority to promulgate safety regulations that "relate to location or routing" of a pipeline. *See Couser*, 139 F.4th at 672. If states could use the location exception to regulate pipelines once they are operational, that would interfere with the federal government's exclusive authority to regulate pipeline safety and establish uniform national standards.

At bottom, states can decide where to locate new pipelines and their accompanying facilities, but once those facilities are constructed, they can't invoke the "location" exception to regulate the pipeline's safety and interfere with its operation. Defendants assert that they simply "notif[ed] Enbridge that it can no longer use and occupy a certain portion of State land." (ECF No. 134, PageID.1777). But that's a drastic understatement. Defendants ordered Enbridge to cease operation and permanently decommission its Straits Pipeline, which, in effect, would shut

down Line 5 entirely.[12] Because Line 5's location is determined and it is fully operational, Michigan no longer has authority to regulate its safety under the guise of a location decision. That authority is left to the federal government exclusively.

For those reasons, the Pipeline Safety Act preempts Michigan's attempt to shut down the portion of Line 5 that runs underneath the Straits of Mackinac. As such, Enbridge's motion for summary judgment is granted as to Count I.

### B.  Foreign Affairs Doctrine Preemption

In Count III, Enbridge argues that the foreign affairs doctrine preempts Michigan attempt to revoke the pipeline easement. The Court agrees and grants summary judgment.

### 1.  The Foreign Affairs Doctrine

The federal government has exclusive authority to regulate foreign affairs. *See United States v. Pink*, 315 U.S. 203, 233 (1942) ("Power over external affairs is not shared by the States; it is vested in the national government exclusively."). State action that interferes with that federal authority is preempted. *See Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003). This foreign affairs preemption doctrine stands for the general policy principle "that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy" because of the " 'concern for uniformity in this country's dealings with foreign nations' that

---

[12] Defendants' reliance on *Portland Pipe Line Corp. v. City of S. Portland*, 288 F. Supp. 3d 321, 430-31 (D. Me. 2017) is misplaced. The regulations at issue in both cases are entirely incomparable. *Portland Pipe* involved a city ordinance that prohibited the loading of crude oil onto tankers in a city harbor and restricted new structures from being erected for that purpose. 288 F.Supp.3d at 329. The ordinance did not interfere with flow of oil through the pipeline, nor the pipeline's operation in any way. It applied only to facilities at one end of the pipeline. Here, however, Defendants' actions would result in the decommissioning of a four-mile strip of a 70-year-old pipeline. As a result, the entire 645-mile pipeline would shut down. *Portland Pipe*'s reasoning, therefore, has no persuasive force as applied in this case.

animated the Constitution's allocation of the foreign relations power to the National Government . . . ." *Id.* (quoting *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 427, n.25 (1964)).

*Garamendi* is the leading foreign affairs doctrine case. There, the Supreme Court asked whether HVIRA—a California state law—"interferes with the National Government's conduct of foreign relations." *Id.* at 401. In the early 2000s, President Clinton entered into international executive agreements with counties like Germany, Austria, and France as part of an effort to establish a national policy on unpaid insurance claims held by Holocaust victims. *Id.* at 404-08. Those executive agreements encouraged those governments and insurance companies to voluntarily disclose policy information. *Id.* In HVIRA, however, California compelled disclosure of far more policy information than the executive agreements discussed. *Id.* at 408-13. The Supreme Court found that because the executive agreements established an express federal foreign policy and HIVRA clearly conflicted with that foreign policy, that alone was enough to require state law to yield to federal law. *Id.* at 425.

Notably, the federal executive agreements at issue in *Garamendi* did not contain an express preemption clause. Instead, the Court's preemption analysis rested on the state law's interference and conflict with the foreign policy embodied in the executive agreements. The Court, relying heavily on the doctrine of conflict preemption, noted that foreign policy will preempt when there is "the likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government." *Id.* at 420. Specifically, the Court found that California's state law was preempted because it would "stand[] in the way of [the President's] diplomatic objectives." *Id.* at 427.

After *Garamendi*, courts have emphasized that when determining whether conflict preemption applies, courts should look for "express federal foreign policy," *Movsesian v. Victoria*

*Versicherung AG*, 670 F.3d 1067 (9th Cir. 2012), and whether there is "evidence of clear conflict between" that policy and the state action. *Gingery v. City of Glendale*, 831 F.3d 1222, 1228 (9th Cir. 2016); *Mayor & City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 213 (4th Cir. 2022). Federal foreign policy can be expressed through treaties, executive agreements, and other executive statements. *See, e.g.*, *Zschernig v. Miller*, 389 U.S. 429, 441 (1968) ("When those [state] laws conflict with a *treaty*, they must bow to the superior federal policy." (emphasis added)); *Garamendi*, 539 U.S. 396 (finding foreign policy in executive agreements).

Even in the absence of any express federal policy, a state action may still be preempted under the doctrine of field preemption. *See Zschernig*, 389 U.S. at 441 ("[E]ven in absence of a treaty, a State's policy may disturb foreign relations."). Under this analysis, the Court will ask (1) whether the state's "real purpose" in taking the action "does not concern an area of traditional state responsibility," and (2) whether that action "intrudes on the federal government's foreign affairs power." *Gingery*, 831 F.3d at 1228; *see Garamendi*, 539 U.S. at 419 n.11. When courts assess whether an action "intrudes on the federal government's foreign affairs power," they will typically ask whether the state's action "has more than an incidental or indirect effect on foreign affairs." *Gingery*, 831 F.3d at 1230 (quoting *Cassirer v. Thyssen-Bornemisza Collection Found.*, 737 F.3d 613, 617 (9th Cir. 2013)); *see also Mayor & City Council of Baltimore*, 31 F.4th at 214 (asking whether the state law will "disturb foreign relations" such that there is more than an "indirect effect in foreign countries").

In cases finding preemption, courts typically find that the state action "would affect the legal rights and responsibilities of any individuals or foreign governments," *Gingery*, 831 F.3d at 1231, and that state action's "impact on foreign relations" is "direct." *Mayor & City Council of Baltimore*, 31 F.4th at 214.

## 2.   Defendants' Actions Are Preempted by the Foreign Affairs Doctrine

Here, Defendants' conduct is preempted under either preemption doctrine. First, the United States has an express policy preference in favor of the uninterrupted flow of oil through international pipelines. And as shown by recent events, Defendants' attempt to shutdown Line 5 produces far more than an "incidental effect" that conflicts with that express federal foreign policy: a compelled shutdown of an international pipeline blatantly defies it. But even if the Court were not to find that the United States had an expressed foreign policy regarding international pipelines, Defendants' actions would still be preempted under a field preemption analysis. That is because Defendants' "real purpose" was to shut down an international pipeline, which is not a traditional area of state responsibility due to the Pipeline Safety Act, and that shutdown would have "more than an incidental effect on foreign affairs" between the United States and Canada.

### a.    *Defendants' Shutdown Order Conflicts with Express United States Foreign Policy*

Almost a half-century ago, the United States and Canada agreed that neither country would do anything to impede the flow of oil through pipelines between the two countries. Agreement Concerning Transit Pipelines, Can.-U.S., art. II, cl. 1, Jan. 28, 1977, 1086 U.N.T.S. 344. Under the 1977 Transit Treaty, the United States and Canada expressly stated that "[n]o public authority in the territory of either Party shall institute any measures . . . which are intended to, or which would have the effect of, impeding, diverting, redirecting or interfering with in any way the transmission of hydrocarbon in transit" through pipelines. *Id.* The two countries carved out limited exceptions to this directive. For example, the flow of oil through pipelines may be interrupted during natural disasters and emergencies, subject to "the approval of appropriate regulatory authorities." *Id.* at art. V, cl. 1. And the treaty does not prohibit neutral and generally applicable "regulations by the

appropriate government authorities," like the regulations promulgated by PHMSA. *Id.* at art. IV, cl. 1.

The 1977 Transit Treaty embodies the United States' express foreign policy position on the flow of oil by pipeline to and from Canada. *See Zschernig*, 389 U.S. at 441; *Garamendi*, 539 U.S. 396. However, a line-by-line analysis of the treaty to determine its specific requirements is largely unnecessary.[13] That is because both the United States and Canada continue to reiterate—even to this Court—their shared foreign policy position embodied in the Transit Treaty that neither country will do anything to impede the flow of oil between the two countries. And even more conclusively, both countries agree that a compelled pipeline shutdown of Line 5 would conflict with those domestic and foreign policy positions.

Consider both countries' respective positions. Since Defendants issued their shutdown notice, Canada has repeatedly shown its disagreement with that decision. Within a year after Defendants' shutdown attempt, Canada challenged that decision as a violation of the United States' obligation under the treaty. (ECF No. 133, PageID.1712-13). It has since reiterated its position that a shutdown attempt violates the United States' duty under the treaty. (*Id.* at PageID.1715). Further, Canada has explained that it is against interference with Line 5 because "a compelled shutdown would have severe adverse impacts on the interests [of] the United States and Canada . . . [like] North American Energy Security, the interests of energy users in both central Canada and midwestern United States, the interests of energy producers in western Canada, and . . . the economies of both nations." (*Id.* at PageID.1713-14).

---

[13] Defendants, for example, argue that their shutdown attempt qualifies as a lawful regulation by "appropriate government authorities" under the Treaty. The Court doubts the merits of that argument. But because a full interpretation of the treaty is unnecessary to resolve their claim, the Court does not resolve the question.

The Unites States' foreign policy position is equally clear. The United States has explained that it has "a manifest interest in protecting its exclusive authority over matters of foreign affairs." (ECF No. 140, PageID.2056). As stated by the United States, it "has adopted a foreign policy commitment to avoid substantial disruptions to Line 5." (*Id.* at PageID.2059). To that end, it agrees with Canada that " '[n]o public authority of either country may institute any measures, except in limited circumstances, which are intended to, or which would have the effect of interfering in any way with Line 5's transmission." (*Id.* (internal quotations omitted)).

The Court could not find any other case in which every country affected by the disputed state action has so clearly indicated that a state's action interferes with their foreign policy. Both countries continue to reiterate a foreign policy position to keep international pipelines, like Line 5, open. Defendants' attempt to shut down Line 5 defies those policy positions. As such, Defendants' shut down attempt must "yield to the National Government's policy" on international pipelines. *Garamendi*, 539 U.S. at 413.

b.     *Defendants' Shutdown Order "Disturbs Foreign Relations" Between the United States and Canada*

Even if the United States did not have an explicit policy position regarding the flow of oil through pipelines to Canada, Defendants' order to shut down the Straits Pipelines would still be preempted under the doctrine of field preemption. That is because Defendants' order to shutdown Line 5 has already "disturb[ed] foreign relations."

First, as previously discussed, the state's "real purpose" in attempting to shut down Line 5 was to regulate its safety. But, as previously discussed, international pipelines safety regulation is not "a traditional state responsibility." *Garamendi*, 539 U.S. at 419 n.11; *Gingery*, 831 F.3d at 1228. Congress said so explicitly when it reserved that authority for the federal government in the Pipeline Safety Act.

Second, Defendants' action intrudes on the United States foreign relation power because it interferes with the United States's relations with Canada. Within a year after Defendants issued the shutdown order, Canada invoked the 1977 Transit Treaties international dispute resolution mechanism. Canada asserted that the United States breached its obligation under the treaty. Negotiations on the matter are still ongoing. (ECF No. 140, PageID.2060). It is possible that if the matter were to continue to arbitration, "the United States could be exposed to liability for significant damages if an arbitral panel found the United States breached in treaty obligations." (*Id.*). The fact that Defendants' conduct triggered a dispute resolution process between the United States and Canada is enough to show that a shutdown of Line 5 would likely "disturb foreign relations." But that's not the only disturbance that a shutdown could cause.

A compelled shutdown of Line 5 would also have a direct, negative impact on trade relations between the United States and Canada. *See Bad River*, 626 F. Supp. 3d at 1057 ("[T]here is little question that an immediate shutdown of the pipeline would have significant public policy implications on the trade relationship between the United States and Canada."). As the Unites States explained, "Canada is a key U.S. partner in energy trade, with investment flowing in both directions across the border, and the continued operation of Line 5 plays a significant role in that partnership." (*Id.* at PageID.2057). Canada further explained that "Line 5 is vitally important to [its] energy security and economic," and the "loss of Line 5 would have a devastating impact on [its] economy." (ECF No. 133, PageID.1719-20).

At bottom, two sovereign nations are asking this Court to prevent Michigan from shutting down an international pipeline that helps both fulfill their energy needs. That shared position makes it easy for the Court to conclude that Defendant's conduct "interferes with the National

Government's conduct of foreign relations." *Garamendi*, 539 U.S. at 401. As such, Defendants' attempt to shut down Line 5 is preempted.

### C.  Abstention

Defendants argue that the Court should abstain under both the *Younger* and *Colorado River* doctrines to allow *Nessel v. Enbridge* to proceed in state court. (ECF Nos. 120-21). Enbridge argues that both of those doctrines fail on the merits. But it also asserts that the Court need not abstain because its preemption claims are "facially conclusive." (ECF No. 135, PageID 1873). The Court agrees that abstention hinges on the strength of Enbridge's preemption claims. And the strength of Enbridge's preemption claims is evident from the Court's prior analysis on each issue. Because Enbridge's preemption claims are facially conclusive, abstention is inappropriate.

### 1.  Abstention Is Not Necessary when Preemption Claims Are Facially Conclusive

Federal courts have a "virtually unflagging" obligation to hear and decide a case within their jurisdiction, even when parallel proceedings are pending in state court. *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). As such, "[a]bstention rarely should be invoked." *Ankenbrandt v. Richards*, 504 U.S. 689, 705 (1992). That makes the court's decision to abstain from exercising that jurisdiction the "exception, not the rule." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 82 (2013) (quoting *Colorado River*, 424 U.S. at 813).

The Sixth Circuit has instructed that the unique characteristics of strong preemption claims present a situation where abstention should not "be invoked." *Ankenbrandt*, 504 U.S. at 705. Under Sixth Circuit caselaw, "abstention is not required in a case presenting facially conclusive claims of federal preemption." *Bunning v. Kentucky*, 42 F.3d 1008, 1011 (6th Cir. 1994); *United States v. Kentucky*, 252 F.3d 816 (6th Cir. 2001). The hallmark of a facially conclusive preemption claim is that "the dispute does not require the court to interpret state law or make factual findings."

*Bunning*, 42 F.3d at 1011; *see also Norfolk & W. Ry. Co. v. Pub. Utilities Comm'n of Ohio*, 926 F.2d 567 (6th Cir. 1991); *GTE Mobilnet of Ohio v. Johnson*, 111 F.3d 469 (6th Cir. 1997). If the court determines that the case "present[s] facially conclusive claims of federal preemption," it should not abstain but instead proceed to decide the preemption issue. *Kentucky*, 252 F.3d at 826. The court should proceed with the *Younger* or *Colorado River* analysis only if it has first determined that the preemption claim is not facially conclusive. *See GTE Mobilnet*, 111 F.3d at 480 ("Because we conclude that this sort of regulation by the states is not facially preempted . . . *Bunning* and *Norfolk* do not require us to ignore abstention arguments.").

The Sixth Circuit's application of these principles helps illustrate when a preemption claim is "facially conclusive." In *Bunning*, for example, the court found that abstention was inappropriate because the case presented a facially conclusive preemption claim under the Federal Election Campaign Act. *Bunning*, 42 F.3d at 1012. The court found that because the relevant state law touched on an area of election law already addressed by a regulation prescribed under FECA's "express preemption clause," the state law was preempted. *Id.* Notably, the court did not need to interpret state law when making its decision. It simply determined that the state law addressed an area of election law reserved exclusively for federal regulation.

Similarly, in *Norfolk*, the court found a facially conclusive preemption claim. There, the court analyzed whether an Ohio railroad regulation was preempted by the Federal Railroad Safety Act. *Norfolk*, 926 F.2d 567. The federal law "include[d] a broad preemption provision" that excluded "states from legislating in any area of railroad safety already covered by regulations adopted by the secretary." *Id.* at 570. The court found that because the Ohio regulation addressed an area of railroad regulation already covered by federal regulations, the law was preempted. *Id.* at 571-72. In explaining why abstention was not appropriate, the court explained that the

41

preemption analysis did not require the court to "interpret the [state] rule as a matter of state law." *Id.* at 573. The only question in the case was whether the applicable federal law "covered the issue." *Id.*

On the other hand, in *GTE Mobilnet*, the court abstained because it did not find that a preemption claim was facially conclusive. *GTE Mobilnet*, 111 F.3d 469. There, the court struggled to interpret the "preemptive scope" of the 47 U.S.C. § 332. *Id.* at 477-78. The court could not "conclusively determine" from the language of the statute whether it covered the state law at issue. *Id.* at 478. To decide the preemption issue, the court would need to enter "a detailed analysis of state law." *Id.* As such, it found that preemption claim was not "facially conclusive" and abstention the more appropriate route.

These cases show that the facial conclusiveness of a preemption claims turns on whether the preemptive scope of the federal statute is clear. If courts find that the extent of the preemption provision is ambiguous, the claim is likely not facially conclusive. *See id.* If, however, the Court finds that the federal preemption provision unambiguously covers the state's conduct, it is likely facially conclusive. *See Norfolk*, 926 F.2d 567; *Bunning*, 42 F.3d at 1012.

### 2.  Enbridge's Preemption Claims Are Facially Conclusive

The Court's preemption analysis shows that both preemption claims hinge on its analysis of federal, not state law. And as the prior analysis shows, federal law unambiguously applies to Defendants' conduct such that the preemption claim is facially conclusive.

First, unlike *GTE Mobilnet*, neither preemption claim requires the Court to interpret state law. Under the Foreign Affairs Doctrine preemption claim, the preemption analysis depends on the Court's interpretation of Unites States' foreign policy directive regarding international oil pipelines, as shown through the 1977 Transit Treaty and other statements. State law is entirely

irrelevant to the analysis. The only state action relevant to the foreign affairs analysis is whether the Defendant's conduct would, as a result, interfere and conflict with federal foreign policy and its relations with Canada. That review is entirely different than the "detailed analysis of state law" that the court would have had to do in *GTE Mobilnet*.

Similarly, the Pipeline Safety Act preemption claim turns on the scope of its preemption provision, not an analysis of state law. Unlike *GTE Mobilnet*, the Court can "conclusively determine" that the Pipeline Safety Act's preemption provision covers state-issued pipeline shutdown orders and the kinds of safety standards imposed by Michigan. The Pipeline Safety Act preemption provision is broad, and it would clearly cover a state's attempt to shut down a pipeline because of safety concerns. This straightforward preemption analysis resembles the courts' tasks in *Norfolk* and *Bunning*, where state law addressed an issue reserved exclusively for federal regulation. Here, all the Court needed to do was determine whether the shutdown order regulated safety, which is apparent from the face of the order. No interpretation of state law is required for this analysis.

Furthermore, the Court need not make any factual findings for either preemption claim. The parties largely agree on the relevant facts. The facts relevant to the preemption analysis are not in dispute.

Accordingly, because the Court need not "interpret state law or make factual findings," *Bunning*, 42 F.3d at 1011, both the Pipeline Safety Act and Foreign Affairs Doctrine preemption claims are facially conclusive. Abstention is therefore inappropriate. As such, Defendants' motion to abstain is denied.[14]

---

[14] As an alternative to abstain, Defendants asks that the Court to issue a stay in its discretion. The Court declines to do so. This case has been pending in this Court for over 5 years. In the interests of judicial economy and efficiency, the case must be allowed to proceed.

* * *

An oil spill in Michigan's Great Lakes would undoubtably be an environmental catastrophe. And Michigan would undoubtably be the recipient of almost all the environmental damage that would result. Defendants' shutdown order and multiple amicus briefs emphasize this fact. The Great Lakes are also a vital natural resource. Alone, they contain roughly 84% of the North America's fresh surface water and 21% of the world's.[15] They must be protected. All relevant parties—Enbridge, Michigan, the United States, and Canada—should continue to work together to ensure that the Great Lakes are kept safe.

But for better or worse, the national government has unequivocally decided to displace state power in this area and assume exclusive responsibility for interstate pipeline safety. It is not this Court's job "to judge the wisdom of the National Government's policy." *Garamendi*, 539 U.S. at 427. Instead, "dissatisfaction" with the current regulatory scheme for interstate pipelines "should be addressed" to either Congress or the President. *Id.* This Court must simply enforce the clear dictates of federal law.

### CONCLUSION

For the foregoing reasons, Defendant's attempt to shut down the Straits Pipeline is preempted by federal law and abstention is inappropriate.

**ACCORDINGLY, IT IS ORDERED** that:

1. Enbridge's Motion for Summary Judgment (ECF No. 124) on Counts I and III is **GRANTED**.

2. Defendants' Motion to Stay or Abstain (ECF No. 120) is **DENIED.**

---

[15] *See Great Lakes Facts and Figures*, EPA, https://www.epa.gov/greatlakes/great-lakes-facts-and-figures.

3.  Defendants are precluded from enforcing their 2020 Notice (ECF No. 1-1) that revokes and terminates the 1953 Easement.

Dated:   December 17, 2025          /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    UNITED STATES DISTRICT JUDGE